## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

---

**N.H. and G.H., THE STUDENTS, AND**
**F.H. AND K.H., THE STUDENTS' PARENTS,**

        Plaintiffs                No.:_____

**v.**

**MEMPHIS-SHELBY COUNTY SCHOOLS and**
**TENNESSEE DEPARTMENT OF EDUCATION**

        Defendants.

---

## COMPLAINT

---

**COME THE PLAINTIFFS, N.H. and G.H..,** through their parents, F.H. and K.H. They show:

### I.      PARTIES, JURISDICTION, and VENUE

1. N.H. and G.H. are children who reside with their father and mother, F.H. and K.H., in Memphis, Tennessee. Each of them is a child with a disability.

2. G.H. is a student with a disability as defined by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§1400 *et seq*. She has an Individualized Education Program (IEP) for the following disabilities: intellectual giftedness, specific learning disability (SLD), and speech/language and auditory processing deficits. She just completed the second grade at Grahamwood Elementary School, an MSCS school.

3. N.H. is also a student with a disability as defined by the IDEA. While enrolled as an MSCS student, he had an Individualized Education Program (IEP) from age three for intellectual giftedness. While in the third grade at Grahamwood Elementary School, his IEP team also decided

that N.H. had a specific learning disability (SLD). He recently completed the fourth grade at a private school, the Bodine School, "designed specifically for high potential students whose primary diagnosis is a specific reading disability," particularly dyslexia. *See* https://bodineschool.org.

4.   Defendant Memphis-Shelby County Schools (also doing business as the Shelby County Board of Education and referred to as MSCS, the District, and Defendant MSCS) is the educational entity providing a public education to students residing in Shelby County, Tennessee. Defendant MSCS receives state and federal funding to provide special education to persons with a disability, like N.H., under the IDEA, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Section 504), and Title II of the Americans with Disabilities Act of 1990, 42 U.S.C.A. § 12101 *et seq*., (ADA).

5.   Defendant Tennessee Department of Education (Defendant TDOE) is the state education agency with the responsibility for ensuring that mandates of the IDEA are carried out by the local education agencies, of which Defendant MSCS is one. "Any State educational agency, State agency, or local educational agency that receives assistance under this subchapter shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies." 20 U.S.C. §1415(a).

6.   This action arises under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§1400 *et seq*. Jurisdiction is conferred upon this Court by the IDEA, 20 U.S.C. §§1415(i)(2)(A) and 1415(i)(3)(A), which provides district courts of the United States with jurisdiction over any action brought under the IDEA, without regard to the amount in controversy.

7.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b), as Plaintiffs reside within the Western District of Tennessee and all events and omissions giving rise to this Complaint occurred in this judicial district.

8.    Administrative exhaustion of the underlying case (APD Case No. 07.03-230615J) occurred through a state due process hearing with a Final Order by Tennessee Administrative Judge Shannon Barnhill dated April 18, 2023 (attached as *Exhibit A*). This appeal is timely brought within sixty (60) days after the issuance of the Final Order in the administrative proceeding. Plaintiffs seek, *inter alia*, reversal of the ALJ's decision and *de novo* review.

9.    Plaintiffs filed a subsequent due process complaint on behalf of both N.H. and their daughter G.H. because of retaliation they suffered as a result of filing the underlying case. Although Plaintiffs filed the subsequent due process complaint as one complaint on behalf of both of their children, the Tennessee Administrative Procedures Division divided the case into two separate cases and issued final orders on April 24 and 25, 2023 (APD Case No. 07.03-232067J on behalf of G.H. attached as *Exhibit B*, and APD Case No. 07.03-232068J on behalf of N.H. attached as *Exhibit C*). Administrative Law Judge Kim Summers erroneously dismissed both of these due process complaints *sua sponte* and without requiring an answer, evidentiary hearing, or any of the procedural safeguards mandated by the IDEA. As they arise from the same set of facts and circumstances as the underlying case, they are properly joined in the instant Complaint.

## II.    INTRODUCTION

The **inability to read and write will handicap the individual deprived of a basic education each and every day of his life**. The inestimable toll of that deprivation on the social, economic, intellectual, and psychological wellbeing of the individual, and the obstacle it poses to individual achievement, make it most difficult to reconcile the cost or the principle of a status-based denial of basic education with the framework of equality embodied in the Equal Protection Clause.

*Plylerv. Doe,* 457 U.S. 202, 222 (1982)(emphasis added).

> It is the policy of this state to provide, and to require school districts to provide, as an integral part of free public education, special education services **sufficient to meet the needs and maximize the capabilities of children with disabilities**. The timely implementation of this policy to the end that all children with disabilities **actually receive** the special education services necessary to their proper development is declared to be an **integral part of the policy of this state**. This section applies to all children with disabilities regardless of the schools, institutions or programs by which those children are served.

Legislative Intent Section of Tennessee's Special Education Laws, Tenn. Code. Ann. § 49-10-101 (emphasis added).

10. Defendant MSCS is a publicly-funded entity tasked with educating the children living within its tax base. It also receives federal funding on the condition that it provides a free appropriate public education (FAPE) to children with disabilities. Tennessee's legislature has recognized (above) that it is the policy of the State to not only meet the needs of children with disabilities but to maximize their capabilities. *Id.*

11. While N.H. can read – indeed, he is a child who is considered "twice-exceptional" because he is both intellectually gifted and has a disability – the District nonetheless failed to provide him a free appropriate public education (FAPE) because it fundamentally misunderstood twice-exceptionality and, as a result, was unable to identify, evaluate, accommodate, and provide the necessary curricula and related services.

12. While N.H. is intellectually gifted, he also has dyslexia, a specific learning disability (SLD). "Dyslexia is a specific learning disability that is neurobiological in origin. It is characterized by difficulties with accurate and/or fluent word recognition and by poor spelling and decoding abilities. These difficulties typically result from a deficit in the phonological component of language that is often unexpected in relation to other cognitive abilities and the provision of effective classroom instruction. Secondary consequences may include problems in reading

comprehension and reduced reading experience that can impede growth of vocabulary and background knowledge."[1]

13. MSCS failed to timely identify N.H. as a child with a disability (in addition to his intellectual giftedness), failed to meaningfully evaluate N.H. in all areas of suspected disability (i.e. failed to evaluate him for a specific learning disability such as dyslexia), failed to provide the necessary personnel with the appropriate training to implement the necessary curricula and related services, and failed to implement the necessary curricula and related services and to provide services and accommodations to all students with dyslexia requiring such accommodations, services, and accommodations, including N.H. As a result of this failure, N.H. suffered educational and emotional harm.

14. Dyslexia is one of the most prevalent learning disabilities. According to the Tennessee Department of Education (TDOE) in "Understanding Dyslexia: A Guide for Tennessee Parents and Educators," "Approximately 1 in 5 school-age children demonstrate some of the characteristics of dyslexia – some of these students have a formal diagnosis but most do not. Regardless of whether a diagnosis has been made, educators should be aware of these characteristics in order to intervene appropriately and provide the necessary supports." Tennessee Department of Education, Jan. 2016, https://www.tn.gov/content/dam/tn/education/special-education/dys/sped_understanding_dyslexia.pdf.

