

**State of Tennessee**

# Department of State

Administrative Procedures Division
312 Rosa L. Parks Avenue
8th Floor, William R. Snodgrass Tower
Nashville, Tennessee 37243-1102
Phone: (615) 741-7008/Fax: (615) 741-4472

**April 18, 2023**

Janet Goode, Esq.
Goode Law
917 South Cooper Street
Memphis, TN 38104

Tricia Craig
Tennessee Department of Education
Andrew Johnson Tower
710 James Robertson Parkway
Nashville, TN 37243

Kavita G. Shelat, Esq.
Shelby County Schools
160 S. Hollywood, #218
Memphis, TN 38112

Kenneth Walker, Esq.
Shelby County Schools
160 S. Hollywood, #218
Memphis, TN 38112

Laura Bailey, Esq.
Shelby County Schools
160 S. Hollywood, #218
Memphis, TN 38112

**RE: N.H., THE STUDENT, AND F.H. AND K.H., THE PARENTS V. MEMPHIS-SHELBY COUNTY SCHOOLS, APD Case No. 07.03-230615J**

Enclosed is a *Final Order*, including a *Notice of Appeal Procedures,* rendered in this case.

Administrative Procedures Division
Tennessee Department of State

Enclosure(s)

**BEFORE THE TENNESSEE DEPARTMENT OF EDUCATION DIVISION OF
SPECIAL EDUCATION**

| | |
|---|---|
| IN THE MATTER OF:<br><br>F.H. THE PARENT,<br>N.H. THE STUDENT,<br>       *Petitioner,*<br><br>*v.*<br><br>MEMPHIS-SHELBY COUNTY<br>SCHOOLS,<br>       *Respondent.* | APD Case No. 07.03-230615J |

## FINAL ORDER

This contested case, arising from claims made under the Individuals with Disabilities Education Act (IDEA), was heard before Administrative Judge Shannon Barnhill on April 3-5, 2023. The Petitioners, N.H., the student and F.H. and K.H., the student's parents, are represented by attorney Janet Goode. The Respondent, Memphis-Shelby County Schools (or "MSCS"), is represented by attorneys Laura Bailey and Kavita Shelat.

The due process complaint was filed on February 2, 2023. Per the ORDER SETTING PREHEARING CONFERENCE entered on February 9, 2023, the parties were advised that the hearing would be scheduled "for up to three (3) business days," and that "[a] request for additional hearing days shall only be granted at the discretion of the Administrative Judge upon a showing of good cause." The ORDER SETTING HEARING entered on February 22, 2023, reflects that the hearing was scheduled for three (3) days and was set to be heard on April 3-5, 2023. The parties were reminded to plan their presentation of proof such that the hearing could be concluded within the time allotted. The parties agreed that Petitioners would have two days to present their proof and Respondent would have one day to present its proof.

The ORDER SETTING HEARING entered on February 22, 2023, set post-hearing filing dates as follows: the transcript was to be filed no later than April 11, 2023, and the parties were to file proposed findings of fact and conclusions of law no later than April 12, 2023.

The issue in this case is whether MSCS failed to timely identify N.H. as a student with a specific learning disability, i.e., dyslexia, and whether N.H. was denied a free and appropriate public education (FAPE) and, if so, the appropriate remedy. Based on review of the entire record, it is **DETERMINED** that the relief sought by the Petitioners should be **DENIED**.

Witnesses who testified at the due process hearing, in the order they appeared, were:

(1) F.H., the father/parent; (2) Re'khel Burke, Ed.S., MSCS school psychologist, Respondent's expert; (3) Dr. Mary Berk, MSCS school psychologist manager, Respondent's expert; (4) Sherry James, M.S., Director of Student Services and Transition at the Bodine School; (5) Katherine Mendez, M.A., CCC-SLP, speech and language pathologist University of Memphis, Respondent's expert in identifying children with dyslexia; (6) K.H., the mother/parent; (7) Carin Fuller, MSCS 3rd grade teacher at Grahamwood Elementary School; (8) Carolyn Mendillo, MSCS 2nd grade teacher at Grahamwood Elementary School; (9) Dr. Amy Maples, MSCS Program Director in Curriculum and Development, Respondent's expert; and (10) Dr. Tiffany Luckett, MSCS Director , special education teacher with MSCS.

## **FINDINGS OF FACT**

1.      N.H. was born on October 18, 2012. He lives with his parents, F.H. (father) and K.H. (mother), in Memphis, Tennessee, in the Memphis-Shelby County School District.

2.      N.H. is a student with a disability as defined by the IDEA. While enrolled as an MSCS student, he had an Individualized Education Program (IEP) from 2016 until his parents withdrew him.

3.      In 2016, MSCS evaluated N.H. for intellectual giftedness (known as the CLUE[1] program within MSCS). As a result of that evaluation, an IEP team determined that N.H. is intellectually gifted and entitled to an IEP per Tennessee's definition of disability under the IDEA.

4.      N.H.'s verbal intelligence score was 109, which was in the average range.  (Hearing Transcript, V.2, 252:11-20).

5.      N.H.'s non-verbal intelligence score was 143, which was in the very high range. (Hearing Transcript, V.2, 253:4-5).

6.      N.H.'s composite score was 129.  (Hearing Transcript, V.2, 252:5-8).

7.      From 2016 until November 2021, N.H.'s IEPs identified him solely as a child with intellectual giftedness. (Hearing Exhibit 32).

8.      While enrolled as an MSCS student, N.H. was a student at Grahamwood Elementary School, a public school operated by MSCS.

9.      At the start of N.H.'s second grade year in September 2020, N.H. took the I-Ready teacher diagnostic for English Language Arts, and he scored a 502, which corresponds with a 78th percentile and an overall placement at early 2nd grade.  (Hearing Exhibit 59).

10.     In the subcategories for English Language Arts (phonological awareness, phonics/decoding, vocabulary, high frequency words, reading comprehension literature, and reading comprehension informational text), N.H. performed behind grade level in a couple of subcategories, at grade level on one subcategory, and ahead of grade level on three of the subcategories. (Hearing Exhibit 59).

---

[1] Creative Learning in a Unique Environment

11.    One month later in October 2020, N.H. took the first Illuminate-Fastbridge Universal Screener and scored a 520, which placed him at the 98th percentile.  (Hearing Exhibit 59).

12.    Three months later in January 2021, N.H. took another I-Ready teacher diagnostic for English Language Arts, and he scored a 554, which corresponds with a 93rd percentile and an overall placement ahead of his then current stage to late 2nd grade.  (Hearing Exhibit 59).

13.    In the subcategory of phonics/decoding, N.H. had now reached a score of 592 or a "max score."  (Hearing Exhibit 59).

14.    In the subcategory of vocabulary, he had jumped from 1st grade to late 2nd grade placement.  In the subcategory of high-frequency words he stayed flat at early 2nd grade.  In reading comprehension literature, he stayed ahead at 3rd grade.  His reading comprehension informational text slipped slightly to mid-2nd grade level.  (Hearing Exhibit 59).

15.    Three months later in April 2021, N.H. took the second Illuminate-Fastbridge Universal Screener and scored a 545, which placed him at the 99th percentile nationally.  (Hearing Exhibit 59).

16.    Due to the Covid-19 pandemic, N.H. attended school virtually for the majority of his second-grade year.

17.    In May of 2021, toward the end of N.H.'s second grade year, N.H. returned to in-person school and took the TCAP without accommodations.  (Hearing Transcript, V.7, 651:20-23).

18.    He scored a 381 in English Language Arts, which corresponds to the 94th percentile of Tennessee students.  (Hearing Exhibit 59).

19.    One month later in June 2021, while N.H. was attending school in-person, N.H. took another I-Ready teacher diagnostic for English Language Arts, and he scored a 553, which corresponds with an 87th percentile and an overall placement in late 2nd grade.  (Hearing Exhibit 59).

