## BEFORE THE TENNESSEE DEPARTMENT OF EDUCATION DIVISION OF SPECIAL EDUCATION

| | |
|---|---|
| **IN THE MATTER OF:** | |
| **N.H., THE STUDENT, and** | |
| **F.H. and K.H., THE PARENTS,** | |
| *Petitioners,* | |
| | **APD Case No.: 07.03-230615J**. |
| **v.** | |
| **MEMPHIS-SHELBY COUNTY SCHOOLS** | |
| **Respondent.** | |

## RESPONDENT'S *PROPOSED* FINDINGS OF FACT AND CONCLUSIONS OF LAW

Respondent Memphis-Shelby County Schools ("School District") submits its Proposed Findings of Fact and Conclusions of Law as follows:

## I.  Findings of Fact:

## Background information about Petitioner K.H. and student N.H.

1. Petitioner K.H. has legal training and worked as a Solicitor in the United Kingdom before emigrating to the United States.  (V.7, 637:9-15).

2. Thereafter Petitioner K.H. obtained a master's in education at Christian Brothers University in 2005-2006.  (V.7, 637:16-23).

3. Petitioner K.H. worked as an apprentice teacher for two years until her oldest child was born in 2008.  (V.7, 637:24-638:15).

4. Petitioner K.H. became a homeschooling parent and homeschooled N.H.'s older sister all the way until the current academic school year 2022-2023. (V. 7; 638:20-639:7).

5. Until N.H. started 2nd grade, N.H.'s younger sister was also homeschooled. (V. 7; 640:7-641:2).

6. As a homeschooling parent, K.H. selected the program and curriculum to use for her children. (V.7, 646:6-8).

7. In 2016, N.H. was IQ-tested as part of an eligibility determination of intellectual giftedness under the state of Tennessee. (*See* Exhibit 1).

8. N.H.'s verbal intelligence score was 109, which was in the average range. (V.2, 252:11-20).

9. N.H.'s non-verbal intelligence score was 143, which was very high. (V.2, 253:4-5).

10. N.H.'s composite score was 129. (V.2, 252:5-8).

**The Say Dyslexia Law defines "characteristics of dyslexia" in the context of universal reading screeners.**

11. Dr. Amy Maples is the School District's Program Director in Curriculum and Instruction, and she oversees all of the curriculum, tool development, and implementation including the RTI framework. (V.9, 879:4-10).

12. Dr. Maples earned her Ph.D. in Leadership and Policy Studies, and she has been in education since 2006. (V.9, 879:11-21).

13. In 2017 Dr. Maples became professionally involved with the Say Dyslexia Law when she became an instructional advisor specifically for RTI. (V.9, 880:4-9). In that capacity, she had to become familiar with the Say Dyslexia Law to develop a system for district level implementation across all schools including ongoing education and professional development. (V.9, 880:10-19).

14. Dr. Maples led the work on the School District's implementation guide collaboratively with people from Exceptional Children, English as Second Language, and leaders in core

content areas to make sure the needs of all students could be met through the RTI framework. (880:20-881:5).

15. Dr. Maples was deemed a Rule 702 fact expert in the School District's implementation and compliance with the Say Dyslexia Law. (V.9, 881:6-882:7).

16. The School District's obligations under the Say Dyslexia Law are to screen for characteristics of dyslexia, provide dyslexia specific interventions through the RTI framework for students in Tiers 2 and 3, and communicate with parents. (V.9, 882:11-883:6).

17. RTI stands for Response to Instruction and Intervention, and it is the State of Tennessee's framework for providing high quality instruction across all Tiers – Tier 1, Tier 2, and Tier 3. The Say Dyslexia Law focuses on the framework for Tier 2 and Tier 3, which are the students that are academically at risk. (V.9, 883:7-21).

18. The Say Dyslexia Law requires that students be identified as being academically at risk for characteristics of dyslexia through a universal screener, and there are seven areas within the foundational literacy umbrella that have to be screened when a student is failing below or scoring below the 25th percentile on the universal screener. (V.9, 894:23-895:22).

19. In 2020 and 2021, the School District used Illuminate-Fastbridge as its Universal Screener under the Say Dyslexia Law. (V.9, 884:14-22).

20. N.H. scored within the 70th, 80th, and 90th percentiles on his universal screeners, and therefore the 504 or IEP process would need to come into play for N.H. (V.9, 911:7-21).

21. In 2020 and 2021, the School District used I-Ready so that teachers could screen their students for reading ability and develop lessons accordingly. (V.8, 798:25-796:17; 814:12-815:2).

22. The School District also uses I-Ready to create a student's individualized learning paths on the computer.  (V.9, 915:12-19).

23. Teachers are instructed and trained to look at diagnostic data from I-Ready because it links to all the resources that teachers need to provide the small group instruction for Tier 2 and Tier 3 students.  (V.9, 914:3-915:3).

24. Small group instruction is face-to-face instruction with generally a ratio of 1:6 students at the elementary level.  (V.9, 914:3-915:5).

25. The School District trains its intervention providers to ensure they know how to use the instructional materials from I-Ready and how to incorporate teaching that is multisensory, explicit, aligned to student, language based, and systematic cumulative (MEALS).  (V.9, 919:12-921:10).

26. As part of Dr. Maples submitting a business justification form for having employees attend the Orton-Gillingham Academy, she has had to research the efficacy of Orton-Gillingham methodology or philosophy, and there are very limited findings on its efficacy. (V.9, 929:18-930:18).

27. The State of Tennessee has not endorsed any particular methodology or philosophy for providing instruction to students that have been identified in Tier 2 or Tier 3, just a "sounds first" approach.  (V.9, 931:5-14).

**During his 2nd and 3rd grade years, N.H.'s results under the Illuminate/Fastbridge universal screener fell within the 78th-99th percentiles, and his I-Ready teacher diagnostic screeners placed him at grade level.**

28. At the start of N.H.'s second grade year in September 2020, N.H. took the I-Ready teacher diagnostic for English Language Arts, and he scored a 502, which corresponds with a 78th percentile and an overall placement at early 2nd grade.  (Exhibit 59).

4

29. In the subcategories for English Language Arts (phonological awareness, phonics/decoding, vocabulary, high frequency words, reading comprehension literature, and reading comprehension informational text), N.H. performed behind grade level in a couple subcategories, at grade level on one subcategory, and ahead of grade level on two of the subcategories.  (Exhibit 59).

30. One month later in October 2020, N.H. took the first Illuminate-Fastbridge Universal Screener and scored a 520, which placed him at the 98th percentile nationally.  (Exhibit 59).

31. Three months later in January 2021, N.H. took another I-Ready teacher diagnostic for English Language Arts, and he scored a 554, which corresponds with a 93rd percentile and an overall placement ahead of his current stage to late 2nd grade.  (Exhibit 59).

32. In the subcategory of phonics/decoding, N.H. had now reached a score of 592 or a "max score."  (Exhibit 59).

33. In the subcategory of vocabulary, he had jumped from 1st grade to late 2nd grade placement, in the subcategory of high-frequency words he stayed flat at early 2nd grade, in reading comprehension literature he stayed ahead at 3rd grade, and his reading comprehension informational text slipped a little to mid-2nd grade level.  (Exhibit 59).

34. Three months later in April 2021, N.H. took the second Illuminate-Fastbridge Universal Screener and scored a 545, which placed him at the 99h percentile nationally.  (Exhibit 59).

35. The next month during May 10-12, 2021, N.H. returned to in-person school and took the TCAP without accommodations.  (V.7, 651:20-23).

36. He scored a 381 in English Language Arts, which corresponds to the 94th percentile of Tennessee students.  (Exhibit 59).

37. One month later in June 2021, while N.H. was attending school in-person, N.H. took another I-Ready teacher diagnostic for English Language Arts, and he scored a 553, which corresponds with an 87th percentile and an overall placement in late 2nd grade. (Exhibit 59).

38. In the subcategory of vocabulary, he had jumped to 3rd grade placement, in the subcategory of high-frequency words he backslid to 1st grade, and in reading comprehension there was a divergence between his literature and informational text comprehension – early 2nd grade placement for the former but 5th grade placement for the latter.

39. At the start of N.H.'s third grade year, on August 18, 2021 N.H. took the I-Ready teacher diagnostic for English Language Arts, and he scored a 548, which corresponds with an 84th percentile and an overall placement ahead of where he was to mid-3rd grade. (Exhibit 59).

40. Three weeks later in September 2021, N.H. took the Illuminate-Fastbridge Universal Screener and scored a 508 which was at the 76th percentile. (Exhibit 4 at MSCS 3359; Exhibit 59).

41. For a student like N.H. who scored in Tier I on all his universal screeners, it would be up to the school leadership team to determine what supports can be put in place in Tier 1 and then, if needed, whether a referral to the exceptional children side is appropriate. (V.9, 950:21-951:12).

**N.H.'s 2nd Grade teacher recalls that N.H. performed at grade-level beside his peers in an optional class, and N.H.'s CLUE teacher provided after-school reading tutoring that helped him perform at the 94th percentile on his spring TCAP test.**

42. Carolyn Mendillo was N.H.'s second grade teacher, and she taught him all academic subjects – English, Math, Science, and Social Studies. (V.9, 845:25-846:9).

43. Ms. Mendillo has been a teacher at Grahamwood Elementary School for the last 24 years, she has a bachelor's degree in Education, and she is licensed to teach grades K-3rd. (V.9, 846:24-847:10).

44. Ms. Mendillo has only taught 2nd grade at Grahamwood, and she taught an optional classroom during N.H.'s second grade year. (V.9, 847:19-22; 848:5-11).

45. The optional class moves at a faster pace than the non-optional 2nd grade class, and the teachers supplement the curriculum to make it more enriched and higher level. Many of the students are reading above grade level, and many of the students are identified as intellectually gifted and attend the CLUE program. (V.9, 848:25-849:14).

46. Most of N.H.'s 2nd grade year was spent virtually. Ms. Mendillo did a lot of on-camera teaching to engage with the students for the most part of the day. (V.9, 849:20-850:6).

47. N.H. returned to in-person learning in early May, and that year school went until June 18th, 2021. (V.9, 850:23-851:6).

48. Ms. Mendillo recalls that about half of her optional students also participated in the CLUE program. (V.9, 851:10-15).

49. Ms. Mendillo recalls that N.H. worked in a learning pod with two other students, and that that pod of students was always participating in class. They would ask questions, and when it was time to share out, they would volunteer to share. (V.9, 857:2-12; 857:24-858:9).

50. Ms. Mendillo explained that at the start of 2nd grade, since students are coming from 1st grade, there is a lot of oral instruction and then learning to read directions. By the end of

2nd grade, she wants her students to be ready for 3rd grade where they read their own directions. (V.9, 858:10-859:3).

51. During that virtual year, Ms. Mendillo was not able to listen to her students read, whereas when the students are in-person she can call students one-on-one to do a reading assessment. (V.9, 859:4-11).

52. Likewise, Ms. Mendillo was not able to watch her students as they wrote, other than their writing on dry erase boards that students held up on the screen. Once N.H. returned to in-person learning in May, Ms. Mendillo noticed that N.H. was having trouble with writing. (V.9, 859:15-860:6).

