**BEFORE THE TENNESSEE DEPARTMENT OF EDUCATION DIVISION OF SPECIAL EDUCATION**

IN THE MATTER OF:

**G.C.A. THE STUDENT,**
**W.A. THE PARENT,**
   *Petitioner,*

*v.*           **APD Case No. 07.03-190734J**

**WILLIAMSON COUNTY SCHOOLS,**
   *Respondent.*

## FINAL ORDER

The hearing in this matter came before Mattielyn B. Williams, Administrative Judge, assigned by the Tennessee Secretary of State's Administrative Procedures Division, on January 21, 23-24, 27-29, and March 10-12, 2020.

G.A., the Student, and W.A., the Parent, were represented by W.A. Williamson County Schools was represented by Attorneys Deanna Arivett and Angel McCloud.

Petitioners sought the following relief: (1) that it be declared that Respondents failed to offer G.A. FAPE (Free Appropriate Public Education) (2) that Respondents finance GA's education at Currey Ingram Academy (CIA) for the 2017-2018 school year (3) that Respondents finance GA's psychotherapy, counseling, and exposure response prevention therapy for 2017-2018.

Based upon the pleadings, the evidence at trial, the parties' post-trial briefs, the oral arguments of the parties, and the record in this case, it is **DETERMINED** that the relief sought by the Petitioners should be **DENIED**.

This decision is based upon the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### Background

*1.*     The student, G.A., is a fourteen-year-old (DOB 12/5/2005) young man who at all times relevant to this case, has attended Currey Ingram Academy (CIA), a private school located in Williamson County, Tennessee.

*2.*     G.A.'s transition from Tennessee Early Intervention Services was initiated in November 2008 when WCS (Williamson County Schools) identified G.A. as a student with Developmental Delay pursuant to the Individuals with Disabilities Education Act (IDEA).

*3.*     An IEP (Individual Education Plan) was proposed by WCS, but W.A. did not consent to the implementation of the IEP.

*4.*     Another IEP meeting was held in in the summer of 2011 leading into G.A.'s kindergarten school year. His eligibility category was changed to Autism, and an IEP was proposed at that time, but not consented to by W.A. Subsequently, W.A. unilaterally enrolled G.A. in kindergarten at CIA where he has attended since that time.  W.A. has never consented to an IEP for G.A.

*5.*     The claims set forth in Petitioners' Complaint in this matter revolve around the IEP proposed for G.A. for the 2017-2018 school year when G.A. would have been in the 7th grade.

### Key Personnel

*6.*     Lori Peterson is a WCS school psychologist who was assigned to conduct unilateral evaluations during all times relevant to this case. Ms. Peterson has been a school psychologist for Williamson County Schools since the 1992-1993 school year. She has a

APD 07.03-190734J TR Page 935

Bachelor's degree in Psychology and a Master's degree in school psychology. She is licensed as a school psychologist through the Tennessee Department of Education.

7.    Courtney Baumer is the WCS occupational therapist who completed the occupational therapy and sensory assessments for G.A.'s comprehensive evaluation in June of 2017. Ms. Baumer has a Bachelor's degree and Master's degree in Occupational Therapy and is licensed through the Tennessee Department of Education. She has been an occupational therapist since 2012 and has practiced in WCS since 2014.

8.    Dr. Brandon Barkley is the principal at BMS (Brentwood Middle School) and held that position at all times relevant to this case. Dr. Barkley has a Bachelor's degree in Mathematics Education, a Master's degree in Educational Leadership, and a Doctorate in Education. Dr. Barkley has been the principal of BMS for the past five (5) years. Prior to that he was an assistant principal at BMS for six (6) years and prior to that he was a middle school math teacher for WCS.

9.    Maria Griego is the Executive Director of Student Support Services for WCS, which includes serving as the special education director, and has been in that position since July of 2019. Prior to being promoted to Executive Director for Student Support Services, Maria Griego was a WCS student support services specialist. Ms. Greigo has an undergraduate degree in psychology with minors in communication disorders and special education. She has a Master's degree in school psychology and an Education Specialist degree in curriculum and instruction with an emphasis in school psychology.

10.    Dr. Krista Hogan has been a WCS Student Support Specialist for the past six (6) years and was assigned to BMS at all times relevant to this case. Dr. Hogan holds a Bachelor's degree in Education, a Master's degree in Special Education, and a Doctorate in Special Education. Dr. Hogan has previously held positions as a regular education teacher, special

education teacher, university professor in special education, supervisor of special education, and director of special education.

11.     Abby Fletcher is a WCS general education teacher English/Language Arts teacher at BMS and held that position at all times relevant to this case. Ms. Fletcher holds a Bachelor's degree in Human Development and Elementary Education and a Master's degree in Administration and Academic Leadership. Ms. Fletcher has a professional license issued through the Tennessee Department of Education as a teacher and administrator.

12.     Deanna Arnoldt is a WCS teacher for the hearing impaired and held that position at all times relevant to this case. Ms. Arnoldt holds a Bachelor's degree in elementary education, deaf education, and mathematics. She holds a Master's degree in deaf education and elementary education. Ms. Arnoldt holds a teaching certification in elementary (K-12) deaf education and mathematics (7-12).

13.     Dr. Lyn McRainey was identified as an expert witness in the areas of psychology and diagnosis and treatment of mental health and developmental disabilities. Dr. McRainey holds a Bachelor's degree in psychology, a Master's degree in psychology, and a Ph.D. in psychology from Vanderbilt University. Dr. McRainey is a licensed School Psychologist and Senior Psychological Examiner. Dr. McRainey currently maintains a private practice through which she conducts evaluations and provides testimony in various federal courts throughout Tennessee. Prior to private practice, Dr. McRainey was a school psychologist for twenty years during which she conducted evaluations, counseling, crisis intervention, and threat assessments for students in a public school system in both neighborhood schools and day treatment programs. Dr. McRainey also has extensive experience in working with students in residential treatment facilities.

14.     Dr. David Rostetter, Ed.D. was identified as an expert witness in IDEA compliance and the standards of public policy and acceptable practice in that area.

APD  07.03-190734J  TR  Page 937

*15.*    Judicial notice was taken of the fact that Dr. Rostetter has been identified as a nationally recognized expert in IDEA compliance by the Sixth Circuit Court of Appeals.

*16.*    Dr. Rostetter holds a bachelor's degree in political science, a master's degree in educational administration, and a doctorate of education in education administration. Dr. Rostetter's professional career began in Washington at the Bureau of Education for the Handicapped, working on the new regulations for the Education for all Handicapped Children's Act (now IDEA) and at the Office of Civil Rights developing Section 504 regulations. After approximately ten (10) years with the federal government, Dr. Rostetter has consulted with states, families, and local school districts, including providing assistance in drafting special education regulations for thirteen states (including Tennessee), and testifying as an expert witness in due process hearings and federal courts.

### Did District Predetermine Placement?

*17.*    Petitioner W.A. contacted Brandon Barkley, Principal at Brentwood Middle School (BMS), on May 31, 2017, which was the day after the last day of school for the 2016-2017 school year. W.A. indicated she would be enrolling G.A. at BMS for the 2017-2018 school year and requested an evaluation for special education.

*18.*    It is **NOTED** that W. A. was the first person to consider BMS to be the LRE (least restrictive environment) for G.A. when W.A. expressed her intent to enroll G.A. at BMS.

*19.*    W.A. cannot, then, complain that the IEP (Individual Education Plan) Team predetermined that G.A. was to be educated at BMS. Further, Dr. David Rostetter testified that it is permissible to assume that a child will be educated in his/her home school.

*20.*    It is **CONCLUDED** that, based on the tapes of the IEP Team meetings, the IEP Team was open to placement of G.A. at locations other than BMS.

21.     Per Dr. Rostetter, under the IDEA, the student's home school is the starting point

for an IEP.

*APD  07.03-190734J  TR  Page 939*

**Fully and Timely Identify G.A.'s Disabilities and Present Levels of Performance?**

*22.*    The IEP team convened a meeting to begin the evaluation process for determining eligibility. During the meeting, the IEP team agreed to conduct a comprehensive psychoeducational evaluation. W.A. consented to the evaluation and recommended assessments several days after the meeting. After collecting numerous records from W.A., including records from CIA, medical records, and mental health records from private providers, and conducting its own evaluations, the IEP team from G.A.'s home school, BMS, met with W.A. to determine eligibility and to develop an IEP for G.A.

*23.*    After determining that G.A. met the eligibility requirements for the categories of Autism and Emotional Disturbance and meeting for many hours to develop an IEP for G.A. for the 2017-2018 school year, W.A. refused to sign the IEP, continued G.A.'s placement at CIA and informed WCS she would seek reimbursement for G.A.'s placement at CIA.

*24.*    Upon receiving such notification, WCS convened a second IEP meeting to discuss and consider W.A.'s request for placement of G.A. at CIA and to revise the IEP as necessary. Placement at CIA was considered by the IEP Team, but rejected.

*25.*    W.A. again refused to sign the IEP and continued G.A.'s placement at CIA.

*26.*    WCS convened another IEP meeting in March 2018 to review the results of a hearing impairment evaluation and revise the IEP as necessary. W.A. again refused to sign the IEP and continued G.A.'s placement at CIA.

*27.*    Thereafter, W.A. initiated the instant due process complaint alleging that WCS failed to offer G.A. a "free appropriate public education" ("FAPE") as required by the IDEA, 20 U.C.A. 1400 *et seq*. and related state law and regulations.

*28.*    The central issues presented are as follows:  (1) whether WCS failed to fully and timely identify G.A.'s disabilities and present levels of performance; (2) whether WCS failed to

offer an IEP that was reasonably calculated to enable G.A. to make progress in light of his circumstances; (3) whether the district predetermined G.A.'s placement at BMS and developed the IEP based on BMS instead of G.A.'s individual needs; (4) whether the district failed to offer an appropriate placement for G.A.; and (5) whether the district prohibited the parent from meaningfully participating.

29.    Lori Peterson, WCS School Psychologist, was assigned to coordinate the evaluation as she was the district psychologist designated to coordinate evaluations for unilateral students (i.e. students whose parents have placed the student in a private setting).

30.    Ms. Peterson has twenty-seven (27) years of experience administering standardized assessments and has given hundreds and hundreds of social/emotional assessments, providing her the experience and training to interpret such assessment results.

31.    Ms. Peterson coordinated the scheduling of an IEP team meeting for June 15, 2017 to review a reevaluation summary report and determine the reevalation process.

32.    Ms. Peterson's Reevalaution Summary Report was compiled using documents that were already a part of G.A.'s educational record from previous evaluations. She added additional information provided by W.A. during the June 15, 2017 IEP meeting.

33.    The Reevaluation Summary Report included the following information:  (a) previous medical diagnoses of Autism in 2007, 2008, and 2010; (b) mental health diagnoses of separation anxiety disorder, obsessive compulsive disorder, and major depressive disorder from Rogers Behavioral Health in 2017; (c) mental health diagnoses of Generalized Anxiety Disorder and Major Depressive Disorder with psychotic features from Dr. Richard Navarre; (d) partial hospitalization and intensive outpatient treatment at Rogers Behavioral Health in 2017; (e) results of audiological evaluations from 2016 and 2017; (f) vision screening in 2015; (g) educationally relevant change in home or school environment in that G.A. had attendance

Page **8** of **65**

problems due to mental health issues during the 2016-2017 school year, required more emotional supports in the school setting over the last two school years, older brother was hospitalized and could not come home due to the combination of both boys emotional health, parents currently separated and father has not lived in the home in over a year; (h) a summary of previous assessments from 2007, 2008, 2009, 2010, and 2011; and (i) services provided in most recent IEP from 2011.

34.    The IEP team met on June 15, 2017, reviewed the Reevalaution Summary Report, discussed parent concerns, and agreed to move forward with a comprehensive reevaluation that would look at the following areas of suspected disability:  Autism, Emotional Disturbance, and Hearing Impairment.

35.    The IEP team included the following members:  (a) Dr. Brandon Barkley, Principal BMS; (b) Abby Fletcher, General Education Teacher; (c) Sandra Haynie, Special Education Teacher; (d) Lori Peterson, School Psychologist; (e) Kim Palmer, Student Support Services Specialist, (f) W. A., Parent; (g) Dr. Krista Hogan, Student Support Services Coordinator; (h) Cindy Knapp, Occupational Therapist, and (i) Allison Drost, Speech/Language Pathologist.

36.    At the 6/15/17 IEP meeting, W.A. provided 186 pages of documents and evaluations for G.A. dating back to 2007. The documents and evaluations through September 2011 were already a part of G.A.'s WCS record. The remaining documents were attached to the reevaluation summary report and the medical and mental health related documents were reported under Medical Information in the report. The documents included previous assessment information, Individual Learning Plans (ILPs) from CIA, medical records, including audiological exams, and mental health records from G.A.s private mental health providers and Rogers Behavioral Health.

