

**State of Tennessee**

# Department of State

Administrative Procedures Division
312 Rosa L. Parks Avenue
8ᵗʰ Floor, William R. Snodgrass Tower
Nashville, Tennessee 37243-1102
Phone: (615) 741-7008/Fax: (615) 741-4472



Nashville, TN 37209

Nashville, TN 37219

Nashville, TN 37209

Nashville, TN 37323

**RE: E.S., THE STUDENT AND K.W., THE STUDENT'S PARENT/GUARDIAN V. CLARKSVILLE MONTGOMERY COUNTY SCHOOL SYSTEM, APD Case No.**

Enclosed is a *Final Order*, including a *Notice of Appeal Procedures,* rendered in this case.

Administrative Procedures Division
Tennessee Department of State

Enclosure(s)

**BEFORE THE TENNESSEE DEPARTMENT OF EDUCATION DIVISION OF
SPECIAL EDUCATION**

IN THE MATTER OF:

**E.R.S. THE STUDENT,**
**K.W. THE PARENT,**
   *Petitioner,*
*v.*
              APD Case No. ████████

**CLARKSVILLE MONTGOMERY**
**COUNTY SCHOOL SYSTEM,**
   *Respondent.*

## <u>FINAL ORDER</u>

 The hearing in this matter came before Shannon Barnhill, Administrative Judge, assigned by the Tennessee Secretary of State's Administrative Procedures Division, on ████████ and ████████.

 E.S., the Student, and K.W., the Parent, were represented by Attorneys ████████ and ████████. Clarksville Montgomery County School System (CMCSS) was represented by Attorney ████████.

 Petitioners alleged the following: (1) The Individualized Education Plan (IEP) developed for the ████████ school year failed to provide E.S. with a free appropriate public education. (2) CMCSS violated the Special Education Behavior Supports Act and the IDEA by using excessive and unlawful restraints. (3) CMCSS committed numerous procedural violations of the IDEA which resulted in substantive harm to E.S., and (4) CMCSS violated Section 504, 29 U.S.C. § 794 and the Americans with Disabilities Act by failing to provide E.S. with proper accommodations and services and that CMCSS's actions also caused E.S. to experience unjustified discrimination, psychological trauma, and physical harm from the widespread and improper use of restraint.

Petitioners sought the following relief: (1) Provide compensatory education for the failure to provide FAPE during the ▮▮▮▮▮ school year; (2) Fund E.S.'s placement at ▮▮▮▮▮ ▮▮▮▮▮ for the ▮▮▮▮▮ school year; and (3) Attorney's fees and costs associated with the due process case.

Based upon the pleadings, the evidence at trial, the parties' post-trial briefs, the oral arguments of the parties, and the record in this case, it is **DETERMINED** that the relief sought by the Petitioners should be **DENIED**.

This decision is based upon the following findings of fact and conclusions of law:

## **FINDINGS OF FACT**

### **Background**

1.      The student, E.S., is a ▮▮▮▮▮ (DOB ▮▮▮▮▮) young lady who enrolled at ▮▮▮▮▮ in ▮▮▮▮▮, Tennessee, on ▮▮▮▮▮.

2.      Prior to attending ▮▮▮▮▮, E.S., attended two schools in the CMCSS District.   The first being ▮▮▮▮▮ and the second being ▮▮▮▮▮ ▮▮▮▮▮ (▮▮▮▮▮).

3.      E.S. attended ▮▮▮▮▮ for ▮▮▮▮▮ and ▮▮ grade.

4.      E.S. was initially evaluated for eligibility for special education in ▮▮.

5.      The claims set forth in Petitioners' Complaint in this matter revolve around the ▮▮▮▮▮ school year when E.S. was in ▮▮ grade.

### **Witnesses**

6.      ▮▮▮▮▮, Ed.S., is a licensed school psychologist.   She was employed by the district during the ▮▮▮▮▮ and ▮▮▮▮▮ school years.   She completed E.S.'s psychoeducational report on ▮▮▮▮▮.

7.     ████████████ is a special education teacher at ██████.  She was E.S.'s case manager during the ██████ school year. ██████ has a bachelor's degree and master's degree in Special Education. She has been a special education teacher since 1998. In addition, ██████ has been trained in the CRT and CPI methods of restraint for 10-15 years. ██████ was qualified as an expert in special education and in restraint, transport and calming techniques.

8.     ████████████ is the Director of Schools for ██████. He has served as Director of Schools for four years.

9.     ████████████ is a Command Sergeant Major (CSM) with the United States Army, Fifth Battalion Regiment stationed at Fort Campbell. S.W. is one of his soldiers.

10.    S.W. is K.W.'s husband and E.S.'s stepfather. He is a UH-60 Blackhawk repairer with the military.

11.    ████████████ served as the principal at ██████ during the ██████ school year. ██████ has been in education since 1987 as a teacher or administrator.  She has a bachelor's degree in science, a master's degree in administration and supervision and an Ed.S. in administration and supervision.  ██████ was qualified as an expert in administration and supervision.

12.    ████████████ is a Staff Sergeant with the United States Army stationed at Fort Campbell.

13.    ████████████, LBA, BCBA, M.Ed., is a licensed board-certified behavior analyst.  ██████ also teaches and supervises students in applied behavior analysis at Lipscomb University. ██████ was qualified as an expert in applied behavioral analysis.

14.    K.W. is the mother of E.S.

15.    ████████████ is a teacher at ██████████ in ██████, Tennessee. Prior to the Fall of ██████ she was the Director of the ██████████ at ██████████.  She has been

licensed to teach in Tennessee for more than 47 years. She has a master's degree in elementary administration.

16. ████████████ is a behavior consultant with the district. She has been with the district for five years. She has a bachelor's degree in psychology and a master's degree in behavior analysis. ████████ was qualified as an expert school behavior specialist and consultant.

17. ████████ is one of the elementary special population's coordinators for ████. She also oversees or assists in special education matters in the elementary schools and supervises the behavior consultant team. Since 2004 she has served as a special education teacher, behavioral consultant, or coordinator. She holds a bachelor's degree in special education and a master's degree in psychology. ████████ was qualified as an expert in special education and behavioral issues in a school setting.

18. ████████████ was an educational assistant who worked with E.S. during the ████████ school year.

19. ████████ is the Assistant Principal at ████ during the ████ school year. She has held that position for more than eleven years. She holds a bachelor's degree in elementary education and a master's degree in administration supervision. She is a licensed K-8 teacher and a licensed professional administrator. She is certified in restraints. ████ was qualified as an expert in administration and supervision.

20. ████████ was E.S.'s general education teacher during the ████ school year. She has a bachelor's and a master's degree in education. She was a licensed teacher with more than 15 years of teaching experience. ████ was qualified as an expert in general education.

21.    ███████ was the school counselor at ██████ during the ████████ school year.  She has a bachelor's and a master's degree in education and a master's degree in school counseling.   She is a licensed school counselor for grades K-12.  She has 10 of counseling experience in the elementary school setting in addition to 18 years of elementary teaching experience. ██████ was qualified as an expert in school counseling.

22.    ████████ is a criminal investigator with the Montgomery County Sheriff's Office Special Victims Unit.  During the ████ school year Detective Largent was a School Resource Officer (SRO) with the Montgomery County Sheriff's Office assigned to ██████. Detective ████ has 7 years of experience in law enforcement and a bachelor's degree in criminal justice.

## Eligibility for Special Education

23.    E.S. was initially evaluated for eligibility for special education in ████ by ████████. E.S. was ████ years old at the time. The referral was made due to E.S.'s excessive behavioral difficulties and her above average academic skills. (Hr. Transcript, Vol. █ p. █, Lines ████, Exhibit █).

24.    The referral packet that ████████ received included a letter from Dr. ██████ ████████. (Hr. Transcript, Vol. █ p. █, ██, p. █ Lines ██).

25.    Dr. ████████ letter stated that he had diagnosed E.S. with ██████ ████████ ████████████████████████████████████.

26.    ████████ testified that E.S., to the best of her recollection, had been cooperative during the evaluation.  (Hr. Transcript, Vol. █ p. █, Lines ███).

27.    ████████ completed the required psychoeducational evaluation and included the following assessments: Reynolds Intellectual Assessment Scales, Woodcock-Johnson Tests of Achievement, Behavior Assessment System for Children, Adaptive Behavior Assessment

System, Tennessee Teacher Observation Checklist for Gifted and Tennessee Parent Observation Checklist for Gifted. (Exhibit █).

28.    The Reynolds Intellectual Assessment Scales ("RIAS") is a nationally normed test of intelligence. E.S. composite score of █ places her in the 99th percentile compared to other children her age. (Hr. Transcript, Vol. █ p. █, Lines ██, p. █, Lines ███, Exhibit █.

29.    The Woodcock-Johnson provides information about a student's academic performance. (Hr. Transcript, Vol █ p. █, Lines ██, Exhibit █).

30.    Based on the results of the Woodcock-Johnson, E.S. was achieving at a high level in most academic areas with a relative weakness in math. (Exhibit █).

31.    The Behavior Assessment System for Children ("BASC") looks at several types of behavior, externalizing behavior, e.g. hyperactivity and aggression, and internalizing behavior, e.g. anxiety, depression, and withdrawal. (Hr. Transcript, Vol. █ p. █, Lines ███, Exhibit █).

32.    Based on the teacher ratings, E.S.'s scores on the BASC placed her in the at-risk range in the areas of ██████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████).

33.    ██████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████

34.    ████████ testified that 'at risk' indicates that follow-up is required. 'Clinically significant' indicates that the behaviors are concerning compared to other students her age. (Hr. Transcript, Vol. █ p. █, Lines ████, p. █, Line █).

35.    Conduct problems are 'typically overt behaviors that can be choice in nature. It's a very gray area in educational eligibility and emotional disturbance because it's very difficult to ascertain what are choice behaviors and what are true emotional disturbance. But conduct problems are more typically things that again if we're looking more toward adolescents lead to criminal types of activity.' (Hr. Transcript, Vol. █ p. █, Lines █████).

36.    ████████ also testified that E.S. is capable of making choices and following school rules. However, 'it's extremely difficult to differentiate between what are choice behaviors and what are true emotional disturbances. She scored high on hyperactivity, which could be related to a diagnosis of ████████ can sometimes look like choice behaviors if there are overt decisions, anger, aggression. It would be very difficult unless I'm looking at a specific incident of specific behavior to say it is or is not every single time.' (Hr. Transcript, Vol. █ p. █, Lines ████, p. █, Lines █████, p. █, Lines ███).