15. Dyslexia, a learning disability under which individuals have difficulty processing written language, is specifically included in the definition of "specific learning disability." SLD is one of the eligibility categories of disability in the IDEA. The IDEA defines an SLD as "a disorder in one

---

[1] Definition of Dyslexia, Int'l Dyslexia Ass'n (2002), https://dyslexiaida.org/definition-ofdyslexia/.

or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations." 20 U.S.C. § 1401(30)(A). "Such term includes such conditions as perceptual disabilities, brain injury, minimal brain dysfunction, **dyslexia**, and developmental aphasia." 20 U.S.C. § 1401(30)(B) (emphasis added). See also 34 C.F.R. § 300.8(c)(10)(i) ("Specific learning disability means a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the **imperfect ability to** listen, think, speak, **read, write, spell**, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, **dyslexia**, and developmental aphasia.") (emphasis added). *See also* United States Department of Education Office for Special Education and Rehabilitative Services, *Dear Colleague Letter*, (Oct. 23, 2015), available at http://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/guidance-on-dyslexia-10-2015.pdf (affirming that school districts must allow for the use of the terms dyslexia, dyscalculia and dysgraphia in evaluation documents, IEPs, and other special education materials).

16. Tennessee's regulations mirror the federal regulations and also specifically identify dyslexia as an example of an SLD: "'Specific Learning Disability' means a disorder in one (1) or more of the basic psychological processes involved in understanding or in using language, spoken or written, which may manifest itself in the **imperfect ability to** listen, think, speak, **read, write, spell**, or do mathematical calculations, and that adversely affect a child's educational performance. **Such term includes** conditions such as… **dyslexia**..." Tenn. Bd. of Educ. R. and Reg. Ch. 0520-01-09-.02(16) (emphasis added); see, also, *Dyslexia Resource Guide: Guidance on the "Say*

*Dyslexia" Law*, TDOE, April 2018, at 23, https://www.tn.gov/content/dam/tn/education/special-education/dys/dyslexia_resource_guide.pdf.

17. In 2016, Tennessee passed the "Say Dyslexia" law requiring the TDOE to develop guidance for identifying characteristics of dyslexia and to provide appropriate professional development resources for educators in the areas of identification and intervention methods for students with dyslexia and specifies roles and responsibilities for entities including Local Education Agencies (LEAs) of which MSCS is one. Tenn. Code. Ann. § 49-1-229. The "Say Dyslexia" law further requires LEAs to implement the screening procedures developed by the TDOE. Tenn. Code Ann. § 49-1-229(a)(3).

18. If a student is identified as having characteristics of dyslexia through those screening procedures, the LEA must, *inter alia*, "provide the student with appropriate tiered dyslexia-specific intervention through its RTI[2] framework."[2] Tenn. Code Ann. § 49-1-229(c)(3). "'Dyslexia-specific intervention' means evidence-based, specialized reading, writing, and spelling instruction that is multisensory in nature, equipping students to simultaneously use multiple senses, such as vision, hearing, touch, and movement. Dyslexia-specific intervention employs direct instruction of systematic and cumulative content, with the sequence beginning with the easiest and most basic elements and progress methodically to more difficult material. Each step must also be based on those already learned. Components of dyslexia-specific intervention include instruction targeting phonological awareness, sound symbol association, syllable structure, morphology, syntax, and semantics." Tenn. Code Ann. § 49-1-229(f)(1).

---

[2] "RTI[2]' means Response to Instruction and Intervention, which is a framework designed to identify both struggling and advanced students in order to provide them with appropriate interventions in their specific areas of need. RTI[2] relies on the premise of high-quality core instruction, data-based decision making, and research-based interventions aligned to students' needs." Tenn. Code Ann. § 49-1-229(f)(2).

19. Nonetheless, the District remains responsible to identify and timely evaluate students suspected of having a disability pursuant to the IDEA even if a student were to pass the screener and/or receive intervention services through the RTI[2] framework if there are other reasons to suspect the student as having a disability. In N.H.'s case, the District was responsible to identify and evaluate him as a child with the suspected disability of dyslexia despite his intellectual giftedness.

20. But the District did not have the appropriately trained personnel in place to identify any child with dyslexia, let alone a child who is also intellectually gifted, until N.H.'s parents began to advocate on his behalf and on behalf of all children with dyslexia in the District. Likewise, the District did not have appropriately trained personnel to provide appropriate interventions and reading instruction to children with dyslexia, particularly children who are also intellectually gifted.

### III.    FACTS OF UNDERLYING CASE

21. On or about June 28, 2016, MSCS evaluated N.H. for intellectual giftedness (known as the CLUE[3] program within MSCS). N.H's psychoeducational evaluation identified him as intellectually gifted. N.H.'s full-scale IQ testing demonstrated a composite score of 129 which is almost two standard deviations above the norm (placing him in approximately the 90-98[th] percentile), but his nonverbal intelligence index had a score of 143 which is almost three standard deviations above the norm (placing him in the top 2%). This psychoeducational evaluation also showed deficits and discrepancies between N.H.'s verbal intelligence index scores and his non-verbal index scores that are, in fact, consistent with students with dyslexia. Not a single MSCS

---

[3] "CLUE (Creative Learning in a Unique Environment) is an education program designed to meet the needs of academically talented and gifted students in the Shelby County Schools." http://www.scsk12.org/exceptional/clue?PID=886.

employee discussed dyslexia or expressed concern about those deficits and discrepancies with N.H.'s parents after he was evaluated.

22. In or about September 2016, N.H.'s parents attended the first IEP meeting with N.H.'s CLUE teacher, Mrs. Pankey. In that meeting, Mrs. Pankey noted the discrepancy between N.H.'s verbal intelligence index scores and his non-verbal index scores. Mrs. Pankey stated that she had not seen such discrepancies before but said was unable to explain them.

23. Upon information and belief, MSCS had not provided Mrs. Pankey with the appropriate and necessary professional development resources for educators to know and identify those discrepancies as characteristics of dyslexia.

24. From approximately August 2017 to April 2018, N.H. began to read, but progressed very slowly. N.H.'s mother communicated her concerns to Mrs. Pankey, particularly because she noticed that his reading skills were developing so slowly. Mrs. Pankey told N.H.'s mother that she noticed his difficulty reading fluently.

25. From approximately August 2018 to May 2019, N.H. attended kindergarten at Grahamwood Elementary School (an MSCS school). His reading ability placed him ahead of the majority of his peers, but he continued to have difficulty with fluency and sight words.

26. By the end of his kindergarten year, N.H. had failed to make the progress expected of him in reading. Upon information and belief, N.H.'s kindergarten teacher, Mrs. Stone, noticed some peculiarities; for example, N.H. began to reverse letters and had difficulty with spelling and sight words. N.H.'s parents now know that those "peculiarities" are characteristics of dyslexia particularly for children who are also intellectually gifted.

27. Also during the kindergarten year, N.H. became more withdrawn and was reluctant to talk about his school day with his parents.

28. From approximately August 2019 to May 2020, N.H. was in the first grade and continued to attend Grahamwood Elementary School. At the beginning of the year, N.H.'s mother met with his first-grade teacher, Mrs. Paris, and expressed her concerns about his reading fluency.

29. As the first semester progressed, N.H. struggled with his assignments. He had previously excelled in math but struggled as the number of word problems increased. His reading did not progress and, instead, seemed to regress.

30. Upon information and belief, Mrs. Paris began to notice some peculiarities in the way that N.H. processed auditory instructions. She gave as an example an incident when she asked N.H. to put a book on a "counter." Instead of walking to the counter, N.H. paused for a moment, looking confused, then walked around the classroom, before eventually arriving at the counter. This prompted Mrs. Paris to question whether another term for "counter" is used at home. N.H.'s mother told Mrs. Paris that another term for counter is not used in their home. N.H.'s mother shared some similar behaviors that she had noticed at home, where it seemed that N.H. needed a little more time to process instructions or required instructions to be repeated which was particularly concerning given his relatively high nonverbal IQ score.

31. During the autumn of the first semester of first grade, N.H.'s mother learned that N.H. was second from the bottom of his class in reading. More disturbingly, his peers also knew that N.H. was second from bottom of his class in reading because his reading marker (which displayed his position relative to other students in the class) was visible for everyone who knew where to look to see. N.H also knew that he, the only black boy in his class, was at the bottom of the class. His peers knew that he was at the bottom of the class, and his teacher knew that he was at the bottom of the class. This robbed N.H of his self-esteem.