20.    In the subcategory of vocabulary, he had jumped to 3rd grade placement, in the subcategory of high-frequency words he backslid to 1st grade, and in reading comprehension there was a divergence between his literature and informational text comprehension – early 2nd grade placement for the former but 5th grade placement for the latter. (Hearing Exhibit 59).

21.    At the start of N.H.'s third grade year, on August 18, 2021, N.H. took the I-Ready teacher diagnostic for English Language Arts, and he scored a 548, which corresponds with an 84th percentile and an overall placement ahead of where he then was to mid-3rd grade.  (Hearing Exhibit 59).

22.    Three weeks later in September 2021, N.H. took the Illuminate-Fastbridge Universal Screener and scored a 508 which was at the 76th percentile.  (Hearing Exhibit 4 at MSCS 3359; Hearing Exhibit 59).

23.    For a student like N.H. who scored in Tier I on all his universal screeners, it would be up to the school leadership team to determine what supports can be put in place in Tier 1 and then, if needed, whether a referral to the exceptional children side is appropriate.  (Hearing Transcript, V.9, 950:21-951:12).

24.    Carolyn Mendillo was N.H.'s second grade teacher, and she taught him all academic subjects – English, Math, Science, and Social Studies.  (Hearing Transcript, V.9, 845:25-846:9).

25.    Ms. Mendillo has been a teacher at Grahamwood Elementary School for the last 24 years, she has a bachelor's degree in Education, and she is licensed to teach grades K-3rd.  (Hearing Transcript, V.9, 846:24-847:10).

26.    Ms. Mendillo has only taught 2nd grade at Grahamwood, and she taught an "optional classroom" during N.H.'s second grade year.  (Hearing Transcript, V.9, 847:19-22; 848:5-11).

27.    The optional class moves at a faster pace than the non-optional 2nd grade class, and the teachers supplement the curriculum to make it more enriched and higher level.  Many of the

students are reading above grade level, and many of the students are identified as intellectually gifted and attend the CLUE program. (Hearing Transcript, V.9, 848:25-849:14).

28.    Most of N.H.'s 2nd grade year was spent virtually. However, Ms. Mendillo often taught on-camera to engage with the students for much of the day. (Hearing Transcript, V.9, 849:20-850:6).

29.    N.H. returned to in-person learning in early May, and that year school ended on June 18th, 2021. (Hearing Transcript, V.9, 850:23-851:6).

30.    About half of Ms. Mendillo's optional students also participated in the CLUE program. (Hearing Transcript, V.9, 851:10-15).

31.    N.H. worked in a learning pod with two other students during the part of the school year presented virtually, and that pod of students routinely participated in class. They asked questions, and when it was time to share, they volunteered to do so. (Hearing Transcript, V.9, 857:2-12; 857:24-858:9).

32.    Ms. Mendillo explained that at the start of 2nd grade there is a great deal of oral instruction, but the students transition to learning to read their own directions by the end of 2nd grade. (Hearing Transcript, V.9, 858:10-859:3).

33.    During that virtual year, Ms. Mendillo was not able to listen to her students read, whereas when the students are in-person she can call on the students one-on-one to do reading assessments. (Hearing Transcript, V.9, 859:4-11).

34.    Likewise, Ms. Mendillo was not able to watch her students as they wrote, other than writing on dry erase boards that students held up on the screen. Once N.H. returned to in-person learning in May, Ms. Mendillo noticed that N.H. was having trouble with writing. (Hearing Transcript, V.9, 859:15-860:6).

35.     In Ms. Mendillo's class N.H. was performing academically in English Language Arts at the same level as his peers, and that he often got 100% scores.  (Hearing Transcript, V.9, 861:9-13).

36.     Around April 2021, either K.H. or N.H.'s second grade CLUE teacher, Ms. Pankey, began to suspect that N.H. may have dyslexia based on a writing sample K.H. shared with Ms. Pankey. (Hearing Transcript, V. 6, 560:4-5, 18-24).

37.     Ms. Mendillo recalled that K.H. reached out about her concerns with what she was seeing at home regarding N.H.'s work or performance.  In response, Ms. Mendillo spoke with N.H.'s CLUE teacher, Ms. Pankey, and then the school's RTI specialist, Ms. Rica Davis, who would be the one to do any further screening.  (Hearing Transcript, V.9, 861:20-863:13).

38.     On April 27, 2021, Ms. Mendillo emailed Ms. Davis that "Nathaniel Hunt's mother is requesting to have him tested for dyslexia.  He is a virtual student.  Thank you for your help with this."  (Hearing Exhibit 58).

39.     N.H. scored a 381 in English Language Arts, which was categorized as "On-Track" and a 385 in Math, which was categorized as "Mastered" in his 2nd Grade Tennessee Comprehensive Assessment Program (TCAP) testing.  (Hearing Exhibit 38).

40.     On the TCAP English Language Arts sub-score categories N.H. scored as follows:

Reading: Informational Text:  Similar, 5 of 6;

Reading: Literature: Higher, 6 of 6;

Listening: Informational Text: Higher, 8 of 8

Listening: Literature: Higher, 8 of 8

Writing: Informational Text: Lower, 3 of 5

Writing: Literary Text: Lower, 3 of 5

Foundational Literacy: Similar: 29 of 39

Fluency: Higher, 5 of 5 (Hearing Exhibit 38).

41.    N.H. received no accommodations when he took the TCAP test in May 10-12, 2021. (Hearing Transcript, V.7, 651:20-23).

42.    On or around May 18, 2021, Ms. Rica Davis arranged to screen N.H. after he returned to in-person learning.  (Hearing Exhibit 58).

43.    The results of that screening showed that N.H. scored in the 44th percentile in CBM reading, 32nd percentile in letter sounds, 34th percentile in word segmenting and 36th percentile in nonsense words. (Hearing Exhibit 62 at MSCS 0208).   This screening was administered without accommodations. (Hearing Exhibit 62 at MSCS 0208).

44.    In the spring of 2021, N.H.'s 2nd Grade CLUE teacher, Ms. Pankey, volunteered to tutor N.H.  (Hearing Transcript, V.7, 653:1-654:8).

45.    Ms. Pankey did not provide N.H. with Orton-Gillingham style tutoring. (Hearing Transcript, V. 7, 653:21-25).

46.    Petitioner K.H. credited Ms. Pankey's after school reading lessons to N.H.'s TCAP scores (supra at paragraphs 39 and 40).  (Hearing Exhibit 39).

47.    N.H. began tutoring with Michelle Brown on May 17, 2021.  (Hearing Transcript, V.7, 657:2-15).

48.    At that time, Ms. Brown was not an Orton-Gillingham associate level instructor although she did utilize Orton-Gillingham methodology.  The tutoring of N.H. also assisted in fulfilling her practicum hours.  (Hearing Transcript, V.7, 659:1-12).

49.    Following the administration of the dyslexia screening, N.H.'s IEP team met on May 21, 2021. (Hearing Exhibit 62).

50.    K.H. explained to the May 21, 2021, IEP Team that she supervised N.H. at home during N.H.'s virtual school experience.  (Hearing Exhibit 62 at MSCS 0208).

51.    Regarding N.H.'s high Illuminate/Fastbridge screening results, K.H. "read the questions and answer choices only, and Nathanial made his answer choices independently." (Hearing Exhibit 58 at MSCS 0208).

52.    Carin Fuller was N.H.'s 3rd grade English Language Arts teacher.  (Hearing Transcript, V.8, 766:3-7).

53.    Ms. Fuller joined the School District in October 1993.  She has a bachelor's degree in Elementary Education and a master's degree in Administration and Supervision, and she is licensed to teach grades 1-8.  (Hearing Transcript, V.8, 766:9-22).