53. Ms. Mendillo recalls that N.H. was performing academically in English Language Arts at the same level as his peers and that he made 100s most of the time. (V.9, 861:9-13).

54. K.H. testified that around April 2021 either she or N.H.'s second grade CLUE teacher Ms. Pankey raised that N.H. may have dyslexia based on a writing sample K.H. shared with Ms. Pankey. (V. 6, 560:4-5, 18-24).

55. Ms. Mendillo recalls that K.H. reached out about her concerns with what she was seeing at home regarding N.H.'s work or performance. In response, Ms. Mendillo spoke with N.H.'s CLUE teacher Ms. Pankey and then the school's RTI specialist Ms. Rica Davis who would be the one to do any further screening. (V.9, 861:20-863:13).

56. On April 27, 2021, Ms. Mendillo emailed Ms. Davis that "Nathaniel Hunt's mother is requesting to have him tested for dyslexia. He is a virtual student. Thank you for your help with this." (Exhibit 58).

57.    N.H. scored a 381 in English Language Arts and a 385 in Math in his 2nd Grade TCAP testing.  (Exhibit 38).

58.    On the English Language Arts subscore categories N.H. scored as follows:

Reading: Informational Text:  Similar, 5 of 6;
Reading: Literature: Higher, 6 of 6;
Listening: Informational Text: Higher, 8 of 8
Writing: Informational Text: Lower, 3 of 5
Foundational Literacy: Similar: 29 of 39
Fluency: Higher, 5 of 5

(Exhibit 38).

59.    N.H. received no accommodations when he took the TCAP test in May 10-12, 2021.  (V.7, 651:20-23).

60.    On or around May 18, 2021, Ms. Rica Davis made arrangements to screen N.H. after he returned to in-person learning.  (Exhibit 58).

61.    The results of that screening showed that N.H. scored 44th percentile in CBM reading, 32nd percentile in letter sounds, 34th percentile in word segmenting and 36th percentile in nonsense words. (Exhibit 62 at MSCS 0208).  This screening was administered without accommodations. (Exhibit 62 at MSCS 0208).

62.    In spring 2021, N.H.'s 2nd Grade CLUE teacher Ms. Pankey volunteered to tutor N.H.  (V.7, 653:1-654:8).

63.    Ms. Pankey did not provide N.H. with Orton-Gillingham style tutoring. (V. 7, 653:21-25).

64.    Petitioner K.H. credited Ms. Pankey's after school reading lessons to N.H.'s TCAP scores. (Exhibit 39).

65.    N.H. did not begin tutoring with Michelle Brown until May 17, 2021.  (V.7, 657:2-15).

66.     Michelle Brown was not an Orton-Gillingham associate level instructor when she began

tutoring N.H., and she was fulfilling her practicum hours by tutoring N.H.  (V.7, 659:1-12).

67.     Following the administration of the dyslexia screening, N.H.'s IEP team met on May 21,

2021. (Exhibit 62).

68.     K.H. explained to the May 21, 2021 IEP Team that she supervised N.H. at home during

N.H.'s virtual school experience.  (Exhibit 62 at MSCS 0208).

69.     Regarding N.H.'s high Illuminate/Fastbridge screening results, K.H. stated to the May 21,

2021 IEP Team that she "read the questions and answer choices only, and Nathanial made his

answer choices independently." (Exhibit 58 at MSCS 0208).

**N.H.'s 3rd grade teacher recalls that N.H. performed at grade-level with his accommodations
but that his writing needed a classroom strategy.**

70.     Carin Fuller was N.H.'s third grade English Language Arts teacher.  (V.8, 766:3-7).

71.     Ms. Fuller joined the School District in October 1993, she has a bachelor's degree in

Elementary Education and a Master's degree in Administration and Supervision, and she is

licensed to teach grades 1-8.  (V.8, 766:9-22).

72.     Ms. Fuller has taught 1st, 3rd, 4th, 5th, and 7th grades, and she has taught 3rd grade for about

7 years.  (V.8, 766:23-767:22).

73.     The optional program at Grahamwood is a program of enriched academics that moves at

an accelerated pace.  In English Language Arts, that means more outside book studies and book

projects, and the teacher may pull text that is above grade level when teaching a grade-level

standard.  (V.8, 768:5-6).

74.    Ms. Fuller taught N.H. all of English language arts, spelling, grammar, writing, reading, and social studies.  A different teacher, Ms. Young, taught N.H. math and science.  (V.8, 768:17-769:4).

75.    On August 12, 2021, Ms. Fuller emailed Grahamwood's guidance counselor to discuss clarifying N.H.'s accommodations that were in his IEP.  (Exhibit 49).

76.    That academic year, approximately 70-75% of Ms. Fuller's optional students were also identified as intellectually gifted and received CLUE services.  (V.8, 770:12-20; 771:24-772:5).

77.    Ms. Fuller explained that she will typically spend two weeks teaching a standard.  She starts with explaining the vocabulary around that standard.  Then she will do the work in front of her students while they watch.  Then the teacher and the students will do the work together.  Then the students will do the work in groups.  Finally, the students will do the work individually.  At the conclusion of the two-weeks there may be a written assignment or a teacher assignment on the I-Ready platform.  (V.8, 773:22-774:25).

78.    Ms. Fuller explained that the purpose of group work is to see the students' thought processes in arriving at their answers and to gauge their understanding.  Group work also gives students another opportunity to grasp the material from their peers if it did not connect for them earlier.  (V.8, 775:5-18).

79.    Ms. Fuller found that her students needed challenge to stay engaged, and she might provide a challenge by using a text with a higher reading difficulty.  (V.8, 775:23-776:19).

80.    Ms. Fuller recalls that N.H. was a very polite, well-behaved and respectful student who seemed eager to learn and who would do his work without needing to be reminded.  (V.8, 776:20-777:4).

81.    Ms. Fuller recalls that N.H. volunteered answers, and she remembers him volunteering during whole group sessions.  (V.8, 777:5-22).

82.    Ms. Fuller recalls that N.H.'s diagnostic tests were on grade-level.  (V.8, 777:23-778:4).

83.    Regarding N.H.'s reading work, Ms. Fuller recalls one occasion where she called on N.H. to explain the text support for an answer he gave, and N.H. was able to identify the paragraph and read the paragraph.  (V.8, 778:5-12).

84.    The State of Tennessee expectation is that by year-end of third grade, students can write one cohesive paragraph on a topic after reading a text.  Ms. Fuller recalls that N.H. could come up with ideas but it was a challenge to get sentences on the paper.  (V.8, 778:13-780:2).

85.    When N.H. turned in a writing assignment that Ms. Fuller did not regard as being on standard, she called him up individually, asked what he was trying to communicate, and then would do shared writing whereby Ms. Fuller would ask N.H. what sentence he was trying to write and she would write the number of lines necessary for that sentence.  (V.8, 780:3-19).

86.    Ms. Fuller recalls that N.H. understood what she was trying to do and was able to write the sentences.  (V.8, 780:20-781:2).

87.    Based on the teacher diagnostic screening, Ms. Fuller recalls that the majority of her students were on grade-level, with a handful of students perhaps a grade level ahead and 2-3 students a grade level behind.  (V.8, 781:14-782:1).

88.    Ms. Fuller recalls that N.H. was on grade level on the screeners.  (V.8, 782:2-4; Exhibit 59).

89.    Ms. Fuller was aware that N.H. had accommodations for read aloud and extended time. (V.8, 782:5-21).

90.    Ms. Fuller implemented read aloud through the immersive reader that had that option built in and by using an outside website that was used for reading texts that had that option built in. Additionally, if N.H. turned in an assignment where it seemed he may not have understood something, Ms. Fuller would have N.H. read it to her and then go from there. (V.8, 784:20-785:15).

91.    On September 22, 2021, Petitioner K.H. also requested that Ms. Fuller make additional modifications and accommodations for N.H. that were not contained in the May 2021 IEP Addendum, with which Ms. Fuller complied.  For example, K.H. wanted Ms. Fuller to test N.H. on the spelling words that N.H. was learning in private tutoring rather than the spelling words that Ms. Fuller assigned.  (Exhibit 51).

92.    Ms. Fuller offered to reduce the number of spelling words N.H. was tested on to 10 instead of the 16 to 20 the other students were tested on.  (V.8, 792:4-25; 794:14-25).

93.    On September 20, 2021, Petitioners wrote an email requesting that the teacher provide clean, preferably editable digital copies of all PowerPoint slides, lesson guides, note taking prompts, and study guides so that K.H. could edit them and have them ready for N.H. to use in class. (Exhibit 53).

94.    Ms. Fuller responded with what categories of document could be provided earlier and which ones would be difficult to provide. (Exhibit 55).

95.    Ms. Fuller also remembers implementing extended time. (V.8, 785:18-786:1).

96.    N.H. would have taken the August 2021 screener without a read-aloud accommodation to get a true indicator of what his performance was and to help with instruction.  (V.8, 816:4-21).

97.   Ms. Fuller's teaching involves students giving answers with pen and paper, giving answers out loud, working on multimedia projects, and all of these approaches constitute a multisensory approach to teaching.  (V.9, 934:8-25).

**Petitioners were admitted to Bodine School on September 8, 2021, and then pushed for a psycho-educational evaluation beginning on September 14, 2021.**

98.   On August 25, 2021, Petitioners F.H. and K.H. submitted an application for N.H. at the Bodine School.  (Exhibit 16).

99.   Petitioners' application affirms that N.H. has never had a formal diagnosis of dyslexia. (Exhibit 16).

100.   On September 5, 2021, K.H. texted Ms. Pankey that N.H. will visit the Bodine School this week for assessments.  (Exhibit 44).

101.   On September 8, 2021, Bodine School administered admissions testing to N.H.  (V.4, 355:19-356:14).

102.   That same day of September 8th, Bodine School admitted N.H. to its 3rd grade program. (Exhibit 17).

103.   Bodine School requires a $500.00 tuition deposit to enroll.  (Exhibit 17; V.4, 381:11-21).

104.   Bodine School instructors have Orton-Gillingham branded teaching certifications.  (V.4, 383:4-6).

105.   On September 13, 2021, Petitioner K.H. toured Bodine School to observe instruction according to the Orton-Gillingham philosophy.  (Exhibit 18).

106.   Orton-Gillingham is a philosophy or methodology of instruction.  There is no such thing as an Orton-Gillingham curriculum.  (V.4, 382:18-383:12).

107.   The next day on September 14, 2021, Petitioner K.H. sought to move up N.H.'s re-evaluation meeting to the earliest date possible within the 10 day notice timeframe.  K.H.

texted N.H.'s 3rd grade CLUE teacher Lisa Ziegler that "Hi, I have some questions about N.H.'s IEP reevaluation. I believe that it is due this year. Due to family scheduling conflicts, I would to to [sic] have it on Friday, September 24th." (Exhibit 43).