*37.*    W.A. provided the following input regarding G.A.'s mental health during the June 15, 2017 meeting:  G.A.'s mental health started to decline significantly at the end of the 2015-2016 school year which included suicidal thoughts and plans. His intrusive thoughts significantly impacted his ability to function in the school setting. He reported hallucinations in which his brother or father would be killing him or he would be killing himself. He missed a good bit of school during the 2016-2017 school year due to inpatient and extensive outpatient mental health treatment.

*38.*    All members of the IEP team, including W.A., agreed to proceed with a comprehensive reevaluation that would include the following assessment plan: (a) vision screening; (b) academic achievement; (c) intellectual functioning; (d) speech/language skills (pragmatics); (e) adaptive behavior; (f) social-emotional assessment; (g) fine motor and sensory assessment; and (h) classroom observations.

*39.*    In June 2017 Lori Peterson, WCS School Psychologist, conducted assessments including:  Weschler Individual Achievement Test (WIAT-III), Weschler Intelligence Scale for Children (WISC-V), Adaptive Behavior Assessment Scale (ABAS) (Parent/Teacher), Behavior Assessment Scale for Children (BASC-3) (Parent/Teacher/Student), Beck Youth Inventory (Beck) (Student), and Scales for Assessing Emotional Disturbance (SAED) (Parent/Teacher).

*40.*    At no point during the testing by Ms. Peterson did G.A. demonstrate signs of mental or physical fatigue. He demonstrated good self-awareness and clearly stated what tasks were more difficult or non-preferred (ex-handwriting, engaging with messy/dirty textures), why they were difficult, and how he typically completes these activities.

*41.*    Information was also collected from Rogers Behavioral Health during the comprehensive evaluation. G.A. participated in a partial hospitalization program from 1/5/17-2/14/17 due to anxiety, depressed mood, excessive fear, OCD, and suicidal thoughts. Services

Page **10** of **65**

provided included interdisciplinary assessment, experiential therapy, social services group, individual and family sessions, aftercare planning, and safety plan development.

42.    At the close of the inpatient program, G.A. was successfully discharged to the intensive outpatient program which he attended through 3/13/17. At the close of the intensive outpatient program, G.A. was successfully discharged and goals achieved included being a better person, trying to be in the moment, lessened intrusive thoughts, and getting back in school.

43.    On July 24, 2017, Courtney Baumer, WCS Occupational Therapist (OT), conducted assessments related to fine motor, handwriting, and sensory including the Bruininks-Oseretsky Test of Motor Proficiency-2 (BOT-2), the Evaluation of Children's Handwriting-Manuscript (ETCH-M), and the Adolescent/Adult Sensory Profile.

44.    On July 20, 2017, the Clinical Evaluation of Language Fundamentals-5 Pragmatics Profile was completed by W.A. This profile is a checklist related to speech intentions that are typically expected for social and school interactions in classrooms.

45.    A comprehensive language assessment was not completed as G.A. had demonstrated overall receptive and expressive language skills to be with average limits on multiple prior language assessments.

46.    On July 20, 2017, the same pragmatics profile was provided to G.A.'s teachers and speech/language pathologist at CIA to complete; however, the forms were not returned as of the time the report was written.

47.    On August 8, 2017, W.A. requested that Courtney Baumer provide her with copies of the materials from G.A.'s OT testing. Ms. Baumer responded to W.A. indicating she could not provide copies of the assessments because they were copyrighted material, but would be happy to meet with W.A. prior to the IEP meeting to review the assessments and results.

*48.*     As a result of W.A.'s request, Courtney Baumer reviewed her assessment results, reviewed manuals for administration of assessments, and checked the scoring of the assessments and was confident in the validity of the results.

*49.*     An IEP meeting was held on August 9, 2017 to consider the results of the comprehensive reevaluation. Ms. Peterson presented the IEP team with an Individual Assessment Report that included:   (1) Parent input and developmental/educational history; (2) review of parent provided documents and evaluations; (3) medical information; (4) audiological evaluation; (5) direct and anecdotal behavioral observations; (6) cognitive assessments; (7) achievement assessments; (8) behavior assessments; (9) ED assessments; (10) speech/language assessments; (11) occupational therapy assessments; and (12) sensory assessments.

*50.*     W.A. attended the IEP meeting and was provided a copy of the report in advance of the meeting.

*51.*     The IEP team noted that G.A.'s most recent audiological indicated he had moderate rising to mild conductive hearing loss in his right ear with a history of tinnitus and had previously agreed (6/15/17 IEP meeting) to consider eligibility under the category of Hearing Impaired. The team determined that information from G.A.'s teachers and observations in his instructional setting were required in order to complete an evaluation to make such determination. As such, the IEP team developed a follow-up action plan to gather the additional information from teachers and to complete the necessary observations once school started and to reconvene in six to eight weeks to review the evaluation results and consider eligibility.

*52.*     The IEP team determined G.A. met the eligibility criteria for the categories of Autism and Emotional Disturbance and would consider a tertiary eligibility for hearing impairment upon completion of the hearing evaluation.

*53.*    Although both areas of disability were significant for G.A., the team determined that Autism should be the primary disability category and Emotional Disturbance should be secondary.

*54.*    W.A. agreed with the eligibility determinations of Autism and Emotional Disturbance.

*55.*    Thus, it is **DETERMINED** that WCS fully and timely identified G.A.'s disabilities and present levels of performance. It is **DETERMINED** that the evaluations conducted by WCS were appropriate under the IDEA, timely, and evaluated all areas of suspected disabilities.

### IEP Offered That Was Reasonably Calculated To Enable G.A. To Make Progress In Light Of His Circumstances?

*56.*    According to the cognitive and achievement assessments results, all of G.A.'s academic scores were within average to superior range and there were no significant concerns with his overall cognitive ability or academic achievement.

*57.*    According to the behavior and social-emotional assessment results, G.A. indicated concerns in the areas of self-esteem and some concerns with anxiety and disruptive behaviors, while W.A. reported concerns in the areas of anxiety, depression, withdrawal, emotional self-control, negative emotionality, physical symptoms or fears, and adaptive behaviors and some concerns in the areas of atypicality, adaptability, social skills, anger control, developmental social disorders, executive functioning, resiliency, and relationship problems.

*58.*    Specifically, G.A. rated himself in the average range for all areas except self-esteem, which fell into the clinically significant range, on the BASC-3.  On the Beck, G.A. rated himself mildly elevated on the anxiety and disruptive behavior scales and much lower than average on the self-concept scale.

59.     On the BASC-3, W.A. rated G.A. in the clinically significant range for anxiety, depression, somatization, withdrawal, emotional self-control, and negative emotionality and the at-risk range for the atypicality, adaptability, social skills, anger control, developmental social disorders, executive functioning, and resiliency scales. On the SAED-2, W.A. rated G.A. in the highly indicative of emotional disturbance range for the unhappiness/depression and physical symptoms or fears scales and in the indicative of emotional disturbance range for the relationship problems scale. On the ABAS-3, W.A. rated G.A. in the below average range for the conceptual and social composites and the extremely low range for the practical composite.

60.     According to the results of the occupational therapy fine motor assessment (BOT-2), G.A. fell within the below average category for fine motor control and manual coordination. G.A.'s handwriting legibility was 51% for overall letter legibility, 59% for overall number legibility, and 71% for overall word legibility. His writing speed was within grade level expectations. G.A. demonstrated adequate balance and posturing needed to assume and maintain sitting and standing positions to complete all tasks asked of him. At no point, during the evaluation, did G.A. demonstrate signs of mental or physical fatigue.

61.     According to the results of the occupational therapy handwriting assessment (ETCH-M), G.A. fell within the below average category on the subtests of fine motor precision, fine motor integration, and upper limb coordination and within the average category on the manual dexterity subtest.

62.     The results of the OT assessments were consistent with prior assessments conducted by CIA, and there was no dispute that his handwriting skills were below average.

63.     According to the results of the sensory assessments conducted, G.A.'s scores in the areas of Low Registration, Sensory Sensitivity, and Sensation Avoiding were within the typical range. His scores in the area of Sensory Seeking fell within the "less than most people"

Page **14** of **65**

category. When he reported distress or difficulty with specific sensory input, he followed with how he self-accommodates with these difficulties. G.A. appeared to be very aware of his sensory needs and how to meet them.

64.     After determining eligibility, the IEP team, including W.A., met for several hours on August 9, 2017 to draft an IEP for G.A. for the 2017-2018 school year. During the IEP August 9, 2017 meeting, Ms. Peterson and the entire IEP team reviewed 187 pages of records provided by W.A. which included assessment information and Individual Learning Plans ("ILPs") from CIA, medical records including audiological exams, and mental health records from G.A.'s private providers and Rogers Behavioral Health.

65.     The IEP team also considered a letter from Dr. Jeri Fitzpatrick, G.A.'s treating psychiatrist, that was faxed in during the meeting.

66.     All of the information collected and reviewed during the evaluation process was considered in developing present levels of performance.

67.     The IEP team developed measurable goals for the four (4) present levels of performance that were exceptional (not within normal limits): communication, fine motor, pre-vocational, and social/emotional behavior.

68.     The IEP team discussed various options to address G.A.'s fine motor needs related to handwriting and determined G.A.'s needs could be met with consultative OT services and appropriate accommodations.

69.     The IEP reflected upon the following information regarding how G.A.'s emotional and behavioral issues impact his access to participation in the general curriculum: emotional and behavioral issues adversely impacted his educational performance over an extended period of time and to a marked degree.

*70.*    G.A. has learned many compensatory strategies to manage his emotional health. The extent to which he uses them is based on the degree of distress he is experiencing. There continues to be a need for environmental accommodations and differentiation relative to process content and products.

*71.*    The team discussed various options to address G.A.'s mental health needs and determined that, in addition to goals and objectives, a safety plan was appropriate.

*72.*    The safety plan included daily check-ins with the school counselor who was located in close proximity to G.A.'s classrooms. The counselor would assess G.A.'s mental health at each check in and respond accordingly.

*73.*    The safety plan was included in the IEP that was proposed on 8/9/17.

*74.*    W.A. complained that the Safety Plan was not specific enough and that it left out what resources would be brought to bear if G.A. needed them. WCS and Dr. Rostetter confirmed that a Safety Plan is a framework and that details are usually filled in later, as BMS gains experience with a student.

*75.*    It is **DETERMINED** that the Safety Plan could have been improved to include that G.A. was not to be left alone in the quiet room and specified that counseling was available from various personnel at BMS. However, it is **ALSO DETERMINED** that the 8/9/17 Safety Plan was sufficient on its face as a framework for services G.A. would receive.

*76.*    The IEP included two specific and measurable goals to address G.A.'s social-emotional behavior deficits.

*77.*    G.A.'s IEP proposed direct special education support services in all academic areas and consultative service for occupational therapy and language therapy.

*78.*    The IEP included the following accommodations for English/Language Arts, Math, Science, Social Studies:  allow student to type or record assignments, typed copies of

lecture notes, pacing, extended time for testing, use of technology for notes and assignments, preferential seating with left ear towards speaker/sound source, obtain student's attention prior to speaking, allow extra time for processing (wait time), reduce auditory and visual distractions, and small group for testing.

79.    The IEP included the following accommodations for related arts:  preferential seating with left ear towards speaker/sound source, obtain student's attention prior to speaking, allow extra time for processing information (wait time), and reduce auditory and visual distractions.

80.    Specific accommodations (preferential seating with left ear towards speaker/sound source, obtain student's attention prior to speaking, reduce auditory distractions) were included to address G.A.'s unilateral hearing loss, pending the team revisiting eligibility under the category of hearing impaired.

81.    After developing G.A.'s present levels of performance, goals and objectives, and a safety plan, the IEP team discussed G.A.'s placement and determined that the proposed services and accommodations could be provided at his home school, BMS, which was his least restrictive environment (LRE).

82.    The IEP team agreed to meet again in 6 to 8 weeks  (after G.A. began attending at BMS)  to review the results of additional assessments and observations (hearing impairment evaluation, observations by the occupational therapist relative to sensory needs, observations by the autism specialist related to behavioral needs, and the effectiveness of the safety plan in managing GA's mental health needs).

83.    W.A. refused to sign the IEP and unilaterally placed G.A. at CIA for the 2017-2018 school year, barring WCS from providing services to G.A.

*84.*    On the evening of August 9, 2017, Deanna Arnoldt, the teacher of the Hearing Impaired who was a member of the 8/9/17 IEP team, sent documents to G.A.'s special education teacher detailing the classroom accommodations for G.A.'s hearing impairment that were included in the August 9, 2017 proposed IEP. Ms. Arnoldt also corresponded with W.A. to let her know the information had been provided to his teacher in anticipation of him starting school on August 10, 2017.

*85.*    August 10, 2017 was the first day of the 2017-2018 school year for BMS. However, G.A. did not attend BMS on August 10, 2017.

*86.*    Instead, WCS received written notification of W.A.'s intent to place G.A. at CIA and seek reimbursement on August 10, 2019.