37.    The Adaptive Behavior Assessment System looks more at adaptive behavior skills, e.g. conceptual skills, which are school-based skills, following directions, completing

work. It also looks at a social domain for that as well as a practical domain, e.g. hygiene. (Hr. Transcript, Vol. █ p. █, Lines █████, p. █, Line █, Exhibit █).

38.     In the school setting, teachers rated E.S.'s adaptive skills as below average in almost all areas. (Exhibit █).

39.     Both the teacher and parent checklists for gifted are used to determine whether a student qualifies under the eligibility category of Intellectually Gifted. (Hr. Transcript, Vol. █ p. █, Lines █████, p. █, Lines █).

40.     █████ recommended that the IEP team consider the results of her evaluation to determine whether E.S. is eligible for special education under the categories of ████████ ████████████████████████████

41.     █████ findings were presented to E.S.'s IEP team and the team determined that E.S. was eligible under the categories of ███████████████████████████ ███████████ ██ ████████ ████████ ████████ ███████████

42.     █████ testified at the hearing that E.S. could be manipulative but stated she was basing her opinion solely on the fact that E.S. is highly intelligent. (Hr. Transcript, Vol. █ p. █, Lines █).

43.     █████ testified that despite E.S.'s Emotional Disturbance designation that she is capable of making choices, including whether to follow school rules or not to follow school rules. (Hr. Transcript, Vol. █ p. █, lines █████, p. █, line █).

44.     █████ testified that the criteria for an Emotional Disturbance designation is based more on internalizing scales as opposed to externalizing scales when determining emotional disturbance eligibility. (Hr. Transcript, Vol. █ p. █, lines █████).

**IEP/FBA/BIP**

45.    On ▮▮▮▮▮▮▮▮, E.S.'s IEP team met to develop E.S.'s annual IEP. (Exhibit ▮).

46.    The Special Considerations section of the IEP states indicates that E.S.'s behavior impedes her learning or the learning of others. The section also states that a Functional Behavior Assessment ("FBA") and Behavior Intervention Plan ("BIP") will be used to address E.S.'s behavior. The IEP also notes that E.S. will be removed from the classroom and gifted services will not be made up if E.S.'s behavior impedes the learning of others. (Exhibit ▮).

47.    The Present Levels of Performance ("PLOPs") section of the IEP lists her as exceptional in the areas of Advanced Reading, Pre-Vocational, Social/Emotional Behavior and Speech. (Exhibit ▮).

48.    The Pre-Vocational PLOPs indicate that E.S. has difficulty with following directions, responding to criticism, obeying rules and regulations, accepting mistakes and disappointments, refraining from disturbing and distracting others, and beginning work without hesitation. The Impact of Mastery of Standards section of the IEP states that E.S. has an FBA in place to address her behaviors that impact her learning and others. (Exhibit ▮).

49.    The pre-vocational goal states that 'Given a directive, E.S. will follow directions with no more than one (1) prompt during eight (8) out 10 opportunities as measured by Daily Point Sheet. (Exhibit ▮).

50.    The Social/Emotional Behavior PLOPs include the assessment data from the psychoeducational evaluation that was completed by ▮▮▮▮▮▮. The section also includes a narrative that states 'E.S. struggles to attend P.E. and recess with her peers. She will often refuse to participate and/or go outside. E.S. struggles with tasks she perceives as pointless or trivial. She will refuse to complete them. When confronted, she will become angry and use inappropriate language, elope or pout extensively.' The Impact of Mastery of Standards section states that E.S.

will refuse to follow directives, disrupt the learning environment, destroy classroom materials and become aggressive towards adults. (Exhibit █).

51.     ███████ testified that if E.S. did not want to go to recess or P.E., she would 'dig her feet in and not move.' (Hr. Transcript, Vol. █ p. █ , Lines ████ ).

52.     ███████ also testified that if E.S. did not want to do things that she 'felt were beneath what she could do. If she didn't understand the reason for doing it, you had to have conversations with her and explain things, and she'd usually come around.' (Hr. Transcript, Vol. █ p. █ , Lines ████ ).

53.     The Social/Emotional goal states that 'When faced with a frustrating situation, E.S. will appropriately request a break in 8/10 observable trials for 10 consecutive trial periods, as measured by her daily behavior tracking form. (Exhibit █).

54.     The IEP includes the following services: 30 minutes/day of Social Behavior with Resource, 60 minutes/week of Gifted Services, and 60 minutes/week of Speech Therapy. (Exhibit █).

55.     The Social Behavior services were provided by a special education assistant. (Hr. Transcript, Vol. █ p. █ , Line █ , p. █ , Lines ███ ).

56.     The IEP does not include any supports for school staff. (Exhibit █).

57.     On ██████████, the IEP team met to create an annual IEP for E.S. (Exhibit █).

58.     The Pre-Vocational PLOPs were the same as the prior IEP. (Exhibit █, Exhibit █).

59.     The objective assessment data was removed from the Social/Emotional Behavior PLOPs. The narrative has been updated to state that E.S. has made improvement, but the remainder of the narrative is the same as the prior IEP. (Exhibit █, Exhibit █).

60.     The Pre-Vocational and Social/Emotional goals from the prior IEP were updated to state that E.S. will meet the goals 9/10 times instead of 8/10 times. (Exhibit █).

61.     One additional Pre-Vocational goal was added: Given a non-preferred directive, E.S. will be able to comply without verbal/non-verbal refusal during 7 out of 10 opportunities as measured by her daily point sheet. (Exhibit █).

62.     One additional Social/Emotional goal was added: Given a situation E.S. perceives as frustrating, she will be able to use classroom materials appropriately during 8 out 10 opportunities as measured by a daily behavior tracker. (Exhibit █).

63.     Except for the removal of speech services, the related services and program support for school staff remained the same as the prior IEP. (Exhibit █, Exhibit █).

64.     The Student's FBA and BIP were initially developed in ████████████. (Exhibit █).

65.     ████████ explained that the function of a behavior is 'what the student is trying to gain from whatever behavior she is exhibiting.' (Hr. Transcript, Vol. █ p. █, Lines ████).

66.     According to the FBA, the function of E.S.'s behavior is escape from demands or access to tangible items. (Exhibit █).

67.     ████████ testified that an example of escape would be E.S. either shuts down or goes to the bathroom. She seeks something else to do. (Hr. Transcript, Vol. █ p. █, Lines ██ █).

68.     ████████ also testified that E.S. received individual therapy weekly from ██ ██. (Hr. Transcript, Vol. █ p. █, Lines ████).

69.     The weekly therapy was not included as a related service on the IEP. According to ████ this was because in the Respondent's school district guidance counselors are not usually included on an IEP. (Hr. Transcript, Vol. █ p. █, Lines ████).

70.     ████████ testified that she saw E.S. in private counseling sessions during the ████████ school year. (Hr. Transcript, Vol. ██, p. ██, Lines █).

71.    She did not keep any logs or records of the counseling sessions. (Hr. Transcript, Vol. ██ , p. ██ , Lines ██ ).

72.    The BIP allowed E.S. to take one break per subject period. (Exhibit ██ ).

73.    The BIP also allowed E.S. to request a break in the cafeteria because the cafeteria is noisy and very loud. (Hr. Transcript, Vol. ██ , p. ██ , Lines ██ ).

74.    E.S. liked to talk to the adults, go for walks, or have some earned computer time on her breaks. (Hr. Transcript, Vol. ██ p. ██ , Lines ██ ).

75.    ████████ was part of the team that drafted E.S.'s behavior plan. (Hr. Transcript, Vol. ██ , p. ██ , Lines ██ ).

76.    ████████ did not provide any direct services to E.S. (Hr. Transcript, Vol. ██ , p. ██ , Lines ██ ).

77.    ████████ testified at the hearing that as a consultant she could not provide any direct services to E.S. ████████ did not know if anyone else in the district could have provided direct services. (Hr. Transcript, Vol. ██ , p. ██ , Lines ██ ).

78.    IEP Progress Monitoring reports were created for the goals related to E.S.'s gifted services.  The reports were not created for E.S.'s pre-vocational and social-emotional goals, because the data for those goals was included in E.S.'s FBA. (Hr. Transcript, Vol. ██ p. ██ , Lines ██ , Exhibit ██ ).

79.    It is noted that K.W. participated in the IEP development and approved implementation at the annual IEP Team meeting in ██ . She testified that 'As far as advocating for [E.S.], I feel like we always did well at overcoming some, you know – sometimes things got a little tense in IEP meetings as far as what they could do, couldn't do, what we felt was best for her, but we always worked it out. And it was always talked about. We were able to come to an

agreement and form a plan that I thought we were all on the same page about all the time.' (Hr.

Transcript, Vol. ██, p. ██, Lines ██)

## Reflection Room

80.     The Reflection Room was a room where a student could 'cool down' or take a

break. The student can return to their classroom when they have completed an 'exit ticket' or a

classroom assignment. If a student refuses to complete the 'exit ticket' or assignment, then

school staff will 'wait them out'. There is no limit to how much time a student can spend in the

Reflection Room. (Hr. Transcript, Vol. ██, p. ██, Lines ██).

81.     The Reflection Room is the size of a small workroom. It does not have a window

to the outside. The floor is not carpeted. It has a sink, a countertop, and some cabinets. A desk

and chair can be brought in if a student chooses to sit and complete their work. (Hr. Transcript,

Vol. ██, p. ██, Lines ██).

82.     The 'grumpy room' was another name for the Reflection Room. Only one student

could be placed in the Reflection Room at one time. (Hr. Transcript, Vol. ██, p. ██, Lines ██, p.

██, Lines ██).

83.     ██████████ testified that at times, E.S. had to be transported from the hall to the

Reflection Room. She stated that they do not carry a student and that if a student lifts their feet

off the ground, they stop the transport. (Hr. Transcript, Vol. ██, p. ██, Lines ██, P. ██, Lines

██).

84.     School staff kept a log of the time that E.S. spent in the Reflection Room. The log

shows that on some days, E.S. spent several hours in the Reflection Room. (Hr. Transcript, Vol.

██ p. ██, Lines ██, Exhibit ██).

85.     ██████████ witnessed E.S. causing injuries to other school staff while E.S. was in

the Reflection Room. (Hr. Transcript, Vol. ██, p. ██, Lines ██).