32. His difficulty reading came as a surprise to N.H.'s parents, despite their high level of engagement with school, because N.H. had started kindergarten being able to read and ahead of the majority of his similarly gifted peers. They considered removing N.H. from the optional program (an MSCS program for advanced learners requiring qualifying scores and/or other criteria on tests) but were advised by his teacher(s) that N.H. understood the work and was able to do the majority of the work assigned successfully. Mrs. Paris later arranged for N.H. to have extra help with reading by assigning him to a teacher assistant. Upon information and belief, that teaching assistant had no training or expertise in the identification of dyslexia or in the provision of dyslexia-specific teaching interventions and curricula.

33. N.H.'s mother also spoke with his first grade CLUE teacher and expressed her concerns. Due to the structure of CLUE lessons, she claimed that she had not observed the areas of concern in her classroom. Nevertheless, arrangements were made for N.H. to receive RTI services. N.H. attended scheduled sessions before school, where he completed online i-Ready[4] lessons under supervision. There was little to no improvement in his reading fluency or comprehension.

34. During school closing due to the COVID-19 pandemic and summer break, N.H.'s mother was able to work with N.H. at home using some multisensory strategies and curriculums. His math skills improved, and – significantly to his parents – his love of math returned. Unfortunately, N.H.'s struggles with reading continued.

---

[4] I-Ready is a branded online learning tool utilized by many school districts, including MSCS, produced and owned by Curriculum Associates, LLC. It does not appear to include and teach the elements of language explicitly, systematically, cumulatively, and diagnostically, all of which are the hallmarks of a structured literacy approach to reading. Students with dyslexia require a structured literacy approach, like Orton Gillingham, that uses multisensory techniques and direct instruction.

35.  During this time, N.H. started to express a reluctance to return to school for second grade. During the school closing, MSCS CLUE supervisor, Jennifer Chandler, conducted a "Twice Exceptional"[5] online seminar that N.H.'s mother attended. She realized immediately that N.H. was twice exceptional but could not identify the second exceptionality.

36. From approximately August 2020 to May 2021, N.H. was in the second grade and continued to attend Grahamwood Elementary School. N.H.'s second grade year started in the virtual classroom. Fortunately for N.H., he was able to join a learning pod, where his mother was one of the parent facilitators along with other nurturing parents. His MSCS second-grade teacher was Mrs. Mendillo, and Mrs. Pankey was his CLUE teacher.

37. N.H., alongside his pod peers, was able to engage in virtual lessons and he enjoyed the pod experience. He no longer spoke about wishing to be homeschooled. However, the issues with his reading became glaringly obvious as his mother was able to observe N.H. and his peers in class. N.H.'s comprehension skills were advanced well beyond his years. This was obvious during the online classroom discussions hosted during CLUE by Mrs. Pankey. However, he struggled with his reading fluency and found it difficult to keep up when writing was required.

38. N.H.'s mother spoke with Mrs. Pankey and explained that N.H.'s reading ability did not match his cognitive ability. Mrs. Pankey, offered to tutor N.H. in reading after school. As she worked with N.H., his mother saw some improvement for the first time in years. N.H.'s reading confidence also improved. However, Ms. Pankey had no training in the identification of dyslexia nor in the provision of dyslexia-specific interventions.

---

[5] Twice-exceptional students are those students who are both intellectually gifted and a special need or learning disability. *See, e.g.,* the National Association for Gifted Children, https://www.nagc.org/resources-publications/resources-parents/twice-exceptional-students.

39. However, upon information and belief, Mrs. Pankey was concerned because he was still struggling more than he should. She knew something was not quite right, but she could not identify the issue. For example, in the second semester, Mrs. Pankey gave N.H. a writing assignment. Mrs. Pankey observed that N.H's spelling peculiarities, which she first observed in kindergarten, were still present. Had Mrs. Pankey received the necessary training, she would have recognized that those "spelling peculiarities" are, in fact, characteristics of dyslexia.

40. N.H.'s parents began to suspect N.H. had dyslexia when friends suggested that N.H might be dyslexic and that they should consider hiring a tutor. N.H's parents shared this information with Mrs. Pankey. Mrs. Pankey suggested N.H.'s parents speak with Mrs. Brown who could provide private tutoring. N.H.'s family hired Mrs. Brown, a retired National Board Certified MSCS teacher and RTI specialist who also has training in the Orton-Gillingham approach, the gold standard in dyslexia-specific interventions. *See* https://www.orton-gillingham.com. N.H began receiving Orton-Gillingham based dyslexia-specific tutoring services from Mrs. Brown privately and at his parents' own expense. N.H. did not receive any such instruction, interventions, accommodations, or curricula at school.

41. Mrs. Pankey made arrangements for N.H to be given the District's dyslexia screener at school. Although N.H. passed the school's dyslexia screener, which was given on or about Thursday, May 20, 2021, his "passing" was not an accurate measure of his disability. The cut scores used for determining characteristics of dyslexia were not appropriate given that N.H. is a gifted and advanced learner, a factor known to the District at the time that N.H. was screened for dyslexia because N.H. had an IEP for intellectual giftedness. Furthermore, the TDOE's guidance on dyslexia screening makes clear that the District was required to consider multiple sources of information and follow three well-defined steps. *See* Tennessee Department of Education,

'<u>Dyslexia Resource Guide: Guidance on the "Say Dyslexia Law</u>,'" Updated April 2018,

<u>https://www.tn.gov/content/dam/tn/education/special-education/dys/dyslexia_resource_guide.pdf</u>

at 11-14. The second step includes the following:

> school teams should consider the results of the skills-based universal screener or EWS
> [early warning system] compared to other classroom-based assessments. These **<u>may
> include but are not limited to</u>**: standards-based assessments, grades, formative
> assessments, summative assessments, classroom performance, and teacher
> observations, in addition to any other relevant information such as medical or family
> history. This information should be used to corroborate performance on the skills-based
> universal screener. School teams should also consider sources that measure early risk
> factors or indicators of dyslexia. See Appendix D for an example checklist.
>
> **<u>The school team should also consider a parent's request for additional screenings
> if there are concerns beyond the results of the universal screening process</u>**.

*Id*. at 13 (emphasis added). The <u>TDOE Dyslexia Resource Guide</u> also provides guidance that,

"Students with dyslexia share some common characteristics, but it is important to remember that

it manifests differently depending on the individual, their age, and other factors affecting his/her

foundational reading skill development. In addition, students may have co-occurring

disabilities/disorders, including twice exceptionality (i.e., gifted and dyslexia). Comorbid

symptoms may mask characteristics of dyslexia (e.g., inattention and behavioral issues are more

apparent or gifted students may compensate well)…". *Id*. at 6. With regard to intellectual

giftedness, the <u>TDOE Dyslexia Resource Guide</u> explains that consideration should be given when

"[d]eficits are unexpected relative to cognitive abilities in that the student's skills are lower than

their overall ability and are not due to a lack of intelligence." *Id*. at 5. N.H.'s mother protested that

N.H. had a problem. However, not a single MSCS employee referred N.H. for a full

psychoeducational evaluation despite his difficulties and the discrepancy between his intellectual

giftedness and his (in)ability to read.

42. An IEP meeting was scheduled in order to ensure that N.H. had accommodations in place for his return to school in third grade that would help him to be successful. Unfortunately, upon information and belief not a single member of the IEP team had received any dyslexia-specific training, and MSCS had none of the legally required dyslexia-specific interventions in place in order for N.H. to receive a free appropriate public education.