54.    Ms. Fuller has taught 1st, 3rd, 4th, 5th, and 7th grades, and she has taught 3rd grade for approximately 7 years.  (Hearing Transcript, V.8, 766:23-767:22).

55.    The optional program at Grahamwood is a program of enriched academics that moves at an accelerated pace.  In English Language Arts, that means more outside book studies and book projects, and the teacher may pull text that is above grade level when teaching a grade-level standard.  (Hearing Transcript, V.8, 768:5-6).

56.    Ms. Fuller taught N.H. all english language arts, spelling, grammar, writing, reading, and social studies in his 3rd grade year.  A different teacher, Ms. Young, taught N.H. math and science during that same school year.  (Hearing Transcript, V.8, 768:17-769:4).

57.    On August 12, 2021, Ms. Fuller emailed Grahamwood's guidance counselor to discuss clarifying the accommodations that were in N.H.'s IEP.  (Hearing Exhibit 49).

58.    That academic year, 2021-2022, approximately 70-75% of Ms. Fuller's optional students were also identified as intellectually gifted and received CLUE services.  (Hearing Transcript, V.8, 770:12-20; 771:24-772:5).

59.    Ms. Fuller typically spent two weeks teaching a standard.  First, she explains the vocabulary around that standard.  Second, she will model the work in front of her students while

they watch.  Third, Ms. Fuller and the students will do the work together.  Fourth, the students will do the work in groups.  Finally, the students will do the work individually.  At the conclusion of this two-week period, there may be a written assignment or a teacher assignment on the I-Ready platform.  (Hearing Transcript, V.8, 773:22-774:25).

60.     Ms. Fuller explained that the purpose of group work is to see the students' thought processes in arriving at their answers and to gauge their understanding.  Group work also gives students another opportunity to grasp the material from their peers if it did not connect for them earlier.  (Hearing Transcript, V.8, 775:5-18).

61.     Ms. Fuller found that her students needed to be challenged to stay engaged, and she might provide a challenge by using a text with a higher reading difficulty.  (Hearing Transcript, V.8, 775:23-776:19).

62.     Ms. Fuller recalled that N.H. was a very polite, well-behaved, and respectful student who seemed eager to learn and who would do his work without needing to be reminded.  (Hearing Transcript, V.8, 776:20-777:4).

63.     Ms. Fuller recalled that N.H. volunteered answers, and she remembered him volunteering during whole group sessions.  (Hearing Transcript, V.8, 777:5-22).

64.     Ms. Fuller recalled that N.H.'s diagnostic tests were on grade-level.  (Hearing Transcript, V.8, 777:23-778:4).

65.     Regarding N.H.'s reading work, Ms. Fuller recalled one occasion where she called on N.H. to explain the text support for an answer he gave, and N.H. was able to identify and read the paragraph.  (Hearing Transcript, V.8, 778:5-12).

66.     The State of Tennessee expectation is that by year-end of third grade, students can write one cohesive paragraph on a topic after reading a text.  Ms. Fuller recalls that N.H. could come

up with ideas, but it was a challenge for him to write the sentences out on paper.    (Hearing Transcript, V.8, 778:13-780:2).

67.    When N.H. turned in a writing assignment that Ms. Fuller did not regard as being on standard, she called him up individually and asked what he was trying to communicate.  She then did shared writing whereby Ms. Fuller would ask N.H. what sentence he was trying to write, and she would write the number of lines necessary for that sentence.  (Hearing Transcript, V.8, 780:3-19).

68.    Ms. Fuller recalled that N.H. understood what she was trying to do and was able to write the sentences after shared writing.  (Hearing Transcript, V.8, 780:20-781:2).

69.    Based on the teacher diagnostic screening, Ms. Fuller recalled that most of her students were on grade-level, with a handful of students perhaps a grade-level ahead and 2-3 students a grade-level behind.  (Hearing Transcript, V.8, 781:14-782:1).

70.    N.H. was on grade level on the screeners.  (Hearing Transcript, V.8, 782:2-4; Exhibit 59).

71.    Ms. Fuller was aware that N.H. had accommodations for things to be read aloud and that he was to be given extended time to complete his tasks.  (Hearing Transcript, V.8, 782:5-21).

72.    Ms. Fuller implemented the read aloud accommodation through the immersive reader program that had that option built in and by using an outside website that was similarly used for reading text aloud.  Additionally, if N.H. turned in an assignment where it seemed he may not have understood something, Ms. Fuller would have N.H. read the assignment to her and then go from there. (Hearing Transcript, V.8, 784:20-785:15).

73.    N.H. took the August 2021 screener without a read aloud accommodation to get a true indicator of the level of his performance and to help determine any further needed instruction. (Hearing Transcript, V.8, 816:4-21).

74.    Ms. Fuller uses a multisensory approach to teaching, which involves students giving answers with pen and paper, giving answers aloud, and working on multimedia projects. (Hearing Transcript, V.9, 934:8-25).

75.    On August 25, 2021, Petitioners F.H. and K.H. submitted an application for N.H. to attend the Bodine School.  (Hearing Exhibit 16).

76.    Petitioners' application does not indicate that N.H. had a formal diagnosis of dyslexia. (Hearing Exhibit 16).

77.    On September 5, 2021, K.H. texted Ms. Pankey that N.H. would visit the Bodine School that week for certain assessments.  (Hearing Exhibit 44).

78.    On September 8, 2021, Bodine School administered admissions testing to N.H.  (Hearing Transcript, V.4, 355:19-356:14).

79.    That same day, on September 8th, Bodine School admitted N.H. to its 3rd grade program. (Hearing Exhibit 17).

80.    Bodine School requires a $500.00 tuition deposit to enroll.  (Hearing Exhibit 17; Hearing Transcript, V.4, 381:11-21).

81.    Bodine School instructors have Orton-Gillingham branded teaching certifications. (Hearing Transcript, V.4, 383:4-6).

82.    On September 13, 2021, Petitioner K.H. toured Bodine School to observe instruction being provided according to the Orton-Gillingham philosophy.  (Hearing Exhibit 18).

83.    Orton-Gillingham is a philosophy or methodology of instruction.  There is no such thing as an Orton-Gillingham curriculum.  (Hearing Transcript, V.4, 382:18-383:12).

84.    The next day, on September 14, 2021, Petitioner K.H. sought to move up N.H.'s re-evaluation meeting, with the School District, to the earliest date possible within the applicable 10-day notice timeframe.  K.H. texted N.H.'s 3rd grade CLUE teacher, Lisa Ziegler, requesting

that the meeting be held on Friday, September 24, 2021, due to "family scheduling conflicts." (Hearing Exhibit 43).

85.     On September 16, 2021, Petitioners submitted a complete financial aid application to Bodine School.  (Hearing Exhibit 19).

86.     The next day, on September 17, 2021, Bodine School offered Petitioners a financial aid package.  (Hearing Exhibit 20).

87.     On September 20, 2021, Petitioners wrote an email to N.H.'s teachers, principals, and CLUE representative noting that N.H. had been identified as a student with a specific learning disability in the area of dyslexia.  (Hearing Exhibit 50).

88.     On September 20 and 21, 2021, Petitioner K.H. and Ms. Fuller exchanged several emails about scheduling N.H.'s re-evaluation meeting when Ms. Fuller could be present because Ms. Fuller was on leave at the time and because Ms. Fuller's input and understanding of the expectations would be necessary for any strategies to be successfully implemented.  (Hearing Exhibit 54).

89.     On September 22, 2021, CLUE teacher Sherry Coates indicated that she would pull N.H. from class the next day to complete the TN Teacher Observation Questionnaire for Dyslexia. (Hearing Exhibit 52).

90.     On September 24, 2021, N.H.'s IEP team convened but did not conclude.  Therefore, the team re-convened on September 29, 2021.  (Hearing Exhibits 4 and 5).