108. On September 16, 2021, Petitioners submitted a complete financial aid application to Bodine School. (Exhibit 19).

109. The next day on September 17, 2021, Bodine School offered Petitioners a financial aid package. (Exhibit 20).

110. On September 20, 2021, Petitioners wrote an email to N.H.'s teachers, principals, and CLUE representative regarding setting out in its second full paragraph that N.H. has now been identified as a student with a specific learning disability in the area of dyslexia. (Exhibit 50).

111. On September 20 and 21, 2021, Petitioner K.H. and Ms. Fuller exchanged several emails about scheduling N.H.'s re-evaluation meeting for when Ms. Fuller could be present because Ms. Fuller was on leave at the time and because Ms. Fuller's input and understanding of the expectations would be necessary for any strategies to be successfully implemented. (Exhibit 54).

112. On September 21, 2021, Petitioner K.H. wrote a letter to April Ebbinger in which K.H. indicated that the School District was about to breach the law. (Exhibit 7).

113. Also on September 22, 2021, CLUE teacher Sherry Coates indicated that she would pull N.H. from class tomorrow to complete the TN Teacher Observation Questionnaire for Dyslexia. (Exhibit 52).

114. On September 24, 2021, N.H.'s IEP team convened and on September 29, 2021 re-convened. (Exhibits 4 and 5).

115. Dr. Mary Berk had recommended that the School District re-do cognitive testing as part of N.H.'s evaluation for specific learning disability, but Petitioner K.H. did not want to do that because if N.H. scored lower than he did originally, it might jeopardize his participation in the gifted program.  (V.2, 249:6-25).

116. On September 26, 2021, K.H. emailed Dr. Berk and others identifying that the purpose of the reconvening on September 29th would be to determine what evaluation needs to be completed in the suspected disability classification, to determine if N.H. has a secondary disability, and to discuss classroom accommodations for N.H.  (Exhibit 8).

117. On September 28, 2021, Ms. Fuller filled out a Gifted Reevaluation Parent and Teacher Input Form that identified his weaknesses as "Nathaniel struggles with spelling and writing assignments."  She wrote "Mostly" under the question about whether the student's current educational program meets his/her needs.  Ms. Fuller added that "The area of concern with spelling and writing needs a strategy."  (Exhibit 56).

118. The outcome of the September 29th IEP meeting was that N.H. would maintain his eligibility for intellectual giftedness and that he would be evaluated in the area of specific learning disability.  (Exhibit 4 and 5).

119. To evaluate a student for a specific learning disability under Tennessee requirements, the School District must gather both direct and indirect teacher observations.  (V.2, 255:15-256:8).

**The School District's psychologist found that N.H. had characteristics of dyslexia, and it would be the decision of the IEP team as to whether N.H. had a specific learning disability.**

120. On October 12, 2021, Ms. Burke conducted a psycho-educational evaluation of N.H. (Exhibit 1; V.1, 82:20-24).

121. Ms. Re'khel Burke has a B.S. in Science, M.S. in Science and Psychology, and an Ed.S. She obtained all three degrees from Middle Tennessee State University (MTSU). (V.1, 63: 24-64:14).

122. As part of her M.S. degree, Ms. Burke's curriculum included a semester-long course on the psychological assessments given for each of the learning disabilities under the IDEA and Tennessee law. (V.1, 67:19-68:25).

123. Ms. Burke did a two-year graduate assistantship with the MTSU's Center for the Research and Study of Dyslexia. (V.1, 69:16-19; 70:3-5).

124. As a graduate assistant, Ms. Burke assessed children for characteristics of dyslexia, which included interviewing parents, administering assessments, and attending meetings to discuss her findings. (V.1, 70:6-12).

125. While at MTSU's Dyslexia Center, Ms. Burke would not have diagnosed children as having a specific learning disability because that diagnosis is only done in a school setting. (V.1, 75:20-71:1).

126. Ms. Burke was a licensed school psychologist at the time she conducted the evaluation. (V.1, 122:20-22).

127. Ms. Burke is deemed to be a fact-expert under Rule 702. (V.1, 122:9-14).

128. Normally an evaluation for specific learning disability in the area of dyslexia would include a cognitive assessment in order to rule out any cognitive deficit. (V.1, 92:20-93:1).

129. Ms. Burke did not conduct cognitive testing on N.H. because parent K.H. did not give consent for it. (V.1, 123:7-12).

130. Ms. Burke tested N.H.'s academic ability with the Weschler Individual Achievement Test (WIAT).   N.H. scored "Above Average" in Reading Comprehension subtest and scored better than 99% of third graders administered that reading passage.  (Exhibit 1, pp. 5, 9).

131. N.H. also scored "Above Average" in Listening Comprehension and scored better than 96% of third graders administered that subtest.  (Exhibit 1, pp. 5, 9).

132. N.H. scored "Average" in Pseudo-Word Decoding, Oral Reading Fluency, and Spelling. (Exhibit 1, p. 5).

133. N.H.'s Pseudo-Word Decoding score was the grade equivalent to 2nd grade, his Oral Fluency score was equivalent to 3rd grade, and his Spelling score was equivalent to mid-2nd grade.  (Exhibit 1, p. 9).

134. Under the WIAT, his total reading and basic reading abilities fell in the "Average" range while his reading comprehension and fluency was in the "Above Average" range.  (Exhibit 1, p. 9).

135. Ms. Burke tested N.H.'s memory with the Wide Range Assessment of Memory (WRAM). N.H.'s attention and concentration was "Above Average."   N.H.'s general memory, working memory, and visual memory testing results came back with scores of "Average." (Exhibit 1, p. 5).

136. Ms. Burke tested N.H.'s core phonics ability with the CORE Phonics Survey.  N.H. met benchmarks for certain phonics sounds, was just below benchmark in certain phonics sounds, and in 3-4 phonics sounds needed strategic intervention.  (Exhibit 1, p. 9; V.1, 132:15-137:1).

137. Ms. Burke administered the Developmental Spelling Analysis (DSA), and N.H. scored in the frustration range, which indicates he would need intervention.  (Exhibit 1).

138. Ms. Burke's report indicated that N.H. had characteristics of dyslexia and that the IEP team should review the report to make a determination about specific learning disability. (Exhibit 1, p. 8).

**In October and early November 2021 the IEP team convened to decide that N.H. would be made eligible for SLD.**

139. On October 18, 2021, Petitioner K.H. and private tutor Michelle Brown were deciding what his goals should be for his IEP. (Exhibit 41; V.7, 666:22-667:5).

140. Petitioner K.H.'s proposed long-term goals for N.H. was having him reading at 100% in all areas. (Exhibit 41).

141. Outside of the report, and at the request of Petitioners, Ms. Burke made a series of recommendations for accommodations and modifications to the IEP for the IEP team to consider. (V.1, 112:6-113:21; 115:17-20).

142. On October 24, 2021, the IEP team met to determine N.H.'s eligibility for specific learning disability. (Exhibit 6; V.2, 258:15-18).

143. Ms. Burke participated in the IEP meeting for N.H. (V.1, 115:4-16).

144. Ms. Burke did not believe that N.H. had severe enough characteristics of dyslexia to meet the eligibility criteria for specific learning disability (SLD) in the area of dyslexia. (V.1, 135:12-136:2).

145. Ms. Burke also did not believe that N.H. met Tennessee's standards for SLD because there was no period of time where N.H. received interventions to be able to rule out whether interventions were effective. (V.1, 138:1-20).

146. The judge found that Dr. Berk had testified about being threatened with an ethics complaint. (V.2, 284:16-21).

147. Dr. Berk made a recommendation to the IEP team that N.H. should be considered SLD. (V.2, 285:1-5).

148. Dr. Berk's recommendation was not because Petitioners had threatened an ethics complaint or because Petitioners contacted the State of Tennessee. (V.2, 285:1-8).

149. Dr. Berk made her recommendation based on her belief in what Petitioner K.H. was saying about her being genuinely concerned for her son, and therefore Dr. Berk was willing to bend the rules slightly and make him eligible. (V.2, 285:6-20).

150. Dr. Berk was deemed a Rule 702 fact expert in the area of school psychology in this case. (V.2, 240:2-16).

151. The IDEA delegates setting the criteria for each of the IDEA eligibility categories to the states. (V.2, 243:23-244-5).

152. Prior to the RTI2 model, the State of Tennessee followed the discrepancy model. (V.2, 243:20-22).

153. Dr. Berk explained that the Response to Intervention and Instruction (RTI2) model is the whole way that the School District is teaching children and also a way to make targeted remediation available before somebody needs to get labeled as having that condition. (V.2, 241:10-243:20).

154. Under the RTI2 model, in order to identify a student with a specific learning disability (SLD), you have to have some intervention, you have to have some monitored progress, and you have to show there's a negative educational impact. (V.2, 244:17-245:6).

155. In N.H.'s case, the School District did interventions and progress monitoring simultaneously with the testing so that testing was not delayed. (V.2, 245:8-21).

156. On October 27, 2021, Petitioner K.H. emailed Dr. Berk and others and stated "Neither my husband nor I wish to preempt any decisions that the team will make. However, for the sake of expedience and in an attempt to consolidate IEP meetings, it would be sensible for the team to proceed on the presumption that there will be a finding of a secondary specific learning disability, namely dyslexia." (Exhibit 9).

157. The State of Tennessee considers it predetermination if you indicate that the data fits within the criteria for a disability prior to convening an IEP meeting with the IEP team. The State advises school districts not to proceed on suspicions because that is predetermination. (V.2, 271: 20-272:6).

158. On October 29, 2021, Petitioner K.H. emailed Dr. Berk and others about Dr. Berk's State of Tennessee guidance on determining specific learning disability not having any reference to gifted students with secondary disability and therefore not being relevant to N.H.'s determination. (Exhibit 10).

159. On October 29, 2021, an IEP meeting was held to interpret the results of N.H.'s evaluation.

160. The IEP team determined that N.H. had the disability of SLD. (V.1, 135:6-11).

**In November 2021, the IEP team met again and there was debate about what services N.H. needed to address his intellectual giftedness, his desire and interest to be with grade-level peers, and his SLD.**

161. On October 31, 2021, Petitioner K.H. emailed Dr. Deborah Harris and Dr. Berk and others about the upcoming IEP meeting. (Exhibit 11).

162. On November 1, 2021, Petitioner K.H. texted Michelle Brown regarding strategy for the upcoming November 9, 2021 IEP meeting. (V.7, 675:4-11).

163. Petitioner K.H. texted Ms. Brown that "I might hold off on your OG qualifications only because I may have shot myself in the foot.  I told the ELA I wanted him to receive tutoring by an OG certified person. The fact that you did RTI will definitely be something that we can use to N.H.'s advantage and the fact that you have been tutoring him so far." (Exhibit 42).

164. On November 5, 2021, Ms. Fuller emailed CLUE Supervisor Jennifer Chandler about what push-in services for N.H. might look like.  (Exhibit 57).

165. Dr. Luckett testified that N.H.'s IEP Team discussed multiple options to serve N.H. (V.11, 1032:20-1034:21; Exhibit 61 at MSCS 0307-0308).