*87.*    On August 23, 2017 Dr. Krista Hogan sent W.A. an Invitation to an IEP meeting to be held on August 29, 2017.

**Was The IEP Based on BMS, Rather Than G.A.'s Needs?**

*88.*    The IEP team met again on August 29, 2017 to consider W.A.'s request to place G.A. at CIA and to revise the IEP as needed.

*89.*    The team met for several hours on 8/29/17 to address each of the issues raised in W.A.'s letter dated August 10, 2017. Due to W.A.'s continued concerns regarding transition to a new and larger school environment and fluctuating mental health needs, including experiencing intrusive thoughts, the team also discussed providing G.A. with a one-to-one educational assistant for additional support; however, W.A. indicated that the additional support would be harmful to G.A. Thus, it was not included in the proposed IEP.

*90.*    The team was also provided with an updated ILP from CIA for the 2017-2018 school year and added additional accommodations to the IEP that were being provided at CIA (cueing, movement breaks, scaffolding, and reformatting).

*91.*    It is **DETERMINED** that G.A.'s IEP was based on G.A.'s needs, as determined
through the psychoeducational assessment. G.A.'s needs, both before and after W.A.'s unilateral
decision to place G.A. at CIA, were considered.

*APD  07.03-190734J  TR  Page 952*

**Hearing Impairment Testing?**

92.    The team also discussed the teacher information and observations that were required to complete the evaluation for hearing impairment.  Pursuant to the discussions during the August 9, 2017 IEP and the state requirements for hearing impairment evaluations, the observations were to be conducted in the current educational setting.  The original intent was to do the observations after G.A. began attending BMS on August 10, 2017.

93.    Because W.A. unilaterally placed G.A. at CIA, G.A. did not attend BMS; thus, BMS was not G.A.'s current educational setting. The team, then, proposed completing the observations at CIA since that was where G.A. was attending school.

94.    W.A. indicated she needed additional information regarding the evaluation requirements and the observations that would be conducted and wanted to be informed prior to the observations occurring.

95.    On September 18, 2017, Dr. Krista Hogan provided, via email, the information requested by W.A. regarding the evaluation requirements.

96.    On September 18, 2017, W.A. responded to Ms. Hogan via email indicating the observations at CIA would not be helpful as the hearing impairment did not impact him in that environment. As W.A. had effectively withdrawn consent for observations of G.A. at CIA, the evaluation could not proceed at that point.

97.    On September 20, 2017, Deanna Arnoldt followed up with Dr. Hogan to determine if W.A. had provided consent for the observations at CIA. Ms. Hogan responded by saying she had not provided consent so the evaluation would not proceed.

98.    On January 3, 2018, W.A. corresponded with Dr. Hogan via email inquiring about completion of the hearing evaluation. Ms. Hogan responded to W.A. indicating it was her

understanding from their previous correspondence (9/20/17) that W.A. had withdrawn consent for the observations.

99.    On January 8, 2018, W.A. provided consent for the observations to proceed at CIA.

100.    Deanna Arnoldt observed G.A. at CIA on January 31, February 7, and February 12, 2018. Ms. Arnoldt also collected information from G.A.'s teachers regarding the impact of his hearing impairment in the instructional setting.

101.    WCS proposed several meeting dates to discuss the results of the hearing evaluation, and W.A. agreed to meet on March 9, 2018.

102.    On March 3, 2018, W.A. corresponded with WCS, via email, indicating she needed to reschedule the IEP meeting scheduled for March 9, 2018. WCS proposed additional dates for the IEP meeting, and W.A. agreed to March 15, 2018.

103.    The IEP team reviewed the results of the Hearing Observation and Evaluation Report and an updated audiological examination from Vanderbilt's Bill Wilkerson Center. The Hearing Observation and Evaluation Report indicated that G.A.'s hearing loss did not adversely impact his current educational performance such that he would require individual instruction. The report noted that if his educational environment changed, service provisions and accommodations should be reviewed.  The updated audiological indicated no significant change in G.A.'s hearing loss.

104.    Based upon the results of the Hearing Observation and Evaluation Report and updated audiological exam, the team determined G.A. did not meet the criteria for eligibility as a student with a hearing impairment.

APD 07.03-190734J TR Page 954

*105.*    The team also reviewed current progress reports from CIA, and W.A. indicated it had been a good school year and he had no absences due to emotional illness. This information was added to the social-emotional behavior present level of educational performance of the IEP.

*106.*    The team reviewed parent concerns, present levels of educational performance, accommodations, services, and placement in the proposed IEP. Additional accommodations were added to all subject areas to reflect what was being provided at CIA (give directions in small, distinct steps, directions read aloud, redirect student to test).

*107.*    However, again, W.A. refused to sign the IEP and continued G.A.'s placement at CIA and filed the due process complaint in this matter.

### Did the District Prohibit the Parent from Meaningfully Participating?

*108.*    W.A. was provided with a copy of the procedural safeguards prior to each IEP meeting.

*109.*    It is **DETERMINED** that W.A. was afforded the opportunity to meaningfully participate in the development of the 2017-2018 IEPs proposed on August 9, 2017, August 29, 2017, and March 15, 2018. The recordings of these sessions show that W.A. participated meaningfully and often.

### Is CIA an Appropriate Placement?

*110.*    CIA selects who is accepted to the school and does not accept students with significant emotional or behavioral problems, according to Dr. Rostetter.

*111.*    Individual Learning Plans (ILPs) are developed by the administration at CIA without parental input.

*112.*    CIA discouraged G.A. from attending school during times when he was expressing emotional distress, according to Dr. Fitzpatrick. Dr. Fitzpatrick had input into when G.A. resumed attending CIA.

Page **22** of **65**

*113.*    It is **DETERMINED** that CIA is not an appropriate placement for G.A. in that it does not require certification of special education teachers, doesn't provide experiences with nondisabled peers, its services are not IEP driven, there is an absence of procedural protections, and there are exclusionary admission criteria.

*114.*    It is **DETERMINED** that WCS made FAPE available to G.A., and CIA is not equipped to do so, per Dr. David Rostetter's Expert Report.

### Should WCS Pay for Private Counseling Services for G.A.?

*115.*    Medical services, including private psychotherapy and psychiatric treatment, that were provided G.A., outside of the school environment, were not related to the curriculum needs of G.A. and WCS is in no way obligated to pay for such services, per Dr. Rostetter.


### CONCLUSIONS OF LAW

*1.*    When enacting IDEA, Congress clearly conferred jurisdiction of a student's IDEA claims upon hearing officers, also known as administrative law judges. *See* 20 U.C.A. § 1415(f)(3)(A).    Administrative judges are bestowed the jurisdiction to determine whether a student received an appropriate education under the IDEA.  20 U.C.A. § 1415(f)(3)(E).

*2.*    In Tennessee, the Office of the Secretary of State, Division of Administrative Procedures, has jurisdiction over the subject matter and the parties of this proceeding and the undersigned Administrative Law Judge has the authority to issue final orders. *See* State Board of Education Rules, Special Education Programs and Services, 0520-01-09-.18; *see* T.C.A. § 49-10-101.

*3.*    The U.S. Supreme Court held in *Schaffer v. Weast*, that the burden of proof is on the party "seeking relief".  546 U.S. 49, 51 (2005). Thus, when a parent files a request for a due

Page **23** of **65**

process hearing, the parent bears the burden of proof, or burden of persuasion in the due process hearing. *Id.* At 56 (citing 2 J. Strong, McCormick on Evidence § 337, p. 412 (5th Ed. 199)) (referencing the "default rule that [Petitioners] bear the risk…" and "[t]he burdens of pleading and proof…should be assigned to the [Petitioner] who generally seeks to change the present state of affairs…"); *see also, Cordrey v. Euckert*, 917 F.2d 1460, 1469 (6th Cir. 1990) (the party challenging the IEP bears the burden of proof in an IDEA action).

4.      In the instant case, Petitioners clearly bear the burden of persuasion. W.A., the parent of G.A., filed the request for due process hearing claiming that WCS failed to offer G.A. a free appropriate public education pursuant to the IDEA. Thus, W.A. bears the burden to prove the specific violations alleged in the due process complaint:  (1) WCS failed to fully and timely identify G.A.'s disabilities and present levels of performance; (2) WCS failed to offer an IEP that was reasonably calculated to enable G.A. to make progress appropriate in light of his circumstances; (3) WCS predetermined G.A.'s placement at BMS by developing the IEP based on BMS instead of G.A.'s individual needs; (4) WCS failed to offer an appropriate placement, and (5) WCS prohibited the parent from meaningfully participating. See *Endrew F.  v. Douglas Cnty. Sch. Dist. RE-1*, 137 S.Ct. 988, 999 (2017). Finally, W.A. bears the burden of proving that CIA, the private school where she unilaterally placed G.A, is appropriate within the meaning of the IDEA. *See Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993).

5.      The IDEA requires WCS to provide FAPE in the LRE (Least Restrictive Environment) to all students with disabilities who are in need of special education and related services. IDEA, 20 U.C.A. §1400 *et. seq.* The requirements of the IDEA have been adopted, with some additional requirements, by the Tennessee State Board of Education. Tenn. State Bd. of Educ. Rules, Regulations, and Minimum Standards Chapter 0520-01-09.

6.      School districts are required to identify students suspected of having a disability who are "in need of" special education and related services. See IDEA U.C.A. §1401 (3)(A). Students who are eligible for special education and related services are entitled to an IEP. *Bd. of Educ. of the Hendrick Hudson School Dist. V. Rowley*, 458 U.S. 176, 181 (1982). In developing educational programs and determining appropriate services for those students through an IEP, school districts must comply with the substantive and procedural requirements of the IDEA and related state law.  *See Rowley* at 182. However, parents are not entitled to relief for minor procedural violations alone. Technical procedural violations do not render an IEP invalid.  *Dong v. Board of Educ. of Rochester Community Schs.*, 197 F.3d 793, 800 (6th Cir. 1999). A determination of whether a student received FAPE must be based on substantive grounds. 34 C.F.R. § 300.513(1). When a procedural violation is alleged, an administrative law judge can only find a FAPE violation if a procedural violation "(2) impeded the child's right to FAPE; (2) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of FAPE to the parent's child; or (3) caused a deprivation of educational benefit." 34 C.F.R.  § 300.513(2). Only procedural violations that result in substantive harm constitute a denial of FAPE and justify relief.  *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001) (procedural violations must cause substantive harm and constitute denial of FAPE to be actionable); see also *Bd. of Educ. of Fayette County, Ky. V. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007).

7.      It is **CONCLUDED** that the Petitioners, here, have failed to prove any substantive harm and thus are not entitled to relief.

8.      Rather, it is **CONCLUDED** that WCS properly evaluated and identified G.A. as a student with a disability entitled to special education and related services and WCS properly and

APD  07.03-190734J  TR  Page 958

timely evaluated G.A. in all suspected areas of disability. The psychoeducational evaluation, occupational therapy evaluation, and speech/language evaluation were timely conducted.

9.    More specifically, WCS timely completed a comprehensive evaluation for G.A. After receiving email correspondence from W.A. on May 31, 2017 indicating G.A. would be entering 7th grade in the fall of the 2017-2018 school year, the principal at BMS, Dr. Brandon Barkley, promptly forwarded the correspondence to Kim Palmer, the student support services specialist responsible for coordinating evaluations of privately placed students. Ms. Palmer emailed W.A. on 6/5/17, timely responding to W.A.'s request.

10.    The IEP team met on June 15, 2017 to determine what information and assessments would be needed to complete a comprehensive evaluation for G.A. to determine eligibility for special education. Because G.A. had previously been found eligible as a student with autism in 2011, the request for an evaluation in May 2017 was a request for a reevaluation.

11.    A reevaluation is distinguishable from a request for an initial evaluation which is required to be conducted within sixty (60) calendar days. 34 C.F.R. § 300.301(c)(1).

12.    The IDEA does not provide an evaluation timeline for reevaluations other than the 3-year reevaluation timeline.

13.    At the June 15, 2017 meeting, the IEP team proposed an assessment plan and agreed to evaluate G.A. for the following eligibility categories:   (1) Autism; (2) Emotional Disturbance (ED); and Hearing Impairment (HI).

14.    There was no dispute by W.A. that these were the assessments that should be conducted and/or the disability categories that should be considered.

15.    The team also collected numerous records from W.A. including assessment information and Individual Learning Plans (ILPs) from CIA, medical records including audiological exams, and mental health records from G.A.'s private counselor, psychiatrist, and

Page **26** of **65**

Rogers Behavioral Health. After reviewing all of the records provided by W.A. and conducting its own comprehensive evaluation, the IEP team determined G.A. was eligible under the categories of Autism and Emotional Disturbance. W.A. agreed with the eligibility determination. All of the assessments were completed between 6/19/17 (when W.A. provided consent) and 8/9/17 (when the IEP team met to discuss eligibility), encompassing a total of fifty-one (51) calendar days. Thus, although there is no requirement under the law that the reevaluation must be completed within sixty (60) calendar days, WCS met that deadline, never-the-less, and was able to propose an IEP prior to the start of the 2017-2018 school year. As such, it is **CONCLUDED** that the comprehensive psychoeducational evaluation was conducted timely.