86.     School staff would attempt to deescalate E.S.'s behavior by 'try[ing] to talk to her
… giv[ing] her her space … just kind of back away.' However, they could not leave her by
herself in the Reflection room, so if they had to be in there, they 'would just give her space.' (Hr.
Transcript, Vol. ██, p. ██, Lines ███).

87.     K.W. testified at the hearing that she believes that the documentation shows that
E.S only becomes involved in 'what the school staff says is hand-to-hand combat' after E.S. has
been transported or restrained and taken to the grumpy room or the Reflection Room. (Hr.
Transcript, Vol. ██, p. ██, Lines ███).

███████ - ███████

88.     K.W. testified that the ██████ school started out 'great' and that E.S. was
looking forward to it. E.S. was coming home 'happy, smiling.' (Hr. Transcript, Vol. ██, p. ██,
Lines ████, p. ██, Lines ███).

89.     Text messages exchanged between K.W. and ██████ indicate E.S. was
generally doing well in ██████ and ██████. (Exhibit █).

90.     The point sheets that were used to track E.S.'s behavior also indicate that the year
started off well although several point sheets indicate that E.S. was sleeping during class.
(Exhibit █).

91.     On ██████, E.S. received a Disciplinary Referral. The description for
the infraction states that E.S. ran from an adult and then was taken to the Reflection Room. She
then tore up her work and said, "I hate you". She also hit two adults multiple times while trying
to run again. As a consequence, E.S. received a one day of out of school suspension. (Exhibit
█).

92.     The behavior data collected for ██████ showed that E.S. was removed from
the class four times, eloped from the class twice and fell asleep in class five times. (Exhibit █).

93.    Eloping was added to the BIP as a new target behavior but sleeping was not. (Hr. Transcript, Vol. ▮ p. ▮, Lines ▮).

94.    ▮▮▮ testified that they 'didn't have any trouble at the beginning of the year. Everything basically happened after ▮▮▮ although there was a period in ▮▮▮ where things were good and then it got worse after Christmas break. (Hr. Transcript, Vol. ▮ p. ▮ Lines ▮, p. ▮ Lines ▮).

95.    ▮▮▮ testified that E.S. did well the first semester of the school year. Her behavior changed drastically around mid-January, when E.S. began shutting down. (Hr. Transcript, Vol. ▮, p. ▮ Lines ▮).

96.    Initially, ▮▮▮ noticed E.S. shutting down or withdrawing mainly during math, but then E.S.'s withdrawal and avoidance 'started impacting everything.' (Hr. Transcript, Vol. ▮ p. ▮ Lines ▮, p. ▮ Lines ▮).

97.    In ▮▮▮ opinion, E.S. made educational progress during the ▮▮▮ school year. (Hr. Transcript, Vol. ▮ p. ▮ Lines ▮, p. ▮ Line ▮).

98.    ▮▮▮ also believed that E.S. made academic progress during the time she was enrolled in the district. (Hr. Transcript, Vol. ▮ p. ▮ Lines ▮).

99.    E.S.'s grades for the ▮▮▮ school year show that she received all F's in the third quarter of the year. (Exhibit ▮

100.    ▮▮▮ testified at the hearing that E.S. was generally quiet in her classroom, but that at times E.S. would elope from the classroom. (Hr. Transcript, Vol. ▮ p. ▮ Lines ▮ ).

101.    ▮▮▮ testified that E.S.'s behavior was 'definitely worse' after the ▮▮▮ suspension. (Hr. Transcript, Vol. ▮ p. ▮ Lines ▮).

102.    ███████ described E.S. as 'checked out' during both the first and second

semester of the ██████ school year. (Hr. Transcript, Vol. ██ p. ██ Lines ██ ).

103.    ███████ stated that E.S.'s violent behavior began from 'week one'. (Hr.

Transcript, Vol. ██ p. ██ Lines ██ ).

<u>**U.S. Army Involvement**</u>

104.    ██████████ was the military school liaison officer for ████████ (Hr.

Transcript, Vol. ██ p. ██ Lines ██ ).

105.    A military school liaison officer serves as a bridge between the military

community and the schools in that community of the installation. (Hr. Transcript, Vol. ██ p. ██

Lines ██ ).

106.    Involvement of the liaison officer can be initiated by either the military family or

the school. (Hr. Transcript, Vol. ██ p. ██ Lines ██ ).

107.    ███████ testified at the hearing that she reached out to █████████ for

advice concerning E.S.'s situation at ██████ ██████ explained that she "was asking for

any direction or insight. Maybe there were just things that [██████████] could, you know,

had access to, or services that she knew of that we couldn't access because they were military

dependents on post, with things that maybe a regular community member would not have access

to, you know, and if there's other things that are available after working there for so many years.

So just looking for advice. We were at our wit's end with trying to help E.S and work with the

parents, and I was gonna welcome any, any and all advice.' (Hr. Transcript, Vol. ██ p. ██ Lines

██ , p. ██ Lines ██ , p. ██ Lines ██ , Exhibit ██ ).

108.    ███████ also testified at the hearing that she shared information about E.S. with

██████████ to enlist her support in identifying possible services that could assist the school

with E.S. (Hr. Transcript, Vol. ██ p. ██ Lines ██ ).

Page **16** of **53**

109. K.W. did not invite ██████████ to E.S.'s IEP meetings. ██████████ became involved after the school reached out to the garrison through ██████████, another Army official. (Hr. Transcript, Vol. ██ p. ██ Lines ██ ).

110. CSM ██████ became involved with the situation between the district and the Petitioners after being contacted by the 101st Division leadership. (Hr. Transcript, Vol. ██ p. ██ Lines ██ ).

111. According to CSM ██████ he got involved because his higher command advised that E.S. was having difficulty at school and K.W. did not want to help out. (Hr. Transcript, Vol. ██ p. ██ Lines ██ ).

112. After receiving information from S.W. and K.W. that didn't coincide with the information he received from his higher command about the situation at Rossview, CSM ██████ decided that he would attend a meeting to assess the situation himself. (Hr. Transcript Vol. ██ p. ██ Lines ██ ).

113. CSM ██████ requested that S.W. invite him to the next meeting at the school, which was the ██████████ IEP meeting. (Hr. Transcript, Vol. ██ p. ██ Lines ██ ).

114. Staff Sergeant ██████████ was asked by the Rear D Command to escort K.W. to meetings at ██████████ (Hr. Transcript, Vol. ██ p. ██ Lines ██ ).

115. In ██████████, Superintendent ██████ shared information about E.S. and S.W. in an email with ██████████, the aforementioned Executive Officer to the Commander at Fort Campbell. (Exhibit ██ ).

116. ██████████ denied knowing what conversation the email referred to. (Hr. Transcript, Vol. ██ p. ██ Lines ██ ).

117. ██████████ testified at the hearing that he and ██████████ have a great relationship. (Hr. Transcript, Vol. ██ p. ██ Line ██

118.   ███████ testified that 'it's very possible' that he had a conversation with ██ ███ about the situation with E.S at ███████ (Hr. Transcript, Vol. █ p. ██ Lines ██).

119.   About 13,000 of the students in the district are military-connected. (Hr. Transcript, Vol. █ p. ██ Lines ██).

120.   ███████ stated that reaching out to the garrison's office at Fort Campbell is done to 'ensure that we're exhausting any and all supports that might exist that we may not be aware of.' (Hr. Transcript, Vol. █ p. ██ Lines ███).

121.   ███████ could not recall 'ever reach[ing] out to provide or have any kind of communication about consent or anything else with the family.' (Hr. Transcript, Vol. █ p. ██ Lines ██).

122.   ███████ did not recall disclosing any confidential information about E.S. with the military and his conversations with the military concerned the inappropriate conduct of the parents. ███████ impression was that the military thought he was correct to question the parents conduct. (Hr. Transcript Vol. █ p. ██ Lines ███, p. ██ Lines ██).

123.   On ███████, ███████ emailed ███████ notifying ███████ that ███████ had requested military presence again at a meeting involving E.S. (Exhibit █).

124.   ███████ testified that he did not have any reason to dispute that ███████ had requested military presence at the meeting for E.S. (Hr. Transcript, Vol. █ p. ██ Lines ███).

125.   ███████ also testified that he was not concerned that the district's efforts in involving the U.S. Army in the issues related to E.S. at ███████ might adversely impact S.W. as a career soldier. (. (Hr. Transcript, Vol. █ p. ██ Lines ███).

### SRO Involvement

126.   SROs do not typically attend IEP meetings. (Hr. Transcript, Vol. █ p. ██ Lines ██).

127.    ██████ testified that she did not ever remember an SRO attending an IEP meeting prior to the situation with E.S. She offered that the SRO was required due to security and safety issues. (Hr. Transcript, Vol. █ p. ██ Lines ██).

128.    Detective ██████ has attended IEP meetings with students other than E.S. on occasion. (Hr. Transcript, Vol. ██ p. ██ Line ██ p. ██ Line █).

129.    Detective ██████ restrained E.S. at ██████ on at least one occasion. (Hr. Transcript, Vol. ██ p. ██ Lines ██).

130.    Detective ██████ testified that she had not received any training specifically for students with disabilities, but that she had received training 'in people with mental illness or mental incapacities.' (Hr. Transcript, Vol. ██ p. ██ Line ██).

131.    As part of her law enforcement duties, Detective ██████ wrote and filed several incident reports documenting E.S.'s behavior at ██████ (Exhibit █).



PageID 228

134.    On ██████████, Detective ██████ responded to a call from school staff advising that E.S. was attempting to elope.  E.S. was taken to the reflection room where she assaulted three school staff and Detective Largent who placed herself between E.S. and school staff. (Exhibit ██ ).

135.    On ██████████, Detective ██████ responded to a call from school staff involving E.S. who had attempted to elope from the school building.  ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ ███ ██████████████████

████████████ ██

136.    On ██████████, Deputy ██████████ was called to ██████ because E.S. had walked out of the building.  Upon arriving at ██████ Deputy ████ observed E.S., who had been brought back into the building, ████████████████████████████

██████████████ ██ ████████████████████████████

████████████████ ██████ ████████████████ ██ ████████████

████████████████████████ ██

137.    To this point Detective ██████ had declined to file juvenile petitions against E.S. because of her age.  According to Detective ██████ the judge typically will not hear cases for juveniles under the age of ██████ (Exhibit ██ ). (Hr. Transcript Vol. ██ p. ██ Lines ██ ).