43. On or about May 21, 2021, the school held another IEP meeting for N.H. During the IEP meeting, N.H.'s mother told the IEP team that N.H. needed Orton-Gillingham-based interventions (or other comparable dyslexia-specific interventions). Rather than provide those interventions, school personnel suggested N.H.'s family speak to a representative from a training program[6] that would improve their understanding of dyslexia. N.H.'s parents attended that training at their own expense. Furthermore, the IEP team acknowledged that the screener given by the District to N.H. was not the appropriate tool to identify characteristics of dyslexia in advanced learners.

44. From approximately August 2021 to the end of November 2021, N.H. was in the third grade and continued to attend Grahamwood Elementary School. N.H.'s parents provided N.H.'s teachers, Mrs. Fuller and Mrs. Young, with his revised IEP at the start of the school year and met with them to explain some of the accommodations that would be necessary. However, within the first few weeks of school, it became apparent that urgent targeted interventions were necessary. N.H. was clearly overwhelmed as a result of his reading disability, had increasing and alarming anxiety, cried at home every evening, exhibited frequent stomach aches and headaches, and did not want to go to school. His mother spent weekends and evenings modifying his teachers'

---

[6] The training program is private nonprofit program called SMILA (Simultaneous Multisensory Institute for Language Arts). More information about SMILA can be found on its website: https://www.smilareading.com.

presentations/lessons herself and printing them to make them easier to read and write on because the school was not providing vital accommodations and/or interventions for N.H.'s disability.

45. As a result, N.H.'s mother contacted N.H.'s CLUE teacher Mrs. Ziegler and requested that his triennial IEP meeting be brought forward so that his IEP team could determine whether N.H. had a secondary disability requiring further interventions and accommodations for his individual needs. Mrs. Zielger scheduled the meeting for September 24, 2021.

46. On or about September 21, 2021, N.H.'s mother called and emailed MSCS requesting to speak to a dyslexia expert/advisor/reading specialist. After a number of calls and call backs, she was advised that MSCS does not have anyone in its employ with any dyslexia-specific expertise.

47. N.H.'s mother did speak, however, to MSCS's supervising school psychologist, Dr. Mary Berk. During the course of the conversation with Dr. Berk, it became apparent that Dr. Berk had no expertise in the field of dyslexia. Dr Berk was unaware of the developments or best practices in this area or in the area of the law pertaining to it. Upon information and belief, Dr. Berk and her department were relying on out-of-date TDOE guidelines in order to inform their understanding. Dr. Berk had not heard of the Orton-Gillingham approach to instruction for students with dyslexia, despite the fact that it has been used for in excess of ninety years and is considered the gold-standard approach to dyslexia-specific instruction. *See, e.g.,* Structured Literacy Instruction (Middle Tennessee State University), https://www.mtsu.edu/dyslexia/studentInstruction.php; see also https://www.orton-gillingham.com. Dr. Berk told N.H.'s mother that there was not a dyslexia-specific expert/advisor/reading specialist within MSCS and that she (Dr. Berk) was the person most qualified person to address her concerns.

48. At hearing, Dr. Berk testified that she has more than 40 years of experience as a psychologist. Nonetheless, she also testified that she did not possess the expertise to evaluate N.H.

in the fall of 2021 for dyslexia even though dyslexia is one of the most prevalent learning disabilities.

49. Dr. Berk testified that the only person on her staff with more experience and expertise in evaluating children for dyslexia in the fall of 2021 was Re'Khel Burke. Ms. Burke had only just graduated with her masters degree in May 2021, and her testimony at hearing lacked both internal consistency as well as consistency with the testimony of other witnesses.

50. On September 24, 2021, N.H.'s mother attended the virtual IEP triennial meeting. The stated purpose of the meeting was to reevaluate N.H. for CLUE services and to investigate the presence of a secondary disability. However, the MSCS members of the IEP team had predetermined that the reevaluation would not take place and unilaterally repurposed the meeting without giving notice to N.H.'s parents and without their consent. Dr. Berk proposed that the meeting be adjourned until December for a period of "process monitoring." N.H.'s mother objected to the proposal and repeated her request that N.H. be evaluated for dyslexia.

51. The IEP team determined that N.H. had a continuing need for gifted services. However because MSCS had unilaterally predetermined to repurpose the meeting the IEP team did not have the necessary reevaluation paperwork on hand. The meeting was adjourned to September 29, 2024, when N.H.'s parents were able to consent to reevaluation because the District finally provided the correct paperwork.

52. During fall break, in about October 2021, MSCS conducted an evaluation of N.H. However, that evaluation was not a comprehensive evaluation in that it did not evaluate N.H. in every area of suspected disability, namely dyslexia. Furthermore, the evaluator(s) utilized out-of-date testing protocols, and the report(s) contains errors. Finally, the evaluation is incomplete

because the evaluator(s) did not include an auditory processing evaluation (another area of suspected disability for N.H. and commonly comorbid with dyslexia).

53. On October 29, 2021, N.H.'s IEP team met again. N.H.'s parents believed that the purpose of the meeting was to discuss the results of N.H.'s evaluation and to determine whether or not he had a secondary disability, namely a specific learning disability (i.e. dyslexia). Without giving his parents notice and without their consent, the District's members of the IEP team disinvited the people who had conducted N.H.'s evaluation (upon information and belief, those people were Ms. Clayton and Ms. Burke). In effect, the District predetermined and repurposed the meeting to not consider the possibility that N.H. has a specific learning disability (i.e. dyslexia).

54. After N.H.'s mother protested in the meeting that she wanted to discuss his evaluation(s), Ms. Clayton joined the meeting and shared her report. The findings were consistent with a finding of a secondary learning disability, namely dyslexia. N.H's parents asked the team to make an SLD determination, but the team declined to make any determination at that time. The meeting was briefly reconvened and then adjourned to November 2, 2021, to permit Ms. Burke to attend for the eligibility determination.

55. As a result of Ms. Burke's and Ms. Clayton's evaluation, the IEP team decided that N.H. had "characteristics of dyslexia." Even once N.H.'s IEP team made the determination that N.H. is both intellectually gifted and has an SLD, they failed to provide appropriate and necessary accommodations and related services. Instead of providing dyslexia-specific accommodations and instruction – the only interventions that more than 50 years of research have shown to be effective in teaching children with dyslexia to read – the District "offered" to place N.H., a gifted student with a high IQ, in a special education classroom to receive instruction from a special education teacher with no experienced in teaching students with high cognition and with no relevant

dyslexia-specific training, experience or expertise. With no regard for his academic needs or social and emotional well-being, MSCS proposed placing N.H. in a special education setting to receive generalized special education with students whose disabilities required radically different instruction and accommodations. Put even more plainly, MSCS proposed placing N.H. in a setting that failed to meet any of his academic or social emotional needs.

56. MSCS refused to adopt a proven Orton-Gillingham (or other comparable dyslexia-specific) based approach for N.H., preferring instead to rely on an *ad hoc*, trial-and-error, approach, with no evidence of success. MSCS further proposed that N.H. and the special education teacher, who had no relevant dyslexia-specific expertise, work together to develop and complete TDOE's Dyslexia-Specific Intervention checklist. Such a proposal was and is preposterous. The TDOE intended the District to use the checklist to develop dyslexia-specific interventions for district-wide implementation. Such a task requires a team of educators, who are qualified and experienced in the field of dyslexia and the psychology of dyslexia.

57. At no point did the District offer N.H. dyslexia-specific instruction from an educator trained to provide such instruction.

58. Throughout this semester, N.H. experienced a crisis of confidence and anxieties which his parents communicated to his teachers and IEP team. N.H. lost interest in school, and it became a struggle to get him to go every day. N.H. repeatedly requested to be homeschooled. Notwithstanding this, MSCS showed no regard for the academic, social or emotional well-being of N.H., one of its most academically promising and yet vulnerable students.