91.     Dr. Mary Berk, MSCS school psychologist manager, had recommended that the School District re-do cognitive testing as part of N.H.'s evaluation for specific learning disability, but Petitioner K.H. did not want to do that because if N.H. scored lower than he did originally it might jeopardize his participation in the gifted program.  (Hearing Transcript, V.2, 249:6-25).

92.     On September 26, 2021, K.H. emailed Dr. Berk and others noting that the purpose of reconvening on September 29th would be to determine what evaluations needed to be completed in the suspected disability classification, to determine if N.H. has a secondary disability, and to discuss classroom accommodations for N.H.  (Hearing Exhibit 8).

93.     On September 28, 2021, Ms. Fuller filled out a Gifted Reevaluation Parent and Teacher Input Form that identified his weaknesses, stating that "Nathaniel struggles with spelling and writing assignments."  She wrote "Mostly" under the question about whether the student's current educational program meets his/her needs.  Ms. Fuller added that "[t]he area of concern with spelling and writing needs a strategy."  (Hearing Exhibit 56).

94.     The outcome of the September 29th IEP meeting was that N.H. would maintain his eligibility for intellectual giftedness, and that he would be evaluated in the area of specific learning disability.  (Hearing Exhibits 4 and 5).

95.     To evaluate a student for a specific learning disability under Tennessee requirements, the School District must gather both direct and indirect teacher observations.  (Hearing Transcript, V.2, 255:15-256:8).

96.     On October 12, 2021, Ms. Re'khel Burke conducted a psycho-educational evaluation of N.H. (Hearing Exhibit 1; Hearing Transcript, V.1, 82:20-24).

97.     Ms. Burke has a B.S. in Science, M.S. in Science and Psychology, and an Ed.S.  She obtained all three degrees from Middle Tennessee State University (MTSU).  (Hearing Transcript, V.1, 63: 24-64:14).

98.     As part of her M.S. degree, Ms. Burke's curriculum included a semester-long course on the psychological assessments given for each of the learning disabilities under the IDEA and Tennessee law.  (Hearing Transcript, V.1, 67:19-68:25).

99.    Ms. Burke did a two-year graduate assistantship with MTSU's Center for the Research and Study of Dyslexia (Dyslexia Center). (Hearing Transcript, V.1, 69:16-19; 70:3-5).

100.    As a graduate assistant, Ms. Burke assessed children for characteristics of dyslexia, which included interviewing parents, administering assessments, and attending meetings to discuss her findings.  (Hearing Transcript, V.1, 70:6-12).

101.    While at MTSU's Dyslexia Center, Ms. Burke did not diagnose children as having a specific learning disability because that diagnosis is only given in a school setting.  (Hearing Transcript, V.1, 75:20-71:1).

102.    Ms. Burke was a licensed school psychologist at the time she conducted the evaluation of N.H.  (Hearing Transcript, V.1, 122:20-22).

103.    Normally an evaluation for specific learning disability in the area of dyslexia would include a cognitive assessment in order to rule out any cognitive deficit. (Hearing Transcript, V.1, 92:20-93:1).

104.    Ms. Burke did not conduct cognitive testing on N.H. because K.H. did not give consent for it.  (Hearing Transcript, V.1, 123:7-12).

105.    Ms. Burke tested N.H.'s academic ability with the Weschler Individual Achievement Test (WIAT).  N.H. scored "Above Average" in the Reading Comprehension subtest and scored better than 99% of third graders in the reading of that passage.   (Hearing Exhibit 1, pp. 5, 9).

106.    N.H. also scored "Above Average" in Listening Comprehension and scored better than 96% of third graders on that subtest.  (Hearing Exhibit 1, pp. 5, 9).

107.    N.H. scored "Average" in Pseudo-Word Decoding, Oral Reading Fluency, and Spelling. (Hearing Exhibit 1, p. 5).

108.    N.H.'s Pseudo-Word Decoding score was equivalent to a 2nd grade level. His Oral Fluency score was equivalent to a 3rd grade level. His Spelling score was equivalent to mid-2nd grade level. (Hearing Exhibit 1, p. 9).

109.    Under the WIAT, N.H.'s total reading and basic reading abilities fell in the "Average" range, while his reading comprehension and fluency was in the "Above Average" range. (Hearing Exhibit 1, p. 9).

110.    Ms. Burke tested N.H.'s memory with the Wide Range Assessment of Memory (WRAM). N.H.'s attention and concentration level was "Above Average." N.H.'s general memory, working memory, and visual memory testing results were "Average" level. (Hearing Exhibit 1, p. 5).

111.    Ms. Burke tested N.H.'s core phonics ability with the CORE Phonics Survey. N.H. met benchmarks for certain phonics sounds, was just below benchmark in certain phonics sounds, and in 3-4 phonics sounds needed strategic intervention. (Hearing Exhibit 1, p. 9; Hearing Transcript, V.1, 132:15-137:1).

112.    Ms. Burke administered the Developmental Spelling Analysis (DSA), and N.H. scored in the frustration range, which indicates he would need intervention. (Hearing Exhibit 1).

113.    Ms. Burke's report indicated that N.H. had characteristics of dyslexia, and that the IEP team should review the report to make a determination about specific learning disability. (Hearing Exhibit 1, p. 8).

114.    On October 18, 2021, K.H. and private tutor Michelle Brown met to discuss what they thought N.H.'s IEP goals should be. (Hearing Exhibit 41; Hearing Transcript, V.7, 666:22-667:5).

115.    Petitioner K.H.'s proposed long-term goal for N.H. was having him reading at 100% in all areas. (Hearing Exhibit 41).

116.    Outside of Ms. Burke's report, and at the request of Petitioners, Ms. Burke made a series of recommendations for accommodations and modifications to the IEP for the IEP team to consider.  (Hearing Transcript, V.1, 112:6-113:21; 115:17-20).

117.    On October 24, 2021, the IEP team met to determine N.H.'s eligibility for specific learning disability.  (Hearing Exhibit 6; Hearing Transcript, V.2, 258:15-18).

118.    Ms. Burke participated in N.H.'s IEP meeting.  (Hearing Transcript, V.1, 115:4-16).

119.    Ms. Burke concluded that N.H. did not have severe enough characteristics of dyslexia to meet the eligibility criteria for specific learning disability (SLD) in the area of dyslexia.  (Hearing Transcript, V.1, 135:12-136:2).

120.    Ms. Burke also concluded that N.H. had not met Tennessee's standards for SLD because there was no period of time where N.H. received interventions to be able to rule out whether interventions were effective.  (Hearing Transcript, V.1, 138:1-20).

121.    Dr. Berk made a recommendation to the IEP team that N.H. should be considered SLD.  (Hearing Transcript, V.2, 285:1-5).

122.    Dr. Berk's recommendation was not because Petitioners had threatened her with an ethics complaint or because Petitioners contacted the State of Tennessee.  (Hearing Transcript, V.2, 285:1-8).

123.    Dr. Berk made her recommendation based, in large part, on input from Petitioner K.H. and her genuine concern for her son, bending the rules slightly making him eligible.  (Hearing Transcript, V.2, 285:6-20).

124.    The IDEA delegates setting the criteria for each of the IDEA eligibility categories to the states. (Hearing Transcript, V.2, 243:23-244-5).

125.    Prior to the Response to Intervention and Instruction (RTI2) model, the State of Tennessee followed the discrepancy model.  (Hearing Transcript, V.2, 243:20-22).

126.    Dr. Berk explained that the RTI2 model is the way that the School District teaches children, and that it helps to make targeted remediation available before a student is labeled as having a certain condition. (Hearing Transcript, V.2, 241:10-243:20).