166. The School District offered small group instruction in a special education setting where N.H. would be grouped with similarly-situated peers, who were working on the same areas of academic deficit that N.H. would be working to address. (V.11, 1063:1-10).

167. During the IEP meeting, the School District declined to name a specific program for N.H. in his IEP because it took into account the student's unique circumstances: that he was an intellectually gifted student who was succeeding in a challenging general education environment with Tier-1 level instruction, despite having been identified as a student with both Intellectual Giftedness and SLD, and despite missing time from the general education classroom to receive CLUE services.  (V.11, 1056:4-25).

**On November 12th, Petitioners' submitted a Withdrawal Notification and unilaterally placed N.H. at Bodine School.**

168. Bodine School considered N.H. a good fit for the school based on his diagnosis of having SLD, which the parents had indicated to Bodine they were in the process of getting.  (V.4, 423:8-424:15).

169. On November 12, 2021, Petitioners sent a Withdrawal Notification to the School District. (Exhibit 45).

170. On November 17, 2021, K.H. texted Ms. Pankey that "We are well, just waiting for our notice period to expire so that we can place N.H. in a school with appropriate accommodations.  But we have one more IEP meeting scheduled for tomorrow." (Exhibit 46).

171. On November 22, 2021, K.H. texted Michelle Brown that "This may be our last session. Hopefully, not our last meeting before N.H. starts at Bodine."  (Exhibit 47).

172. On November 27, 2021, Petitioners made the $500.00 tuition deposit to enroll N.H. at Bodine.  (Exhibit 21).

173. On November 29, 2021, Bodine School introduced Petitioners to N.H.'s new third grade teacher. (Exhibit 22).

174. On December 1, 2021, N.H. started attending Bodine School.  (V.4, 409:10-12).

**<u>Bodine School only serves students with dyslexia, and its curriculum does not meet Tennessee's grade level standards.</u>**

175. In 2021, Bodine School had two second grade classes, three third grade classes, and two upper elementary classes.  (Exhibit 27; V.4, 402:16-403:5).

176. Bodine's largest application pool by far is for the 3rd grade program.  (V.4, 403:22-404:5).

177. Bodine teaches only three academic subjects - reading, writing, and mathematics.  (V.4, 421:3-7).

178. Bodine does not offer science or social studies curriculum. (V.4, 421:3-7).

179. Bodine's curriculum for 3rd and 4th grade includes teaching a set of high-frequency words for each grade.  (Exhibits 23 and 24).

180. Bodine does not use Individual Education Plans (IEPs). (V.4, 425:16-21).

181. Bodine does not offer Intellectually Gifted services. (*See id.*).

182. N.H. knew half of the third-grade high frequency word list when he began at Bodine. (Exhibit 28).

183. Bodine's math curriculum for 4th graders in January 2023 included word problems requiring addition, multiplication, and division.  (Exhibit 25; V.4, 391:3-392:12).

184. N.H.'s 4th grade class at Bodine is the high class, and it would have been reading the Pocahontas narrative.  The other 4th grade classes at Bodine would not be able to read that Pocahontas narrative.  (Exhibit 25; V.4, 393:3-21)

185. Bodine has not been able to improve N.H.'s ability in the area of phonics/decoding.  In fact, N.H.'s decoding ability has remained flat to slightly declining from the time N.H. left the School District and joined Bodine through his most recent test scores.  This is evidenced by N.H.'s Winter 2021 scaled score of 94 at the 35th percentile, his Spring 2022 scaled score of 94 placing him in the 35th percentile, his Fall 2022 scaled score of 96 placing him in the 39th percentile, and his Winter 2022 scaled score of 91 placing him in the 27th percentile.  (Exhibits 12 and 13 at p. 4; V.4, 357:6-358:7; 360:10-363:2).

186. Consistent with N.H.'s flat to slightly declining performance on decoding, on April 11, 2022, K.H. emailed N.H.'s third grade teacher Lisa Grant that N.H. struggles with decoding.  K.H. wrote that "He explained that he is able to work it out in class because he usually goes last and watches everyone else, but even then he still needs help.  When we looked at it today, after saying "rabbit" "tiger" "camel" and "turtle", he said that he

really didn't know what to do. I explained that it was important for you to know where he struggles so that he can get help." (Exhibit 48).

187. Bodine initially helped N.H. improve his high frequency words/sight word efficiency, but his ability has remained flat over the last year. N.H.'s ability in the area of high frequency words/sight word efficiency started out in the "Below Average" range in Winter 2021 and improved to the "Average" range in Spring 2022 where it has remained static ever since, as evidenced by N.H.'s Winter 2021 scaled score of 84 at the 14th percentile, his Spring 2022 scaled score of 96 placing him in the 39th percentile, his Fall 2022 scaled score of 93 placing him in the 32nd percentile, and his Winter 2022 scaled score of 94 placing him in the 35th percentile. (Exhibits 12 and 13 at p. 4, V.4, 363:3-365:3).

188. Bodine has not changed N.H.'s knowledge of grade-level vocabulary because N.H.'s ability has been consistent from the time he left the School District and entered Bodine through his most recent testing period. (Exhibits 12 and 13 at p. 4, V.4, 365:4-366:24).

189. N.H. still has some anxiety related to school since being at Bodine. (V.7, 688:21-24).

190. N.H. does not always understand everything that is happening at Bodine. (V.7, 688:25-689:3).

191. In summer 2022, Petitioner K.H. bartered with Michelle Brown over the cost of tutoring N.H. as part of Bodine's summer requirement. (V.7, 660:15-24).

192. In June 2022, Michelle Brown was still not an Orton-Gillingham certified instructor. (Exhibit 40; V.7, 661:14-662:16).

193. Bodine is not providing grade-level, Tier 1 instruction to N.H. (Exhibit 24 "Adverb-Adjective Sort" at "Level 2").

194. Bodine's "high frequency words" lists for third grade and fourth grade are not grade level instruction. (V. 11, 1068:1-1069:4; Exhibits 23 and 24).

195. All students at Bodine have dyslexia, and there are no non-disabled students at Bodine. (V. 4, 423:9-18).

## II.    Legal Conclusions

### A. The School District Fulfilled Its "Find" Duty.

196.    To show a procedural violation of the "child find mandate," Petitioners have the burden of proof to show that "…school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for deciding not to evaluate." *Ja. B. v. Wilson Co. Bd. of Educ.*, 61 F.4th 494, 502 (6th Cir. 2023)(citing *Bd. of Educ. of Fayette Cnty. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007)).

197.    For a student to be eligible to receive benefits as a disabled child under the IDEA, "three criteria must be met: (1) the child must suffer from one or more of the *categories* of impairment delineated in the IDEA, (2) the child's impairment must adversely affect his educational *performance*, and (3) the child's qualified impairment must require special education and related services." *Jackson v. Nw. Local Sch. Dist.*, No. 1:09-CV-300, 2010 WL 345322, at *6 (S.D. Ohio Aug. 3, 2010), *report and recommendation adopted*, No. 1:09-CV-300, 2010 WL 3474970 (S.D. Ohio Sept. 1, 2010) (emphasis added). Thus, the fact that a child may have a qualifying disability does not necessarily make him "a child with a disability" eligible for special education services under the IDEA. *Id.*

198.    The child must also need special education and related services. *A.P. ex rel. Powers v. Woodstock Bd. of Educ.*, 572 F. Supp. 2d 221, 225 (D. Conn. Aug. 19, 2008), *aff'd*, 370 Fed. App. 202 (2nd Cir. 2010).  "[A] child 'needs special education' if he cannot attain educational standards

in the general education environment." *J.M. v. Summit City Bd. of Educ.*, No. CV1900159KMESK.
2020 WL 6281719, at *10 (D.N.J. Oct. 27, 2020) (citing *Durbow v. Cobb Cnty. Sch. Dist.*, 887
F.3d 1182, 1194-95 (11th Cir. 2018).

199.    Accordingly, "to violate child find, the school district must have been on notice not only
of the student's disability but also of the student's need for special education services." *Northfield
City Bd. of Educ. v. K.S. on behalf of L.S.*, No. CV 19-9582 (RBK/KMW), 2020 WL 2899258, at
*9 (D.N.J. June 3, 2020); *A.P.*, 572 F. Supp. 2d at 255 (citing 29 U.S.C. § 1412(a)(3)(A)) (holding
that the child find provision itself applies only to children with disabilities "who are in need of
special education and related services.").

200.    Whether a child find violation has occurred is fact-intensive inquiry. *Ja. B. v. Wilson Co.
Bd. of Educ.*, 61 F.4th 494, 502 (6th Cir. 2023) (citing *Spring Branch Indep. Sch. Dist. v. O.W. ex
rel Hannah W.,* 961 F.3d 781, 794 (5th Cir. 2020)).

201.    When conducting a fact-intensive inquiry, courts should consider, among other things, the
amount of time the observed behavior indicated that a possible disability occurred, usually over a
number of years. *Ja. B. v. Wilson Co. Bd. of Educ.*, 61 F.4th 494, 502 (6th Cir. 2023) (citing *L.M.*,
478 F.3d at 313-14 & *N.G. v. Dist. of Columbia*, 556 F. Supp. 2d 11, 18, 24, 26-27 (D.D.C. 2008)).

202.    For example, D.C. District Court found that when a student had been with a school district
for 10 years, where the student had been hospitalized in her ninth and tenth grade years and the
school district had knowledge of both hospitalizations, knew of a dramatic change in the student's
academic performance, and knew of a dramatic change in the student's academic performance,
and knew of the student's formal diagnosis of ADHD depression, the LEA violated the child find
requirement by failing to evaluate. *Ja. B. v. Wilson Co. Bd. of Educ.*, 61 F.4th 494, 503 (6th Cir.
2023)(citing *N.G. v. District of Columbia*, 556 F. Supp. 2d 11, 18, 24, 26-27 (D.D.C. 2008)).

203.     In this case, the School District determined that K.H. was a student with an IDEA disability

in the form of a Specific Learning Disability (SLD) in the area of basic reading on November 4,

2021, Fall Semester of his third-grade year. (Exhibit 6). The Court concludes that the School

District did not violate its obligation under the IDEA to identify or evaluate N.H. in making this

determination, nor did the School District delay in evaluating N.H.

> i.      **The nature of dyslexia makes it difficult to identify, especially in Intellectually Gifted students.**

204.     "[A] school's failure to diagnose a disability at the earliest possible moment is not per se

actionable, in part because some disabilities 'are notoriously difficult to diagnose and even experts

disagree about whether [some] should be considered a disability at all.'" *Ja. B. v. Wilson Co. Bd.

of Educ.*, 61 F.4th 494, 502 (6th Cir. 2023) (quoting *D.K. v. Abbington Sch. Dist.*, 696 F.3d 233,

249 (3d Cir. 2012)).

205.     Dyslexia is spectrum disorder. (V. 5 498:17-500:7). Not all students with dyslexia have a

specific learning disability. (*Id.*; V. 5, 499:25-500:9). Part of determining whether a student has a

specific learning disability is evaluating whether there is an adverse educational impact resulting

from their disability. (V. 5, 499:17-500:70.)