 *16.* It is **CONCLUDED** that the hearing impairment evaluation was conducted timely because at the June 15, 2017 meeting, the IEP team noted that G.A.'s most recent audiological exam indicated he had unilateral hearing loss in his left ear and they agreed to consider eligibility under the category of Hearing Impaired. Pursuant to state eligibility requirements, such evaluation should include audiological records, academic records, speech/language evaluations, parent and teacher input, and classroom observations in the current educational setting.

 *17.* Because school was out for summer break during the duration of the assessment period, teacher input could not be gathered and observations could not be conducted in G.A.'s current educational setting. Therefore, the IEP team developed a follow-up action plan to gather the needed data and complete the necessary observations once school started on August 10, 2017. Pursuant to the action plan, the team would reconvene in six to eight weeks (after having time to gather teacher input and conduct observations once school started) to review the hearing evaluation and further consider eligibility for hearing impairment. Accordingly, the team determined that G.A. did not meet the criteria for eligibility under the category of hearing impairment at that time.

*18.*    G.A. did not begin school at BMS on the first day of school. Instead, W.A. unilaterally placed G.A. at CIA.  G.A. never attended BMS.  Thus, the team was unable to collect teacher input and observe G.A. at BMS. The team became aware of G.A.'s placement at CIA  after receiving W.A.'s letter on August 10, 2017. The IEP team met again on August 29, 2017 and proposed gathering the necessary teacher input from CIA teachers and completing the required observations at CIA since that was G.A.'s current educational setting. However, W.A. demanded additional information about the evaluation and observations prior to their completion. WCS promptly provided the requested information to W.A. at which time she denied consent for the observations at CIA indicating his hearing was not impacted in that environment and further observations may be harmful to him.

*19.*    Months later, on January 8, 2018, W.A. finally consented to the observations being conducted at CIA.  The observations were promptly completed by Deanna Arnoldt on January 31, February 7, and February 12, 2018. Ms. Arnoldt also gathered information from teachers at CIA in order to complete the evaluation. Upon completion of the evaluation, the team proposed several dates for an IEP team meeting to review and discuss the Hearing Observation and Evaluation Report. W.A. agreed to meet on March 9, 2018. WCS was prepared to present the results of the hearing evaluation on March 9, 2018; however, on March 3, 2018, W.A. sent an email to Krista Hogan indicating she needed to reschedule the meeting.

*20.*    After proposing several dates, W.A. agreed to meet on March 15, 2018. During the meeting, the IEP team reviewed the results of the hearing evaluation and determined that G.A. did not qualify as a student with a hearing impairment under the IDEA because his unilateral hearing loss and tinnitus did not adversely impacted in his current educational setting. Thus, consent to move forward with the hearing evaluation was obtained from W.A. on January 8, 2018, and the evaluation was completed by March 9, 2018—a timeframe encompassing a total

Page **28** of 65

of fifty-nine (59) calendar days. Thus, although there is no requirement, under the law, that the reevaluation be completed within sixty (60) calendar days, WCS met that deadline. As such, it is **CONCLUDED** that Petitioners claim that WCS failed to timely evaluate G.A. for a hearing impairment is without merit.

21.     Based on the foregoing, it is **CONCLUDED** that Petitioners claims that evaluations were not conducted timely are without merit.

22.     It is **CONCLUDED** that the comprehensive psychoeducational evaluation was appropriate pursuant to the IDEA.  The IDEA requires an evaluation assess all areas of suspected disability and "identify all of the child's special education and related service needs." 34 C.F.R. § 300.304(c)(4). An educational evaluation must collect information from a variety of sources, about multiple traits, using multiple methods, collected over time in varying educational environments, and WCS's reevaluation met these requirements, according to Dr. Rostetter who testified that the WCS evaluation was a comprehensive evaluation that met the fundamental standards for an appropriate evaluation for a child with a disability.

23.     The evaluations included information from the parent, multiple teachers, and multiple service providers to obtain a complete picture of the student before making a determination about eligibility. Specifically, the evaluation included (1) parent input and developmental/educational history; (2) review of parent provided documents and evaluations; (3) medical information; (4) audiological evaluation; (5) direct and anecdotal behavioral observations; (6) cognitive assessments; (7) achievement assessments; (8) behavior assessments; (9) social-emotional behavior assessments; (10) speech/language assessments; (11) occupational therapy assessments; and (12) sensory assessments.

24.     The evaluation properly identified all of G.A.'s special education and related service needs.  Specifically, the team and parent met and developed an assessment plan, and

Page **29** of **65**

WCS completed an evaluation that used multiple sources of data to identify whether G.A. had special education or related service needs in the areas identified by the team as possible areas of need:  hearing, fine motor, sensory, academic achievement, pragmatic language skills, adaptive behavior, intellectual functioning, characteristics of autism, and social emotional skills. The team considered information provided from one hundred eighty-six (186) pages of documents from medical records and prior evaluations for G.A., including multiple prior Autism evaluations.

25.    WCS was unable to obtain ratings forms from G.A.'s teachers at CIA since the evaluation was completed during the summer when school was not in session. On July 20, 2017, [a pragmatics profile] was provided to CIA staff for [G.A.'s] teacher and SLP to complete. These forms had not been returned at the time this report was written.

26.    WCS completed standardized assessments in the areas of cognition, academic achievement, social-emotional self-report and parent rating scales, adaptive rating scale, pragmatics, fine motor, and sensory. The evaluation results[1] were documented in a twenty-four (24) page evaluation report which was provided to the parent, W.A.

27.    It is **CONCLUDED** that the evidence does not support Petitioners' claim that WCS's evaluation for emotional disturbance was flawed. WCS considered information from WCS's direct assessments, G.A.'s medical providers,[2] G.A.'s teachers at CIA in multiple educational settings, and specific reports about G.A.'s intrusive thoughts.  Lori Peterson, WCS's school psychologist, also had the opportunity to witness an incident where G.A. became distressed and reportedly had thoughts of killing himself during her testing session[3] with G.A.

---

[1] Petitioners appear to assert that WCS failed to document every single assessment score possible by the test manufacturer (e.g., percentile, age equivalent, confidence intervals).  However, IDEA does not require assessment results be provided in a specific format, and the results of the assessment complied with state requirements for determining eligibility.

[2] WCS was not required to contact every provider that G.A. had ever seen when it already had documentation of G.A.'s current needs from medical records and evaluations.  Furthermore, the team fully considered the late received report from G.A.'s psychiatrist.

[3] There was no indication that G.A. had suicidal thoughts or was contemplating suicidal thoughts when completing

After taking a break, G.A. was able to continue the assessment without significant level of distress. Despite reports that G.A. frequently had suicidal ideations, there is no evidence that G.A. was currently suicidal.

28.    WCS ruled out vision as the primary reason for G.A.'s emotional disturbance, as he had no significant vision issues that would cause behaviors of emotional disturbance. Furthermore, failing his distance vision screening in his right eye only, when he passed all other screening measures and later passed a complete vision screening prior to eligibility determination, would not have prohibited him from participating in the evaluation process.

29.    Ultimately, a decision was made considering all of the evidence together.

30.    It is **CONCLUDED** that the evidence shows that WCS's determination of G.A.'s fine motor skills was appropriate. First, G.A.'s fine motor needs and services were determined based on multiple sources of data[4] (i.e., prior occupational therapy report from CIA, standardized assessments using the BOT-2, the ETCH, and a sensory profile, observations during testing, and parent and child interview). Second, the evidence shows that the evaluations were administered in accordance with any instructions provided by the producer of the assessments. 34 C.F.R. 300.304(c)(v).[5] Lastly, the results of WCS's fine motor evaluations were consistent with his prior and later occupational therapy evaluations. WCS Independent Assessment Report-Reevaluation (August 2017 BOT-2 Assessment: Fine Motor Control SS=35, Below Average; Manual Coordination SS=37 Below Average), *compare with* CIA OT Eval, (September 2017 BOT-2

---

the BASC-3 assessment with Ms. Peterson.

[4] The evaluator was merely required to make decisions based on multiple pieces of data, not based on the recommendation (not requirements) of one assessment instrument. 34 C.F.R. § 300.304(b)(must "not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability and for determining an appropriate educational program for a child.").

[5] Petitioners appear to assert that a clinician cannot have a conversation with a student prior to administration of the assessment.

Assessment: Fine Motor Control SS=31, Below Average; Manual Coordination SS=33 Below Average).

*31.*    It is **NOTED** that the fine motor skills goal in G.A.'s IEP had already been achieved. This error, on WCS's part, is not fatal to the IEP, however.

*32.*    Petitioners assert that G.A.'s gross motor skills were a concern, and that WCS failed to evaluate these skills. However, the it is **CONCLUDED** that the evidence does not support such a conclusion.

*33.*    First, there is no evidence that G.A.'s gross motor skills were identified as an area of concern in the educational environment by W.A. or G.A.'s records. Nor is there evidence that W.A. requested a physical therapy evaluation.[6] Second, despite the fact that gross motor was not a specific area of concern and was not a specific component of the evaluation,[7] WCS's occupational therapist observed G.A.'s gross motor skills and documented no apparent concerns with G.A.'s gross motor skills finding no indication there was further assessment needed. G.A. demonstrated adequate balance and posturing needed to assume and maintain sitting and standing positions to complete all tasks asked of him. Testimony from W.A. also confirmed that G.A. participates in many physical activities such as walking, biking, bowling, and swimming. Thus, there is no evidence that G.A.'s gross motor skills required special education or related services to access the educational environment.

*34.*    Petitioners also assert that G.A.'s visual motor skills should have been evaluated by WCS. However, it is **CONCLUDED** that the evidence does not support such conclusion. G.A.'s own occupational therapist at CIA did not evaluate his visual motor or handwriting skills

---

[6] Instead, the evidence shows that W.A. had knowledge that G.A.'s physician had recommended a medical referral for a physical therapy evaluation, but did not request a physical therapy evaluation from WCS.

[7] The team specifically underlined fine motor (not gross motor) and added sensory as areas to be assessed. Ms. Baumer testified that she did not test G.A.'s gross motor skills because she is not a physical therapist and the team did not have consent to test his gross motor skills.

APD 07.03-190734J TR Page 965

during his fifth or sixth grade school years, despite the fact that he participated in other lengthy standardized assessment during this time period. Nor is there evidence that W.A. requested a specific evaluation to address G.A.'s visual motor skills. Furthermore, there is no documentation by WCS's occupational therapist that visual motor difficulties impacted G.A.'s performance on motor tasks.  Ms. Baumer testified that her notes on the fine motor protocol stating "Vision? Visual perception?" were written prior to beginning testing and based upon her interview with W.A. and G.A., continuing that she wanted to keep an eye out for visual motor deficits since there was a prior history of such difficulties, but did not make any notes of any concerning visual perceptual deficits.  It is **CONCLUDED** that there was no evidence of a suspected need for special education and related services due to a visual motor impairment separate from the fine motor deficits already addressed by the team.

35.    It is **CONCLUDED** that the hearing evaluation was also appropriate under the IDEA. To meet requirements as a student with a hearing impairment under the IDEA under Tennessee's guidelines, the student's hearing impairment must result in one of the following:  (1) an inability to communicate effectively due to a hearing impairment, (2) an inability to perform academically on a level commensurate with the expected level because of a hearing impairment, or (3) delayed speech and/or language development due to the hearing impairment. *See* Tenn. Hearing Impairment eligibility criteria, https://www.tn.gov/education/student-support/special-education/special-education-evaluation-eligibility.html; The evaluation must be conducted in the child's learning environment. G.A. presents medically with a unilateral hearing loss and tinnitus.  In one ear, G.A. has moderate rising to mild conductive hearing loss at certain frequencies. G.A.'s audiological evaluation did not indicate current issues academically or in difficult listening situations. In fact, G.A.'s occupational therapist at CIA who had worked with

him for four (4) years across settings, including the classroom, P.E., and art, was unaware that he had any hearing deficits. There is no evidence to support that G.A. had an inability to communicate effectively or perform academically on a level commensurate with expectations or had delayed speech and/or language development due to the hearing impairment which adversely impacted his educational performance.

*36.*     It is **CONCLUDED** that Petitioners claims that WCS failed to identify all areas of suspected disability and need are without merit.

*37.*     WCS appropriately identified G.A. as a student eligible to receive special education and related services under the disability categories of Autism and Emotional Disturbance.