138.    On ██████████, Detective ██████ E.S. responded to a call from school staff involving E.S. who was assaulting school staff. ██████ ██████ ████████████

██████████ ██████ ████████████████████████████ ██████

████████████████████████ ██████ ██ ████████████





143.     █████████ testified that she does not receive copies of any incident reports written by the SRO. (Hr. Transcript, Vol. ██ p. ██ Lines ██).

144.     K.W. testified at the hearing that prior to █████████, she had a good relationship with E.S.'s IEP team. (Hr. Transcript, Vol. ██ p. ██ Lines ██).

145.    On ████████████, E.S. was restrained by ████████ and ████████. The restraint occurred in the Reflection Room after E.S. began hitting and kicking adults. E.S. was warned prior to the restraint that if she didn't stop hitting and kicking, she would be restrained using a two-man seated hold. E.S. had been transported to the Reflection Room because she refused to do her work, refused to take a break, and refused to call her mother. (Exhibit ██).

146.    If an IEP does not include a provision for restraint, then an IEP meeting must be held within 10 days of every restraint. (Hr. Transcript, Vol. ██ p. ██ Lines ████).

147.    The school did not follow-up with an IEP meeting within the 10 days required by law. (Hr. Transcript, Vol. ██ p. ██ Lines ████, p. ██ Line ██).

148.    It is noted that the school attempted to schedule an IEP meeting twice to discuss adding restraint to the IEP, however, K.W. was the individual who declined the first meeting attempt because she did not receive 10 days' notice, although she acknowledged in her testimony that apparently she received an email regarding the ████████████, meeting to conduct an IEP meeting and watch video that she had requested, and canceled the second meeting because of homecoming. (Exhibit ██) (Hr. Transcript Vol. ██ p. ██ Lines ████, p. ██ Lines ████).

149. ██ ████████████████████████████ ████████ ██ ████████



151.    Beginning in late ████ ████████ was assigned to work with E.S. every day in an "ISS" setting. ████████ was assigned to work with E.S. because E.S.'s behaviors had escalated and she was eloping from the classroom and wandering the halls. When E.S. began the

school day, she was offered a choice as to whether she wanted to go to her classroom to complete her work or go to her 'office' to complete her work. E.S.'s office was a room that was also used for in-school suspension. If E.S. chose the office, then she would be asked to complete her classwork. If she refused, the staff would give her some time and then reiterate their request that she complete her work. (Hr. Transcript, Vol. ██ p. ██ Lines ██, p. ██ Lines ██, p. ██ Lines ██, p. ██ Lines ██ Exhibit ██ and ██ p. ██ Lines ██, p. ██ Lines ██, Line ██, Exhibit ██).

152.    ██████████ testified at the hearing that she had sustained injuries that were inflicted by E.S. (Hr. Transcript, Vol. ██ p. ██ Lines ██, p. ██ Lines ██).

153.    ██████████ stated that the injuries would occur when E.S. did not want to work. (Hr. Transcript, Vol. ██ p. ██ Lines ██).

154.    ██████████ testified that she did not have any idea why E.S. did not want to work.  She stated that sometimes E.S. would come in 'a mood not wanting to work.' Staff would attempt to speak with E.S. about why she didn't want to work but E.S. would not always answer them. (Hr. Transcript, Vol. ██ p. ██ Lines ██, p. ██ Lines ██, p. ██ Lines ██).

155.    ██████████ testified that at times she carried E.S. when transporting her. (Hr. Transcript, Vol. ██ p. ██ Line ██ p. ██ Lines ██).

156.    E.S. suffered injuries during some restraints. She hit her head on the wall during one restraint. ██████████ did not recall whether DCS was contacted. E.S. would also refuse to allow the nurse to examine her after a restraint. (Hr. Transcript, Vol. ██ p. ██ Lines ██, Exhibit ██).

157.    ██████████ was not aware of any photos being taken of E.S.'s injuries. (Hr. Transcript, Vol. ██ p. ██ Lines ██).

158.    ███████ testified that she was also injured by E.S. She could not remember when the injuries occurred. (Hr. Transcript, Vol. ██ p. ██ Lines ██ ).

159.    K.W. told school staff the E.S. did not have violent behavior at home. (Hr. Transcript, Vol. ██ p. ██ Lines ██ .

160.    ███████ testified that she sustained injuries that were caused by E.S. (Hr. Transcript, Vol. ██ p. ██ Lines ██ ).

161.    After the "ISS setting" plan was implemented, E.S.'s behaviors were worse. (Exhibit ██ ).

162.    On ███████, E.S. was restrained three times by ███████ and ███ for hitting, kicking and biting adults. (Exhibit ██ Exhibit ██ ).



164.    That same day, E.S. was restrained six times by ███████, ███████, and ███████ for hitting, kicking and pushing adults. (Exhibit ██ Exhibit ██ ).

165.    ███████ testified at the hearing that they considered whether the "ISS setting" plan should be discontinued, but the school staff decided that they did not have any other options. (Hr. Transcript, Vol. ██ p. ██ Lines ██ ).

166.    Behavior data collected showed that E.S.'s work completion during the ███████ ███ school year initially decreased but then rebounded in ███████ . The same downward pattern occurred in ███████ , but the rebound did not occur in ███████ . ███████ did not know what factors accounted for the difference. (Hr. Transcript, Vol. ██ p. ██ Lines ██ , Exhibit ██ ).

167.   The behavior data showed that E.S. utilized a significantly fewer number of breaks in ███████ then she did in ███████. ███████ was not sure why E.S. required fewer breaks during the ███████ school year. (Hr. Transcript, Vol. ██ p. ██ Lines ████ Exhibit ██).

168.   On ███████, E.S. was restrained by ███████ and ███████ after E.S. spent 40 minutes hitting, kicking, punching and choking adults. Prior to the restraint, E.S. was warned she would be restrained if she did not stop aggressing. (Exhibit ██).

169.   Sometime in late ███████ K.W. noticed that E.S. had bruises on her arms and torso.  When asked what led to the bruising, E.S. responded that they happen at school from her teachers holding and restraining her. (Hr. Transcript, Vol. ██ p. ██ Lines ████, p. ██ Lines ██, p. ██ Lines ██, Exhibit ██).

170.   K.W. then requested that she be able to view video footage of E.S. at ███████ She sent between 8-10 emails to school staff, including ███████ and ███████. K.W. was consistently told that her request was too broad or that pulling the video footage was otherwise too difficult. (Hr. Transcript, Vol. ██ p. ██ Lines ████ p. ██ Lines ██).

171.   Eventually, the school agreed to allow K.W. to view some of the video footage. ███████ informed the army command that K.W. would require an escort at the meeting. (Hr. Transcript, Vol. ██ p. ██ Lines ████, p. ██ Lines ████, Line ██ p. ██ Lines ██).

172.   The meeting was scheduled for ███████. (Hr. Transcript, Vol. ██ p. ██ Lines ██).

173.   Sergeant ███████ attended the meeting with K.W. (Hr. Transcript, Vol. ██ p. ██ Lines ██).

174.   When K.W. and Sergeant ███████ arrived at the school, the school staff attempted to discuss changes to the IEP. Specifically, the school staff proposed amending E.S.'s IEP to add

restraint to E.S.'s IEP. However, K.W. had not received an invitation to an IEP meeting and thought she was there only to view the videos, not to attend an IEP meeting. Because she had not received the required 10-day notification of an IEP meeting, K.W. declined to make any changes to the IEP. (Hr. Transcript, Vol. ██ p. ██ Lines ███, p. ██ Lines ██, Exhibit ██).[1]





177.    The bruising on E.S.'s arms was consistent with the transport depicted in the video. (Hr. Transcript, Vol. ██ p. ██ Lines ██).

179.    On ███████████, K.W. sent an email to ██████████ requesting all documentation referencing the times E.S. had been restrained. (Exhibit ██).

180.    K.W. testified that prior to receiving the documentation on ██████████, she had not received any of the restraint reports. (Hr. Transcript, Vol. ██ p. ██ Lines ██).

[1] As noted earlier, K.W. acknowledged receiving an email that included an ISP meeting request at the ██████████ ██, meeting.

181.    On ███████████, ████████ emailed K.W. to request that K.W. tell E.S. that it was not safe for E.S. to roam the halls. (Exhibit ██).

182.    ████████ testified that E.S. would wander down hallways which were unsafe and where children were not supposed to be. On at least one occasion, E.S. walked out of the front door of the school. (Hr. Transcript, Vol. ██ p. ██ Lines ██).

183.    School staff began recording additional details about E.S.'s behavior in an ABC (antecedent/behavior/consequence) log. (Hr. Transcript, Vol. ██ p. ██ Lines ██, Exhibit ██ ██).

184.    On ███████████, ████████ met with E.S. to discuss planning goals and rewards that E.S. might like. At one point, ████████ asked E.S. if she was thinking about what she might like to work for and E.S. responded by saying 'No. I'm thinking about how I could sabotage this plan.'

185.    On ███████████, ████████ emailed other school staff stating that the purpose of an upcoming IEP meeting was to add restraint language to E.S.'s IEP. (Exhibit ██).

186.    ████████ responded to the email, stating that K.W. does not have to agree with the proposal to add restraint language to the IEP and that K.W. 'could file due process if she chooses.' (Exhibit ██).

187.    ████████ testified at the hearing that she agreed with adding restraint language to the IEP because 'things had escalated to that degree that, that there was a threat to her or others.' (Hr. Transcript, Vol. ██ p. ██ Lines ██).

188.    ████████ also testified that the school would not implement an IEP that the parent disagreed with. (Hr. Transcript, Vol. ██ p. ██ Lines ██).

189.    ███████ testified at the hearing that if IEP team members disagree about changes to an IEP, the LEA can make the final decision. (Hr. Transcript, Vol. ██ p. ██ Lines ███ ).

190.    ███████ testified that if a student is restrained on one or more occasion, then 'you should always call a meeting to discuss the addition of CRT or restraint to the IEP.' (Hr. Transcript, Vol. ██ p. ██ Lines ██ ).

191.    On ████████, ████████ emailed ████████ to provide her with an update on E.S.'s situation. ████████ shared that E.S. had been recently suspended and that as a result ████████ was "enjoying a peaceful day with the other 986 students at ████████." (Exhibit █ ).

192.    On ████████, ████████ emailed ████████. In her email ████████ states that E.S. had not completed any work that day and that E.S. had not attended class in weeks. (Exhibit █ ).

193.    ███████ testified at the hearing that ████████ was typically assigned to ████████ for one day per week, but the school required more of her services due to E.S.'s escalating behavior. (Hr. Transcript, Vol. ██ p. ██ Lines ███ ).