59. On November 12, 2021, N.H.'s mother sent a letter via email giving MSCS ten-day's notice of their intent to withdraw N.H. from MSCS as a result of MSCS's failure to provide a free

appropriate public education and seek reimbursement for placing him in a private school that could provide him with the requisite dyslexia-specific interventions and instruction.

60. On November 29, 2021, N.H.'s parents withdrew N.H. from the District.

61. On December 1, 2023, N.H.'s parents placed him at the Bodine School, a private school "designed specifically for high potential students whose primary diagnosis is a specific reading disability," particularly dyslexia. *See* https://bodineschool.org. Since attending the Bodine School, N.H. has made substantial progress in his ability to read and in all of his academic work. N.H. no longer suffers from crippling anxiety, bouts of crying, or refusal to do his schoolwork.

62. As a result of his move to private school, MSCS has failed to provide N.H. with the CLUE program services he previously received for intellectual giftedness. Furthermore, MSCS required his parents to privately pay for CLUE Summer Camp in 2021, a camp that was free to every other MSCS student who attended, even though N.H. continued to reside in the District.

## IV.    FACTS OF SUBSEQUENT DUE PROCESS COMPLAINT FILING

63. G.H.'s second grade (2022-2023 academic year) general education teacher was Carolyn Mendillo, who also taught her brother N.H. when he was in the second grade at Grahamwood Elementary School.

64. N.H.'s underlying due process case was held from April 3-5, 2023, in front of Administrative Law Judge Shannon Barnhill.

65. Plaintiffs did not choose to call Ms. Mendillo as a witness. Defendant MSCS, however, called Ms. Mendillo as part of their defense case.

66. Ms. Mendillo's reluctance to testify was obvious to everyone and she appeared to be visibly uncomfortable and/or unhappy.

67. F.H. and K.H. (the parents) have an ongoing need to meet and/or speak with G.H.'s teachers and IEP team.

68. On Monday April 10, 2023, following the conclusion of N.H.'s due process hearing, K.H. (mother) received the following message from Ms. Mendillo:

April 10, 2023

> There will be no meeting between the two of us, due to your pending litigation involving me. This will be the last personal correspondence until such litigation is concluded. You will still receive the Parent group DoJo messages.

69. F.H. and K.H. (the parents) were supposed to meet with various teachers and related service providers for G.H. as soon as Wednesday, April 12, 2023.

70. Ms. Mendillo's text was in direct retaliation against this family for pursuing remedies provided by Congress under the IDEA.

71. Dialogue between the parents, F.H. and K.H., and Ms. Mendillo was necessary for Plaintiffs to obtain a free appropriate public education (FAPE) for their daughter. But Ms. Mendillo's refusal to speak with them constrained them to only receive what the parents of every other child in the District receive if they are not in litigation. They were punished for filing due process.

72. The right of parents to speak with the child's teacher cannot be overstated. This is even more true when the child has been identified as a child with a disability and has an IEP. By refusing to speak to her parents, G.H.'s teacher denied her a FAPE because her parents could not discuss her progress, her upcoming IEP meeting, or anything else to do with her and her educational needs.

73. Furthermore, as the educational rights holder for their son N.H., F.H. and K.H.'s rights as N.H.'s parents under the IDEA were violated. By punishing them for filing a due process complaint, Defendant MSCS attempted to chill their ability bring this instant complaint.

## V.   LEGAL CLAIMS AND ADMINISTRATIVE JUDGES' AND HEARING ERRORS

### a.   Child Find Violation

74. MSCS has an affirmative obligation to identify and evaluate children suspected of having a disability and in need of special education, "even though they are advancing from grade to grade." 34 C.F.R. § 300.111(c)(1); see also 20 U.S.C. § 1412(a)(3). This obligation is called "child find." 34 C.F.R. § 300.111. This affirmative duty is to actively and systematically "identify[], locate[], and evaluate[]" all children with disabilities within its jurisdiction "who are in need of special education and related services" and to "develop[] and implement[]" a "practical method… to determine which children with disabilities are currently receiving needed special education and related services." *See* 20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.111(a)(1)(ii). These duties are commonly referred to as the "child find" obligation, and they apply to all children within the District – even "highly mobile children" – who are "reasonably suspected" of having a disability in need of special education:

> This mandate is . . . an ***affirmative obligation*** of every local educational agency (LEA) to identify students who are ***reasonably suspected*** of having disabilities and to evaluate those students to determine whether they are eligible for special education services.

*Bd. of Educ. of Fayette Cnty. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007) (emphasis added); *see also* 34 C.F.R. § 300.111(c)(1) and (2) ("Child find also must include [c]hildren who are suspected of being a child with a disability . . . and in need of special education, even though they are advancing from grade to grade...").

75. "A school district may be held liable for procedural violations of the IDEA that cause substantive harm to the student." *Bd. of Educ. of Fayette Cnty. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007), citing Metro. Bd. *of Pub. Ed. v. Guest*, 193 F.3d 457, 464 (6th Cir. 1999). The Sixth

Circuit's standard for determining child find violations is that the plaintiff "'must show that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate.'" *Id*. (quoting *Clay T. v. Walton County Sch.* Dist., 952 F.Supp. 817, 823 (M.D. Ga. 1997)).

76. Overlooking clear signs of disability requires a District to have in place personnel trained and experienced in identifying IDEA disabilities. The testimony at the due process hearing in this case demonstrated that until this family advocated not only for their own child, but for all children, with dyslexia, the District did not have the prerequisite knowledge or personnel to identify children with dyslexia despite the fact that up to 20,000 of its students have this prevalent disability.

77. For N.H., MSCS failed to timely identify him as a child with a suspected disability and failed to evaluate N.H. in all areas of suspected disability. Although MSCS correctly identified N.H. as intellectually gifted, his teachers did not recognize the signs and symptoms of dyslexia starting as early as pre-kindergarten because they had not received the necessary training in such identification.

78. None of the trainings produced in discovery in the underlying due process case pre-date N.H.'s withdrawal from the District on December 1, 2021. Instead, the District's own witnesses credited N.H. and G.H.'s family with the dyslexia trainings the District currently provides its employees. Furthermore, one of the District's two top school psychologists, Dr. Berk, testified that despite her more than 40 years of professional experience, the only person on her staff that she considered qualified to evaluate N.H. for dyslexia in December 2021 was a new employee who had only graduated from her masters degree program a mere six to seven months prior. And Dr. Berk, through simple math, also confirmed that she believes that at least 20,000 students in the District have dyslexia. Thus, if the only person in December 2021 more qualified than Dr. Berk to

evaluate a child with dyslexia only had several months of experience as a school psychologist, it was a factual impossibility that any MSCS could have evaluated N.H. in all areas of suspected disability, i.e. dyslexia, from 2016 until Re'Khel Burke evaluated him in October 2021. The District failed in its child find obligations because it simply has not had the staff to fulfill its obligations under the IDEA.

### b. Denial of FAPE

79. Under the IDEA, the District is required to provide "all children with disabilities have available to them a free appropriate public education (FAPE) that emphasizes special education and related services ***designed to meet their unique needs*** and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A) (emphasis added). "Special education" is defined to mean "specially designed instruction, at no cost to parents, to meet the ***unique needs of a child*** with a disability." 20 U.S.C. § 1401(29) (emphasis added). "Related services" include psychological services, social work services, transportation, and counseling services as may be required to assist the child with a disability to benefit from special education. 20 U.S.C. § 1401(26).