127.    Under the RTI2 model, in order to identify a student with a specific learning disability (SLD), you have to have some intervention, some monitored progress, and you have to show there's a negative educational impact absent intervention. (Hearing Transcript, V.2, 244:17-245:6).

128.    In N.H.'s case, the School District performed interventions and progress monitoring simultaneously with the testing so that testing was not delayed. (Hearing Transcript, V.2, 245:8-21).

129.    On October 27, 2021, Petitioner K.H. emailed Dr. Berk and others and stated as follows:

> Neither my husband nor I wish to preempt any decisions that the team will make. However, for the sake of expedience and in an attempt to consolidate IEP meetings, it would be sensible for the team to proceed on the presumption that there will be a finding of a secondary specific learning disability, namely dyslexia.

(Hearing Exhibit 9).

130.    On October 29, 2021, Petitioner K.H. emailed Dr. Berk and others about Dr. Berk's use of State of Tennessee guidance in determining specific learning disability not having any reference to gifted students with secondary disability and therefore not being relevant to N.H.'s determination. (Hearing Exhibit 10).

131.    On October 29, 2021, an IEP meeting was held to interpret the results of N.H.'s evaluation.

132.    The IEP team determined that N.H. qualified as a student with dyslexia, an SLD. (Hearing Transcript, V.1, 135:6-11).

133.    On October 31, 2021, Petitioner K.H. emailed Dr. Deborah Harris and Dr. Berk and others about an upcoming IEP meeting, which was scheduled for November 9, 2021.  (Hearing Exhibit 11).

134.    On November 1, 2021, Petitioner K.H. texted N.H.'s private tutor, Ms. Michelle Brown, regarding strategy for the upcoming November 9, 2021, IEP meeting.  (Hearing Transcript, V.7, 675:4-11).

135.    On November 1, 2021, Petitioner K.H. texted Ms. Brown the following message:

> I might hold off on your OG qualifications only because I may have shot myself in the foot.  I told the LEA I wanted him to receive tutoring by an OG certified person. The fact that you did RTI will definitely be something that we can use to N.H.'s advantage and the fact that you have been tutoring him so far.

(Hearing Exhibit 42).

136.    On November 5, 2021, Ms. Fuller emailed CLUE Supervisor Jennifer Chandler about what push-in services for N.H. might look like.  (Hearing Exhibit 57).

137.    N.H.'s IEP Team discussed multiple options to serve N.H. (Hearing Transcript, V.11, 1032:20-1034:21; Hearing Exhibit 61 at MSCS 0307-0308).

138.    The School District offered small group instruction in a special education setting where N.H. would be grouped with similarly situated peers who were working on the same areas of academic deficit that N.H. would be working to address. (Hearing Transcript, V.11, 1063:1-10).

139.    During the IEP meeting, the School District declined to name a specific program for N.H. stating as follows:

> The team was more concerned about making sure that we had the opportunity to be flexible in addressing the goals and not necessarily locking ourselves in or the team into a specific program considering, again, the unique needs of N.H., considering how the score did fluctuate, considering how, you know, the observations reflected something totally different to where, you know, you see a child who's performing very well. · · · · · He enjoys gifted. · He's talented. He's -- he's being successful. · So, you know, the team,

> ultimately, repeatedly said that we wanted to create a structured
> literacy -- provide a structured literacy approach for N.H.· and we
> did not lock ourselves into a particular program to do that.

(Hearing Transcript, V.11, 1056:4-25).

140.    Bodine School considered N.H. a good fit for the school based on his diagnosis of having SLD, which the parents had indicated to Bodine they were in the process of getting.  (Hearing Transcript, V.4, 423:8-424:15).

141.    On November 12, 2021, Petitioners sent a Withdrawal Notification to the School District to advise that they were taking N.H. out of the School District's schools.  (Hearing Exhibit 45).

142.    On November 17, 2021, K.H. texted Ms. Pankey that "[w]e are well, just waiting for our notice period to expire so that we can place N.H. in a school with appropriate accommodations. But we have one more IEP meeting scheduled for tomorrow."  (Hearing Exhibit 46).

143.    On November 22, 2021, K.H. texted Michelle Brown that "[t]his may be our last session. Hopefully, not our last meeting before N.H. starts at Bodine."  (Hearing Exhibit 47).

144.    On November 27, 2021, Petitioners made the $500.00 tuition deposit to enroll N.H. at Bodine.  (Hearing Exhibit 21).

145.    On November 29, 2021, Bodine School introduced Petitioners to N.H.'s new third grade teacher. (Hearing Exhibit 22).

146.    On December 1, 2021, N.H. started attending Bodine School.  (Hearing Transcript, V.4, 409:10-12).

147.    In 2021, Bodine School had two 2nd grade classes, three 3rd grade classes, and two upper elementary classes.  (Hearing Exhibit 27; Hearing Transcript, V.4, 402:16-403:5).

148.    Bodine's largest application pool, by far, is for the 3rd grade program.  (Hearing Transcript, V.4, 403:22-404:5).

149.    Bodine teaches only three academic subjects - reading, writing, and mathematics. (Hearing Transcript, V.4, 421:3-7).

150.    Bodine does not offer a separate science or social studies curriculum. (Hearing Transcript, V.4, 421:3-10).

151.    Bodine's curriculum for 3rd and 4th grade includes teaching a set of high-frequency words for each grade.  (Hearing Exhibits 23 and 24).

152.    Bodine does not use Individual Education Plans (IEPs). (Hearing Transcript, V.4, 425:16-21).

153.    Bodine does not offer Intellectually Gifted services.

154.    N.H. knew half of the third-grade high frequency word list when he began at Bodine. (Hearing Exhibit 28).

155.    Bodine's math curriculum for 4th graders in January 2023 included word problems requiring addition, multiplication, and division.  (Hearing Exhibit 25; Hearing Transcript, V.4, 391:3-392:12).

156.    N.H.'s 4th grade class at Bodine is the highest-level class, and, as an example, would have been reading the Pocahontas narrative.  The other 4th grade classes at Bodine would not be able to read that Pocahontas narrative.  (Hearing Exhibit 25; Hearing Transcript, V.4, 393:3-21)

157.    Bodine has not been able to improve N.H.'s ability in the area of phonics/decoding. N.H.'s decoding ability has remained flat to slightly declining from the time N.H. left the School District and joined Bodine through his most recent test scores.  This is evidenced by N.H.'s Winter 2021 scaled score of 94 (35th percentile), his Spring 2022 scaled score of 94 (35th percentile), his Fall 2022 scaled score of 96 (39th percentile), and his Winter 2022 scaled score of 91 (27th percentile).  (Hearing Exhibits 12 and 13 at p. 4; Hearing Transcript, V.4, 357:6-358:7; 360:10-363:2).

158.    Consistent with N.H.'s flat to slightly declining performance on decoding, on April 11, 2022, K.H. emailed N.H.'s third grade teacher at Bodine, Lisa Grant that N.H. struggles with decoding.  K.H. wrote as follows:

> He [N.H.] explained that he is able to work it out in class because he usually goes last and watches everyone else, but even then he still needs help.  When we looked at it today, after saying "rabbit" "tiger" "camel" and "turtle", he said that he really didn't know what to do.  I explained that it was important for you to know where he struggles so that he can get help.

(Hearing Exhibit 48).

159.    Bodine initially helped N.H. improve his high frequency words/sight word efficiency, but his ability has remained flat over the last year.  N.H.'s ability in the area of high frequency words/sight word efficiency started out in the "Below Average" range in Winter 2021 and improved to the "Average" range in Spring 2022 where it has remained static ever since.  This is evidenced by N.H.'s Winter 2021 scaled score of 84 (14th percentile), his Spring 2022 scaled score of 96 (39th percentile), his Fall 2022 scaled score of 93 (32nd percentile), and his Winter 2022 scaled score of 94 (35th percentile).  (Hearing Exhibits 12 and 13 at p. 4, Hearing Transcript, V.4, 363:3-365:3).