206.     Students who have intellectual giftedness, as defined as a composite IQ of 122 or greater,

are more likely to be able to compensate using their intellectual giftedness to show a higher level

of academic performance. (V. 5, 491:8-15; V. 5, 495:7-11).

207.     The incidence of Intellectual Giftedness and dyslexia is believed to occur in 1% of the

general population. (V.3, 298:22-299:4)

208.     When a student has a high level of academic performance, it is more difficult to identify

indicators of dyslexia. (V.5, 495:7-498:16.

209.    Bodine, a private school that exclusively serves students with dyslexia, does not require its first-grade students to have dyslexia diagnoses for admission because psychologists are hesitant to give dyslexia diagnoses because they do not want to "label" students. (V. 2, 323:2-7).

210.    Third-grade is the grade in which Bodine has the highest applicant pool because third-grade literacy curriculum is more demanding than second grade and dyslexia is a literacy and language problem. (V. 2, 404:6-14).

211.    Prior to the September 29, 2021 determination that N.H. should be evaluated for SLD, there was no clear indication that N.H. that dyslexia was causing an adverse impact on his education such that N.H. required special education supports or services. *See Northfield City Bd. of Educ. v. K.S. on behalf of L.S.*, No. CV 19-9582 (RBK/KMW), 2020 WL 2899258, at *9 (D.N.J. June 3, 2020); *A.P.*, 572 F. Supp. 2d at 255 (citing 29 U.S.C. § 1412(a)(3)(A)) (holding that the child find provision itself applies only to children with disabilities "who are in need of special education and related services.").

212.    N.H. was an Intellectually Gifted student, under the Tennessee disability standards, and he was enrolled in a competitive optional school program at Grahamwood Elementary School. (V.2, 274:25-275:11).

213.    N.H.'s optional school program admittance required that he read in at least the 80th percentile for reading. (V.2, 274:25-275:4).

214.    N.H. entered the optional program in his first-grade year, School Year 2019-2020, and he maintained his admission in the optional program through the date that his parents withdrew him from the School District. (V. 7, 646:17-20; V. 8, 766:3-7).

215.    Although N.H.'s parents testified that he struggled with reading, taking into account N.H.'s overall academic performance, including his universal screening scores and diagnostic scores, his

ability to compensate for his dyslexia as a student with composite IQ of 129, his high reading comprehension scores, and the nature of dyslexia as a spectrum disorder, the weight of the evidence does not show that the School District overlooked clear signs of disability and was negligent in failing to order testing.

ii.     **The School District's provision of tutoring is not a "child find" violation.**

216.    Likewise, the School District's provision of before and after school tutoring for N.H. during his first and second grade year of school is not determinative of whether the School District overlooked clear signs of a disability.

217.    A school does not violate its child-find responsibility by first attempting other interventions for a student instead of immediately referring a student for an evaluation. *Ja. B. v. Wilson Co. Bd. of Educ.*, 61 F.4th 494, 502 (6th Cir. 2023) (citing *L.M.*, 478 F.3d at 313-314; *D.K.*, 696 F.3d at 249, 252)).

218.    A school district's provision of specialized reading instruction to ensure that a student maintains progress or even catches up with grade-level standards does not mean that school district has overlooked clear signs of disability, especially when a student is maintaining grade level standards, as was N.H. *See L.M.*, 478 F.3d at 314 (holding that the school district did not fail to identify a student in grades kindergarten through second grade where the school "provided additional services designed to aid T.D. in catching up to his peers in kindergarten and first grade, even though at that point he was not identified as being disabled within the meaning of the IDEA.").

219.    Ms. Pankey tutored N.H. twice a week for about an hour each session. (V. 6, 558:7-559:6). Ms. Pankey provided this tutoring while N.H. was in his COVID-19 virtual learning pod during his second-grade year between November 2020 and April 2021. *Id.*

220.    At the time that Ms. Pankey tutored N.H. after school, Ms. Pankey was employed by MSCS. (V. 7, p. 653:5-20). Ms. Pankey did not charge Petitioners for the November 2020-April 2021 after-school tutoring, even though Ms. K.H. offered to pay Ms. Pankey for tutoring N.H. (V. 6, p. 560:18-24).

221.    Ms. K.H. saw some improvement from Ms. Pankey's tutoring. (V. 6, 558:25-559:2).

222.    Although, the request for and provision of tutoring *could* indicate that N.H. had a disability, the provision of tutoring does not prove that the School District overlooked clear signs of disability, especially when considering that N.H. showed academic performance sufficient to maintain his enrollment in Grahamwood's optional program (V. 1, 54:13-55:3), that all students have different strengths and weaknesses (V. 2, 218:11-14), and that students with composite IQ scores of 122 or greater have the ability to compensate for dyslexia in such a way that their academic performance may not show an adverse impact. (V. 5, 491:8-15; V. 5, 495:7-11).

### iii.    The School District was sufficiently trained to identify N.H.

223.    Petitioners appear to argue that the School District did not train on how to identify students with dyslexia or characteristics of dyslexia, and this resulted in a delay in identifying N.H. as a student with Specific Learning Disability in the area of basic reading (i.e., dyslexia that was severe enough to qualify for a specific learning disability). The Petitioners' proof, however, does not support this contention.

224.    Dr. Berk, one of the School District's managing psychologist and a fact-expert in this case, testified that she is required have 64 hours of professional in-service training, and that she meets virtually every two weeks with the Director of Psychology for the Tennessee Department of education. (V. 2, 171:19-172:10) Dr. Berk also testified that when the Tennessee Department of Education adopted the Response to Intervention model for evaluating students with suspected

SLDs, the Tennessee Department of Education started with training for school psychologists, and

that the TDOE presented "extensive training from experts." (V. 2, 240:24-243:18). Dr. Berk

described the TDOE as "saturating" school districts with trainings on the standards for SLD in

light of the change from the discrepancy model to the RTI model. (V. 2, 244:1-16).

225.    Furthermore, Ms. Hunt testified that it may have been N.H.'s second-grade Intellectually

Gifted teacher, Ms. Pankey, who had provided N.H. tutoring that same year, who suggested that

N.H. might have dyslexia in April 2021. (V. 6, 560:4-561:4).

226.    Based on this identification of a suspected disability and Ms. K.H.'s request to test for

dyslexia[1], the School District administered N.H. a dyslexia test in May of 2021 once N.H. had

returned from COVID-19 virtual instruction to in-person instruction. (Exhibit 58).

227.    The School District then convened an IEP meeting on May 21, 2021, determined that N.H.

had dyslexia in light of the results of the testing, Petitioners' report of N.H.'s reading progress,

and N.H.'s academic performance. (Exhibit 62 at MSCS 0208). The School District provided N.H.

with accommodations and modifications for dyslexia in his Intellectually Gifted IEP. (Exhibit 62

at MSCS 0208; Exhibit 32).

228.    The accommodations and modifications developed by the IEP Team during the May 21,

2021 IEP meeting were based on the comparison between the FastBridge scores for which Ms.

K.H. indicated she read aloud to N.H., and the CBM scores which N.H. obtained without

accommodations. These scores showed that he could make academic progress in then existing

placement with the addition of accommodations and modifications. (Exhibit 62; Exhibit 32).

229.    The School District was not required to conduct a Specific Learning Disability or

comprehensive evaluation of N.H. because there was no indication that N.H. needed special

---

[1] There is no proof in the Record that Petitioners made a written request for evaluation.

education services to address dyslexia. (Exhibit 58 May 21, 2021 IEP Meeting Minutes).

*Northfield City Bd. of Educ. v. K.S. on behalf of L.S.*, No. CV 19-9582 (RBK/KMW), 2020 WL

2899258, at *9 (D.N.J. June 3, 2020); *A.P.*, 572 F. Supp. 2d at 255 (citing 29 U.S.C. §

1412(a)(3)(A)) (holding that the child find provision itself applies only to children with disabilities

"who are in need of special education and related services.")."Child find does not demand that

schools conduct a formal evaluation of every struggling student." *Ja. B. v. Wilson Co. Bd. of Educ.*,

61 F.4th 494, 502 (6th Cir. 2023) (quoting *D.K. v. Abbington Sch. Dist.*, 696 F.3d 233, 249 (3d

Cir. 2012)).

230.    Disabilities such dyslexia, which are spectrum disorders, do not require IDEA evaluation,

when there is no indication that a student needs special education services to overcome the adverse

impact of a disability. *Id.;* 28 C.F.R. 35.108 (under Section 504 of the Rehabilitation Act a student

may be eligible for Section 504 Accommodations if a student has a physical or mental impairment

that substantially limits one or more major life activities); *see* 34 CFR 104.35 (the criteria for

determining eligibility under Section 504 are broader and more inclusive than the IDEA); *see ibid*,

Tenn. R. & Reg. sec 0520-01-09.-05.(a Tennessee school district meets the obligations of a free

appropriate public education by serving the child's needs not the child's disability); *see also, In

re: Student with a Disability*, 114 LRP 39929 (SEA  VA 06/17/14) (Office of Civil Rights

concluded a school district could have addressed a student's 504 needs for a mood disorder and

sexual addiction through his IEP for ADHD).

   **iv.    There was no delay in evaluating N.H. for SLD.**

231.    Curiously, rather than requesting an SLD evaluation or a comprehensive re-evaluation for

N.H, in writing, on September 14, 2021, Ms. K.H. requested that N.H.'s CLUE teacher hold his

annual IEP meeting in September 2021 instead of November 2021 "due to family scheduling conflicts." (Exhibit 43).

232.    In response to this request to move N.H.'s annual IEP meeting from November 2021 to September 2021, which did not mention a request to evaluate N.H. for SLD, the School District convened an IEP meeting on September 24, 2021 and reconvened the IEP meeting on September 29, 2021. (Exhibit 43; Exhibit 5). The outcome of those meetings was that N.H.'s IEP Team completed a re-evaluation packet for N.H. in which IEP Team agreed that there was no need to reevaluate N.H. for Intellectual Giftedness but that it would proceed with evaluating N.H. for SLD. (Exhibit 4, Exhibit 5). The School District neither refused to evaluate N.H. for an SLD, nor did it delay in evaluating N.H. for SLD. (Exhibit 4; Exhibit 6).

233.    As Dr. Berk testified, the Department of Education's Office of Special Education Program (OSEP) regularly transmits its guidance letter that SLD testing may not be delayed for progress monitoring, and if that means that the School District has to conduct interventions and progress monitoring simultaneously with evaluations, the School District makes that happen. (V. 5, 245:7-21).

234.    The School District agreed to evaluate N.H. for a Specific Learning Disability on September 29, 2021. (Exhibit 4). On November 4, 2021, MSCS certified N.H. as an IDEA eligible student with a secondary disability of Specific Learning Disability (SLD) in the area of basic reading skills. (Exhibit 6; Exhibits 36 & 37).

235.    The School District satisfied the IDEA by evaluating the student for a "specific learning disability." *See Crofts v. Issquah School Dist. No. 411*, 22 F. 4th 1048, 1055 (9th Cir. Jan. 12, 2022).