*38.*     The team, including the parent, agreed that G.A. met the eligibility criteria for Autism. WCS's comprehensive evaluation documents behaviors and characteristics that are consistently described throughout the assessment including flat affect, flat tone of voice, sensory issues, and a history of language-based deficits along with difficulty with social relationships consistent with Autism. There is a longstanding diagnosis of Autism for which G.A. has received extensive intervention. Educational impact is not as significant as in early school years as G.A. has learned many compensatory strategies; however, there continues to be a need for environmental accommodations and differentiation relative to process, content, and products. Thus, it is not disputed that G.A. met the criteria for Autism.

*39.*     The team, including the parent, also agreed that G.A. met the eligibility criteria for Emotional Disturbance. WCS's comprehensive evaluation documents G.A.'s struggle with emotional issues over a period of time that have resulted in treatment by a psychologist and psychiatrist, as well as a partial hospitalization at Rogers Behavioral Health. These are the factors necessary for a classification of Emotional Disturbance in the school setting and are

Page **34** of **65**

relevant to G.A.'s emotional profile—specifically G.A. showed a general pervasive mood or unhappiness or depression and the tendency to develop physical symptoms of fear associated with personal or school problems. WCS's comprehensive evaluation documents G.A.'s emotional and behavioral issues adversely impacting educational performance, and the data supports the manifestation has been over an extended period of time and to a marked degree.

*40.*    G.A. met the state requirements for eligibility under both Autism and Emotional Disturbance; thus, the team made appropriate eligibility determinations. Based on the foregoing, it is **CONCLUDED** that Petitioners' claims regarding the appropriateness of the G.A.'s identification are without merit.  WCS identified all of G.A.'s special education and related service needs. It is further **CONCLUDED** that the record is void of proof to support Petitioners' claim that WCS failed to identify G.A.'s needs.

*41.*    IDEA requires school districts to conduct evaluations "to determine the educational needs of a child." 34 C.F.R. § 301(c)(2). The district must ensure that the evaluation "is sufficiently comprehensive to identify all of the child's special education and related service needs, whether or not commonly linked to the disability category in which the child has been classified. 34 C.F.R. § 300.304(c)(6). Here, WCS took specific efforts to do just that.

*42.*    After Petitioners requested an evaluation, WCS scheduled an IEP meeting for June 15, 2017 to discuss and obtain consent for assessments and evaluations that were needed to determine eligibility and to develop an appropriate IEP. Thereafter, WCS completed a comprehensive evaluation and scheduled an IEP meeting for August 9, 2017 to review the evaluations to determine eligibility and develop an appropriate IEP prior to the start of the school year.

*43.*    It is **CONCLUDED** that Petitioners have failed to prove substantive harm. Assuming, *arguendo,* that there were a procedural violation with WCS's evaluation or

APD 07.03-190734J TR Page 968

identification of G.A., it is **CONCLUDED** that such failure did not result in substantive harm. Only procedural violations that result in substantive harm constitute a denial of FAPE that justify relief. *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764-69 (6th Cir. 2001).

*44.*    There was no substantive harm since (1) G.A. was found eligible to receive special education and related services as a student with a disability during the August 9, 2017 IEP meeting and (2) the IEP proposed on 8/9/17 addressed all areas of need regardless of disability category.

*45.*    Eligibility categories act a gate keeper for special education services, but they do not dictate what special education services are received. Not surprisingly, at least one district court in the Sixth Circuit has held that a district's determination that a student did not qualify under a specific disability category did not amount to a substantive violation when the child remained eligible under other disability categories and was provided FAPE. *Shafer v. Whitehall Dist. Sch.*, No. 1:10-CV-1170, 2013 WL 1304920, at *8-11 (W.D. Mich. March 28, 2013). "The IDEA concerns itself not with labels, but with whether a student is receiving a free and appropriate education." *Id.* At 30 (citing *Heather S. v. State of Wis.*, 125 F.3d 1045, 1055 (7th Cir. 1997). Even more importantly, regardless of G.A.'s identification,[8] the IEPs proposed by WCS on August 9th and August 29th of 2017, and March 9th of 2018 included goals, services, and accommodations for all G.A.'s deficit areas, including appropriate accommodations for G.A.'s unilateral hearing loss (notwithstanding the fact that he was not eligible as hearing impaired at such time). As such, even if the hearing impairment evaluation was not timely, constituting a procedural violation under the IDEA, it is **CONCLUDED** that the Petitioners have failed to prove substantive harm and are not entitled to relief.

---

[8] Furthermore, any disagreement about whether G.A. met two (2) or three (3) of the five (5) areas of emotional disturbance is without merit. Regardless, he met the criteria for emotional disturbance as only one (1) area is required.

Page **36** of **65**

46.    WCS proposed IEPs that were reasonably calculated to enable G.A. to make progress appropriate in light of his circumstances. At all times relevant to Petitioners' Complaint, WCS offered G.A. an IEP that provided FAPE. The IDEA, at 20 U.C.A. § 1414(d)(1)(A), requires that an IEP include, among other things: (1) a statement of the child's present levels of performance; (2) a statement of measurable annual goals; (3)a statement of the special education and related services and supplementary aids and services to be provided to the child that, to the extent practicable, are based on peer-reviewed research; (4) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in nonacademic and extracurricular activities; (5) a statement of how the child's parents will be regularly informed of their child's progress. These "are requirements by which the adequacy of an IEP is to be judged, although minor technical violations may be excused." *Cleveland Heights-University Heights City Sch. Dist. V. Boss*, 144 F.3d 391, 398 (6th Cir. 1998).

47.    It is **CONCLUDED** that G.A.'s IEPs met or exceeded the procedural requirements of the IDEA. WCS's IEPs were also substantively appropriate.

48.    The United States Supreme Court modified the test to determine whether an IEP substantively provided FAPE under the IDEA in *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S.Ct. 988 (2017). For a district to substantively offer FAPE, an IEP must be reasonably calculated to enable a child to make progress appropriate in light of his circumstances. *Id.* At 999. An IEP should be "construed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Id.* "For a child fully integrated into the regular classroom, an IEP typically should…be 'reasonably calculated to enable a child to achieve passing marks and advance from grade to grade.'" *Id., citing Bd. of Ed. Of Hendrick Hudson Central Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 203-04 (1982); see also *Rowley*, 137 S.Ct. at 1000

("providing a level of instruction reasonably calculated to permit advancement through the general curriculum").

49.    In this case, G.A. was supposed to be actually enrolled in regular education with the special education support. G.A. was to receive special education support so that he could derive benefit from his regular education program. Furthermore, at all times relevant to this dispute, G.A. was enrolled in general education curriculum, was consistently receiving passing grades, and was a high achieving student. Thus, G.A. was to attend BMS and be a child fully integrated in the regular classroom pursuant to *Rowley and Endrew F.,* receiving FAPE through an IEP that is reasonably calculated to enable G.A. to achieve passing marks and advance from grade to grade.

50.    When determining the appropriateness of an IEP, "[a]ny review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S.Ct. 988, 999 (2017).  Furthermore, an IEP is a snapshot in time. *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1041 (3rd Cir. 1993). Thus, the appropriateness of an IEP must be viewed by "what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted." *Id.* Retroactive analysis of an IEP is not something that can be conducted with any kind of reliability or validity, per Dr. Rostetter.  Furthermore, an IEP is a fundamental document and process that should be used to inform our work over a student's school year. It is not a curriculum—it is not a description of everything the child will receive, according to Dr. Rostetter. Here, G.A.'s IEPs consistently addressed his educational needs through goals, services, and accommodations to address his identified deficit areas of fine motor, social/emotional behavior, and prevocational skills, provided accommodations to address his hearing impairment, and provided special education services in the LRE.

Page **38** of **65**

*51.*     WCS thoroughly considered G.A.'s individual circumstances in developing an IEP that was reasonably calculated to enable him to make appropriate progress. It is **CONCLUDED** that the evidence shows that G.A.'s IEPs were substantively appropriate and were designed with his unique needs in mind for the purpose of providing him with access to educational services that were reasonably calculated to enable him to achieve passing marks and advance from grade to grade.

*52.*     The starting point for determining the appropriateness of an IEP is determining the child's unique needs. To determine his unique needs, G.A.'s IEP team considered multiple sources of data from multiple informants and in multiple environments to determine his present levels of performance for the development of the 2017-2018 IEP. The IEP team members obtained and reviewed information from CIA, medical records, and psychiatric records, and completed its own comprehensive evaluation. As previously noted, G.A. had no deficits in academic areas; thus, the team was focused on providing appropriate goals and services for his areas of exceptionality which were social-emotional behavior, fine motor, and pre-vocational. The 8/9/17 IEP addressed all areas of exceptionality and provided an appropriate road map for G.A.'s school year. It is **CONCLUDED** that the IEP was set up to start G.A. in the school year, to obtain information that was relevant but wasn't available at that time, and then come back and flesh out the IEP and include any new information.

*53.*     It is **CONCLUDED** that WCS thoroughly considered G.A.'s individual circumstances related to his social-emotional behavior and prevocational needs in developing the 2017-2018 IEPs. With respect to G.A.'s current social/emotional behavior, it was reported that G.A.'s fourth quarter of the 2016-2017 school year was very successful. Specifically, he was doing a great job of self-advocating and was able to approach challenging situations on his own with minimal assistance. G.A. was successful academically and emotionally.

*54.*    The IEP team spent many hours discussing what led to G.A. being admitted to the partial hospitalization program at Rogers Behavioral Health in January 2017 (second semester of his sixth-grade school year) and his progress and treatment since being discharged. According to the information from CIA and Rogers Behavioral Health, G.A. had successfully completed the program at Rogers, had returned to school and performed well academically, had no absences from school, and was having less frequent visits to the counselor for the remainder of the 2016-2017 school year.

*55.*    The IEP team celebrated the fact that G.A. was able to return to school after discharge and be educated at CIA with minimal supports. The same was evidenced by testimony and notes from G.A.'s psychiatrist, Jeri Fitzpatrick, M.D. who served as an expert witness for Petitioners.

*56.*    The IEPs that were proposed included goals for social-emotional behavior (when given a frustrating situation, G.A. will use coping strategies to reduce the time out of the classroom to less than 5 minutes per class in 4 out of 5 observable opportunities as measured by a data collection sheet), and pre-vocational (when given an assignment, G.A. will develop the necessary skills to be prepared for future expectations and responsibilities). The 8/9/17 IEP also included special education support in all academic areas to support each of these goals.

*57.*    In order to further accommodate G.A.'s mental health needs and to address concerns of intrusive thoughts and suicidal ideations, the IEP team developed a safety plan and included it in the proposed IEP. The plan provided a specific time each day that G.A. would check in with a designated school counselor. In the event he was unable to check in at the specific time, the counselor would locate him to check in. During the daily check in, the counselor would provide whatever counseling supports were needed.  The safety plan also set out additional procedures for the special education teacher in his classes to escort him to a

Page **40** of **65**

designated space outside of the classroom if he began feeling unsafe or emotionally distressed. The safety plan was developed because of concerns about his safety and suicidal thoughts in order to set procedures for school personnel to intervene and keep him safe. The ultimate goal would be to provide the support he needed to work through whatever was troubling him at the time and be able to return to class.

58.    The team took efforts to put a safety plan in place to ensure that G.A. was safe and had the supports he needed in place and that everyone knew their role in supporting G.A.'s mental health needs. If at any time, G.A. was experiencing any type of emotional needs, such as those articulated by W.A., then the counselor would respond accordingly. Dr. Rostetter testified that the counselor was perfectly qualified to implement the accommodations and service plan in the instructional setting and opined that the district was not required to provide a licensed counseling therapist to a student who the district believes can be accommodated in the natural setting with natural supports, consequences, and interventions.

59.    W.A. asserted that class size was key in dealing with G.A.'s mental health and emotional needs, since he continued to have intrusive and suicidal thoughts every day. Dr. Barkley testified that the student-teacher ratio at BMS was approximately 1-12 because although there may be up to 24 students in the classes G.A. would be assigned to, the classes included both a general education teacher and a special education teacher. In comparison, the average teacher-student ration at CIA was approximately 1-8.

60.    Furthermore, Dr. Barkley testified that the most recent research indicates that class size has little impact on student achievement. However, to further address W.A.'s concerns with class size, the team proposed a 1:1 educational assistant to provide constant support for G.A.'s mental health and emotional needs, but W.A. rejected this proposal asserting that it would not be beneficial. It is **CONCLUDED** that the evidence clearly indicates that WCS considered

Page **41** of **65**

G.A.'s individual circumstances regarding social-emotional behavior and prevocational needs and developed IEPs that were reasonably calculated to address those needs and allow him to receive passing marks and advance from grade to grade.

61.    WCS thoroughly considered G.A.'s individual circumstances related to his fine motor needs in developing the 2017-2018 IEPs. With respect to fine motor, G.A.'s OT evaluations, past and present, had consistently shown deficits in fine motor related to handwriting. CIA's ILPs (Individual Learning Plans) had included goals and accommodations for using technology to type rather than write. WCS's OT evaluation results were also consistent with this conclusion, and the IEP included a fine motor goal that was consistent with that being worked on at CIA. "Given a longer classroom assignment G.A. will self-manage technology to type 4/5 assignments, as measured by therapist and teacher observation." The IEP also included accommodations for the use of technology to type notes and assignments.