194.    ███████ testified that the school never held a manifestation hearing for E.S. (Hr. Transcript, Vol. ██ p. ██ Lines ███ ).

195.    ███████ explained that a manifestation determination was not appropriate because E.S. had neither been suspended for 10 days nor had the school sought a change in placement. (Hr. Transcript, Vol. ██ p. ██ Lines ██ ).

196.    On ████████, ████████ emailed a drawing that was created by E.S. to ████████. ████████ stated in the email that the drawing reflected E.S.'s desire to blow up the school with TNT. (Exhibit █ Exhibit █ ).

197.    ████████ testified at the hearing that she sent the drawing to ████████ to

inform ████████ that things were not improving with E.S. and that the school was still in a

moment of crisis. (Hr. Transcript, Vol. █ p. █ Lines █).

198.    ████████ did not recall whether she had shared the drawing with K.W. (Hr.

Transcript, Vol. █ p. █ Lines █).

199.    On ████████, K.W. sent ████████ an email. In her email, K.W.

requests information regarding the triggers that result in E.S.'s aggressive behavior. K.W. also

asks how the data is collected and how a behavior plan is developed. In her response, ██

████ states that the data shows that E.S.'s behavior escalated after the ████ suspension.

(Exhibit █).

200.    On ████████, ████████ emailed ████████ stating that E.S.

needed 'more than ROES' and that it had been 'hand to hand combat'. (Exhibit █).

201.    ████████ testified at the hearing that she had sent the email to Dr. ████ to

discover what options were available to address E.S.'s situation. (Hr. Transcript, Vol. █ p. ██

Lines ██).

202.    ████████ did not know what other placements might be available. (Hr.

Transcript, Vol. █ p. █ Lines █.

203.    On ████████, the IEP team met at ████████ CSM ████████ attended the

meeting also. When they arrived at the school, he and K.W. were taken to a room where E.S. was

being held because she was out of control earlier that day. CSM ████ testified that the room

reminded him of a detention room from his memories as a youngster and that a teacher guarded

the doorway blocking E.S. from leaving. (Hr. Transcript, Vol. █ p. ██ Lines ██).

204.    At the meeting, the school members of the team proposed adding restraints to

E.S.'s IEP, but K.W. would not consent. K.W. requested that E.S. be removed from the ISS



setting and placed back in her general education classroom and the team agreed. (Hr. Transcript, Vol. ▮ p. ▮ Lines ▮, p. ▮ Lines ▮, Exhibit ▮).

205.    The IEP was also amended to provide a 1:1 aide in the general education and special education setting for a trial period of one month. (Hr. Transcript, Vol. ▮ p. ▮ Lines ▮ ▮ Exhibit ▮).

206.    After the meeting, CSM ▮ K.W. and S.W. were permitted to view video footage of E.S. CSM ▮ testified at the hearing that the video showed E.S. being carried by her arms by two adult women and was "getting walked, escorted out of the building backwards." (Hr. Transcript, Vol. ▮ p. ▮ Lines ▮, p. ▮ Lines ▮).

207.    S.W. testified that the video showed E.S. being carried in a 'crucifix position and that she was elevated off the floor by at least a foot.' (Hr. Transcript, Vol. ▮ p. ▮ Lines ▮, p. ▮ Lines ▮).

208.    After the meeting, CSM ▮ emailed his supervisor to notify them that the situation at the school was not consistent with the information that the district had shared with the command leadership. (Hr. Transcript, Vol. ▮ p. ▮ Lines ▮).

209.    Following the meeting, K.W. sent daily emails to ▮ to verify that E.S. was walking to her classroom. (Exhibit ▮ ▮ ▮ ▮).

210.    E.S. attended counseling sessions with Connect Counseling in 2019. (Hr.Transcript, Vol. ▮ p. ▮ Lines ▮, Exhibit ▮).

211.    K.W. testified that she believed E.S. could follow school rules when E.S. had the right supports and was in a supportive environment. (Hr. Transcript, Vol. ▮ p. ▮ Lines ▮).

212.    It is noted that E.S. follows school rules at ▮ with no supports in place. (Hr. Transcript Vol. ▮ p. ▮ Lines ▮, p. ▮ Lines ▮, p. ▮ Lines ▮, p. ▮ Lines ▮, p. ▮ Lines ▮).

213.    According to ████████████ E.S. is capable of following school rules and does so. (Hr. Transcript Vol. ██ p. ██ Lines ██).

214.    According to ████████ during the first six weeks of the ████████ school year 'the only day that she was out of sorts at all was a day where she had stayed up way too late and she was tired. She was just a tired kid. Any child can act like that when they're tired.' (Hr. Transcript Vol. ██ p. ██ Lines ██).

215.    On ████████, ████████ sent an email to ████████ reminding ████████ to document all of E.S.'s behaviors. ████████ explained that the team would not be able to move forward with a change of placement if behaviors are not being documented. (Exhibit ██).

216.    During the days prior to ████████, E.S. had been on her computer a lot and staff wanted to ween her from that. (Hr. Transcript, Vol. ██ p. ██ Lines ██).

217.    On ████████, ████████ sent an email to ████████ stating that it was 'problematic' that E.S. was 'being allowed the computer all day after refusing to get off.' (Exhibit ██).

218.    ████████ testified at the hearing that E.S.'s behavior often escalated when she was not given what she wanted. (Hr. Transcript, Vol. ██ p. ██ Lines ██).

219.    ████████ also testified that E.S. knew what her expectations were and that she was expected to work first and then earn her computer. (Hr. Transcript, Vol. ██ p. ██ Lines ██).

220.    ████████ testified that prior to the morning of ████████, E.S. had not wanted to complete any work in the classroom but school staff had permitted her access to her computer to play YouTube videos. (Hr. Transcript, Vol. ██ p. ██ Lines ██, p. ██ Lines ██, Exhibit ██).

221.    ████████ further testified that it was ████████ who suggested that E.S. be denied access to her laptop on the morning of ████████. ████████ did not recall whether she personally had knowledge of the plan to remove the computer from the cart. (Hr. Transcript, Vol. █ p. ██ Lines ██, p. ██ Lines ██).

222.    On the afternoon of ████████, ████████ removed E.S.'s computer from the cart so that E.S. would not be able access it the next day. (Hr. Transcript, Vol. █ p. ██ Lines ██).

223.    ████████ was not aware of the plan to remove E.S.'s computer. (Hr. Transcript, Vol. █ p. ██ Lines ██).

224.    On ████████, E.S.'s computer was not on the cart. ████████ told E.S. that E.S. was going to need to start working for her computer and that she would no longer be permitted to stay on it all day doing whatever she wanted to do. (Hr. Transcript, Vol. █ p. ██ Lines ██, Exhibit █).

225.    When E.S. noticed that her computer was missing, she picked up her things and left the classroom. She wandered down a hallway where students are not permitted and hit ██ with her t-shirt. School staff led 'her back that way, just like a human chain, and walked her towards the Reflection Room.' Once in the Reflection Room, E.S. began choking herself. (Hr. Transcript, Vol. █ p. ██ Line █ p. ██ Lines ██).

226.    ████████ testified at the hearing that she never considered offering E.S. her computer back. (Hr. Transcript, Vol. █ p. ██ Line ██).

227.    ████████ testified that she and ████████ were attending a meeting at central office the morning of ████████. When ████████ arrived at the school, she saw E.S. lying on the floor attempting to bang her head. (Hr. Transcript, Vol. █ p. ██ Lines ██, p. ██ Lines ██).

228.     School staff at ███████ called K.W. and S.W. to notify them that E.S. was trying to commit suicide and that the school staff had called an ambulance. K.W. asked to speak with E.S. When the phone was put on speaker, K.W. could hear E.S. screaming 'Let me go'. K.W. asked the school staff to release E.S. so that K.W. could speak to her, but the school staff would not release E.S. (Hr. Transcript, Vol. █ p. █ Lines █, p. █ Lines █, p. █ Lines █ █).

229.     It is noted that school staff could not release E.S. under the circumstances for her own safety.

230.     K.W. replied that she and S.W. were on their way to the school and would be there in approximately 15 minutes. They also requested that the school not allow the ambulance to transport E.S. (Hr. Transcript, Vol. █ p. █ Lines █, Vol. █ p. █ Lines █).

231.     When K.W. and S.W. arrived at the school, they did not see an ambulance. They waited for several minutes in the front office until they were addressed by a ███████ staff member. After inquiring about where E.S. was, they were informed that the front office did not have communication with the school staff who were with E.S. After several minutes, K.W. and S.W. were informed that E.S. was being loaded in an ambulance at the back of the school. (Hr. Transcript, Vol. █ p. █ Lines █, Vol. █ p. █ Lines █, p. █ Lines █, p. █ Lines █, Exhibit █).

232.     As the ambulance started to drive away, K.W. and S.W. raced after it. They were able to get the attention of the driver, who stopped when he saw them. (Hr. Transcript, Vol. █ p. █ Lines █, p. █ Lines █, Exhibit █).



234.    When K.W. asked that E.S. be released to her, the law enforcement officers stated that they had legal documents to take E.S. into custody. However, after speaking with the EMS supervisor, K.W. and S.W. were permitted to leave with E.S. (Hr. Transcript, Vol. ██ p. ██ Lines ████, p. ██ Lines ███, Vol. ██ p. ██ Lines ████, Exhibit ██).

235.    K.W. and S.W. transported E.S. to the emergency room at ████████████



Hospital where they were met by behavioral health. Behavioral health was on-scene due to the claim that E.S. was suicidal. After behavioral health evaluated E.S., they determined that she was not a threat to herself and they released her to her parents. (Hr. Transcript, Vol. ██ p. ██ Lines ████, p. ██ Lines ███).

236.    Later that afternoon, K.W. emailed ████████ and ████████ requesting an explanation for what had happened that morning. K.W. also stated that no one from the school had reached out to her and that the parents shouldn't be left in the dark regarding what led to the incident. When questioned on direct regarding ████████ 'premature' comment in her response to school staff in a reply email. ████████ responded that she believed the accusation that the parents were being left in the dark was 'premature'. The email from K.W. was sent at 2:31 p.m. on the day of the incident and the school day hadn't ended at that point. (Exhibit ██). (Hr. Transcript Vol. ██ p. ██ Lines ███).

237.    Based on the statements made by law enforcement on ████████, K.W. became fearful that someone was planning on taking E.S. away from them. Instead of going home, they spent the night in a hotel. (Hr. Transcript, Vol. ██ p. ██ Lines ██).