80. Through the IDEA, Congress has conditioned the federal funds provided to states to assist in educating children with disabilities on the state's "pledge[] to comply with a number of statutory conditions," which include providing a FAPE to all eligible children. *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017); *see also* 20 U.S.C. § 1414. A FAPE must include "specially designed instruction… to meet the unique needs of a child with a disability." 20 U.S.C. § 1401(9). To that end, schools must devise and implement an IEP for disabled children. *Id.* at § 1401(9)(D). The IEP is "[t]he centerpiece of the [IDEA's] educational delivery system." *Endrew F.,* 137 S. Ct. at 994 (*quoting Honig v. Doe,* 484 U.S. 305, 311 (1988));

*see also* 20 U.S.C. §1414(d)(1)(A). It "is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability and potential for growth." *Id.* at 999; *see also Coventry Pub. Sch. v. Rachel J.,* 893 F. Supp. 2d 322, 332 (D.R.I. 2012) ("[A]n IEP must target 'all of a child's special needs,' whether they be academic, physical, emotional, or social.").

81. Federal law also distinguishes between educational and academic performance and establishes that educational performance is a broad concept. Accordingly, schools must assess students in all areas of suspected disability. *See* 20 U.S.C. § 1414(b)(3)(B).[7] Those areas are defined by federal regulation, and academic performance is only one of the areas in which students must be assessed. *See* 34 C.F.R. § 300.304(c)(4). In addition to grades and standardized test scores, schools must consider how the student's social-emotional conditions adversely affect their non-academic performance in social, behavioral, and other domains as well. *Id.*

82. The District has both substantive and procedural obligations under the IDEA:

> Procedural violations generally concern "the preparation of an IEP," such as the evaluation, placement, and IEP-formation procedures outlined in § 1414. Substantive violations concern the substance of the IEP; namely, whether the school has provided "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."

*L.H. v. Hamilton Cty. Dep't of Educ.*, 900 F.3d 779, 789, 2018 WL 3966517 (6th Cir. 2018). To satisfy its procedural obligations, a school designates an IEP Team (comprised of teachers, school officials, and the child's parent(s)) tasked with preparing a "comprehensive plan . . . in compliance with a detailed set of procedures." *Endrew F.*, 137 S. Ct. at 994. *See also* 20 U.S.C. § 1414(d)(1)(B). An actionable procedural violation of the IDEA exists where the school district's

---

[7] Contrary to Ms. Bailey's argument in closing statements, the plain text of the IDEA specifies that school districts to evaluate students in ***all*** areas of suspected disability. 20 U.S.C. § 1414(b)(3)(B).

violation: (1) impeded the child's right to a FAPE; (2) significantly impeded the parent's opportunity to participate in the decision-making process; *or* (3) caused a deprivation of educational benefits. *See* 20 U.S.C. § 1415(f)(3)(E)(ii) (emphasis added).

83. To meet its substantive obligations, a school must provide an IEP that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 997. Thus, a substantive violation of the IDEA exists where a FAPE is not provided. Here, the District's failure to meaningfully understand dyslexia and the components of a structured literacy program, let alone have the personnel in place to deliver such a program (it did not until ***after*** this family's advocacy and ***after*** they withdrew N.H.), means that there is a substantive violation in this case.

84. The Supreme Court has determined that FAPE is "markedly more demanding that the 'merely more than *de minimis*' test" … and IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017). In this case, MSCS has failed to provide an education program reasonably calculated for N.H. to make progress appropriate in light of his circumstances. By failing to have a single employee in Tennessee's largest school district[8] with a budget of almost two billion dollars who is specifically trained in the identification of dyslexia and the implementation and provision of dyslexia-specific interventions and/or curriculum, MSCS has not only failed to provide N.H. with a FAPE but to provide a FAPE to any child with dyslexia requiring such interventions. Given that dyslexia is one

---

[8] MSCS is the largest school district in the state of Tennessee and amongst the largest 25 school districts in the nation. *See* http://www.scsk12.org/about/. According to MSCS's website, MSCS serves over 110,500 students with almost 14,000 employees. (*Id.*).

of the most prevalent learning disabilities that affects up to one in five children[9], such a failure is great indeed.

85. N.H. was denied a FAPE because MSCS failed in its duty to identify N.H.'s specific learning disability. By withholding appropriate professional development from its teachers during in-service training, MSCS deprived N.H.'s teachers of the professional development tools they needed to identify his characteristics of dyslexia.

86. Had MSCS given appropriate professional development opportunities and resources to its teaching staff and developed or purchased dyslexia-specific interventions (with a program design and critical concepts), as required in 2016 by the Say Dyslexia legislation, N.H.'s teachers and the school psychologist(s) and other professionals who evaluated him would have been able to timely identify his characteristics of dyslexia and provide him with appropriate dyslexia-specific interventions.[10]

87. The absence of early identification not only resulted in N.H. being deprived of appropriate instruction through the legally prescribed medium of dyslexia-specific interventions and in significant learning loss, but also in a tragic loss of self-esteem and interest in learning. Such a loss was compounded by the shame N.H. experienced in the public posting of his reading placement for his classmates, peers, and classroom visitors to see.

---

[9] *See*, Debunking the Myths about Dyslexia, http://dyslexiahelp.umich.edu/parents/learn-about-dyslexia/what-is-dyslexia/debunking-common-myths-about-dyslexia.

[10] "Dyslexia-specific intervention" means evidence-based, specialized reading, writing, and spelling instruction that is multisensory in nature, equipping students to simultaneously use multiple senses, such as vision, hearing, touch, and movement. Dyslexia-specific intervention employs direct instruction of systematic and cumulative content, with the sequence beginning with the easiest and most basic elements and progress methodically to more difficult material. Each step must also be based on those already learned. Components of dyslexia-specific intervention include instruction targeting phonological awareness, sound symbol association, syllable structure, morphology, syntax, and semantics." Tenn. Code Ann. § 49-1-229(f)(1).

88. But even after MSCS did identify N.H. as having an SLD, i.e. dyslexia, in November 2021, it failed to offer a FAPE. The District's own witnesses confirmed that it only provided meaningful dyslexia training for its employees after N.H.'s parents withdrew him from the District. For example, although Dr. Tiffany Luckett (one of the District's directors of special education) initially said that the District offered personnel with dyslexia-specific training, she later clarified that that training only occurred in 2022 after N.H. had withdrawn from the District. The District could not have offered a structured literacy program in November 2021 because it did not have one in place. The only District-wide program in place was iReady, and iReady's own RPD makes clear that it is not a dyslexia-specific intervention by itself. (Due Process Hearing Ex. 35).

89. Instead, the only credible testimony at the due process hearing on this issue was from K.H. who testified that the District offered to place N.H. in a pull-out resource room with children of unspecified disabilities and unspecified intellectual abilities. And the credible professional experience at the due process hearing made clear that a dyslexia-specific program (structured literacy or Orton-Gillingham or other similar approach) is effective when given either one-on-one or in extremely small group settings of similarly situated students. The District was unable to offer such a FAPE because it had not yet engaged in the learning and training to understand or implement that approach.

90. As a result of MSCS's failure to comply with the law and to provide N.H. a FAPE, N.H.'s parents incurred significant out-of-pocket expenses: (1) to receive their own training to support N.H.; (2) to pay a private tutor to fulfill the District's responsibility and to pay for training for themselves to support N.H.'s learning; (3) to pay tuition at the Bodine School in order for N.H. to receive an appropriate education in light of his dyslexia; and (4) to pay to privately transport N.H. to and from Bodine each day.

**c. The ALJ materially prejudiced Plaintiffs with erroneous prehearing rulings.**

91. The administrative judge made several pre-hearing rulings in error, including but not limited to:

    a. Granting Defendant MSCS's motion limiting the subject matter of the due process hearing to the two years prior to the filing of the due process complaint when this was a violation that could only have been discovered after N.H. received a dyslexia diagnosis and was continuing in nature[11];

    b. Correspondingly granting Defendant MSCS's motion to limit discovery in the case solely to materials from that two-year look back period with no basis in law or rule of civil procedure;

    c. Refusing to accommodate the schedule of Plaintiffs' proposed expert witness in contravention of standard practice and procedure in the Tennessee Administrative Procedures Division and resulting in Plaintiffs' inability to call a reading specialist expert witness in its case.