160.    Bodine has not changed N.H.'s knowledge of grade-level vocabulary.  N.H.'s ability has been consistent from the time he left MSCS and entered Bodine through his most recent testing period.  (Hearing Exhibits 12 and 13 at p. 4, Hearing Transcript, V.4, 365:4-366:24).

161.    Bodine is not providing grade-level, Tier 1 instruction to N.H. (Hearing Exhibit 24 "Adverb-Adjective Sort" at "Level 2").

162.    Bodine's "high frequency words" lists for third grade and fourth grade are not grade level instruction. (Hearing Transcript, V. 11, 1068:1-1069:4; Hearing Exhibits 23 and 24).

163.    Bodine does not have a Kindergarten class because most students are not identified as dyslexic at that age. (Hearing Transcript, V. 4, 403:18-21)

164.    Bodine has a first grade but does not require a diagnosis of dyslexia because most students are not identified as dyslexic at that age. (Hearing Transcript, V. 4, 403:18-21)

165.    At Bodine, the overwhelming majority of applications are for third grade, followed by second grade applications. This is because correctly diagnosing dyslexia can be more accurate at the age of a typical 3rd grader. (Hearing Transcript, V. 4, 403:18-404:13).

## CONCLUSIONS OF LAW

When enacting the IDEA, Congress clearly conferred jurisdiction of a student's IDEA claims upon hearing officers, also known as administrative law judges. See 20 U.C.A. § 1415(f)(3)(A).  Therefore, administrative judges are to determine whether a student received an appropriate education under the IDEA.  20 U.C.A. § 1415(f)(3)(E).

In Tennessee, the Office of the Secretary of State, Division of Administrative Procedures, has jurisdiction over the subject matter and the parties of this proceeding and the undersigned Administrative Law Judge has the authority to issue final orders. See State Board of Education Rules, Special Education Programs and Services, 0520-01-09-.18; see T.C.A. § 49-10-101.

The U.S. Supreme Court held in Schaffer v. Weast, that the burden of proof is on the party "seeking relief".  546 U.S. 49, 51 (2005). Thus, when a parent files a request for a due process hearing, the parent bears the burden of proof, or burden of persuasion in the due process hearing. Id. at 56 (citing 2 J. Strong, McCormick on Evidence § 337, p. 412 (5th Ed. 199)) (referencing the "default rule that [Petitioners] bear the risk…" and "[t]he burdens of pleading and proof…should be assigned to the [Petitioner] who generally seeks to change the present state of affairs…"); see also, Cordrey v. Euckert, 917 F.2d 1460, 1469 (6th Cir. 1990) (the party challenging the IEP bears the burden of proof in an IDEA action).

In the instant case, Petitioners clearly bear the burden of persuasion. F.H. and K.H., the parents of N.H., filed the request for due process hearing claiming that MSCS violated child find

and failed to offer N.H. a free appropriate public education (FAPE) pursuant to the Individuals

with Disabilities Act, 34 U.S.C. 1401 et seq. (IDEA). Thus, F.H. and K.H., bear the burden to

prove the specific violations alleged in the due process complaint – that MSCS violated child

find and failed to provide a FAPE to N.H. as required by the IDEA by (1) failing to timely

identify N.H. as a child with a specific learning disability, i.e. dyslexia and (2) failing to design

Individualized Education Programs (IEP) for the latter part of the 2020-2021 school year and the

2021-2022 school year that were reasonably calculated to enable N.H. to make progress in light

of his circumstances. See Endrew F.   v. Douglas Cnty. Sch. Dist. RE-1, 137 S.Ct. 988, 999

(2017). Finally, F.H. and K.H. bear the burden of proving that the Bodine School, the private

school where they unilaterally placed N.H., is appropriate within the meaning of the IDEA. See

Florence Cnty. Sch. Dist. Four v. Carter, 510 U.S. 7, 15 (1993).

## CHILD FIND

School districts are required to identify students suspected of having a disability who are

"in need of" special education and related services. See IDEA U.C.A. §1401 (3)(A). Students

who are eligible for special education and related services are entitled to an IEP. Bd. of Educ. of

the Hendrick Hudson School Dist. V. Rowley, 458 U.S. 176, 181 (1982). In developing

educational programs and determining appropriate services for those students through an IEP,

school districts must comply with the substantive and procedural requirements of the IDEA and

related state law.   See Rowley at 182. However, parents are not entitled to relief for minor

procedural violations alone. Technical procedural violations do not render an IEP invalid.  Dong

v. Board of Educ. of Rochester Community Schs., 197 F.3d 793, 800 (6th Cir. 1999). A

determination of whether a student received FAPE must be based on substantive grounds. 34

C.F.R. § 300.513(1). When a procedural violation is alleged, an administrative law judge can

only find a FAPE violation if a procedural violation "(1) impeded the child's right to FAPE; (2)

significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of FAPE to the parent's child; or (3) caused a deprivation of educational benefit." 34 C.F.R. § 300.513(2). Only procedural violations that result in substantive harm constitute a denial of FAPE and justify relief. Knable v. Bexley City Sch. Dist., 238 F.3d 755, 764 (6th Cir. 2001) (procedural violations must cause substantive harm and constitute denial of FAPE to be actionable); see also Bd. of Educ. of Fayette County, Ky. V. L.M., 478 F.3d 307, 313 (6th Cir. 2007).

Under the IDEA, school districts have an obligation to identify, locate, and evaluate all children reasonably suspected of a disability, commonly referred to as "child find." 34 C.F.R. § 300.111; 20 U.S.C. § 1412(a)(3). The mandate is an affirmative obligation. Ja.B. v. Wilson Cty. Bd. of Educ., No. 3:20-CV-00955, 2022 WL 326273, at *1 (M.D. Tenn. Feb. 2, 2022).

Petitioners claim that MSCS violated the 'child find' requirement of the IDEA by failing to timely identify N.H. as a child with a specific learning disability, in this case dyslexia. To prove that a delayed evaluation for a student constitutes a procedural violation of IDEA's child find requirements, a petitioner "must show that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate." Bd. of Educ. of Fayette County, Ky. v. L.M., 478 F.3d 307, 313 (6th Cir. 2007). For a student to be eligible to receive benefits as a disabled child under the IDEA, "three criteria must be met: (1) the child must suffer from one or more of the categories of impairments delineated in IDEA, (2) the child's impairment must adversely affect his educational performance, and (3) the child's qualified impairment must require special education and related services." Jackson v. Nw. Local Sch. Dist., No. 1:09-CV-300, 2010 WL 3452333, at *6 (S.D. Ohio Aug. 3, 2010), report and recommendation adopted, No. 1:09CV300, 2010 WL 3474970 (S.D. Ohio Sept. 1, 2010). Thus, the fact that a child may have a qualifying disability does not

necessarily make him "a child with a disability" eligible for special education services under the IDEA. Id. The child must also need special education and related services. A.P. ex rel. Powers v. Woodstock Bd. of Educ., 572 F. Supp. 2d 221, 225 (D. Conn. Aug. 19, 2008), aff'd, 370 Fed. Appx. 202 (2nd Cir. 2010). "[A] child 'needs special education' if he cannot attain educational standards in the general education environment." J.M. v. Summit City Bd. of Educ., No. CV1900159KMESK, 2020 WL 6281719, at *10 (D.N.J. Oct. 27, 2020), referencing Durbow v. Cobb Cnty. Sch. Dist., 887 F.3d 1182, 1194–95 (11th Cir. 2018). Thus, "to violate child find, the school district must have been on notice not only of the student's disability but also of the student's need for special education services." Northfield City Bd. of Educ. v. K.H. on behalf of L.S., No. CV 19-9582 (RBK/KMW), 2020 WL 2899258, at *9 (D.N.J. June 3, 2020); A.P., 572 F. Supp. 2d at 225 (citing 20 U.S.C. §1412(a)(3)(A)) (holding that the child find provision itself applies only to children with disabilities "who are in need of special education and related services").