236.    "Specific Learning Disability' is one of the enumerated categories under the IDEA and is defined as "a disorder in 1 or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself on the imperfect ability to listen, think, speak, read, write, spell or do mathematical calculations. *Crofts,* 411 F.4th at 1055 (quoting § 1401(30)(A)). "The category includes 'such conditions as perceptual disabilities, brain injury, minimal brain dysfunction, *dyslexia*, and developmental aphasia'." *Id.* (emphasis original).

237.    The School District was not required to evaluate N.H. for dyslexia.  *Crofts*, 22 F. 4th at 1056 n. 3 (explaining that neither of the Department of Education Dear Colleague letters that the parent relied on suggested that the LEA was required evaluate the student for dyslexia instead of a language-related specific learning disability). In fact, the School District was not required to affix any particular label or diagnosis to a student's evaluation "so long as the child is regarded as having a disability and receives needed special education related services." *Crofts*, 22 F.4th at 1053 n. 3 (quoting Dep't of Edu. Off. of Special Educ. and Rehab. Servs., *Letter to Kelli Unnerstall* 1-2, 1 (April 25, 2016) (internal citations omitted)).

238.    In *Crofts*, the LEA conducted a battery of assessments in the area of reading and writing, areas that dyslexia impacts, and it considered a phonological processing assessment conducted by an outside evaluator, to determine that the student had a SLD. For these reasons, the *Crofts* court concluded that the parent's contention that the LEA should have evaluated the student for dyslexia instead of a specific learning disability was "a distinction without a difference."

239.    Based on *Crofts*, it stands to reason that the School District was not required to provide Petitioners with an evaluator who had prior experience in dyslexia, although it did utilize Ms. Re'kel Burke, a school psychologist, who had trained at Middle Tennessee State University's Tennessee Center for the Study and Treatment of Dyslexia.

240.    The overwhelming evidence shows that the School District conducted a legally sufficient evaluation of N.H. It evaluated his reading, writing and spelling skills in the areas relevant to dyslexia. (Exhibit 1). The School District also utilized the evaluation and input of one the School District's speech language pathologist to evaluate N.H. Even, Petitioners' expert incorporated the School District's evaluation into her own report to determine that N.H. met the standard for dyslexia under the DSM-V and found the testing to be useful in her determination that N.H. had dyslexia. (Exhibit 29).

241.    In this case, Petitioners have offered no proof that N.H. failed to meet grade-level standards or even the standards for success in the Grahamwood Elementary School Optional Program, did not have academic success, or did not perform at the same level or close to his intellectually gifted peers. Petitioners did not provide any testimony or documentary evidence about N.H.'s grades, test scores or other measures of academic performance that indicate that the School District overlooked clear signs of disability.  In the absence of this evidence, the Court determines that Petitioners did not carry their burden of proof to show that the School District failed to fulfill its "child find" duty N.H. in a timely manner.

**B.        The District Offered N.H. a Free Appropriate Public Education (FAPE).**

242.    A school district provides FAPE when it designs an Individual Education Plan (IEP) that is reasonably calculated enable a child make progress appropriate in light of the child's circumstances. *Endrew F ex rel. Joseph F. v. Douglas County Sch. Dist., RE-1*, 580 U.S. 386, 403 (2017)

i.      The "Say Dyslexia" statute does not set the standard for a FAPE[2].

243.    To the extent, however, that Petitioners are asserting that the School District had a duty to

provide N.H. with "dyslexia specific interventions" as defined by the Say Dyslexia law in order to

provide N.H. with a FAPE, the Say Dyslexia law does not set the standard for a FAPE.

244.    The Tennessee legislature enacted the "Say Dyslexia" law in 2016. The statute first became

effective on July 1, 2016. Tenn. Code Ann. § 49-1-229 (eff. July 1, 2016-May 9, 2019).

245.    The Tennessee legislature amended the "Say Dyslexia" law in 2019, and the amendments

became effective on May 10, 2019. Tenn. Code Ann. § 49-1-229 (eff. May 10, 2019-March 28,

2019).

246.    The "Say Dyslexia" law was most recently revised on March 29, 2021. Tenn. Code Ann.

§ 49-1-229 (eff. March 29, 2019).

247.    The relevant subsections of the "Say Dyslexia" statute, cited and relied upon herein, were

not changed from the May 10, 2019 version to the March 29, 2021 version. *Compare* Tenn. Code

Ann. § 49-1-229 (eff. March 29, 2019) *with* Tenn. Code Ann. § 49-1-229 (eff. May 10, 2019-

March 28, 2019).

248.    Accordingly, the Court will apply May 10, 2019 version of the "Say Dyslexia" law applies

to the relevant two-year statute of limitations timeframe before this Court from February 1, 2021

to March 28, 2021[3]. *See Kuykendall v. Wheeler*, 890 S.W.2d 785, 788 (Tenn. 1994) (explaining

---

[2] Petitioners appear to seek redress before the Tennessee Administrative Procedures Division (APD) for an alleged violation of Tennessee's "Say Dyslexia" statute. This Court lacks subject matter jurisdiction to determine whether Petitioners have suffered a violation of the Tennessee "Say Dyslexia" statute, as this determination exceeds the subject matter jurisdiction conferred to the APD by the IDEA and its status as an independent hearing officer under the IDEA and Tennessee law.

[3] This Court has subject matter jurisdiction to hear claims arising during the two years preceding the date of filing the IDEA Due Process action. The Technical Record shows that the Petitioners

that whether a statute applies retroactively depends on whether its character is substantive or procedural and holding that statutes that confer substantive rights are "not applied retroactively because to do so would 'disturb a vested right or contractual obligation'.") (internal citations omitted).

249.    Likewise, the March 29, 2021 version of the "Say Dyslexia" law applies to from March 29, 2021 to present. *See Kuykendall v. Wheeler*, 890 S.W.2d 785, 788 (Tenn. 1994) (explaining that whether a statute applies retroactively depends on whether its character is substantive or procedural and holding that statutes that confer substantive rights are "not applied retroactively because to do so would 'disturb a vested right or contractual obligation'.") (internal citations omitted).

250.    This Court finds that Tennessee's "Say Dyslexia" statute did not require the School District to provide N.H. with "dyslexia specific interventions" as defined by the "Say Dyslexia" law in order to provide N.H. with a FAPE.

251.    The text of the Tennessee's "Say Dyslexia" supports this determination.

252.    Tennessee's "Say Dyslexia" law requires that "the [Tennessee] department of education develop procedures for identifying characteristics of dyslexia through the universal screening process required by the existing RTI-2 framework or other available means." Tenn. Code Ann. § 49-1-229(a)(1) (eff. March 29, 2021); Tenn. Code Ann. § 49-1-229(a)(1) (eff. May 10, 2019-March 28, 2019).

---

filed their IDEA Due Process Complaint on February 2, 2023. Therefore, the relevant statute of limitations period is February 2, 2021 to present.

253.    The statute states that dyslexia screening procedures "shall include phonological and phonemic awareness, sound symbol recognition, alphabet knowledge, decoding skills, rapid naming, and encoding skills." Tenn. Code Ann. § 49-1-229(a)(2) (eff. March 29, 2021).

254.    The text of the "Say Dyslexia" statute is silent when it comes to identifying the scores on the dyslexia screener that would indicate that a student has "characteristics of dyslexia" under the "Say Dyslexia" statute. Tenn. Code Ann. § 49-1-229 (eff. March 29, 2021); Tenn. Code Ann. § 49-1-229 (eff. May 10, 2019-March 28, 2019).

255.    Instead, the "Say Dyslexia" statute, by its terms, states that "the [Tennessee] department of education shall develop procedures for identifying characteristics of dyslexia through the universal screening process required by the existing RTI-2 framework or other available means."  Tenn. Code Ann. § 49-1-229(a)(1) (eff. March 29, 2021).

256.    In accordance with this legislative mandate, the TDOE issued guidance in the form of "FAQs" on the "Say Dyslexia" statute that students scoring below the 25th percentile on the universal screener shall be considered to be students with characteristics of dyslexia under the "Say Dyslexia" statute.  (V.9, 908:7-20; https://www.tn.gov/content/dam/tn/education/special-education/dys/say_dyslexia_faq.pdf)

257.    When a student is identified as having "characteristics of dyslexia" (i.e., falling in the 25th percentile on the Universal Screener) under the "Say Dyslexia" statute, the LEA must: "(1) notify the student's parent or legal guardian; (2) provide the parent or legal guardian with information and resources material containing dyslexia; (3) provide the student with appropriate tiered dyslexia-specific intervention through its RTI-2 framework; and (4) monitor the student's progress using a tool designed to measure the effectiveness of intervention." Tenn. Code Ann. § 49-1-

229(c)(1)-(4) (eff. March 29, 2021); Tenn. Code Ann. § 49-1-229(c)(1)-(4) (eff. May 10, 2019-

March 28, 2021).

258.     The "Say Dyslexia" statute defines "dyslexia specific intervention" as "evidenced-based,

specialized reading, writing and spelling instruction that is multisensory in nature, equipping

students to simultaneously use multiple senses, such as vision, hearing, touch and movement.

Dyslexia-specific intervention employs direct instruction of systematic and cumulative content,

with the sequence beginning in the easiest and most basic elements and progressing methodically

to more difficult material. Each step must also be based on those already learned. Components of

dyslexia-specific intervention include instruction targeting phonological awareness, sound symbol

association, syllable structure, morphology, syntax and semantics [.]" Tenn. Code Ann. § 49-1-

229(f)(2) (eff. March 29, 2021); Tenn. Code Ann. § 49-1-229(a)(1) (eff. May 10, 2019-March 28,

2019).

259.     The "Say Dyslexia" statute does not require that an LEA provide "dyslexia-specific

intervention" to students who score at or above the 25th percentile, because these are not students

with "characteristics of dyslexia" under the statute. *See* Tenn. Code Ann. § 49-1-229 (eff. March

29, 2021); Tenn. Code Ann. § (eff. May 10, 2019-March 28, 2019).

260.     Rather, the "Say Dyslexia" statute, by its express terms, requires that "following the

universal screening procedures conducted by the LEA, the LEA shall convene a school-based

problem-solving team to analyze screening and progress monitoring data to assist teachers in

planning and implementing *appropriate instruction* and *evidenced-based interventions* for *all*

*students,* including those who exhibit the characteristics of dyslexia." Tenn. Code Ann. § 49-1-

229(b) (eff. March 29, 2021); Tenn. Code Ann. § (eff. May 10, 2019-March 28, 2019) (emphasis

added).

261.    A school-based problem-solving team's "[g]uidance *may* include suggestions of appropriate tiered interventions, dyslexia-specific interventions, academic accommodations as appropriate, and access to assistive technology." Tenn. Code Ann. § 49-1-229(b); (eff. March 29, 2021); Tenn. Code Ann. § 49-1-229(b) (eff. May 10, 2019-March 28, 2019) (emphasis added).

262.    The legislature's use of the term "may" in the statute makes it clear that the "Say Dyslexia" law does not require school districts to provide dyslexia-specific interventions to students scoring at or above 25% on the "Say Dyslexia" law screener.