62.    Additionally, the IEP included consultative services to be provided by an OT two (2) times per month for fifteen (15) minutes each session as a related service. The IDEA defines related services as supportive services that are required to assist a child with a disability to benefit from special education." 34 C.F.R. § 300.34.  Related services may be provided either directly or on a consultative basis. When determining whether consultative or direct services are appropriate for a student, the team considers what the student needs in order to access their environment. If the student is able access the environment through classroom supports and accommodations that can be provided through less restrictive personnel such as a general education teacher, special education teacher or educational assistant, then the services would be provided on a consultative basis. If the student needs skilled therapeutic interventions in order to access their environment, direct services would be appropriate. Due to G.A.'s success with accessing his curriculum through typing at CIA (G.A.'s average typing speed increased to thirty-

one (31) words per minute which meets grade level expectations) the team determined G.A.'s needs could be met through a consultative service model to support him in the general education setting.

63.    W.A. asserts that G.A. should have been provided with direct OT services for fine motor needs because those services were being provided at CIA. However, unlike public schools, CIA has no criteria for determining whether or not a student receives related services. In fact, Ms. Murillo testified she had no knowledge about what was required for a school district to determine whether a student needed related services under an IEP.

64.    Despite the fact that G.A. had been receiving OT services since second grade at CIA related to fine motor deficits, G.A. still scored below average on the most recent fine motor assessment, and his handwriting was still not legible. There was also conflicting evidence among witnesses regarding G.A.'s fine motor skills (e.g., Elizabeth Murillo testified that he struggled with drawing even basic shapes while Dr. Parrot, CIA counselor, testified that G.A. enjoyed drawing and was very artistic).

65.    It is **CONCLUDED** that Petitioners provided no evidence to support the need for occupational therapy services beyond what WCS proposed. The evidence clearly indicates that WCS considered G.A.'s individual circumstances regarding his fine motor needs and developed IEPs that were reasonably calculated to address those needs and allow him to receive passing marks and advance from grade to grade.

66.    It is **CONCLUDED** that WCS thoroughly considered G.A.'s individual circumstances related to his hearing needs in developing the 2017-2018 IEPs. Although G.A. was determined not eligible as hearing impaired at the 8/9/17 IEP meeting, the IEP included specific accommodations for his hearing impairment (preferential seating with left ear towards speaker/sound source, obtain student's attention prior to speaking, allow extra time for

processing information, reduce auditory and visual distractions). The accommodations were based on medical information provided by W.A. and parent input. Dr. Barkley made comparisons between the noise level in classrooms at BMS and noise levels in classrooms at CIA during the 8/9/17 IEP meeting (testifying that when I do classroom observations-there is not a lot of noise that interrupts or keeps students from finding success. When presenting instruction in classroom at CIA and at BMS, the nature is similar and nature of noise level is similar). BMS provides services to a broad range of students with hearing impairments - from students with mild hearing loss to students with profound hearing loss who wear hearing aids or have cochlear implants. Ms. Arnoldt further testified that those students have been successful at BMS.

67.    Although W.A. presented G.A.'s hearing impairment as so severe that it limited his ability to participate in activities that involve crowds and loud noises, in reality, G.A. regularly participated in activities that involved crowds and loud noises including movies, visits to beaches, Legoland, and concerts. W.A. further asserts that G.A.'s tinnitus gets worse in crowds where noise levels are high and consequently his mental health begins to deteriorate. However, Petitioners presented no evidence to support this assertion or to indicate that G.A. could not tolerate the noise levels in a middle school setting. It is **CONCLUDED** that the evidence clearly indicates that WCS considered G.A.'s individual circumstances regarding his hearing needs and developed IEPs that were reasonably calculated to address those needs and allow him to receive passing marks and advance from grade to grade.

68.    It is **CONCLUDED** that the IEPs were not vague and contained measurable goals. When we review the entirety of the document and the discussion and the notes, we find a very thorough consideration of the needs of G.A. as expressed by W.A. and the data the district had when they developed the 8/9/17 IEP. Per Dr. Rostetter, FAPE was made available. The goals were stated with specificity and were measurable by those who would be serving him in the

Page **44** of **65**

general education classroom. Additionally, because the IEP provided special education support in all the core academic areas, there would be a special education teacher available for consultation with the general education teachers regarding G.A.'s goals, accommodations, and services. Per Ms. Griego, you sometimes have blanket accommodations and that's why there are special education teachers who work with the general education teachers to understand any and all accommodations.

69.    It is **CONCLUDED** that the IEPs that were proposed on 8/29/17 and 3/15/18 were reasonably calculated to enable G.A. to make appropriate progress in light of his circumstances.  The IEPs that were proposed on 8/29/17 and 3/15/18 are even more inclusive of new data regarding G.A. The team updated present levels of performance based on updated medical information and current progress reports from CIA. Ultimately, the totality of information regarding G.A.'s individual circumstances and current needs was considered when developing the IEPs for the 2017-2018 school year. Thus, all the evidence supports the conclusion that G.A. was offered FAPE through IEPs that were reasonably calculated to allow G.A. to make passing grades and advance from grade to grade.

70.    It is **CONCLUDED** that WCS had no obligation to accept the recommendations of G.A.'s private providers. A school district has the right to evaluate a child's special education needs and cannot be forced to use the independent evaluations obtained by a parent. When a parent obtains an independent evaluation, it must be considered by the public agency, if it meets agency criteria, in any decision made with respect to the provision of FAPE to the child.  34 C.F.R. § 300.502(c)(1).  While the "district must draw upon information from a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations," such independent evaluations are not dispositve. *K.W. v. Tuscaloosa Cty. Sch. System*, No. 7:17-cv-01243-LSC, 2018 WL 4539501, at *6 (N.D. Ala. Sept. 21, 2018) (quoting *Dubrow v. Cobb*

Page **45** of **65**

*County Sch. Dist.*, 887 F.3d 1182 at 1193. (quoting 34 C.F.R. § 300.306(c)). A district court in the Sixth Circuit agreed explaining that the district did provide some of the physician's recommendations, but "to the extent [the parent] complains that the District did not indulge every one her requests in the IEP development process, the IDEA does not require such deference to parents. *K.B. by McFarland v. Racine Unified School Dist.*, No. 19-CV-28-JPS, 2019 WL 6219485, at *3 (E.D. Wis. Nov. 21, 2019).

   *71.*    It is **CONCLUDED** that G.A.'s placement was based upon his least restrictive environment (LRE). The IDEA requires that students receive special education services in the LRE with nondisabled children to the maximum extent appropriate and "special classes, special schooling, or other removal of children with disabilities from the regular education environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 34 C.F.R. § 300.114(a)(2). The IDEA further provides the rebuttable presumption that a "child be educated in the school that he or she would attend if not disabled…unless the IEP of a child with a disability requires some other arrangement." 34 C.F.R. § 300.114(c). Thus, the IDEA mandates that the IEP's starting point is the child's home school and presuming so does not constitute predetermination. [9] *See Deal v. Hamilton Co. Bd. of Education*, 392 F.3d 840, 857 (6th Cir. 2004). Only when a child cannot receive FAPE in his or her home school would a school district be required to consider a restrictive special school placement such as CIA.

   *72.*    Even absent such a presumption, after developing G.A.'s present levels of performance, goals, services, and accommodations during the August 9, 2017 IEP meeting, the

---

[9] W.A. attempts to claim predetermination because the IEP team developed a safety plan, which identified persons at BMS, prior to determining G.A.'s placement. However, the team should presume the child can be served in his or her home school unless, through the IEP process, the team determines that child cannot be served in his home school, per Dr. Rostetter.

*APD 07.03-190734J TR Page 979*

IEP team discussed G.A.'s placement and determined the IEP could be implemented primarily in the general education setting with special education support services in all core academic areas at BMS. It is **CONCLUDED** that there is nothing in the record that precludes G.A. from being at BMS with appropriate supports. There is absolutely nothing in the record that would require the school district to deprive him of the liberty of going to school with his nondisabled peers in the general education environment. There is nothing that indicates WCS cannot provide appropriate services for G.A.  See Dr. Rostetter's Expert Report. It is clear that the record supports that G.A. could be served at his home school.

73.    The same is true for the IEP that was proposed during the August 29, 2017 IEP meeting. The team reviewed W.A.'s 8/10/17 letter item by item to address each and every one of her concerns about the IEP proposed on 8/9/17. The team also had a lengthy discussion regarding the requirements for placement in the LRE and presented a document to W.A. outlining the obligations of districts to place students in the school that the child would attend if the child did not have a disability. The team also had a thorough discussion about the continuum of services that were available reiterating the obligation under federal and state law to consider placement in the general education setting first. In fact, during the discussion, W.A. also indicated she did not want G.A. segregated. Ultimately, the team determined that placement in the general education setting for core academics at BMS was G.A.'s LRE.  However, W.A. again refused to sign the IEP and continued G.A.'s enrollment and attendance at CIA.

74.    The IEP team met again on March 15, 2018 to review the results of the hearing evaluation and to consider any updated information. The team reviewed the hearing evaluation report, determined eligibility, reviewed updated information from CIA, and revised the IEP to incorporate additional accommodations that were being implemented at CIA for the 2017-2018 school year.  No significant changes in G.A.'s present levels of performance had occurred since

Page 47 of 65

the last IEP meeting on August 29, 2017; thus, the team continued to propose a placement in primarily in the general education at BMS. Again, W.A. refused to sign the IEP and continued G.A.s placement at CIA.

75.    It is **CONCLUDED** that Petitioners have failed to prove substantive harm.

76.    WCS met or exceeded all the procedural requirements of the IDEA. WCS made FAPE available. See Rostetter Expert Report and testimony, Vol. XVI, p. 1764 (testifying that when we review the entirety of the document and the discussion and the notes, we find a very thorough consideration of the needs of G.A. as expressed by W.A. and the data the district had when they developed the IEP on 8/9/17).

77.    Assuming, *arguendo,* that there was a procedural violation with WCS's IEPs, there is no evidence that any such failure would result in substantive harm.  *Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 764 (6th Cir. 2001) (finding that only procedural violations that result in substantive harm justify relief). Instead, the evidence suggests that G.A. would have made passing grades and advanced from grade to grade at BMS.

78.    It is specifically **CONCLUDED** that there were no procedural violations, in the instant matter.

79.    Petitioners presented no expert testimony regarding the appropriateness of G.A.'s IEPs and proposed placement at BMS. Furthermore, Petitioners presented no expert testimony regarding the appropriateness of CIA.

80.    Petitioners tendered only one expert witness, Dr. Jeri Fitzpatrick, M.D., a licensed psychiatrist, who has been treating G.A. since June 2016. Dr. Fitzpatrick had not attended any of the IEP meetings for G.A., had no knowledge of the IEP team's discussions to develop the IEPs, had not reviewed the IEPs, and had not read notes from the IEP meetings or listened to audio recordings of the IEP meetings. Dr. Fitzpatrick had no knowledge about what resources and

Page **48** of 65

services were included in the proposed IEPs. In fact, her testimony specifically indicated she could not say that BMS couldn't provide counseling services for G.A. Furthermore, although Dr. Fitzpatrick did not render any formal opinions about the appropriateness of CIA, any testimony she provided about the appropriateness of CIA is not credible as it lacks a foundation or basis of reliable knowledge and information regarding CIA. Dr. Fitzpatrick testified she had never observed G.A. at CIA and was only briefly familiar with their academic program.

*81.*    In fact, Dr. Fitzpatrick's testified that she receives a lot of positive feedback from parents regarding BMS.

*82.*    The testimony offered by W.A. is barely credible, when balanced against the testimony and reports of other witnesses. W.A. attempts to paint a picture of G.A. as a child that has such severe mental health issues he is unable to participate not only in a regular school environment but is unable to fully participate in daily life. The Undersigned believes, however, that W. A. is being truthful, with regard to her own impressions of G. A.

*83.*    In her opening statement, W. A. described G.A. as a student with multiple significant disabilities. W.A. began by describing G. A.'s autism, which impairs his ability to communicate and interact with others, then his sensory processing, including a hypersensitivity to sound, mild to moderate unilateral hearing loss, multiple ear surgeries, missing 70 percent of his eardrum, tinnitus, congenital hypotonia which causes significant fine and gross motor deficits, visual motor deficits and finally a lesion on his brain. W.A. further discusses the severity of his mental health diagnoses beginning at age two (2). W. A. arguably mischaracterizes the educational and social impacts of G.A.'s fine and gross motor deficits, mental health issues, and hearing impairment by claiming he is so disabled he is unable to attend his regular school with nondisabled peers.

*84.*    However, the evidence reveals a completely different picture of G.A.  G.A. has consistently been successful academically; he is quite artistic and enjoys drawing; he participates in physical activities such as bowling, walking, biking, and swimming; he vacations with his family to the beach and Legoland; and even goes to concerts.