238.   On ████████, K.W. and S.W. went to the ████████ County Sheriff's Office to find out whether law enforcement had legal papers to take E.S. into custody. (Hr. Transcript, Vol. ██ p. ██ Lines ██ ).

239.   The captain provided them with the reports referencing E.S. that had been created by the SROs at ████████ According to the testimony of K.W., the reports were the first time K.W. became aware of the extent to which the SRO had been involved with E.S. at ████ (Hr. Transcript, Vol. ██ p. ██ Lines ██ , p. ██ Lines ██ , Exhibit ██ ).

### Truancy Petition

240.   After the ████ incident, K.W. testified that she no longer believed that E.S. was safe at school and did not send her back to ████ (Hr. Transcript, Vol. ██ p. ██ Lines ██ ).

241.   K.W. began looking at other placement options for E.S. They considered private placements and inquired about placement options within the school district. (Hr. Transcript, Vol. ██ p. ██ Lines ██ , p. ██ Lines ██ ).

242.   K.W. requested that E.S.'s work be sent home from school and ████ sent the work home with E.S.'s brother. (Hr. Transcript, Vol. ██ p. ██ Lines ██ , Exhibit ██ ).

243.   On ████████, K.W. emailed work completed by E.S. to ████ . It is noted that the due dates for the work completed ranged from late ████ to ████ . (Exhibit ██ ).

244.   On ████████, K.W. informed CMCSS that E.S. would not be returning to ████ (Exhibit ██ ).

245.   On ████████, Dr. ████████ , the Director of Elementary Schools, sent K.W. an email outlining the placement options for E.S. The offer from the District included: (1) implementing E.S.'s IEP at ████ (2) Virtual school or (3) homebound instruction which

could begin if the IEP team felt appropriate and once the proper documentation was present. (Exhibit █).

246.    K.W. did not believe that any of these placement options would work for E.S. (Hr. Transcript, Vol. █ p. █ Lines █).

247.    On ████████, K.W. was referred, by CMCSS, to a Strategies for Improving Student Attendance course but she failed to attend. (Exhibit █).

248.    On ████████, E.S. was dropped from school rolls for non-attendance.  The drop date was backdated to ████████. (Exhibit █).

249.    On ████████, E.S.'s lawyer informed CMCSS that E.S. would be enrolled in an umbrella homeschool. (Exhibit █).

250.    On ████████, having received no proof that E.S. had been enrolled at an umbrella homeschool, the school district filed a truancy petition for E.S. with the Juvenile Court of ████████ County. (Exhibit █).

251.    The district did not hold a manifestation determination hearing prior to filing the truancy petition due to E.S.'s non-enrollment. (Hr. Transcript, Vol. █ p. █ Lines █, Exhibit █).



253.    According to K.W., E.S. some of the absences from school occurred because she was attending counseling sessions with ████████ Counseling (████). ████ does not keep records so K.W. was unable to provide the school district with any excuses related to that counseling. (Hr. Transcript, Vol. █ p. █ Lines █, p. █ Lines █, Exhibit █).

254.    It is noted that there was no proof that K.W. attempted to obtain excuse notes or other documentation related to the ███ counseling sessions contemporaneously with the counseling sessions as they occurred.  A letter dated ███████, from Dr. ████████, EDD, Chief of ██████████ Community Service section confirmed that no records existed but this was well over a year after the sessions had occurred. (Exhibit █).

255.    E.S. began attending ████████ in ██████. (Hr. Transcript, Vol. █ p. █ Lines █).

256.    E.S. has been consistently attending █████████ and is doing well academically. (Exhibit █).

257.    ████████ is accredited by the Southern Association of Colleges and Schools. They have been accredited since 1985. (Hr. Transcript, Vol. █ p. █ Lines █).

258.    ████████ offers accelerated classes in reading and math. ████████ explained that by "accelerated" she meant that a second grader, for example, could be moved to a third-grade reading program and the same for math. (Hr. Transcript, Vol. █ p. █ Lines █ █ p. █ Lines █).

259.    The following subjects are included in the curriculum: reading, English, math, social studies, science, art, music, Spanish, library, computer, and P.E. (Hr. Transcript, Vol. █ p. █ Lines █).

260.    Students at ████████ are exposed to a wide range of learning strategies. ████████ testified that a person leaving ████████ at the end of fourth grade would be above grade level compared to public schools because ████████ teaches deeper into the content. (Hr. Transcript, Vol. █ p. █ Lines █).

261.    ███████ testified that E.S. is a good student and is in the advanced math group. (Hr. Transcript, Vol. ██ p. ██ Lines ██).

262.    Initially, E.S. did not trust adults at the school, but ███████████ worked with her to establish a good rapport. (Hr. Transcript, Vol. ██ p. ██ Lines ██).

263.    Administration at ███████████ shared information about E.S. with her three ███████████ teachers. They explained that she was still fearful of some adults and they needed to build a rapport with her because she was still uneasy due to her previous school experience. (Hr. Transcript, Vol. ██ p. ██ Lines ██).

264.    Although E.S. was a rising ████ grader when she initially enrolled at ████████ ███████ the school determined that developmentally she belonged in ███ grade. ███████ explained that more than 50% of the students who enroll at ███████████ are placed in a lower grade based on their developmental maturity. (Hr. Transcript, Vol. ██ p. ██ Lines ██).

265.    ███████████ does not have IEPs, special education teachers, behavioral services, behavior specialists, psychologists, written behavioral plans or written functional behavioral assessments. ███████████ provides no direct special education related services, whatsoever. (Hr. Transcript, Vol. ██ p. ██ Lines ██, p. ██ Lines ██, p. ██ Lines ██, p. ██ Lines ██).

### Expert Testimony by ███████████

266.    ███████████ testified as an expert for the Petitioners.

267.    Prior to completing his expert report, ███████ reviewed E.S.'s educational records as well as reports from her private physician. He also observed E.S. at her current school, ███████████, and toured E.S.'s previous school, ███████ (Hr. Transcript, Vol. ██ p. ██ Lines ██, p. ██ ██, Exhibit ██).

268.    In ▮▮▮ opinion, the school district did not allocate the necessary services or consult with the appropriate professionals when implementing E.S.'s IEP at Rossview. (Hr. Transcript, Vol. ▮ p. ▮ Lines ▮ p. ▮ ▮ ).

269.    ABC data is one of the fundamental things that behavior analysts use to breakdown behaviors into their individual components and contingencies. A refers to the antecedent, anything that happened before the behavior. B is the behavior. And then C is the consequence, what happened immediately after the behavior. Using the data in their context, you try to draw a database consistency in patterns to then formulate a hypothesis of why the behavior's occurring. Once you know the why, then you have the motive. If you have the right motive, you can try to match the motive earlier in the escalation cycle before it gets to a severe challenging behavior. (Hr. Transcript, Vol. ▮ p. ▮ Lines ▮ ).

270.    Often a behavior can have dual functions. (Hr. Transcript, Vol. ▮ p. ▮ Lines ▮ ▮ ).

271.    In ▮▮▮ ' opinion, the school district mis-analyzed the function of E.S.'s behavior. 'Theoretically, there shouldn't have been 21 restraints for, if you hit the function– if you had the right function, if you had the right environmental antecedents and the right consequences in place for this child.' (Hr. Transcript, Vol. ▮ p. ▮ Lines ▮ , p. ▮ Lines ▮ ).

272.    After analyzing the data, ▮▮▮ determined that Access to Attention was one of the primary functions of E.S.'s behavior. (Hr. Transcript, Vol. ▮ p. ▮ Lines ▮ , Exhibit ▮ ).

273.    ▮▮▮ also testified that the function components should have been broken down into subcomponents, e.g. "she's escaping work, well, what kind of work? You know, is it math? Is it reading? Is it all work? Is it every piece of work? Is it just this piece of work? Is it just

this work from this individual when that individual gives the demand to work, or is it across all individuals with all work? So, I would want to start breaking it all down across classes, across times.' (Hr. Transcript, Vol. ■ p. ■ Lines ■, Page ■ Lines ■).

274.    ■ also opined that the FBA should have been updated prior to the restraints and prior to the level of disruption that is described in the school records. (Hr. Transcript, Vol. ■ p. ■ Lines ■). ■ also defined other points which indicated the need for a new FBA: the subsequent use of restraints, the month where there were no restraints (where the ABC data occurred) and then the last day where she had the suicide attempt. (Hr. Transcript, Vol. ■ p. ■ Lines ■)

275.    ■ described the appropriate process as simply initiating a meeting with the teachers and developing a social validity form, a way of asking the staff whether they like the plan and think that is working. And importantly it would survey whether the teachers thought the identified function was correct. (Hr. Transcript, Vol. ■ p. ■ Lines ■; p. ■ Lines ■). ■ maintains that there is sufficient evidence on the document itself to identify that attention was the real function. (Hr. Transcript, Vol. ■ Page ■ Lines ■).

276.    In order to reevaluate whether the function was correct, ■ testified that it would have taken a single person approximately an hour to review the plan and a simple data trial involving two-three days with 10-20 minute observations and a teacher interview. (Hr. Transcript, Vol. ■ Page ■ Lines ■).

277.    ■ further pointed out that evidence of E.S.'s attention seeking function was apparent on the District's own psychoeducational evaluation that E.S. required lots of attention, preferred conversations with adults and argued with adults. (Hr. Transcript, Vol. ■ Page ■ Lines ■).

278.  ███████ testified that E.S.'s BIP was confounding and could not be followed; and further, the BIP itself present evidence that the function of E.S.'s behavior was attention. (Hr. Transcript, Vol. █ Page ███, Lines ███). Succinctly put, the BIP provided the stimulus of attention, when it had been written to refrain from doing so. (Hr. Transcript, Vol. █ Page ███ █ Lines ███, ██; P. ███ Lines ███).

279.  ███████ further testified that district staff over-utilized punishment and used it excessively (i.e., restraints, suspension, removal from class, forced removal) in its behavioral treatment of E.S. (Hr. Transcript, Vol. █ Page ███ Lines ███).

280.  According to ███████ this is supported by data he reviewed where the District used 21 restraints in 18 days, where the previous year she had only a single office referral. According to ███████, it is excessive because, best practices are to exhaust all preventative, proactive strategies prior to even considering the use of the punishment contingency. Id

281.  ███████ did a four-hour covert observation and investigated E.S.'s current educational setting and recommended that she remain there. E.S. was observed to be on task 100% during the observation, of on-task and did not observe any challenging behavior in presence of peers. It was described as a positive effect. E.S. was observed in an advanced math class, participating with peers, participating in P.E. and led a creative project with other students. There was no need for a BIP. (Hr. Transcript, Vol. █ Page ███ Lines ███).