    **d. The ALJ materially prejudiced Plaintiffs by not allowing Plaintiffs sufficient time to put on their case or adequate time to write a post-hearing proposed findings of fact and conclusions of law given the length and complexity of the case as it unfolded.**

92. Plaintiffs objected to time frames as set by various APD orders in this case as materially prejudicial.

---

[11] Indeed, the practical error of this ruling manifested at hearing as Defendant MSCS's counsel affirmatively elicited testimony on direct examination from one of Defendant MSCS's employee witnesses during its rebuttal case about N.H. test scores prior to this two-year period. The necessity of such background and the continuing and evolving nature of N.H.'s disability was evident for Plaintiffs and Defendant MSCS alike.

93. The IDEA sets forth a quick time frame from the filing of a due process case to a decision from a hearing officer. Typically, a final decision must be reached not more than 45 days after the expiration of the 30-day resolution period. 34 C.F.R. § 300.515(a)(1); *see also* 20 U.S.C. §§ 1415(f)(1)(B)(ii), 1415(g), 1415(i)(1)).

94. However, 34 C.F.R. § 300.515(c) provides that, "A hearing or reviewing officer may grant specific extensions of time beyond the periods set out in paragraphs (a) and (b) of this section at the request of either party." Furthermore, nothing in the IDEA or the related Code of Federal Regulations limits the number of hearing days necessary in these cases. Plaintiffs made several requests both to change and lengthen the hearing days. Those requests were summarily denied.

95. Prior to hearing, Plaintiffs made several requests via email to change or lengthen the number of hearing days because their proposed expert witness was not available until the third day of the scheduled hearing. Defendant MSCS would not consent to the request to accommodate the schedule of the expert witness. ALJ Barnhill denied the request.

96. Again, before testimony began in the hearing, Plaintiffs requested accommodation for their expert witness, and ALJ Barnhill denied that request. ALJ Barnhill stated that he was unable to change the number of days allotted to the hearing but provided no legal or statutory authority for that position. As a result, Plaintiffs' ability to put on their case was materially and seriously prejudiced.

97. Not only were Plaintiffs unable to call their proposed expert witness in the case (Sandy Parus who is a reading specialist based in Nashville, Tennessee), but Plaintiffs were unable to call several essential witnesses. Most significantly, in addition to Sandy Parus, Plaintiffs were unable to call as witnesses any of N.H.'s teachers, including Janice Pankey, nor were they able to call his tutor, Michelle Brown, nor District employees Jennifer Chandler and Patrice Williamson Thomas.

98. As a result of ALJ Barnhill's strict adherence to a three-calendar-day schedule, not only were Plaintiffs unable to present all the necessary witnesses, but the lengthy days at hearing impeded Plaintiffs' ability to fully participate in their own case. Testimony only concluded at approximately 7:15 pm the first day, 7:40 pm the second day, and 9 pm the third day. While Plaintiffs appreciated ALJ Barnhill's attempts to allow as much testimony as possible given his rigid time frame, that problem could have been remedied with an extension of hearing days and an extension of deadlines. Not only do the IDEA and the Code of Federal Regulations provide for this, but Plaintiffs requested it.

99. K.H., N.H.'s mother, had been hospitalized the Saturday prior to the start of hearing. She was visibly uncomfortable throughout the hearing and was extremely ill following the hearing, preventing her full participation in the filing of the post-hearing brief containing proposed findings of fact and conclusions of law. Furthermore, the complete transcript and exhibits were not all filed until the afternoon of the day the post-hearing brief containing proposed findings of fact and conclusions of law was due.

100.    Although the hearing took place over three calendar days, because of the length of those days, there are eleven (11) volumes of transcripts in this matter. The District was represented by a team of lawyers, two of whom attended every single pre-hearing appearance and every minute of hearing in this case, and at least one paralegal. Plaintiffs were represented by a solo practitioner. Requiring a lawyer to read, digest, and produce findings of fact and conclusions of law for approximately 1200 pages of hearing transcripts a mere six days after hearing (and noting that not all transcripts were available immediately following hearing as detailed above), four days of which fell over a major religious holiday observed by undersigned counsel and for which undersigned

counsel attended religious services on Friday, Saturday, and Sunday (April 7-9, 2023), is not only unreasonable; it is impossible.

101.    Finally, Plaintiffs could not have predicted the egregious conduct of Defendant MSCS's attorneys and employees following the hearing. Plaintiffs filed a Motion for Sanctions on April 10, 2023, as a result of Respondent's attorneys attempts to correct and clean up the testimony of their witnesses via email to undersigned counsel and ALJ Barnhill after the hearing had concluded, thereby making themselves witnesses and attempting to introduce new evidence without giving Plaintiffs an opportunity to cross-examine them. Plaintiffs requested as relief in their Motion for Sanctions that they be allowed to present a rebuttal case.

### e.    The ALJ's decision is not entitled to any deference because the ALJ abdicated his IDEA mandated duties.

102.    The IDEA provides that, in hearing appeals from hearing officer decisions under the statute (and in Tennessee, those are heard by Administrative Law Judges in the Secretary of State's Administrative Procedures Division), the federal district court "(i) shall receive the records of the administrative proceedings; (2) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). In such cases, the Court's standard of review is a "modified de novo" standard of review. As the Sixth Circuit has reasoned:

> The Supreme Court has construed this provision to mean that an initial reviewing court should make an independent decision based on the preponderance of the evidence but also should give "due weight" to the determinations made during the state administrative process. *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206, 73 L. Ed. 2d 690, 102 S. Ct. 3034 (1982). Although reviewing courts must not "simply adopt the state administrative findings without an independent re-examination of the evidence," *Doe ex rel. Doe v. Metropolitan Nashville Public Schools*, 133 F.3d 384, 387 (6th Cir. 1998), neither may they "substitute their own notions of sound educational policy for those of the school authorities which they review," *Thomas v. Cincinnati Board of Education*, 918 F.2d 618, 624 (6th Cir. 1990) (quoting *Rowley*, 458 U.S. at 206). The amount of weight

> due to administrative findings depends on whether the finding is based on educational expertise. *McLaughlin v. Holt Pub. Schs. Bd.*, 320 F.3d 663, 669 (6th Cir. 2003). "Less weight is due to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation." *Id*. "More weight, however, is due to an agency's determinations on matters for which educational expertise is relevant." *Id*.

*Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004); *see also Somberg v. Utica Cmty. Schs*, 908 F.3d 162, 172 (6th Cir. 2018). "We may accord deference to an ALJ's factual findings if those findings are thorough and careful, but the extent of deference to be given is within our discretion. An ALJ's findings are not "thorough and careful" if they fail to address and resolve pivotal issues and/or disregard material evidence presented at the administrative hearing. Moreover, the appellate court must ensure that the standards as articulated and applied by an ALJ at a due process hearing do not fall below the minimum standard set by the IDEA." *B.H. v. Manhattan Beach Unified Sch. Dist.,* 35 Cal. App. 5th 563, 582 (2019)(internal citations omitted; citing *JG v. Douglas Cty. Sch. Dist.,* 552 F.3d 786, 793 (9th Cir. 2008) and *M.C. ex rel. M.N. v. Antelope Valley Union High* 858 F.3d 1189, 1194 (9th Cir. 2017)(holding district court erred in deferring to ALJ's rulings when the ALJ "disregarded some of the evidence presented at the hearing" and his analysis was "not entirely satisfying"))(See also *E.M. ex rel. E.M. v. Pajaro Valley Unified School* 652 F.3d 999, 1005 (9th Cir. 2011); *Cty. of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1466 (9th Cir. 1996)("[a]t bottom, the court … is free to determine independently how much weight to give the administrative findings.").