The IDEA requires MSCS to provide FAPE in the LRE (Least Restrictive Environment) to all students with disabilities who are in need of special education and related services. IDEA, 20 U.C.A. §1400 et. seq. The requirements of the IDEA have been adopted, with some additional requirements, by the Tennessee State Board of Education. Tenn. State Bd. of Educ. Rules, Regulations, and Minimum Standards Chapter 0520-01-09.

In Tennessee, gifted children are entitled to an IEP.  The proof in the instant case demonstrates that N.H. had an active IEP in place from 2016 through his withdrawal from MSCS that addressed his individual needs as a gifted student.  The issue presented concerns N.H.'s diagnosis of dyslexia and whether it was timely identified as a specific learning disability and whether the subsequent IEPs were reasonably calculated to enable N.H. to make progress in light of his circumstances.  It is undisputed that N.H. is a twice exceptional student, being a student

who is intellectually gifted who also has a learning disability such as dyslexia. The proof demonstrates that students like N.H. are difficult to identify because they often do well in school and are able, as gifted students, to overcome or mask difficulties related to their disability in their early school years. It is noted that Petitioner's own witness, Sherry James, Director of Student Services and Transition at Bodine, testified that Bodine does not require a diagnosis of dyslexia until the second grade and that third grade is overwhelmingly the range where most dyslexia is identified. Diagnosing an average student prior to the third grade is difficult. Diagnosing a gifted student who is able to more easily overcome and adapt his reading skills is especially challenging. N.H. was identified as a student with a specific learning disability, dyslexia, at the beginning of his third-grade year. The proof shows that his identification as a dyslexic student came about through a team approach involving MSCS staff and K.H., N.H.'s mother. This determination was made despite the fact that N.H. never qualified for Tier II intervention based on any of the universal screeners utilized. The identification, ultimately, was a result of the collaboration between MSCS and K.H. as integral parts of the IEP team in which MSCS gave great weight to K.H.'s input and opinion and at which point MSCS timely moved forward to the diagnosis.

Based on the evidence, including the testimony of Petitioner's witness, Ms. James, it is **CONCLUDED** that MSCS did not violate child find. K.H. is a unique student who, as noted above, is twice exceptional and MSCS's identification of him as a student with dyslexia was timely under the circumstances.

It is also clear from the record that Petitioners had decided to enroll K.H. at Bodine prior to the implementation of his IEP for the 2021-2022 school year. The most recent IEPs dated November 9, 2021, and November 18, 2021, recognized K.H. as a student with a specific learning disability as well as a student who is gifted and considered a multi-sensory approach to

Page **27** of **33**

address his specific learning disability.  It's impossible to determine whether the IEP would have been effective as written or would have needed adjustments because Petitioners disengaged from the process and the IEP was never implemented.  Petitioners advocated for Orton-Gillingham approved methodology but based on the evidence presented at the hearing the efficacy of Orton-Gillingham is inconclusive and there are many other multi-sensory approaches available. Additionally, Petitioners are not entitled to dictate to MSCS which approach is utilized.

Rather, it is **CONCLUDED** that based on the totality of the evidence, MSCS designed an Individualized Education Program (IEP) for the 2021-2022 school year – the school year when N.H. was identified as dyslexic – that was reasonably calculated to enable N.H. to make progress in light of his circumstances and (2) MSCS timely evaluated N.H. in the areas of suspected disability for the purposes of educational planning and IEP development.

At all times relevant to Petitioners' Complaint, MSCS offered N.H. an IEP that provided FAPE.  The IDEA, at 20 U.C.A. § 1414(d)(1)(A), requires that an IEP include, among other things:  (1) a statement of the child's present levels of performance; (2) a statement of measurable annual goals; (3) a statement of the special education and related services and supplementary aids and services to be provided to the child that, to the extent practicable, are based on peer-reviewed research; (4) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in nonacademic and extracurricular activities; (5) a statement of how the child's parents will be regularly informed of their child's progress. These "are requirements by which the adequacy of an IEP is to be judged, although minor technical violations may be excused."  Cleveland Heights-University Heights City Sch. Dist. V. Boss, 144 F.3d 391, 398 (6th Cir. 1998).

It is **CONCLUDED** that N.H.'s IEPs met or exceeded the procedural requirements of the IDEA.  MSCS's IEPs were also substantively appropriate.

The United States Supreme Court modified the test to determine whether an IEP substantively provided FAPE under the IDEA in Endrew F. v. Douglas Cnty. Sch. Dist. RE-1, 137 S.Ct. 988 (2017). For a district to substantively offer FAPE, an IEP must be reasonably calculated to enable a child to make progress appropriate in light of his circumstances. Id. At 999. An IEP should be "construed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." Id. "For a child fully integrated into the regular classroom, an IEP typically should…be 'reasonably calculated to enable a child to achieve passing marks and advance from grade to grade.'" Id., citing Bd. of Ed. Of Hendrick Hudson Central Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 203-04 (1982); see also Rowley, 137 S.Ct. at 1000 ("providing a level of instruction reasonably calculated to permit advancement through the general curriculum").

When determining the appropriateness of an IEP, "[a]ny review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." Endrew F. v. Douglas Cnty. Sch. Dist. RE-1, 137 S.Ct. 988, 999 (2017). Furthermore, an IEP is a snapshot in time. Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1041 (3rd Cir. 1993). Thus, the appropriateness of an IEP must be viewed by "what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted." Id.

MSCS thoroughly considered N.H.'s individual circumstances in developing an IEP that was reasonably calculated to enable him to make appropriate progress. It is **CONCLUDED** that the evidence shows that N.H.'s IEPs were substantively appropriate and were designed with his unique needs in mind for the purpose of providing him with access to educational services that were reasonably calculated to address both his giftedness and dyslexia.

It is **CONCLUDED** that F.H. and K.H. were afforded the opportunity to meaningfully participate in the development of the IEPs for N.H. One or both parents attended all IEP meetings and were active participants.

In general, the IDEA requires a district to ensure that at least one parent of a child with a disability is afforded the opportunity to participate in the IEP process and is informed enough to provide consent to implement an IEP. 34 C.F.R. § 300.322. The IDEA allows parent participation and involvement in meetings and in placement discussions. 34 C.F.R. § 300.501. At all times relevant to this case, MSCS not only allowed, but encouraged the parents to meaningfully participate in the development of the IEP giving their input and opinions great weight. For the purpose of the instant appeal, the only relevant IEPs are the May 21, 2021, November 9, 2021, and November 18, 2021, IEPs. F.H. and K.H. received procedural safeguards at each of the IEP meetings.

It is **CONCLUDED** that MSCS permitted and encouraged F.H. and K.H. to participate to the fullest extent of the law and, therefore, did not prevent them from meaningful participation in the IEP process.

It is **CONCLUDED** that Petitioners' unilateral private placement at Bodine is not an appropriate program under the IDEA.