263.    Here, N.H. was never a student "with characteristics of dyslexia" under the "Say Dyslexia" statute.  N.H.'s universal screening reading scores did not fall in the 25th percentile or below. (Exhibit 59).

264.    N.H.'s universal screening reading scores from Illuminate FastBridge were at the 98th, 99th and 78th percentiles over the course of second and third grade. (Exhibit 59).

265.    Therefore, it would be up to the student support team to consider referral for evaluation of a suspected disability or for a student who already has an IEP, to consider whether the student needs additional accommodations, modifications, supports or services, and/or to refer the student for evaluation. (V.9, 911:7-21).

266.    This finding is not only supported by the text of the Say Dyslexia law, but it is also supported by the purpose of the IDEA, which is to provide specially designed instruction for students with eligible disabilities, so that individual students may receive a FAPE.

267.     A FAPE is individualized to the needs of the student. The Supreme Court recognized the individualized nature of a FAPE in *Endrew F ex rel. Joseph F. v. Douglas County Sch. Dist., RE-1*, 580 U.S. 386, 403 (2017) (holding that the IDEA "requires an educational program reasonably calculated to enable a child make progress appropriate in light of the child's circumstances.").

268.    *Endrew F* focuses on the "child's circumstances" not on dyslexia-specific instruction tied to a particular score on a dyslexia screener.

269.    N.H.'s status as a student with both Intellectual Giftedness and Specific Learning Disability (SLD) further illustrate why the Tennessee "Say Dyslexia" law does not set the standard for a FAPE for N.H.

270.    "A focus on a particular child is at the core of the IDEA. The instruction offered must be '*specially* designed' to meet a child's '*unique* needs' through an '*[i]diviualized* education program.' *Endrew F.*, 580 U.S. at 400 (citing 29 U.S.C. §§ 1401(29),(14)).

271.    The "Say Dyslexia" law, which mandates grouping based on performance on a universal reading screener through the RTI-2 framework, does not address N.H.'s unique individual needs or educational deficits relating to his Intellectual Giftedness and his SLD. *See* Tenn. Code Ann. § 49-1-229(c)(3) (eff. March 29, 2021) & Tenn. Code Ann. § 49-1-229(c)(3) (eff. May 10, 2019-March 28, 2021).

### ii. The School District's IEPs Offered N.H. a FAPE.

272.    *Endrew F.* and its predecessor *Bd. of Edu. of Hendrick Hudson Central School Dist.*, *Westchster Cty v. Rowley*, 458 U.S. 176 (1982) are also instructive of the related but different issue of whether the School District offered N.H. and his parents a FAPE on or before November 29, 2021, the date the 10-business day notice expired.

273.    In *Rowley*, the Supreme Court considered whether Local Education Agencies (LEAs), such as the Respondent, were required to provide IDEA eligible students with "an opportunity to achieve [their] full potential commensurate with the opportunity provided to other children [without disabilities]." *Endrew F.*, 580 U.S. at 393 (quoting *Rowley,* 458 U.S. at 185-186).

274.    The *Rowley* court rejected the "full potential" approach and reasoned that "[e]ven though 'Congress was rather sketchy in establishing substantive requirements' under the Act, the Act guarantees a substantively adequate program of education to all eligible children'." *Endrew F.*, 580 U.S. at 393-94 (quoting *Rowley*, 458 U.S. at 200-202, 206, 207).

275.    In accordance with this reasoning, the *Rowley* court held that an LEA meets the substantive FAPE requirement if the student's IEP is "reasonably calculated to enable the child to receive educational benefits."

276.    The *Rowley* court explained that "for a child receiving instruction in the regular classroom, this would generally require an IEP 'reasonably calculated to enable the child to achieve passing marks and advance from grade to grade'." *Endrew F.*, 580 U.S. at 394 (quoting *Rowley*, 458 U.S. at 207, 204, 203 n. 25). Although, it declined "to establish any one test for determining the adequacy of the educational benefits conferred upon all children covered by the Act." *Id.*

277.    Subsequently, the *Endrew F.* court rejected a standard for a FAPE that "aims to provide a child with a disability opportunity to achieve academic success, attain self-sufficiency, and contribute to society that are substantially equal to the opportunities afforded children without disabilities." *Endrew F.*, 580 U.S. at 403 (citation omitted).

278.    The *Endrew F.* court described this standard as "strikingly similar" to the standard advanced by the parents in *Rowley* and offered by Justice Blackmun's opinion concurring in judgment in *Rowley. Endrew F.*, 580 U.S. at 403 (citing *Rowley,* 458 U.S. at 185-186).

279.    Ultimately, however, the *Endrew F.* court declined to elaborate as what "appropriate" progress would look from case to case. *Endrew F.*, 580 U.S. at 404. It cautioned that the "absence of a bright-line rule, however, should not be mistaken for an 'invitation to the courts to substitute their own notions of sound educational policy for those of the school district authorities which they

review'." *Endrew F.*, 580 U.S. at 404 (quoting *Rowley,* 458 U.S. at 206). The *Endrew F.* court further reasoned that:

> … deference is based on the application of expertise and the exercise of judgment by school authorities. The Act vests these officials with responsibility for decisions of critical performance to the life of a disabled child. The nature of the IEP process, form the initial consultation through state administrative proceedings, ensure that parents and school representatives will fully air their respective opinions on the degree of progress a child's IEP should pursue…A reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances.

*Endrew F.*, 580 U.S. at 404 (citations omitted).

280.    Likewise, school districts are not required to maximize a benefit to a student or provide any particular outcome in order to provide a FAPE. *See Rowley*, 458 U.S. at 179.

281.    The School District's IEPs (Exhibits 36 & 37) offered N.H. 5 hours of Intellectually Gifted services per week in the CLUE classroom setting to address his Intellectual Giftedness. The School District's IEPs also offered 3 hours per week of "pull-out" services for small group intervention in the resources room. (*Id.*). N.H.'s small group instructor was to be a special education teacher supported by School District personnel with Orton-Gillingham style training. (Exhibit 65 at MSCS 1543)/

282.    The IEPs took into account N.H. specific needs by identifying his present levels of performance, academic achievement, and functional performance, which were based on the recent SLD evaluation testing and other relevant measures and data and addressed both of N.H.'s identified disabilities. (Exhibits 36 & 37).

283.    The IEPs included sufficiently detailed statement of goals and objectives that permitted the IEP team to monitor N.H.'s progress, all of which were designed to meet the needs that result from his twice exceptionality. (Exhibits 36 & 37).

284.   The services and goals took into account that N.H. had demonstrated success with reading supports that were not limited to the Orton-Gillingham philosophy. (Exhibits 36 & 37).

285.   His IEPs contained accommodations and modifications that reflected the accommodations and modifications that worked for him previously. (Exhibits 36 & 37).

286.   The School District's special education expert, Dr. Tiffany Luckett, testified that the School District declined to name a specific program for N.H. in his IEP because it took into account the student's unique circumstances: that he was an intellectually gifted student who was succeeding in a challenging general education environment with Tier-1 level instruction, despite having been identified as a student with both Intellectual Giftedness and SLD, and despite missing time from the general education classroom to receive CLUE (intellectually gifted services). (V.11, 1056:4-25).

287.   The School District offered small group instruction in a special education setting where N.H. would be grouped with similarly-situated peers, who were working on the same areas of academic deficit that N.H. would be working to address. (V.11, 1063:1-10).

288.   Dr. Luckett testified that N.H.'s IEP Team discussed multiple options to serve N.H. (V.11, 1032:20-1034:21; Exhibit 61 at MSCS 0307-0308).

289.   The IEP Team meeting minutes indicate that the IEP Team considered that N.H. may need more time in a general education setting, instead of five hours of pull-out instruction for Intellectual Giftedness, since the IEP team was proposing to add special education pull-out services to address N.H.'s SLP.  (Exhibits 61 & 63).

290.   Dr. Luckett testified that she asked the IEP Team to keep in mind they were discussing a child. (V. 11, 1088:1-19). She explained "[N.H.'s intellectual giftedness] really stood out to me, and I felt like, overall, that is who we really need[ed] to focus on. This is a kid that we're talking

about, an intellectually gifted kid, and let us not ever forget him….[a]nd so…it should be the main

goal of the IEP team, think about the child. We - - we see scores, but this is a child. And this a

child with a unique personality." (Id.).

291.    Dr. Luckett also explained during her testimony that the IEP team took into account the

continuum of services. Dr. Luckett testified that the continuum of services relates to the special

education principal of serving the student in the least restrictive environment. (V. 11, 1032:2-

1033:5)

292.    Dr. Luckett opined that when comparing N.H.'s CBM reading scores from May 2021 with

his Spring 2021 FastBridge universal screener of 99%, which Ms. K.H. read aloud to N.H., showed

that N.H. could make progress with read aloud and other accommodations and modifications.

(Exhibit 62; V.11, 1039:20-1042:17).

293.    Therefore, when considering the continuum of services and the least restrictive

environment, the fact that N.H. showed success, with a nearly perfect score of 99% on the Spring

2021 FastBridge, with accommodations, indicated that N.H. did not necessarily need any specific

service, reading program, approach or philosophy and that the accommodations that Petitioners'

sought and obtained for N.H. in May 21, 2021 were sufficient to address his dyslexia. Exhibit 62;

V.11, 1039:20-1042:17

294.    Specifically, Dr. Luckett testified that "…I think I actually led the discussion regarding the

options, and I noted continuum of services where, you know, again, I just mentioned that this was

a child who was performing generally on what we had well.  And we started with just whether or

not it was even appropriate to, you know, pull him out. . . so we initially started with the whole

discussion about whether or not N.H. would be successful with just accommodations and

modifications." (V. 11, 1032:2-1033:5).

295.   The School District did not deprive N.H. of a FAPE by not identifying specific staff members who had received Orton Gillingham branded training. The School District identified qualified personnel, who had Orton-Gillingham style training to support N.H.'s special education teacher, Ms. Idleman. (Exhibit 65 at MSCS 1543). The School District was not required to name the "staff" it had identified as a part of N.H.'s IEP. 71 Fed. Reg. 46,667 (no requirement to identify service providers).

296.   Furthermore, there is not requirement to adopt the parents' preferred teaching method or approach. *Crofts*, 22 F. 4th at 1056-57 (holding that school district did no have provide student with Orton-Gillingham style instruction, despite the parent's preference). "A school district is not required to use the methodology a parent prefers when providing special-education services for a child. School districts are 'entitled to deference in deciding what programming is appropriate as a matter of educational policy'." *Crofts*, 22 F. 4th at 1056-57 (internal citations omitted).

297.   In this case, the School District was entitled to deference in declining to name any specific program for N.H. because N.H. had shown progress while using non-Orton-Gillingham style teaching and instructional methods.

298.   After all, Ms. Pankey did not provide N.H. with Orton-Gillingham style tutoring, and Ms. K.H. admitted that N.H. showed some improvement with her tutoring. (V. 7, 653:21-25). The success of Ms. Pankey's non-Orton-Gilling style tutoring was born out in N.H.'s Spring 2021 TCAP scores, which placed him in the 94th percentile in English Language Arts. (Exhibit 59; Exhibit 38).