*85.*    The Undersigned does **NOT CONCLUDE** that W.A. intentionally misled the staff at BMS and the members of the IEP team to believe that G.A. would attend BMS for the 2017-2018 school year. Rather, W.A. withdrew her intent to place G.A. at BMS because she was dissatisfied with the IEP and its Safety Plan, as well as the lack of a Transition Plan, in that W.A. did not believe the IEP and Safety Plan to be adequate for what she perceived as G.A's needs.

*86.*    It is unclear when W. A. mentioned, for the first time, that the IEP team consider placement at CIA. In fact, during a discussion regarding the continuum of services and LRE at the 8/29/17 IEP meeting, she specifically told the members of the team she did not want G.A. segregated.

*87.*    W.A. never requested that the IEP team include private psychological counseling and psychiatric care as related services in the IEP, but has requested such in her due process complaint.

*88.*    W.A. arguably withdrew consent for completion of the hearing evaluation, and then alleges, as a basis for the due process case, that the district did not complete the evaluation timely.

*89.*    Furthermore, W.A. delayed the March 9, 2018 IEP meeting and now claims the district's denied G.A. FAPE due to the evaluation being delayed.

*90.*    Additionally, W.A. provided testimony during the hearing that was contrary to her deposition testimony. W.A. testified that she knew the specifics of the technology G.A. used in middle school during the due process hearing whereas she testified that she was unaware of the

Page **50** of **65**

technology G.A. was using during her deposition. W.A. also provided contradictory testimony during the due process hearing stating, under oath, that she had not listened to the recordings of the relevant IEP meetings to prepare for the due process hearing. This testimony could not have been accurate as she had previously introduced multiple clips from the recordings as evidence in the hearing. It would have been impossible to identify what portions of recordings to submit into evidence without having listened to the recordings.

91.    It is **CONCLUDED** that W.A. was afforded the opportunity to meaningfully participate in the development of the IEPs for G.A. W.A. attended all IEP meetings, was provided with procedural safeguards, and was an active participant.

92.    W.A. was provided opportunity to meaningfully participate in the development of G.A.'s assessment process, eligibility determinations and IEP meetings on 8/19/17, 8/29/17 and 3/15/18.

93.    In general, the IDEA requires a district to ensure that at least one parent of a child with a disability is afforded the opportunity to participate in the IEP process and is informed enough to provide consent to implement an IEP. 34 C.F.R. § 300.322. The IDEA allows parent participation and involvement in meetings and in placement discussions. 34 C.F.R. § 300.501. At all times relevant to this case, WCS not only allowed, but encouraged W.A. to meaningfully participate in the development of the assessment process, IEP meetings, and discussions with WCS. The record is overflowing with evidence of WCS's efforts to allow her to participate in the process. Dr. Barkley testified that BMS was going to be partnering [with W.A]. in G.A.'s education. Dr. Krista Hogan testimony indicated there was to be an open discussion with an opportunity [for W.A.] to express concerns and identify specifically what was missing from the 8/9/17 IEP. Dr. McRainey described the spirit of the meetings as both collaborative and

respectful with the parent having the opportunity to express her concerns and the staff listening carefully and considering options.

94.    In every instance where procedural safeguards were called for, WCS met its obligations and exceeded them, per Dr. Rostetter's Expert Report.  Meetings were held when a decision was being made about G.A., notice of meetings and the procedural rights were communicated in writing.

95.    WCS responded to all of W.A.'s correspondence timely and considered her input. WCS had an open line of communication with W.A., responding promptly to her requests. W.A. was consistently and persistently involved in the process. The record is overflowing with email exchanges between W.A. and WCS personnel at all times relevant to this case demonstrating WCS's continuous and persistent attempts to include W.A. as an equal team member. It is **CONCLUDED** that there is no evidence to support an allegation that the district failed to fulfill its obligation to communicate with the parent or interfered with the parent's right to ask questions, be heard, and receive a response.

96.    Although WCS asserts it was diligent in maintaining correspondence with W.A., Courts have declined to find violations of the IDEA's parental participation requirements even when districts have failed to respond to parents. *L.M.H. v. Arizona Dep't of Educ.*, No. CV-02212-PHX-JJT, 2016 WL 3910940, at *304 (D. Ariz. July 19, 2016) (holding that parent's opportunity to participate was not seriously infringed by a misstatement or by a failure to provide records because a parent attended both IEP meetings where she had the opportunity to be heard and ask questions, which was significant parental involvement."); *L.B. v Kyrene Elementary District No. 28*, No. CV-17-03316-PHX-SMB, 2019 WL 4187515, at *10 (D. Ariz. Sept. 4, 2019), appeal dismissed sub nom. *J.B. v. Kyrene Elementary District No. 28*, No. 19-16971, 2020 WL 1550669 (9th Cir. Feb. 12, 2020) (holding that "a parent only has a right to a response

Page **52** of **65**

to reasonable requests for explanations of the records" and "even if the district fails to respond…[it would] be a harmless procedural error that does not constitute a denial of FAPE." (referencing *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 910 (9th Cir. 2008). WCS's diligence in maintain communication with W.A. not only establishes compliance with the IDEA's requirements for parent participation but also shows its commitment in protecting her procedural rights.

97.    WCS never prohibited or limited W.A.'s input, rather she was given the same, if not more opportunities, to speak in the meetings, make recommendations, and ask questions prior to, during, and after the meetings. Based upon the foregoing, it is **CONCLUDED** that there is absolutely no evidence to support W.A.'s claims that she was denied meaningful participation during the assessment and IEP process. The evidence clearly shows the IEP team considered all of the information that W.A. provided and had meaningful discussion regarding her concerns. In fact, the evidence clearly shows the team revised the IEP to include suggestions from W.A. and private providers.

98.    It is **CONCLUDED** that not having access to assessment protocols did not deny W.A. meaningful participation. W.A. asserts that WCS's failure to provide her with copies of assessment protocols and answer sheets related to OT assessments deprived her of the right to participate in the IEP process. However, the IDEA does not require districts to copy proprietary, copyrighted assessment protocols for parents. Providing copies of assessment protocols and answer sheets may violate federal copyright laws and practitioner's ethical responsibilities to protect test security. Because testing protocols are copyrighted materials (and may contain proprietary information that must be kept secret from the public), districts can comply with FERPA and IDEA by either allowing the parent to inspect the records and/or by providing a summary of the assessment results in lieu of providing a copy of the test protocol. *Letter to*

Page **53** of **65**

*Price (OSEP* 10/12/10*)*. Courtney Baumer responded to W.A.'s request for copies of answer sheets and protocols by offering to meet with W.A., prior to the eligibility meeting on 8/ 19/17 to review and discuss the protocols and answers. However, W.A. declined this request.

99.    Best practice is to summarize findings and reports and provide scores in a written format. It is not common practice or best procedure to hand over assessment protocols that have already been scored and written on. When a parent requests a copy [of a protocol] WCS offers a set time for parents to come in and review them for two reasons:  (1) professionals who are trained to administer the assessments have an ethical obligation to protect the test security (if there were copies floating around or test questions were widely available it would mean the test wouldn't be as reliable or valid); (2) districts may be prohibited from reproducing copyrighted material. W.A. requested the copies again during the 8/9/17 IEP meeting, and WCS outlined the reasons for denial of such copies in the prior written notice and provided options for inspection and review and/or an individual educational evaluation (IEE) at district expense if she disagreed with the assessment results. W.A. never requested an IEE.

100.    While the IDEA makes it a mission to preserve the rights of parents and their children, those rights are not without limits and parents are not permitted to "dictate the terms and conditions of the reevaluation." *G.J. v. Muscogee Cnty. Sch. Dist*, 668 F.3d 1258, 1263 (11th Cir. 2012); see *McKnight v. Lyon Cty. Sch. Dist.*, No. 315CV00614MMDVPC, 2017 WL 3567519, at *6 (D. Nev. Aug. 17, 2017) (holding that a parent had no right to copies of a test her child had taken due to copyright laws and FERPA regulations)(emphasis added); *see also L.B. v. Kyrene Elementary School District No. 28*, No. CV-17-03316-PHX0SMB, 2019 WL 4187515, at *10 (D. Ariz., Sept. 4, 2019), *appeal dismissed sub nom*;  *J.B. v. Kyrene Elementary District No. 28*, No. 19-16971, 2020 WL 1550669 (9th Cir. Feb. 12, 2020)(holding that "a parent only has a right to a response to reasonable requests for explanations of records" and "even if the district

Page **54** of **65**

failed to respond…[it would] be a harmless procedural error that does not constitute a denial of FAPE."), *referencing L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 910 (9th Cir. 2008). The school district in *McKnight* asserted its refusal of a photocopy of records and tests was due to its obligation to comply with copyright and FERPA regulations and the contract that the district held with the company that created the test. *McKnight v. Lyon Cty. Sch. Dist.*, No. 315CV00614MMDVPC, 2017 WL 3567519, at *6(D. Nev. Aug. 17, 2017). The Court found that the district provided a legitimate reason for such refusal, and therefore, it did not amount to a violation. *McKnight v. Lyon Cty. Sch. Dist.*, No. 315CV00614MMDVPC, 2017 WL 3567519, at *7 (D. Nev. Aug. 17, 2017).

*101.*    It is **CONCLUDED** that WCS had a legitimate reasons for refusing W.A.'s request for copies of assessment protocols. Furthermore, W.A. had the opportunity to inspect and review the protocols and answer sheets with the OT who conducted the assessments and/or request an IEE at district expense if she disagreed with the results of the OT assessments.

*102.*    It is **CONCLUDED** that WCS permitted and encouraged W.A. to participate to the fullest extent of the law and, therefore, did not prevent her from meaningful participation in the IEP process.

*103.*    WCS had no obligation to accept the recommendations of G.A.'s private providers. W.A. appears to confuse medical services with special education and related services. Medical services that can be provided outside of the school environment are typically not medical services that are related to the curriculum needs of a student in special education; therefore, while the information is of importance for a service provider to know to understand the child, it is not information that in any way establishes an obligation on the part of the district to pay for such services, per Dr. Rostetter. For example, counseling services about a mental health

issue that is being addressed by a psychiatrist or counselor outside of the educational curriculum are not required to assist the child and are not educationally related services, per Dr. Rostetter.

*104.*    A lot of the services that G.A. received in the spring 2016 were necessary for him to recover from whatever trauma, depression, and anxiety he was experiencing, but those services were not educationally related medical services—They are analogous to any other type of medical services, per Dr. Rostetter.

*105.*    Furthermore, WCS had no obligation to personally contact G.A.'s private medical and/or mental health providers for their input into the IEP. There is a long history of the medical community making determinations about children that are not sound educationally, per Dr. Rostetter. Medical providers do not make educational placement decisions. In fact, the IEP team presented a document regarding this issue during the 8/29/17 IEP meeting, the LRE discussion document. The LRE placement decision is to be made by a group of persons including the parents, others knowledgeable about the child, and knowledgeable about evaluation data and placement options. Medical providers and other private providers are not required as a part of the decision-making process.

*106.*    In fact, the Sixth Circuit Court of Appeals has taken the position that school districts are not required to "include an expert in the particular teaching method preferred by the parents in order to satisfy the requirement that [the district] include persons knowledgeable about placement options." *Dong v. Bd. of Ed.*, 197 F.3d 793, 801 (6th Cir. 1999); *see also Renner v. Board of Ed.,* 185 F.3d 635, 644 (6th Cir. 1999) ("We cannot find from the record that the failure of the team to consult with plaintiffs' expert…constituted a serious deficiency in the IEP.").

*107.*    In this case, the WCS team members were well qualified to address G.A.'s needs. *See Dong v. Bd. of Ed.,* 197 F.3d 793, 801(6th Cir. 1999) (finding that the school staff members were "extremely well qualified" to address the student's programming needs); *see also Renner v.*

Page **56** of **65**

*Board of Ed.*, 185 F.3d 635 (6th Cir. 1999) (finding that the school's team did have "adequate

background, experience, and training to assess the child's needs and develop a program; thus, the

failure to consult with the child's expert did not create a serious deficiency in the IEP). G.A.'s

private providers were not required team members under the IDEA. At most, the private

providers were allowable team members with knowledge or special expertise regarding G.A. *See*

34 C.F.R. § 300.321(a).

*108*    There is no evidence to suggest that W.A. requested that G.A.'s private providers

attend the IEP meetings or be involved in the development of the IEPs, much less that she was

denied such opportunity. Instead, the record shows that WCS received relevant information that

was developed by private providers and considered such information in the development of the

IEPs. A school district has the right to evaluate a child's special education needs and cannot be

forced to use the independent evaluations obtained by a parent. When a parent obtains an

independent evaluation, it must be considered by the public agency, if it meets agency criteria, in

any decision made with respect to the provision of FAPE to the child. 34 C.F.R. § 300.502(c)(1).