282.  When questioned about the absence of a behavior plan at ███████████, █ ███████ stated that the fact that there weren't any 'challenging behaviors that would show me that all the professionals' behaviors leading up to good behavior that I'm witnessing is part of the behavior management strategy because the goal is to prevent versus react, in essence.' (Hr. Transcript, Vol. █ Page ███ Lines █).

283.    Teachers at ███████████ were described by ████████ as utilizing positive interaction, a higher praise-to-reprimand ratio and calm interaction. (Hr. Transcript, Vol. █ Page ██ Lines ██ Page ██ Lines ██).

284.    ████████ testified that E.S. was capable of following school rules. (Hr. Transcript, Vol. █ Page ██ Lines ██).

285.    ████████ testified that if a parent told a child to misbehave that it could impact a student's behavior at school. (Hr. Transcript, Vol. █ Page ██ Lines ██).

## CONCLUSIONS OF LAW

1.    When enacting IDEA, Congress clearly conferred jurisdiction of a student's IDEA claims upon hearing officers, also known as administrative law judges. *See* 20 U.C.A. § 1415(f)(3)(A).  Administrative judges are bestowed the jurisdiction to determine whether a student received an appropriate education under the IDEA.  20 U.C.A. § 1415(f)(3)(E).

2.    In Tennessee, the Office of the Secretary of State, Division of Administrative Procedures, has jurisdiction over the subject matter and the parties of this proceeding and the undersigned Administrative Law Judge has the authority to issue final orders. *See* State Board of Education Rules, Special Education Programs and Services, 0520-01-09-.18; *see* T.C.A. § 49-10-101.

3.    The U.S. Supreme Court held in *Schaffer v. Weast*, that the burden of proof is on the party "seeking relief".  546 U.S. 49, 51 (2005). Thus, when a parent files a request for a due process hearing, the parent bears the burden of proof, or burden of persuasion in the due process hearing. *Id.* At 56 (citing 2 J. Strong, McCormick on Evidence § 337, p. 412 (5th Ed. 199)) (referencing the "default rule that [Petitioners] bear the risk…" and "[t]he burdens of pleading and proof…should be assigned to the [Petitioner] who generally seeks to change the present state

of affairs…"); *see also, Cordrey v. Euckert*, 917 F.2d 1460, 1469 (6th Cir. 1990) (the party challenging the IEP bears the burden of proof in an IDEA action).

4.    In the instant case, Petitioners clearly bear the burden of persuasion. K.W., the parent of E.S., filed the request for due process hearing claiming that CMCSS failed to offer E.S. a free appropriate public education pursuant to the IDEA. Thus, K.W. bears the burden to prove the specific violations alleged in the due process complaint (1) The IEP developed for the ███ ███ school year failed to provide E.S. with a free appropriate public education. (2) CMCSS violated the Special Education Behavior Supports Act and the IDEA by using excessive and unlawful restraints. (3) CMCSS committed numerous procedural violations of the IDEA which resulted in substantive harm to E.S., and (4) CMCSS violated Section 504, 29 U.S.C. § 794 and the Americans with Disabilities Act by failing to provide E.S. with proper accommodations and services and that CMCSS's actions also caused E.S. to experience unjustified discrimination, psychological trauma, and physical harm from the widespread and improper use of restraint. *See Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S.Ct. 988, 999 (2017). Finally, K.W. bears the burden of proving that Sumner Academy, the private school where she unilaterally placed E.S., is appropriate within the meaning of the IDEA. *See Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993).

5.    The IDEA requires CMCSS to provide FAPE in the LRE (Least Restrictive Environment) to all students with disabilities who are in need of special education and related services. IDEA, 20 U.C.A. §1400 *et. seq.* The requirements of the IDEA have been adopted, with some additional requirements, by the Tennessee State Board of Education. Tenn. State Bd. of Educ. Rules, Regulations, and Minimum Standards Chapter 0520-01-09.

6.    School districts are required to identify students suspected of having a disability who are "in need of" special education and related services. See IDEA U.C.A. §1401 (3)(A).

Students who are eligible for special education and related services are entitled to an IEP. *Bd. of Educ. of the Hendrick Hudson School Dist. V. Rowley*, 458 U.S. 176, 181 (1982). In developing educational programs and determining appropriate services for those students through an IEP, school districts must comply with the substantive and procedural requirements of the IDEA and related state law. *See Rowley* at 182. However, parents are not entitled to relief for minor procedural violations alone. Technical procedural violations do not render an IEP invalid. *Dong v. Board of Educ. of Rochester Community Schs.*, 197 F.3d 793, 800 (6th Cir. 1999). A determination of whether a student received FAPE must be based on substantive grounds. 34 C.F.R. § 300.513(1). When a procedural violation is alleged, an administrative law judge can only find a FAPE violation if a procedural violation "(2) impeded the child's right to FAPE; (2) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of FAPE to the parent's child; or (3) caused a deprivation of educational benefit." 34 C.F.R. § 300.513(2). Only procedural violations that result in substantive harm constitute a denial of FAPE and justify relief. *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001) (procedural violations must cause substantive harm and constitute denial of FAPE to be actionable); see also *Bd. of Educ. of Fayette County, Ky. V. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007).

7.      It is **CONCLUDED** that the Petitioners, here, have failed to prove any substantive harm and thus are not entitled to relief.

8.      Rather, it is **CONCLUDED** that CMCSS properly evaluated and identified E.S. as a student with a disability entitled to special education and related services and CMCSS properly and timely evaluated E.S. in all suspected areas of disability. The psychoeducational evaluation was timely conducted.

9.      According to K.W. there were no problems with the IEP or E.S.'s progress for the first few years of E.S.'s enrollment in CMCSS.  K.W. was involved as an IEP team member and assisted in developing the IEPs for E.S.  The IEP for the year in question remained largely unchanged from the previous year. There was no evidence to suggest that K.W. believed any substantive changes needed to be made.

10.      It is also clear that E.S. is a very smart child who is capable of choosing whether to actively participate in class and to do the assigned work.  When she attends class and does the work she progresses, however, when she is absent from class and refuses to do the work the lack of progress is reflected.  As demonstrated by a conversation E.S. had with ████████, E.S. was capable of planning ways to sabotage her own progress.

11.      CMCSS proposed IEPs that were reasonably calculated to enable E.S. to make progress appropriate in light of her circumstances. At all times relevant to Petitioners' Complaint, CMCSS offered E.S. an IEP that provided FAPE.  The IDEA, at 20 U.C.A. § 1414(d)(1)(A), requires that an IEP include, among other things:  (1) a statement of the child's present levels of performance; (2) a statement of measurable annual goals; (3)a statement of the special education and related services and supplementary aids and services to be provided to the child that, to the extent practicable, are based on peer-reviewed research; (4) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in nonacademic and extracurricular activities; (5) a statement of how the child's parents will be regularly informed of their child's progress. These "are requirements by which the adequacy of an IEP is to be judged, although minor technical violations may be excused." *Cleveland Heights-University Heights City Sch. Dist. V. Boss*, 144 F.3d 391, 398 (6th Cir. 1998).

12.      It is **CONCLUDED** that E.S.'s IEPs met or exceeded the procedural requirements of the IDEA.  CMCSS's IEPs were also substantively appropriate.

13.     The United States Supreme Court modified the test to determine whether an IEP substantively provided FAPE under the IDEA in *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S.Ct. 988 (2017). For a district to substantively offer FAPE, an IEP must be reasonably calculated to enable a child to make progress appropriate in light of his circumstances. *Id.* At 999. An IEP should be "construed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Id.* "For a child fully integrated into the regular classroom, an IEP typically should…be 'reasonably calculated to enable a child to achieve passing marks and advance from grade to grade.'" *Id., citing Bd. of Ed. Of Hendrick Hudson Central Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 203-04 (1982); see also *Rowley*, 137 S.Ct. at 1000 ("providing a level of instruction reasonably calculated to permit advancement through the general curriculum").

14.     In this case, E.S. was enrolled in regular education classroom with the special education support. E.S. was to receive special education support so that she could derive benefit from her regular education program. Thus, E.S. was to attend ███████ and be a child fully integrated in the regular classroom pursuant to *Rowley and Endrew F.,* receiving FAPE through an IEP that is reasonably calculated to enable E.S. to achieve passing marks and advance from grade to grade.

15.     When determining the appropriateness of an IEP, "[a]ny review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S.Ct. 988, 999 (2017).  Furthermore, an IEP is a snapshot in time. *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1041 (3rd Cir. 1993). Thus, the appropriateness of an IEP must be viewed by "what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted." *Id.*

16.    CMCSS thoroughly considered E.S.'s individual circumstances in developing an IEP that was reasonably calculated to enable her to make appropriate progress. It is **CONCLUDED** that the evidence shows that E.S.'s IEPs were substantively appropriate and were designed with her unique needs in mind for the purpose of providing her with access to educational services that were reasonably calculated to enable her to achieve passing marks and advance from grade to grade.

17.    It is **CONCLUDED** that K.W. was afforded the opportunity to meaningfully participate in the development of the IEPs for E.S. K.W. attended all IEP meetings and was an active participant.

18.    In general, the IDEA requires a district to ensure that at least one parent of a child with a disability is afforded the opportunity to participate in the IEP process and is informed enough to provide consent to implement an IEP. 34 C.F.R. § 300.322. The IDEA allows parent participation and involvement in meetings and in placement discussions. 34 C.F.R. § 300.501. At all times relevant to this case, CMCSS not only allowed, but encouraged K.W. to meaningfully participate in the development of the IEP. K.W. testified that she was an effective advocate for E.S. and that while there wasn't always complete agreement in the meetings that they were always able to work through the issues.