103.    Thus, from the case law, the purpose of administrative exhaustion appears to be the educational expertise of the state agency in the due process hearing. To that end, Tennessee requires the administrative judges in the Administrative Procedures Division who hear special education due process cases to "receive training in special education law to comport with the requirements of 20 U.S.C. § 1415. Before hearing any special education due process cases,

an administrative law judge shall receive intensive training in special education law. After receipt

of this initial training, all administrative law judges hearing special education due process appeals

shall undergo annual training in special education law." T.C.A. § 49-10-606.

104.   However, the ALJ in the underlying due process hearing in this case struggled with both

educational concepts as well as the law to the point that he simply threw up his hands to allow this

Court to make decisions. For example, near the beginning of the due process hearing, the ALJ

admitted that the lawyers representing Plaintiffs and Defendant MSCS knew more about special

education than he did:

> ADMINISTRATIVE LAW JUDGE:  Well, and this is me, right?  I'm having a
> little trouble following because you guys are way more of an expert than I am. I am
> probably on the lower end of that curve.  So I can't say for sure.  It's hard for me to
> rule on this objection because I'm not clear where we're going with this.

Hearing Vol. 2, 221:11-17. Further on in the hearing, he simply stated that he would leave it for
this Court to "sort it out":

> THE COURT:· I'm – I'm going -- I'm going to allow the line of questioning, and
> I'm going to note your objection for the record. And it will -- it can go up and be
> reviewed, and, hopefully, a federal judge can sort it out.· · · · · I -- I'm not sure –
> I'm not even sure what the objections are at this point…

Hearing Vol. 9, 904:9-15.

### f.   The ALJ's Final Order is not entitled to any deference because it is largely cut and paste from Defendant MSCS's briefing and from other opinions.

105.   As further demonstration of just how out of his depth the ALJ was at due process hearing,

almost the entirety of his Final order (Exhibit A) was directly copied either from Defendant

MSCS's post-hearing brief containing proposed findings of fact and conclusion of law (Exhibit E)

and/or prior orders from the Administrative Procedures Division (Exhibits F, G, H, and I).

106.   First, the administrative judge copied Defendant MSCS's proposed findings of fact and

conclusions of law almost verbatim on more than 19 pages of his 32-page Order, highlighted in

yellow in Exhibits A, D, and E.[12] In so doing, the ALJ has failed to act independently, omitted substantial facts, and misapplied the law. Instead, the ALJ has simply wholesale adopted the District's version of events without any meaningful analysis.

107.    This failure itself constitutes a denial of Plaintiffs' due process rights. The IDEA provides parents with substantive procedural rights. This includes the right to have a hearing record and to receive written findings of fact and a decision. 20 U.S.C. § 1415(h)(3), (4)

108.    Second, the administrative judge copied both some of Defendant MSCS's conclusions of law verbatim (highlighted in green in Exhibits A, D, and E), as well as from one of his own prior decisions (Exhibit G) and that of at least three of his colleagues (Exhibits F, H, and I). Exhibit D provides a simple graphic overview of just how much of the Order is plagiarized from either Defendant MSCS or other APD orders.[13] It is stunning in its blatant audacity to fail to independently consider, analyze, and rule on the unique and complex facts in Plaintiffs' case.

109.    As a result, this Court should not consider any part of any of administrative judge's decisions or orders (pre- and post-hearing).

---

[12] Although the Order is 36 total pages, the first page is only a cover page, the second lists the parties and hearing dates, and the final two pages are simply form language providing appellate rights information. Thus, the substantive Order is 32 total pages.

[13] The yellow highlighting is verbatim language from Defendant MSCS's proposed findings of fact (Exhibit E); the green highlighting is verbatim language from Defendant MSCS's proposed conclusions of law (Exhibit E) and it is also shared in another ALJ's order (Exhibit I); the blue highlighting is verbatim language contained in four other ALJ orders (Exhibits F, G, H, and I); and the pink highlighting is verbatim language contain in two other ALJ orders (Exhibit H and I). Interestingly, Exhibit I is the order that recently received scrutiny of its own for the exact same reason: judicial plagiarism. *See G.E. v. Williamson Cty. Bd. of Educ.*, No. 3:21-cv-00702, 2023 U.S. Dist. LEXIS 57353 (M.D. Tenn. Mar. 31, 2023).

>   **g.  The dismissal of Plaintiffs' subsequent Expedited Due Process Complaint on behalf of N.H. and G.H. as a result of the District's retaliation was in error.**

110.  Plaintiffs also filed an Expedited Due Process Hearing Request and Complaint on April 11, 2023, as a result of retaliatory acts of District employees stemming from this matter which needed to be filed to prevent irreparable harm to N.H.'s sister.

111.  The dismissal of this subsequent Expedited Due Process Complaint is in error. The dismissal order fails to recognize the denial of G.H.'s rights under the IDEA as well as that of her parents' rights as educational rights holders to bring her brother's due process case and to appeal it to this Court. Without this Court's intervention, Defendant MSCS will continue to retaliate against G.H., N.H., and their parents.

## VI.    RELIEF SOUGHT

112.  Plaintiffs are primarily seeking reimbursement for N.H.'s placement at the Bodine School, as well as compensatory education in the form of his remaining at the Bodine School through the end of his fifth-grade year.

113.  Plaintiffs also seek the following relief:

>   a.  Continued placement at N.H.'s current school, the Bodine School, which is a private school specializing in educating children with specific learning disabilities in reading, including dyslexia, for the 2022-2023 school year;

>   b.  Reimbursement for any out-of-pocket expense for placing and sending N.H. at the Bodine School, including but not limited any application fees, tuition, and transportation costs for the 2021-2022 school year to the present;

>   c.  Defendant MSCS shall provide reimbursement to N.H.'s parents for his transportation to and from the Bodine School;

    d.   Defendant MSCS shall reimburse N.H.'s parents for any out-of-pocket expense for the cost of dyslexia-specific interventions provided by the parents from June 2016 to the present including, but not limited to, reimbursement for all tuition and other related expenses at the Bodine School and for private tutoring and summer camps, including reimbursement for requiring N.H.'s parents to pay for the 2021 CLUE Summer Camp which was provided to other students residing in the District free of charge, and reimbursement for all privately funded trainings to provide dyslexia-specific instruction for N.H.;

    e.   Any other such relief as the Court deems appropriate and as the cause of justice may require.

114.  Plaintiffs also request the following injunctive relief:

    a.   Defendant MSCS shall provide its employees with anti-retaliation training to be overseen by a special education expert or organization agreed upon by Plaintiffs and shall instruct its employees that they may not refuse to communicate with parents who file special education due process complaints;

    b.   Defendant TDOE shall develop policies and procedures to ensure that due process complaints are heard by competent state hearing officers (and/or administrative judges) with the skill and proficiency of writing orders that are as unique as the child and the case before him or her;

    c.   Defendant TDOE shall develop policies and procedures to monitor compliance with their policies and programs, and that students are receiving ***fair and impartial*** due process hearings.

115.  Plaintiffs also request all attorneys' fees and costs for this action and the Due Process proceedings.

Date:   June 19, 2023                    *s/Janet H. Goode*
                                         Janet H. Goode, TN BPR #35872
                                         917 Cooper Street
                                         Memphis, TN 38104
                                         901-308-7511
                                         janet@janetgoodelaw.com

                                         *s/ Michael F. Braun*
                                         MICHAEL F. BRAUN (BPR 032669)
                                         5016 Centennial Boulevard, Ste. 200
                                         Nashville, TN 37209
                                         (615) 378-8942

                                         **Attorneys for Plaintiffs**