The IEPs developed and proposed for N.H., by MSCS, met or exceeded the procedural and substantive requirements under the IDEA. However, assuming, *arguendo*, that MSCS failed to provide FAPE to N.H., Petitioners would still be barred from obtaining reimbursement for the cost of unilaterally placing N.H. at Bodine. The "IDEA's grant of equitable authority empowers a court to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." Carter, 510 U.S. at 12. However, the Sixth Circuit Court

of Appeals has held that a private placement is not appropriate under the IDEA "when it does not, at a minimum, provide some element of special education services in which the public school was deficient." Berger v. Medina City Sch. Dist., 348 F.3d 513, 523 (6th Cir. 2003); see also Indianapolis Pub. Sch. v. M.B., 771 F.Supp.2d 928, 930-31 (S.D. Ind. 2011) (holding that a private placement was inappropriate when it only offered tutoring services, as opposed to special education services, and did not address the student's emotional needs). Thus, evidence that a child is "doing well" in a private placement is not enough to support a claim for reimbursement when the placement fails to provide the special education services the public-school district was found to be lacking. Indianapolis Public Schools v. M.B., 771 F.Supp.2d 928 at 930-31 (S.D. Indiana 2011). Furthermore, a parent's concerns and fears do not justify a private placement at public expense. See John M. v. Brentwood Union Free Sch. Dist., No. 11-CV-3634 PKS SIL, 2015 WL 5695648, at *7-10 (E.D.N.Y. Sept. 28, 2015) (holding reimbursement for a unilateral private placement was inappropriate despite feelings of security and safety at the private school and concerns of returning the child, who suffered from anxiety and depression to an environment where he had been harassed).

Moreover, "parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk." Sch. Comm. of Burlington v. Dept. of Educ., 471 U.S. 359, 373-374. In such a situation, under the Carter standard, parents are "entitled to reimbursement only if a federal court concludes both that the public placement violated the IDEA and that the private school placement was appropriate under the Act." Carter, 510 U.S. at 15. Petitioners have failed to prove either element. One, that public placement (MSCS) violated the IDEA. Or two, that Bodine provided "appropriate" educational services pursuant to the IDEA. Therefore, the

Petitioners have failed to meet their burden to show that they should recover tuition costs of their unilateral placement of N.H. at Bodine.

Additionally, the IDEA directs that an award of private school tuition "may be reduced or denied" under a variety of circumstances, including "upon a judicial finding of unreasonableness with respect to actions taken by the parents." 20 U.S.C. § 1412(a) (10)(C)(iii)(III).

It is **CONCLUDED** that Petitioners actions in unilaterally placing N.H. in a private school setting and seeking public reimbursement were not reasonable.  It is clear based on the evidence that Petitioner's planned to enroll N.H. at Bodine prior to the last IEP meeting, that he was in fact considered a student as of September 8, 2021, the date Bodine admitted N.H. as a student and that Petitioners were simply waiting out the clock when they requested an IEP meeting be scheduled on September 24, 2021.  Petitioners sent a Withdrawal Notification to the School District on November 12, 2021.

N.H. is a student with disabilities who is entitled to receive special education and related services from qualified teachers and service providers in his least restrictive environment. F.H. and K.H. may choose to place N.H. in any private school of their choosing, including Bodine, but he is not entitled to receive public funds to reimburse him for such a placement when it is not appropriate under the IDEA. A unilateral private placement does not satisfy the IDEA unless it "'at a minimum, provide[s] some element of special education services in which the public-school placement was deficient'; for example, specific special-education programs, speech or language therapy courses, or pre-tutoring services." L.H. v. Hamilton County Dept. of Educ. 900 F.3d 779, 791 (6th Cir. 2018), quoting Berger v. Medina City Sch. Dist., 348 F.3d 513, 523 (6th Cir. 2003) (emphasis added). Thus, there must be proof of the specific areas in which the public school was deficient and that the private school specifically addressed those deficiencies; in the absence of such proof the private setting is not appropriate, and reimbursement cannot be had.

Page **32** of 33

Bodine, although designed to address N.H.'s dyslexia, provides no gifted services.  Additionally,
Bodine provides no educational framework, like an IEP, for its students.

It is **CONCLUDED** that the evidence does not support Petitioners' allegations against
MSCS or support the assertion that Bodine is an appropriate placement under the IDEA. MSCS
has offered to provide FAPE and is not obligated to provide reimbursement for an inappropriate
private placement.

It is **CONCLUDED** that Petitioners have failed to prove that MSCS denied N.H. FAPE
and have failed to prove that Bodine was an appropriate placement.

It is further **CONCLUDED** that the Petitioners have failed to carry their burden of proof.

It is **CONCLUDED** that MSCS is the prevailing party on all issues.

## POLICY STATEMENT

The policy reason for this decision is to uphold the federal and state laws pertaining to the
education of children with disabilities.

It is so **ORDERED**.

This FINAL ORDER entered and effective this the **18th day of April, 2023.**


J. SHANNON BARNHILL
ADMINISTRATIVE JUDGE
ADMINISTRATIVE PROCEDURES DIVISION
OFFICE OF THE SECRETARY OF STATE


Filed in the Administrative Procedures Division, Office of the Secretary of State, this the
**18th day of April, 2023.**

**IN THE MATTER OF:**                                                      **APD CASE No.** 07.03-230615J
**N.H., THE STUDENT, AND F.H. AND K.H., THE**
**PARENTS V. MEMPHIS-SHELBY COUNTY**
**SCHOOLS**

## NOTICE OF APPEAL PROCEDURES

### REVIEW OF FINAL ORDER

The Administrative Judge's decision in your case in front of the **Tennessee Department of Education**, called a Final Order, was entered on **April 18, 2023**.  If you disagree with this decision, you may take the following actions:

1.  **File a Petition for Reconsideration:**  You may ask the Administrative Judge to reconsider the decision by filing a Petition for Reconsideration with the Administrative Procedures Division (APD).  A Petition for Reconsideration should include your name and the above APD case number and should state the specific reasons why you think the decision is incorrect.  APD must **receive** your written Petition no later than 15 days after entry of the Final Order, which is no later than **May 3, 2023.**

    The Administrative Judge has 20 days from receipt of your Petition to grant, deny, or take no action on your Petition for Reconsideration.  If the Petition is granted, you will be notified about further proceedings, and the timeline for appealing (as discussed in paragraph (2), below) will be adjusted.  If no action is taken within 20 days, the Petition is deemed denied.  As discussed below, if the Petition is denied, you may file an appeal no later than **June 19, 2023**.  *See* TENN. CODE ANN. §§ 4-5-317 and 4-5-322.

2.  **File an Appeal:**  You may file an appeal the decision in federal or state court within 60 days of the date of entry of the Final Order, which is no later than **June 19, 2023**, by:

    (a)  filing a Petition for Review "in the Chancery Court nearest to the place of residence of the person contesting the agency action or alternatively, at the person's discretion, in the chancery court nearest to the place where the cause of action arose, or in the Chancery Court of Davidson County," TENN. CODE ANN. § 4-5-322; or
    (b)  bringing a civil action in the United States District Court for the district in which the school system is located, 20 U.S.C. § 1415.

    The filing of a Petition for Reconsideration is not required before appealing.  *See* TENN. CODE ANN. § 4-5-317.

### STAY

In addition to the above actions, you may file a Petition asking the Administrative Judge for a stay that will delay the effectiveness of the Final Order. A Petition for Stay must be **received** by APD within 7 days of the date of entry of the Final Order, which is no later than **April 25, 2023**.  *See* TENN. CODE ANN. § 4-5-316.  A reviewing court also may order a stay of the Final Order upon appropriate terms.  *See* TENN. CODE ANN. §§ 4-5-322 and 4-5-317.

**IN THE MATTER OF:**                                              **APD CASE No.  07.03-230615J**
**N.H., THE STUDENT, AND F.H. AND K.H., THE**
**PARENTS V. MEMPHIS-SHELBY COUNTY**
**SCHOOLS**

## <u>NOTICE OF APPEAL PROCEDURES</u>

### FILING

Documents should be filed with the Administrative Procedures Division by email *or* fax:

Email:  APD.Filings@tn.gov

Fax: 615-741-4472

In the event you do not have access to email or fax, you may mail or deliver documents to:

Secretary of State
Administrative Procedures Division
William R. Snodgrass Tower
312 Rosa L. Parks Avenue, 8th Floor
Nashville, TN 37243-1102