299.   Furthermore, the Petitioners' failed to proffer evidence that the Orton-Gillingham philosophy is effective. In fact, the School District elicited testimony from Ms. Mendez, Dr. Maples, and Dr. Luckett, that there were limited, if any, peer reviewed studies that show that

Orton-Gillingham style methodologies are effective. (V.9, 929:18-930:18 ; V. 5 508:12-20; V. 11, 1071:22-1072:18).

300.    The IEP Meeting Minutes for November 9, 2021 and November 19, 2021 and the November 9, 2021 IEP and November 19, 2021 IEP demonstrate that the School District offered N.H. an IEP that was reasonably calculated to provide N.H. with progress appropriate under the circumstances, as reflected in the November 9, 2021 and November 18, 2021 IEPs.

### C.    The Bodine School Is Not a Proper Placement for N.H.

301.    The Bodine School does not provide N.H. with a FAPE, nor does it provide education in the least restrictive environment.

### i.    Bodine School does not provide N.H. with a FAPE.

302.    The Court finds that Bodine School's curriculum does not appear to meet Tennessee grade level standards for Tier I instruction based on the record submitted to the Court.

303.    First, Bodine School only teaches reading, writing, and mathematics, and it does not offer any science or social studies curriculum.  (V.4, 421:3-7).  Second, Bodine's 4th grade students at the mid-year point are working on reading activities that are identified as being "Level 2" on their face.  (Exhibit 25 "Adjective-Adverb" sort).   Third, Bodine's high achieving 4th grade students are reading texts like the Pocahontas narrative at the mid-year point, which appears to be below 4th grade level, and there is testimony that the other 4th grade classes would not be able to read such a text.  (Exhibit 25; V.4, 393:3-21).

304.    Additionally, and as set out earlier, there is no evidence in the record that Bodine School offers intellectually gifted services to N.H., and Bodine does not use IEPs. (*See, e.g.,* V.4, 425:16-21).

305.   The Court also finds that Bodine School has not been able to materially improve N.H.'s ability in the area of phonics/decoding during the 1.5 years he has attended the school.  N.H.'s phonics/decoding scores began at the 35th percentile, rose to the 39th percentile, and then fell down to the 27th percentile.  (Exhibits 12 and 13 at p. 4).  Additionally, K.H. has raised to N.H.'s teacher at Bodine that N.H. explained to her that "he is able to work it out in class because he usually goes last and watches everyone else, but even then he still needs help.  When we looked at it today, after saying "rabbit" "tiger" "camel" and "turtle", he said that he really didn't know what to do.  I explained that it was important for you to know where he struggles so that he can get help." (Exhibit 48).

306.   Bodine initially helped N.H. improve his high frequency words/sight word efficiency, but his ability has remained flat over the last year.  He started in the "Below Average" range in Winter 2021 and improved to the "Average" range in Spring 2022 where it has remained static ever since. (Exhibits 12 and 13 at p. 4, V.4, 363:3-365:3).

### ii.    Bodine School is a more restrictive environment for N.H. than the School District offered.

307.   The IDEA requires that (1) each public agency ensure that to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with students who are nondisabled and (2) special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only if the nature of the severity of the disability is such that education in regular cases with the use of supplementary aids and services cannot be achieved satisfactorily. 34 C.F.R. 300.114 (a)(2).

308.   The Sixth Circuit Court of Appeals explained that the restrictiveness of a student's educational placement and the appropriateness of the IEP are two distinct issues. "The appropriate

yardstick is whether the child, with appropriate supplemental aids and services, can make progress toward the IEPs goals in the general education setting. 72 IDELR 204 (6th Cir. 2018). The LRE mandate does not override the FAPE requirement. If a child's placement does not confer a "meaningful benefit" to the student and more restrictive program is likely to provide such benefit, the child is entitled to be placed in the more restrictive program. *P. v. Newington Bd. of Edu.*, 51 IDELR 2d (2d Cir. 2008). *See also Hartman v. Loudoun Co. Bd. of Educ.*, 26 IDELR (4th Cir. 1997), *cert denied*, 111 LRP 18076, 522 U.S. 1046 (1998).

309.    For students like N.H. with SLDs, an IEP team may not remove a student from a general education setting (mainstream environment) without documenting the reason for placement in a more restrictive environment. *See e.g.*, *Hannah L. v. Downingtown Area Sch. Dist.*, 63 IDELR 254 (E.D. Pa. 2014)(failure to document and reasons for removal from the general education setting, what the IEP team considered and rejected, and explanation for why the student could not make progress in the general education class prevented the district court from holding that the LEA offered the student FAPE in the least restrictive environment); *B.E.L. v. State of Hawaii, Dept. of Educ.*, 64 IDELR 130 (D. Hawaii 2014), *aff'd*, 71 IDELR 162 (9th Cir. 2018, unpublished)*.

310.    In *S.M. v. Gwinnett County Sch. Dist.* a Georgia school district did not violate the IDEA when it separated a second-grader from her non-disabled peers for instruction in reading, writing and math. The 11th Cir. Court of Appeals held in an unpublished decision that the district provide the child with FAPE in the least restrictive environment.  67 IDELR 137 (11th Cir. 2016, unpublished)*.

311.    "Regular educational environment" encompasses regular classrooms and other setting in schools, such as lunchrooms and playgrounds in which children without disabilities participate." 71 Fed. Reg. 46,585 (2006).

312.    "A "resource room" is a specially equipped and staffed classroom in a regular school in which students with disabilities spend part of their day receiving individualized instruction or skills remediation with the balance of the day spent in the regular classroom. *See New Haven Bd. of Educ.*, 110 LRP 4313 (SEA CT Oct. 30, 2009).

313.    The Court finds that the School District's IEP allowed N.H. to stay in his competitive, optional classroom with non-disabled, similarly high-achieving peers for the majority of his school week.  The IEP would remove N.H. two times a week for a total of 5 hours so that he could receive CLUE services with intellectually-gifted peers. (Exhibit 61). The IEP would only remove N.H. three times a week for a total of 3 hours to a resource room so that he could work in a small group setting with students working on similar reading deficits. (Exhibit 61).

314.    Dr. Luckett had explained that "The idea is that N.H. would be supported in the areas – the area of basic reading skills.  He would work on his goals that the team developed in the resource classroom.  And he would be grouped with students who were performing at or around the same grade level and working on the-those reading deficit areas."  (Vol 9, 1030:6-12).

315.    In contrast, the Court finds that Bodine School's entire student body consists of disabled peers, and N.H. has no non-disabled peers.  (V. 4, 423:9-18).  Additionally, there is no evidence in the record that Bodine School offers intellectually gifted services to N.H., and Bodine does not use IEPs. (*See, e.g.,* V.4, 425:16-21).

       **iii.**     **<u>Petitioners are not entitled to tuition reimbursement because did not provide 10 business days' notice or act reasonably in unilaterally placing N.H. at Bodine School.</u>**

316.    While 34 C.F.R. § 300.148(c) sets out that a hearing officer may require a school district

to reimburse the parents for the cost of enrollment in a private school if the hearing officer finds

that the school district has not made FAPE available to the child in a timely manner prior to the

enrollment and that the private placement is appropriate, the regulation provides limitations on

reimbursement at subsection (d).

317.    34 C.F.R. §300.148(d) states that the cost of reimbursement may be reduced or denied if

at least 10 business days (including any holidays that occur on a business day) the parents did not

give written notice to the school district or if there are judicial findings of unreasonableness with

respect to actions taken by the parents.  34 C.F.R. 300.148(d)(1)(ii) and (d)(3).

318.    Petitioners emailed a Withdrawal Notice to the School District on November 12, 2021, and

paid the tuition deposit to enroll N.H. at Bodine School on Monday, November 27, 2021.  (Exhibit

45).

319.    Thursday, November 23, 2021 was Thanksgiving Day, which is a state holiday.  *See*

tn.gov/about-tn/state-holidays.html.

320.    Friday, November 24, 2021 is a state holiday under Tenn. Code Ann. 4-4-105(a)(3)

whereby the Governor has designated that Columbus Day holiday shall be substituted for the

Friday after Thanksgiving.  *See* tn.gov/about-tn/state-holidays.html.

321.    The Court finds that Petitioners are not entitled to reimbursement because they only gave

9 business days' notice to the School District, and the text of the regulation is clear that Petitioners

were required to give at least 10 business days' notice before placing N.H. at Bodine School.  *J.F.*

*v. Byram Township Board of Ed.*, 812 Fed.Appx. 79, 82 (3rd Cir. 2020) (affirming denial of tuition

reimbursement on the basis that parents failed to provide written notice to the school district at

least 10 business days before unilaterally placing their son in private school).

322.    Additionally, the Court finds that Petitioners failed to afford the School District a good faith opportunity to meet its obligations under the IDEA and therefore acted unreasonably.

323.    Petitioners had already decided to enroll N.H. at Bodine School by August 25, 2021, he had been accepted by September 8, 2021, and Petitioners had received a financial aid package by September 17, 2021.

324.    Petitioners' communications via text indicate that their participation in November 2021 IEP meetings was merely procedural.  (Exhibit 46 "We are well, just waiting for our notice period to expire so that we can place N.H. in a school with appropriate accommodations.  But we have one more IEP meeting scheduled for tomorrow."; Exhibit 47 "This may be our last session.  Hopefully, not our last meeting before N.H. starts at Bodine.").

325.    In *J.F.*, the parents formulated an IEP with the public school district in May 2014 even though they already knew at that point that they would relocate for the 2014-2015 school year and the parents enrolled their son at the private school before they even attended the July 2, 2014 meeting with the public school district.  812 Fed.Appx at 82.  The Third Circuit affirmed that the equities of the case did not support reimbursement of private school tuition in such circumstances because the "IDEA was not intended to fund private school tuition for the children of parents who have not first given the public school a good faith opportunity to meet its obligations." *Id.* (*citing C.H. v. Cape Henlopen Sch. Dist*, 606 F.3 59, 72 (3rd Cir. 2010); *Patricia P. v. Bd. of Educ. of Oak Park*, 203 F.3d 462, 469 (7th Cir. 2000)).

326.    For both reasons, the Court finds that Petitioners' demand for the cost of reimbursement should be denied in its entirety.

Dated: April 12, 2023                    Respectfully submitted,

s/ Laura Ann E. Bailey
Laura Ann E. Bailey (TN BPR #27078)
Kavita Goswamy Shelat (TN BPR #29388)
160 S. Hollywood Street, Room 218
Memphis, TN 38112
Phone: 901-416-6370
baileyla@scsk12.org

**Attorney for Respondent,**
**Shelby County Board of Education**

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been served on April 12, 2023, upon the following via email only:

Ms. Janet H. Goode
Goode Law
917 S. Cooper
Memphis, TN 38104
janet@janetgoodelaw.com
*Attorney for Petitioners*

Hon. J. Shannon Barnhill
J.Shannon.Barnhill@tn.gov

s/ Laura Ann E. Bailey