While the "district must draw upon information from a variety of sources, including aptitude and

achievement tests, parent input, and teacher recommendations," such independent evaluations

are not dispositive. *K.W. v. Tuscaloosa Cty. Sch. System*, No. 7:17-cv-01243-LSC, 2018 WL

4539501, at *6 (N.D. Ala. Sept. 21, 2018) (quoting *Dubrow, v. Cobb County Sch. Dist*, 887 F.3d

1182 at 1193. (quoting 34 C.F.R. § 300.306(c)).

*109.*    A district court in the Sixth Circuit agreed explaining that the district did provide

some of the physician's recommendations, but "to the extent [the parent] complains that the

District did not indulge every one her requests in the IEP development process, the IDEA does

not require such deference to parents. *K.B. by McFarland v. Racine Unified School Dist.*, No. 19-

CV-28-JPS, 2019 WL 6219485, at *3 (E.D. Wis. Nov. 21, 2019) (upholding the ALJ's decision

that the parent failed to show a denial of parental participation because the IDEA does not require the district to provide every service or accommodation the parent might request).

*110.* It is **CONCLUDED** that Petitioners' unilateral private placement at CIA is not an appropriate program under the IDEA. The IEPs developed and proposed for G.A. met or exceeded the procedural and substantive requirements under the IDEA.

*111.* However, assuming, *arguendo,* that WCS failed to provide FAPE to G.A., Petitioners would still be barred from obtaining reimbursement for the cost of unilaterally placing G.A. at CIA. WCS does not dispute that "IDEA's grant of equitable authority empowers a court to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Carter*, 510 U.S. at 12. However, the Sixth Circuit Court of Appeals has held that a private placement is not appropriate under the IDEA "when it does not, at a minimum, provide some element of special education services in which the public school was deficient." *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 523 (6th Cir. 2003); see also *Indianapolis Pub. Sch. v. M.B.*, 771 F.Supp.2d 928, 930-31 (S.D. Ind. 2011) (holding that a private placement was inappropriate when it only offered tutoring services, as opposed to special education services, and did not address the student's emotional needs). Thus, evidence that a child is "doing well" in a private placement is not enough to support a claim for reimbursement when the placement fails to provide the special education services the public-school district was found to be lacking. Indianapolis Public Schools v. *M.B., 771 F.Supp.2d* 928 at 930-31 (S.D. Indiana 2011). Furthermore, a parent's concerns and fears do not justify a private placement at public expense. *See John M. v. Brentwood Union Free Sch. Dist.*, No. 11-CV-3634 PKS SIL, 2015 WL 5695648, at *7-10 (E.D.N.Y. Sept. 28, 2015) (holding reimbursement for a unilateral private placement was inappropriate despite feelings of security and safety at the private school

Page **58** of **65**

and concerns of returning the child, who suffered from anxiety and depression, to an environment where he had been harassed).

112.    Moreover, "parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk." *Sch. Comm. of Burlington v. Dept. of Educ.*, 471 U.S. 359, 373-374. In such a situation, under the *Carter* standard, parents are "entitled to reimbursement *only* if a federal court concludes both that the public placement violated the IDEA *and* that the private school placement was appropriate under the Act." Carter, 510 U.S. at 15.  As discussed below, Petitioners have failed to prove that CIA provided "appropriate" educational services pursuant to the IDEA, and are therefore not entitled to reimbursement for the cost of their unilateral placement of G.A. at CIA.

113.    CIA is not an appropriate placement because it lacks the fundamental and essential characteristics that define a free appropriate public education. In general, the very nature of CIA's program is inappropriate to meet G.A.'s needs under the IDEA. CIA does not require its teachers to hold an educator's license, is a one size fits all program where services are not IEP driven, has an exclusionary admission criteria, and does not provide inclusion with nondisabled peers.

114.    Although Petitioners contend that CIA provides supports for G.A. through an ILP, an ILP holds no weight. The administrative staff develop the ILPs without parent input. Many of the items listed in ILPs are included for all students and are not based on individual student needs.  Furthermore, there is no requirement, legal or otherwise, that CIA actually follow through with the implementation of the ILP.

115.    Moreover, CIA can accept or deny student admission based on their own internal criteria and likewise can exclude students, after admission, for any reason. In fact, CIA excluded

Page **59** of **65**

G.A. from attendance at CIA on more than one occasion due to mental health issues and suicidal ideations, per Dr. Fitzpatrick. Furthermore, they provided no in-home services or instruction during the times when he was prohibited from attending school due to mental health issues and suicidal ideations.

*116.*    The only difference that Petitioners can claim between the program at CIA and the program at BMS is the typical class size. However, the IEP team discussed the typical class size for inclusion classes at BMS (which were included in G.A.'s IEP) as having similar teacher-student ratio as the classes at CIA because there was an additional teacher in each class. Dr. Barkley testified that the student-teacher ratio at BMS was approximately 1-12 (testifying that although there may be up to 24 students in the classes G.A. would be assigned to, they included both a general education teacher and a special education teacher). In comparison, the average teacher-student ratio at CIA was approximately 1-8. Dr. Barkley further testified that the most recent research indicates that class size doesn't have much impact on student achievement. Further, Petitioners presented no research to the contrary.

*117.*    Petitioners also contend that the noise level at BMS would be detrimental to G.A. due to his hearing loss. However, the school members of the IEP team indicated that the classroom settings at BMS were likely very similar to those at CIA regarding noise level. Dr. Barkley made comparisons between the noise level in classrooms at BMS and noise levels in classrooms at CIA during the 8/9/17 IEP meeting, testifying that "when I do classroom observations—there is not a lot of noise that interrupts or keeps students from finding success. When presenting instruction in classroom at CIA and at BMS, the nature of noise level is similar."

*118.*    There is no evidence that G.A. could not tolerate the levels of noise in a middle school setting especially in light of the evidence he could attend concerts and go to crowded

Page **60** of **65**

amusement parks. Thus, even if the evidence were to support W.A.'s position that CIA is a quieter environment, it is **CONCLUDED** that there is no evidence to show that G.A. required such environment to receive FAPE.

*119.*    Petitioners allege that WCS denied G.A. a FAPE because they did not include counseling as a related service in the IEP. However, the 8/9/17 IEP included a safety plan which required a daily check in with a specific school counselor. The safety plan further required the counselor to locate and check in with G.A. if he was unable to or failed to check in with her at the designated time. The inclusion of the safety plan into the IEP required WCS to provide the service pursuant to the IDEA.

*120.*    The CIA ILP for the 2016-2017 school year did not include counseling as program component. Petitioners assert the inclusion of social coaching as a component on the ILP was indicative of counseling being provided on an ongoing basis. However, social coaching was described as being a component for all students, per Dr. Parrot. Although, Dr. Parrot testified that she was meeting with G.A. for a full class period weekly, such requirement was clearly not important enough to be included in the ILP. Furthermore, there is no requirement, legal or otherwise, that CIA actually follow through with the implementation of those things that are actually included in the ILP.

*121.*    Moreover, CIA is a highly restrictive placement. All students attending CIA are students with unique learning needs. Thus, it is impossible for G.A. to participate with nondisabled peers at all, much less to the maximum extent appropriate as required under the IDEA. Furthermore, a program in which G.A. is only receiving instruction with other students with special education needs in a separate school is not less restrictive than the inclusion setting in his home school proposed by WCS. Thus, it is **CONCLUDED** that CIA is not the least restrictive environment for G.A. as required by the IDEA. 20 U.C.A. § 1421(a)(5).

*122.* Petitioners contend that G.A.'s academic success is directly correlated with attending CIA. However, there is no evidence to support this correlation. If such logic prevailed, no child would ever be removed from a restrictive placement.

*123.* A district must base a student's LRE on the student's needs at the time the IEP is developed. Even when a student has been successful in a more restrictive setting, the IEP team would work to move back down the continuum of services to determine if they could be successful in a lesser restrictive setting with typical peers to the maximum extent possible.

*124.* One of the primary purposes of the IDEA is to prepare students for further education, employment, and independent living. 20 U.C.A. § 1400(d)(1)(A). Although a placement that segregates G.A. may be desirable to W.A., it will likely not support the primary purposes set out by the IDEA.

*125.* G.A. is a student with disabilities who is entitled to receive special education and related services from qualified teachers and service providers in his least restrictive environment with his neighborhood peers. W.A. may choose to place G.A. in any private school of her choosing, including CIA, but she is not entitled to receive public funds to reimburse her for such a placement when it is not appropriate under the IDEA. The evidence is clear that CIA does not even provide the services and supports that WCS proposed; thus, it could not possibly provide something that was lacking from G.A.'s proposed program. It is **CONCLUDED** that because CIA does not provide the special education and related services which W.A. claims WCS failed to offer, it cannot be "proper" under the IDEA.[10]

---

[10] Petitioners will likely cite to a previous decision from 2010 finding CIA to be an appropriate placement for a student identified as learning disabled and other health impaired along with a medical diagnosis autism as authority for their assertion that CIA is an appropriate placement for G.A.; however, the IDEA requires placement decisions to be made by IEP teams based on the individual needs of the student. Thus, a finding that CIA was appropriate for one student with a disability does not create a presumption that is appropriate for all students with disabilities.

126.    It is **CONCLUDED** that Petitioners are not entitled to reimbursement for psychotherapy or psychiatric treatment. Petitioners have failed to prove that reimbursement for private psychotherapy, exposure responsive prevention therapy, and psychiatric treatment are related services required for G.A. to receive FAPE.

127.    The IDEA defines related services as transportation, and such developmental, corrective, and other supportive services…as may be required to assist a child with a disability to benefit from special education and related services. *Butler v. Evans*, 225 F.3d 887 (7th Cir. 2000). The analysis for what constitutes education and related services must focus on whether [the disabled child's] placement may be necessary for educational purposes, or whether the placement is a response to medical, social, or emotional problems that is necessary quite apart from the learning process. *Doe v. Shorewood School District*, 2005 WL 2387717 (E.D. Wisconsin 2005). Medical services that can be provided outside of the school environment are typically not medical services that are related to the curriculum needs of a student in special education that we address in schools, and therefore, while the information is of importance for a service provider to know to understand the child, it is not information that in any way establishes an obligation on the part of the district to pay for such services, per Dr. Rostetter. Furthermore, W.A. never requested that CIA pay for private psychotherapy, response prevention therapy, or psychiatric treatment even though personnel from CIA recommended that such therapies were necessary. Thus, reimbursement for these services is not appropriate form of relief.

128.    This case turns on a determination of whether WCS properly evaluated G.A., identified all suspected areas of disability, and then offered G.A. an IEP that was reasonably calculated to enable him to make progress appropriate in light of his circumstances. The evidence clearly demonstrates that WCS conducted a timely and proper evaluation and spent hours carefully developing an IEP for the 2017-2018 school year. The IEPs were based upon

Page **63** of **65**

information provided by W.A. from CIA and G.A.'s private providers. The IEP team took into consideration all input of W.A. in the development of the IEPs. Ultimately, WCS provided IEPs that were reasonably calculated to enable G.A. to make progress appropriate in light of his circumstances.

*129.*    It is **CONCLUDED** that the evidence does not support Petitioners' allegations against WCS or support the assertion that CIA is an appropriate placement under the IDEA. WCS has offered to provide FAPE and is not obligated to provide reimbursement for an inappropriate private placement.

*130.*    It is **CONCLUDED** that Petitioners have failed to prove that WCS denied G.A. FAPE and have failed to prove that CIA was an appropriate placement.

*131.*    It is further **CONCLUDED** that the Petitioners have failed to carry their burden of proof.

*132.*    It is **CONCLUDED** that WCS is the prevailing party on all issues.

*APD 07.03-190734J TR Page 997*

It is so **ORDERED**.

This FINAL ORDER entered and effective this the **30th day of June, 2020.**

_Mattielyn B. Williams_
MATTIELYN B. WILLIAMS
ADMINISTRATIVE JUDGE
ADMINISTRATIVE PROCEDURES DIVISION
OFFICE OF THE SECRETARY OF STATE

Filed in the Administrative Procedures Division, Office of the Secretary of State, this the **30th day of June, 2020.**

_Stephanie Shackelford_
STEPHANIE SHACKELFORD, DIRECTOR
ADMINISTRATIVE PROCEDURES DIVISION
OFFICE OF THE SECRETARY OF STATE

<u>**NOTICE OF FILING PROCEDURES**</u>

Due to the COVID-19 pandemic, APD has changed its filing procedures.  Until further notice, filings should be made by **email** to <u>APD.Filings@tn.gov</u> or by **facsimile** to 615-741-4472. Paper filings should only be made by mail if a litigant has no access to either email or facsimile. If you are filing by email, documents should be saved in PDF format prior to filing.  Each document to be filed must be a separate PDF.  Only one filing method should be used.  Please name PDFs for filing in the following format:

"APD CASE NUMBER  YOUR NAME  ABBREVIATED NAME OF DOCUMENT BEING FILED AGENCY NAME"