19.    Although there is some dispute regarding whether there was adequate communication from CMCSS to K.W., Courts have declined to find violations of the IDEA's parental participation requirements even when districts have failed to respond to parents. *L.M.H. v. Arizona Dep't of Educ.*, No. CV-02212-PHX-JJT, 2016 WL 3910940, at *304 (D. Ariz. July 19, 2016) (holding that parent's opportunity to participate was not seriously infringed by a misstatement or by a failure to provide records because a parent attended both IEP meetings where she had the opportunity to be heard and ask questions, which was significant parental

involvement."); *L.B. v Kyrene Elementary District No. 28*, No. CV-17-03316-PHX-SMB, 2019 WL 4187515, at *10 (D. Ariz. Sept. 4, 2019), appeal dismissed sub nom. *J.B. v. Kyrene Elementary District No. 28*, No. 19-16971, 2020 WL 1550669 (9th Cir. Feb. 12, 2020) (holding that "a parent only has a right to a response to reasonable requests for explanations of the records" and "even if the district fails to respond...[it would] be a harmless procedural error that does not constitute a denial of FAPE." (referencing *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 910 (9th Cir. 2008).

20.    It is **CONCLUDED** that CMCSS permitted and encouraged K.W. to participate and, therefore, did not prevent her from meaningful participation in the IEP process.

21.    It is **CONCLUDED** that CMCSS did not use excessive and/or unlawful restraints.  The school staff at all times, according to the proof, utilized only the amount of restraint necessary to protect E.S. from herself and to protect the staff themselves.  The unrebutted proof shows that K.W. told E.S. that she could hit staff members.  The proof demonstrates that E.S. was violent toward school staff, SROs, and herself.  Failing to intervene would likely have caused additional and more severe injuries to all involved.  Had E.S. not been restrained while attempting to elope or when injuring herself a much different type of proceeding is likely.

22.    It is **CONCLUDED** that Petitioners' unilateral private placement at ███████ ███████ is not an appropriate program under the IDEA.  The IEPs developed and proposed for E.S. met or exceeded the procedural and substantive requirements under the IDEA.

23.    However, assuming, *arguendo,* that CMCSS failed to provide FAPE to E.S., Petitioners would still be barred from obtaining reimbursement for the cost of unilaterally placing E.S. at ███████ ███████  CMCSS does not dispute that "IDEA's grant of equitable authority empowers a court to order school authorities to reimburse parents for their expenditures

Page **49** of 53

on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Carter*, 510 U.S. at 12. However, the Sixth Circuit Court of Appeals has held that a private placement is not appropriate under the IDEA "when it does not, at a minimum, provide some element of special education services in which the public school was deficient." *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 523 (6th Cir. 2003); see also *Indianapolis Pub. Sch. v. M.B.*, 771 F.Supp.2d 928, 930-31 (S.D. Ind. 2011) (holding that a private placement was inappropriate when it only offered tutoring services, as opposed to special education services, and did not address the student's emotional needs). Thus, evidence that a child is "doing well" in a private placement is not enough to support a claim for reimbursement when the placement fails to provide the special education services the public-school district was found to be lacking.  Indianapolis Public Schools v. *M.B., 771 F.Supp.2d* 928 at 930-31 (S.D. Indiana 2011). Furthermore, a parent's concerns and fears do not justify a private placement at public expense. *See John M. v. Brentwood Union Free Sch. Dist.*, No. 11-CV-3634 PKS SIL, 2015 WL 5695648, at *7-10 (E.D.N.Y. Sept. 28, 2015) (holding reimbursement for a unilateral private placement was inappropriate despite feelings of security and safety at the private school and concerns of returning the child, who suffered from anxiety and depression, to an environment where he had been harassed).

24.     Moreover, "parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk."  *Sch. Comm. of Burlington v. Dept. of Educ.*, 471 U.S. 359, 373-374. In such a situation, under the *Carter* standard, parents are "entitled to reimbursement ***only*** if a federal court concludes both that the public placement violated the IDEA ***and*** that the private school placement was appropriate under the Act." Carter, 510 U.S. at 15   As discussed below, Petitioners have failed to prove that Sumner Academy provided "appropriate" educational

services pursuant to the IDEA and are therefore not entitled to recover tuition costs of their unilateral placement of E.S. at ███████████████.

25.    ██████████████ is not an appropriate placement because it lacks the fundamental and essential characteristics that define a free appropriate public education.

26.    Petitioners contend that E.S.'s academic success is directly correlated with attending ████████████. However, there is no evidence to support this correlation. In fact, it tends to support the idea that E.S. is perfectly capable of excelling academically when she attends class and chooses to do her assignments.

27.    One of the primary purposes of the IDEA is to prepare students for further education, employment, and independent living. 20 U.C.A. § 1400(d)(1)(A). Although a placement that fails to provide any special education services or supports. may be desirable to K.W., it will likely not support the primary purposes set out by the IDEA.

28.    E.S. is a student with disabilities who is entitled to receive special education and related services from qualified teachers and service providers in her least restrictive environment. K.W. may choose to place E.S. in any private school of her choosing, including ███████████ ███████ but she is not entitled to receive public funds to reimburse her for such a placement when it is not appropriate under the IDEA. The evidence is clear that ████████████ does not provide any special education services or supports; thus, it could not possibly provide something that was lacking from E.S.'s program. It is **CONCLUDED** that because ████████████ does not provide the special education and related services which K.W. claims CMCSS failed to offer, it cannot be "proper" under the IDEA.

29.    The IDEA defines related services as transportation, and such developmental, corrective, and other supportive services…as may be required to assist a child with a disability to benefit from special education and related services. *Butler v. Evans*, 225 F.3d 887 (7th Cir. 2000).

Page **51** of **53**

The analysis for what constitutes education and related services must focus on whether [the disabled child's] placement may be necessary for educational purposes, or whether the placement is a response to medical, social, or emotional problems that is necessary quite apart from the learning process. *Doe v. Shorewood School District*, 2005 WL 2387717 (E.D. Wisconsin 2005).

30.    This case turns on a determination of whether CMCSS provided IEPs that were reasonably calculated to enable E.S. to make progress appropriate in light of her circumstances.

31.    It is **CONCLUDED** that the evidence does not support Petitioners' allegations against CMCSS or support the assertion that ███████ is an appropriate placement under the IDEA. CMCSS has offered to provide FAPE and is not obligated to provide reimbursement for an inappropriate private placement.

32.    It is **CONCLUDED** that Petitioners have failed to prove that CMCSS denied E.S. FAPE and have failed to prove that Sumner Academy was an appropriate placement.

33.    It is further **CONCLUDED** that the Petitioners have failed to carry their burden of proof.

34.    It is **CONCLUDED** that CMCSS is the prevailing party on all issues.

It is so **ORDERED**.

This FINAL ORDER entered and effective this the **10th day of March, 2021.**


_____
J. SHANNON BARNHILL
ADMINISTRATIVE JUDGE
ADMINISTRATIVE PROCEDURES DIVISION
OFFICE OF THE SECRETARY OF STATE

Filed in the Administrative Procedures Division, Office of the Secretary of State, this the **10th day of March, 2021.**

**STÉPHANIE SHACKELFORD, DIRECTOR**
**ADMINISTRATIVE PROCEDURES DIVISION**
**OFFICE OF THE SECRETARY OF STATE**

<u>**NOTICE OF FILING PROCEDURES**</u>

Due to the COVID-19 pandemic, APD has changed its filing procedures.  Until further notice, filings should be made by **email** to APD.Filings@tn.gov or by **facsimile** to 615-741-4472. Paper filings should only be made by mail if a litigant has no access to either email or facsimile. If you are filing by email, documents should be saved in PDF format prior to filing.  Each document to be filed must be a separate PDF.  Only one filing method should be used.  Please name PDFs for filing in the following format:

"APD CASE NUMBER  YOUR NAME  ABBREVIATED NAME OF DOCUMENT BEING FILED AGENCY NAME"

**IN THE MATTER OF:**
**E.S., THE STUDENT AND K.W., THE**
**STUDENT'S PARENT/GUARDIAN V.**
**CLARKSVILLE MONTGOMERY COUNTY**
**SCHOOL SYSTEM**

**APD CASE No.** ████████

## NOTICE OF APPEAL PROCEDURES

### REVIEW OF FINAL ORDER

The Administrative Judge's decision in your case in front of the **Tennessee Department of Education**, called a Final Order, was entered on **March 10, 2021**. If you disagree with this decision, you may take the following actions:

1. **File a Petition for Reconsideration:** You may ask the Administrative Judge to reconsider the decision by filing a Petition for Reconsideration. Mail to the Administrative Procedures Division (APD) a document that includes your name and the above APD case number, and states the specific reasons why you think the decision is incorrect. The APD must **receive** your written Petition no later than 15 days after entry of the Final Order, which is **March 25, 2021.**

   The Administrative Judge has 20 days from receipt of your Petition to grant, deny, or take no action on your Petition for Reconsideration. If the Petition is granted, you will be notified about further proceedings, and the timeline for appealing (as discussed in paragraph (2), below) will be adjusted. If no action is taken within 20 days, the Petition is deemed denied. As discussed below, if the Petition is denied, you may file an appeal no later than **May 10, 2021**. *See* TENN. CODE ANN. §§ 4-5-317 and 4-5-322.

2. **File an Appeal:** You may appeal the decision in federal or state court within 60 days of the date of entry of the Final Order, which is no later than **May 10, 2021**, by:

   (a) filing a Petition for Review "in the Chancery Court nearest to the place of residence of the person contesting the agency action or alternatively, at the person's discretion, in the chancery court nearest to the place where the cause of action arose, or in the Chancery Court of Davidson County," TENN. CODE ANN. § 4-5-322; or
   (b) bringing a civil action in the United States District Court for the district in which the school system is located, 20 U.S.C. § 1415.

   The filing of a Petition for Reconsideration is not required before appealing. *See* TENN. CODE ANN. § 4-5-317. A reviewing court also may order a stay of the Final Order upon appropriate terms. *See* TENN. CODE ANN. §§ 4-5-322 and 4-5-317.

### STAY

In addition to the above actions, you may file a Petition asking the Administrative Judge for a stay that will delay the effectiveness of the Final Order. A Petition for stay must be **received** by the APD within 7 days of the date of entry of the Final Order, which is no later than **March 17, 2021**. *See* TENN. CODE ANN. § 4-5-316.

### FILING

To file documents with the Administrative Procedures Division, use this address:
Secretary of State
Administrative Procedures Division
William R. Snodgrass Tower
312 Rosa L. Parks Avenue, 8th Floor

**IN THE MATTER OF:**

**E.S., THE STUDENT AND K.W., THE**
**STUDENT'S PARENT/GUARDIAN V.**
**CLARKSVILLE MONTGOMERY COUNTY**
**SCHOOL SYSTEM**

**APD CASE No. ▮▮▮▮**

### NOTICE OF APPEAL PROCEDURES

Nashville, TN 37243-1102
Fax: (615) 741-4472