## BEFORE THE TENNESSEE DEPARTMENT OF EDUCATION
### DIVISION OF SPECIAL EDUCATION

**IN THE MATTER OF:**

**C.A.,** *the Student, and*
**W.A.,** *the Student's Parent,*
    *Petitioners,*

**v.**

**WILLIAMSON COUNTY SCHOOLS,**
    *Respondent.*

**DOCKET NO:** ▮▮▮▮▮▮▮

## FINAL ORDER



This matter was heard on ▮▮▮▮▮ and ▮▮▮▮▮▮▮ before Rob Wilson,

Administrative Judge, assigned by the Secretary of State, Administrative Procedures Division.

▮▮▮▮▮ Esq., ▮▮▮▮▮ Esq., and ▮▮▮▮▮ Esq., represented the

Respondent, Williamson County Schools (hereinafter "WCS"). The Petitioner was represented

by ▮▮▮▮▮ Esq.

At the conclusion of the hearing, the matter was taken under advisement, pending the

parties filing Proposed Findings of Fact and Conclusions of Law.

The subject of this proceeding is (1) whether WCS denied a free and appropriate

public education (FAPE) by failing to properly evaluate C.A., by failing to offer IEPs that were

reasonably calculated to enable C.A. to make progress appropriate in light of his circumstances,

by failing to meet procedural requirements of the IDEA, and/or by prohibiting the parent from

meaningfully participating *and* (2) whether ▮▮▮▮▮ Academy (hereinafter "▮▮") is an

appropriate placement pursuant to the IDEA. After consideration of the entire record, testimony

of witnesses, and argument of the parties, it is DETERMINED that Petitioners have failed to prove that WCS denied C.A. FAPE and that ███ is appropriate.    This determination is based on the following findings of fact and conclusions of law:

## PROCEDURAL BACKGROUND

The student, C.A., is an ███ year-old (DOB ███ ) young man who, at all times relevant to this case, attended ███ Academy, a private school located in Williamson County, Tennessee.  In ███ WCS identified C.A. as a student with an ███ (hereinafter ███ ) pursuant to the Individuals with Disabilities Education Act (hereinafter "IDEA").

This dispute was one of several between W.A. and WCS.  W.A. has sued WCS four times and has never allowed WCS to serve C.A. on an individualized education program (hereinafter "IEP").  The claims set forth in Petitioners' Complaint in this matter revolve around the IEPs proposed for C.A. for the ███ and ███ school years.

In the spring of ███ W.A. contacted ███ Executive Director of Student Support Services for WCS, requesting that WCS develop an IEP for C.A.  After collecting numerous records from ███ and C.A.'s private practitioners and conducting its own evaluations for program planning, the IEP team from C.A.'s zoned school, ███ High School (hereinafter "███"), met with W.A. to develop an IEP for C.A.  After meeting for approximately twenty hours to develop an IEP for C.A. for the ███ school year, W.A. refused to the sign the IEP, continued C.A.'s placement at ███ and informed WCS that she would seek reimbursement for C.A.'s placement at ███

The same pattern repeated in ▮▮▮.  In the summer of ▮▮  W.A. contacted WCS personnel requesting that WCS develop an IEP for C.A.  WCS obtained updated records from ▮▮ new private evaluations, and updated input from private providers.  WCS also hastened its own three-year reevaluation to ensure that C.A.'s eligibility and proposed IEP were in place prior to the start of school.  After the IEP team met with W.A. for eleven to twelve hours to develop an IEP for the ▮▮▮▮ school year, W.A. refused to the sign the IEP, continued C.A.'s placement at ▮▮ and informed WCS that she would seek reimbursement for C.A.'s placement at ▮▮

W.A. initiated this due process hearing alleging, among other things, that WCS failed to offer C.A. a "free appropriate public education" ("FAPE") as required by the IDEA, 20 U.C.A. 1400 *et seq.* and related state law and regulations.  Petitioners are requesting reimbursement for the costs of ▮▮ tuition and supplies, private psychotherapy and counseling services, private occupational therapy, private vision therapy, educational consultant services, and private occupational therapy and vision therapy evaluations.

## FINDINGS OF FACT

1.   C.A. is an ▮▮ year-old (DOB ▮▮) young man who, at all times relevant to this case, attended ▮▮ a private school located in Williamson County, Tennessee.

2.   In ▮▮ WCS identified C.A. as a student with an ▮▮ pursuant to the IDEA due to his diagnosis of ▮▮▮▮▮▮▮▮▮▮

3.   However, W.A., C.A.'s mother, has never allowed WCS to serve C.A. on an IEP, instead unilaterally placing him at ▮▮

3

4.  In the spring of ▮▮▮ W.A. contacted Carol Hendlmyer, Executive Director of Student Support Services for WCS, requesting that WCS develop an IEP for C.A.

5.  The IEP team met for approximately twenty hours to develop an IEP for C.A. for the ▮▮▮▮▮▮ school year.

6.  C.A.'s IEP team considered multiple sources of data from multiple informants and in multiple environments to determine his present levels of performance in thirteen different areas for the development of his ▮▮▮▮ IEP. The IEP team members obtained and reviewed information from ▮▮▮ WCS School Psychologist ▮▮▮▮▮▮▮ followed up by phone interview with C.A.'s prior vision therapist, C.A.'s pediatrician, and C.A.'s psychiatrist and shared that information with W.A. and the IEP team. To obtain further information to update C.A.'s present levels of performance for his IEP, ▮▮▮▮▮ also conducted assessments in the areas of attention behaviors and adaptive behaviors. Additionally, ▮▮▮▮▮ High School Special Education teacher, ▮▮▮▮▮▮▮▮ conducted a transition assessment and observation of C.A.

7.  Documentation of C.A.'s reported mental health issues did not indicate an adverse impact on his educational performance.

8.  The attention behavior ratings from C.A.'s teachers did not endorse any behaviors that would be considered elevated or atypical for a student his age.

9.  The adaptive behavior ratings in the school setting were within the realms of average and high average compared to his peers.

10. The only concerns reported by C.A.'s teachers related to organizational skills and mild ▮▮▮▮ like behaviors.

11. On ▮▮▮▮▮▮ WCS proposed an IEP for C.A. for the ▮▮▮▮ school year.

4

12.     The IEP team developed measurable goals for C.A. for the two present levels of
        performance that were exceptional (not within normal limits): transition-vocational and
        social/emotional behavior.

13.     After developing C.A.'s present levels of performance and goals, the IEP team discussed
        C.A.'s placement and determined that he could be served at his home school, ███████

14.     C.A.'s IEP proposed special education services for directed study (a structured study hall
        48 mins. daily) in a special education setting and inclusion lifetime wellness services (48
        mins. daily) in the general education setting at ███████

15.     The IEP team discussed providing C.A. with more extensive special education services
        and supports to address the fact that C.A. was transitioning from a smaller private school
        setting and to address W.A.'s concerns. However, W.A. continually brought up concerns
        that these additional services and supports would be harmful to C.A., so the team
        removed (or did not add) many of their proposed support services.

16.     The IEP also offered accommodations for English/Language Arts, Math, Science, Social
        Studies, Foreign Language, Lifetime Wellness, and Directed Study to address the impact
        of C.A.'s social, emotional, and vocational needs on his educational performance.

17.     The team discussed whether C.A. needed vision therapy, counseling, and occupational
        therapy and determined he did not require them to benefit from his special education
        services. The team discussed the various options for counseling services, and determined
        that since C.A.'s mental health issues were not impacting him in the educational setting,
        counseling was not necessary as a related service. There was never any indication that
        C.A. needed vision therapy. The team determined that C.A.'s fine motor skills were not

5

exceptional and that he did not require occupational therapy as a related service; however, the team included accommodations to address any fine motor needs.

18.     W.A. refused to sign the IEP and unilaterally placed C.A. at ███ for the ████████ school year, essentially barring WCS from providing these services to C.A.

19.     In the summer of ████ W.A. again contacted WCS personnel requesting that WCS develop an IEP for C.A.

20.     The IEP team met approximately eleven or twelve hours to discuss evaluations, eligibility, and develop an IEP for C.A. for the ████████ school year.

21.     Because C.A.'s reevaluation was due ████████ the team conducted a reevaluation of C.A. in ███ and ████████

22.     WCS again began the same process of collecting information to update C.A.'s present levels of performance.

23.     In addition to the other available data, WCS assessed C.A.'s social-emotional skills and academic achievement (in all areas of reading, math, and written language) using standardized assessments.

24.     The IEP team obtained interviews and observations from multiple sources, including a phone interview with a ███ staff member, classroom teacher observation forms from C.A.'s math, English, ethics, Spanish, and chemistry teachers at ███ and related service input from C.A.'s occupational therapist at ███

25.     The IEP team also considered the medical input from C.A.'s psychiatrist.

26.     Taking into consideration the updated data, C.A. was still performing well in school with some mild inattention and/or hyperactivity/impulsivity difficulties.

6

27. In making an eligibility determination, the team considered all of the information they had received from outside providers and the results obtained by WCS to determine whether C.A. qualified as a student with an OHI or emotional disturbance ("ED").

28. Under Tennessee's standards and guidelines for determining eligibility, the IEP team appropriately determined that C.A. met the eligibility guidelines for an OHI in      of      based upon his ADHD diagnosis.

29. After much discussion, the IEP team determined that C.A. did not qualify as a student with ED.

30. The IEP team determined that C.A. did not meet the state requirements for an ED because the data did not support that an ED was causing an adverse impact on C.A.'s educational performance in his learning environment.

31. C.A.'s private mental health diagnoses were made using the Diagnostic & Statistical Manual (hereinafter "DSM") diagnostic criteria, not Tennessee State Standards for an emotional disturbance under the IDEA.

32. C.A.'s evaluation records (e.g.,      and      hospital records and many later evaluations) paint a very different, and irreconcilable, clinical impression than any other sources of data (e.g., Dr.      treatment notes, Dr.      records). For example, there is no evidence of any behaviors in the record that would qualify as manic or even hypomanic symptoms; however, C.A. is labeled with the diagnosis of bipolar disorder, for which mania is a primary symptom. C.A. is also described as having psychosis in the professional notes from the      hospitalization, but there is no evidence he has ever been psychotic.

7

33.  In developing the ████████ IEP, the team made changes to his present levels and medical information based upon the updated information obtained.

34.  The team then amended and added to the IEP goals proposed for C.A. the previous year as needed based upon any changes in his present levels of performance.

35.  The team proposed special education services in the special education setting for directed studies (48 mins. daily) and occupational therapy consultation (20 times per year/15 mins. per session) at ████

36.  The IEP team discussed providing C.A. with more extensive special education services and supports to address the social-emotional behavioral concerns brought up by W.A.; however, W.A. rejected all the services offered.

37.  Again, none of the data supported that C.A. needed counseling to be able to benefit from his special education.    And again, the team discussed whether C.A. needed vision therapy; however, there was no indication that he required it to benefit from his special education services.

38.  On ████████ WCS proposed an IEP for C.A. for the ████████ school year.

39.  Again, W.A. refused to sign the IEP and unilaterally placed C.A. at ████ for the ████ ████ school year, essentially barring WCS from providing these services to C.A.

40.  W.A. was afforded the opportunity to meaningfully participate in the development of both the ████████ and ████████ IEPs, and, in fact, WCS frequently amended the IEP to address W.A.'s concerns.

41.  At all times relevant to this dispute, C.A. was a ████████ student taking courses at ████ that offered ████ credit.

8

42.    ███ is not required to provide a program correlated with Tennessee's curriculum standards.

43.    ███ is a school for students with unique learning styles.

44.    Many of ███ teachers did not have a degree in the subject area in which they were teaching C.A.

45.    ███ is not required to implement an ILP as part of special education laws under the IDEA, and the teachers are not required to collect the same level of progress monitoring data as public schools.

46.    There is no evidence that ███ provided C.A. with any emotional or behavioral supports or services that were not offered by WCS.

47.    ███ is not designed to deal with children with significant emotional or behavioral difficulties.


## APPLICABLE LAW AND ANALYSIS

### A.    Jurisdiction of the Administrative Law Judge

When enacting the IDEA, Congress clearly conferred jurisdiction of a student's IDEA claims upon hearing officers, also known as administrative judges. *See* 20 U.C.A.§1415(f)(3)(A). Administrative judges are bestowed the jurisdiction to determine whether a student received an appropriate education under the IDEA. 20 U.C.A.§1415(f)(3)(E). In Tennessee, the Office of the Secretary of State, Division of Administrative Hearings, has jurisdiction over the subject matter and the parties of this proceeding pursuant, and the assigned Administrative Law Judge has the authority to

issue final orders. *See* State Board of Education Rules, Special Education Programs and

Services, 0520-01-09-.18; *see* T.C.A. § 49-10-101.

**B.    Burden of Proof**

The U.S. Supreme Court held in *Schaffer v. Weast*, that the burden of proof is on the

party "seeking relief." 546 U.S. 49, 51 (2005). Thus, when a parent files due process, the

parent bears the burden of proof, or burden of persuasion, in the due process hearing. *Id.* at 56

(citing 2 J. Strong, McCormick on Evidence § 337, p. 412 (5th Ed. 1999) (referencing the

"default rule that [Petitioners] bear the risk…" and "[t]he burdens of pleading and

proof….should be assigned to the [Petitioner] who generally seeks to change the present state of

affairs…."); *see also, Cordrey v. Euckert*, 917 F.2d 1460, 1469 (6th Cir. 1990) (the party

challenging the IEP bears the burden of proof in an IDEA action).

In the instant case, Petitioners clearly bear the burden of persuasion. W.A., the parent of

▓▓▓▓▓▓ student C.A., filed due process claiming that WCS failed to offer appropriate special

education services and failed to abide by the procedural requirements of the IDEA. Thus, W.A.

bears the burden to prove that WCS violated its duties by failing to appropriately evaluate C.A.

W.A. also bears the burden of proving that WCS's IEPs were not reasonably calculated to enable

C.A. to make progress appropriate in light of his circumstances. *See Endrew F. v. Douglas Cnty.*

*Sch. Dist. RE-1*, 137 S.Ct. 988, 999 (2017). Finally, W.A. bears the burden of proving that CIA

is appropriate within the meaning of the IDEA. *See Florence Cnty. Sch. Dist. Four v. Carter*,

510 U.S. 7, 15 (1993).

**C.    WCS offered C.A. FAPE in his LRE**

The IDEA requires WCS to provide a FAPE in the least restrictive environment

(hereinafter "LRE") to all students with disabilities who are in need of special education and

10

related services.  IDEA, 20 U.C.A. §1400 *et seq.*  The requirements of the IDEA have been

adopted, with some additional state requirements, by the State Board of Education.  Tenn. State

Bd. of Educ. Rules, Regulations, and Minimum Standards, Chapter 0520-01-09.

School districts are required to identify students suspected of having a disability and who

are "in need of" special education and related services.  *See* IDEA, 20 U.S.C. 1401(3)(A).

Students who are eligible for special education and related services are entitled to an IEP.  *Bd. of*

*Educ. of the Hendrick Hudson School Dist. v. Rowley*, 458 U.S. 176, 181 (1982).  In developing

educational programs and determining appropriate services for these students through an IEP,

school districts must comply with the substantive and procedural requirements of the IDEA and

related state law.  *See Rowley*, 458 U.S. at 182.  However, parents are not entitled to relief for

minor procedural violations alone.  Technical procedural violations do not render an IEP invalid.

*Dong v. Board of Educ. of Rochester Community Schs.*, 197 F.3d 793, 800 (6th Cir. 1999).  A

determination of whether a student received FAPE must be based on substantive grounds.  34

C.F.R. § 300.513(1).  When a procedural violation is alleged, an administrative judge can only

find a FAPE violation if a procedural violation "[1] [i]mpeded the child's right to FAPE, [2]

[s]ignificantly impeded the parent's opportunity to participate in the decision-making process

regarding the provision of a FAPE to the parent's child; or [3] caused a deprivation of

educational benefit."   34 C.F.R. § 300.513(2).  Only procedural violations that result in

substantive harm constitute a denial of FAPE and justify relief. *Knable v. Bexley City Sch. Dist.*,

238 F.3d 755, 764 (6th Cir. 2001) (procedural violations must cause substantive harm and

constitute denial of FAPE to be actionable); *see also Bd. of Educ. of Fayette County, Ky. v. L.M.*,

478 F.3d 307, 313 (6th Cir. 2007).  Petitioners have failed to prove any substantive harm and,

thus, are not entitled to relief.

11

1.  **WCS properly evaluated and identified C.A. as a student with a disability entitled to special education and related services.**

Under IDEA's "child find" provisions, WCS acknowledges that it has an obligation to identify, locate, and evaluate all children with disabilities. IDEA, 34 C.F.R. § 300.111. However, to prove that a delayed evaluation for a student was a procedural violation of IDEA's "child find," a petitioner "must show that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate." *L.M.*, 478 F.3d at 313.     Petitioners have failed to meet this burden of proof.

a.  **WCS was not required to reevaluate C.A. prior to the development of his ▮▮▮▮ IEP.**

Petitioners have failed to prove that C.A. was entitled to a reevaluation prior to the development of his ▮▮▮▮ IEP. In ▮▮▮ WCS evaluated C.A. and determined that he qualified as a student with an ▮▮▮▮▮▮▮▮▮▮▮ The IDEA requires WCS to conduct a reevaluation at least every three years (unless the district and parent agree it is unnecessary). 34 C.F.R. §300.303(b)(2).  C.A.'s reevaluation was due ▮▮▮▮▮ Since C.A.'s eligibility was current when W.A. requested an IEP, WCS was not required to conduct a reevaluation in ▮▮▮  There is no proof that W.A. or any of C.A.'s teachers requested an early reevaluation prior to the development of the ▮▮▮▮ IEP. *See* 34 C.F.R. §300.303(a)(2) (allowing a parent or teacher to request a reevaluation).  Furthermore, there was no evidence to suggest that C.A.'s reported mental health issues were having an adverse impact on his educational performance to warrant an early reevaluation.  Because the information from W.A. and ▮▮▮ did not indicate that C.A.'s emotional or behavioral difficulties had an adverse impact

on his educational performance, WCS had a rational reason for not conducting an early

reevaluation—there were *no* clear signs of an emotional disturbance (hereinafter "ED").

**b. WCS properly evaluated and identified C.A. as a student with an other health impairment prior to development of his ▮▮▮▮ IEP.**

Pursuant to the IDEA's three-year revaluation requirements, WCS completed a

reevaluation of C.A. in ▮▮▮▮▮▮▮▮▮▮ The IDEA sets forth the following provisions

regarding reevaluations:

> As part of…any reevaluation under this part, the IEP Team and other qualified professionals, as appropriate, must (1) Review existing evaluation data on the child including—(i) Evaluations and information provided by the parents of the child; (ii) Current classroom-based, local, or State assessments, and classroom-based observations; and (iii) Observations by teachers and related services providers; and (2) On the basis of that review, and input from the child's parents, identify what additional data, if any, are needed to determine (i) …whether the child continues to have such a disability, and the educational needs of the child; (ii) The present levels of academic achievement and related developmental needs of the child; (iii)…whether the child continues to need special education and related services; and (iv) Whether any additions or modifications to the special education and related services are needed to enable the child to meet the measurable annual goals set out in the IEP of the child and to participate, as appropriate, in the general education curriculum.

34 C.F.R. §300.305(a).

In addition to the other available data, WCS assessed C.A.'s social-emotional skills and

academic achievement using standardized assessments. Additionally, the interdisciplinary view

taken by the team involved obtaining interviews and observations from multiple sources, not just

testing. As part of the reevaluation, the team also considered the medical input from C.A.'s

psychiatrist. The IDEA clearly allows the team to determine which additional assessments are

needed, *if any*. The IDEA does not require a certain number of assessments be completed if the

team has determined that needed data is already available. In this case, the IEP team had an

abundance of data available to address C.A.'s academic and social-emotional/behavior needs

13

which included C.A.'s private evaluations and diagnoses provided by W.A., information from ▇, and additional standardized assessments completed by WCS's school psychologist.

In making an eligibility determination, the team considered all of C.A.'s private evaluations and private provider input as well as the assessment results obtained by WCS to determine whether C.A. qualified as a student with an ▇ or ED. Under Tennessee's standards and guidelines for determining eligibility, the IEP team appropriately determined that C.A. met the eligibility guidelines for an ▇ in ▇ based upon his ▇ diagnosis. After much discussion, the IEP team determined that C.A. did not qualify as a student with ED. The State of Tennessee sets forth a two-prong requirement to qualify as a student with ED. Under the first prong, the student must meet the criteria for an ED. The decision of the team hinged on the second prong (which is also incorporated in the definition of ED under the first prong). Under the second prong, the student must display an adverse impact in educational performance in his/her learning environment due to the ED. Furthermore, the Sixth Circuit Court of Appeals has interpreted "adversely affects educational performance" to include "educational performance to the classroom and school experience" but exclude "social or behavioral deficits that were not shown to interfere with [] school based performance." *Q.W. ex rel. M.W. V. Bd. of Educ. of Fayette Cty. Ky.,* 630 Fed.Appx. 580, 583 (6th Cir. 2015) (unpublished). Thus, a student whose has behavior needs at home and generally good at-school behavior will not qualify a student with a disability on the basis of such behavior because his condition does not adversely affect his educational performance. *See Q.W. ex rel. M.W. V. Bd. of Educ. of Fayette Cty. Ky.,* 630 Fed.Appx. 580, 581-82 (6th Cir. 2015) (unpublished). The IEP team determined that the data did not support that an ED was causing an adverse impact on C.A.'s educational performance in his

14

learning environment. Instead, C.A.'s teachers and parent reported that he was doing well in school except for a few difficulties with ████ ike behaviors.

Despite Petitioners' argument to the contrary, C.A.'s clinical diagnoses are not determinative of whether he has a disability pursuant to the IDEA. C.A.'s private mental health diagnoses were made using the Diagnostic Statistics Manual (hereinafter "DSM") diagnostic criteria, not Tennessee State Standards for an emotional disturbance under the IDEA. They are not determinative of eligibility for special education and related services. The record clearly shows that the criteria for clinically diagnosing a mental health disorder under the DSM is different than the criteria for determining whether a student has an emotional disturbance under the IDEA. When making a clinical diagnosis under the DSM, symptoms are not necessarily required in the school setting. An eligibility determination for ED under the IDEA, on the other hand, is made using the eligibility requirements established by the State of Tennessee, which require that the ED adversely affect the child's educational performance. C.A.'s clinical mental health disorders did not have an adverse impact on his educational performance. Furthermore, unlike a clinical diagnosis that can be made by a single clinician, an eligibility determination for special education as a student with ED must be made by an IEP team. See 34 C.F.R. 300.306(a)(1); Thus, expert testimony (including the testimony by W.A.'s own experts) clearly established that a clinical diagnosis under the DSM does not equate to ED under the IDEA. Thus, it is not unusual for a student to be diagnosed with a clinical mental health disorder and still not meet the requirements for ED under the IDEA.

To complicate matters, C.A.'s evaluation records (e.g., ████ and ████ hospital records and many later evaluations) paint a very different, and irreconcilable, clinical impression than any other sources of data (e.g., Dr. ████ treatment notes, Dr. ████

15

records).     Dr. ███████ opined several possible reasons why these evaluation reports paint a different picture.     Based on Dr. ███████ review of C.A.'s mental health records over the years, inaccurate descriptions of symptoms keep getting repeated and exaggerated from one evaluation record to the next.     For example, there is no evidence of any behaviors in the record that would qualify as manic or even hypomanic symptoms; however, C.A. is labeled with the diagnosis of bipolar disorder, for which mania is a primary symptom.     Dr. ███████ opined that such records may have been exaggerated due to W.A.'s tendency "to exaggerate symptoms and to see them when others are not seeing them."     Regardless of the reason, the diagnoses and interpretations of C.A.'s behavior in some evaluation reports do not match up with other reports of C.A.'s behavior.     Based on a review of the data as a whole, the IEP team properly determined that C.A. met the state criteria for an OHI and did not meet the state criteria for an ED.

c.     **Petitioners have failed to prove substantive harm.**

Only procedural violations that result in substantive harm constitute a denial of FAPE and justify relief. *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001).     Petitioners make issue with the fact that the IEP team did not have ███████ addendum report with the social-emotional ratings from C.A.'s teachers and/or that the IEP did not reconvene to review the addendum.     However, WCS could not control whether ███████ teachers timely provide the requested information. Furthermore, this minor delay caused no harm. ███████ testified that she had four of the five rating forms when the IEP team met to determine C.A.'s eligibility. Based on her vast experience interpreting these type of assessments over her ███████ years practicing as a school psychologist, she is able to review the rating forms and determine whether they are going to show a significant area of need.     Anything that came up as a concern on the

16

rating forms once they were scored had already been addressed in the IEP and would not have changed eligibility.

Furthermore, failure to identify C.A. as a student with an ED had no impact on the services and supports offered to C.A. since he remained eligible for special education services as a student with an [redacted] At least one district court in the Sixth Circuit has held that a district's predetermination that a student did not qualify under a specific disability category did not amount to a substantive violation when the child remained eligible under other disability categories and was provided FAPE. *Shafer v. Whitehall Dist. Sch.*, No. 1:10-CV-1170, 2013 WL 1304920, at *8-11 (W.D. Mich. Mar. 28, 2013). The court in *Shafer* differentiated between pre-determination of an IEP and predetermination that a student is not eligible under a specific disability category while remaining eligible under others. "[T]he IDEA concerns itself not with labels, but with whether a student is receiving a free and appropriate education." *Id.* at 30 (citing *Heather S. v. State of Wis.*, 125 F.3d 1045, 1055 (7th Cir. 1997). As in *Shafer*, C.A.'s OHI label did not preclude him from receiving FAPE. Regardless of C.A.'s identification, C.A.'s IEPs consistently addressed his behavioral and emotional needs through goals, as well as through academic accommodations that helped reduce his frustrations in the classroom. Since only procedural violations that result in substantive harm constitute a denial of FAPE and justify relief, Petitioners are not entitled to relief of such claims.

2. **WCS proposed IEP's that were reasonably calculated to enable C.A. to make progress appropriate in light of his circumstances.**

The IDEA, at 20 U.C.A. §1414(d)(1)(A), requires that an IEP include, among other things, (1) a statement of the child's present levels of educational performance; (2) a statement of measurable annual goals, (3) a statement of the special education and related services and

17

supplementary aids and services to be provided to the child that, to the extent practicable, are based on peer-reviewed research, (4) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in the nonacademic and extracurricular activities, (5) a statement of how the child's progress toward the annual goals will be measured, and (6) a statement of how the child's parents will be regularly informed of their child's progress. These "are requirements by which the adequacy of an IEP is to be judged, although minor technical violations may be excused." *Cleveland Heights-University Heights City Sch. Dist. v. Boss,* 144 F.3d 391, 398 (6th Cir. 1998). WCS asserts that C.A.'s IEPs met or exceeded the procedural requirements of the IDEA.

The United States Supreme Court recently modified the test used to determine whether an IEP substantively provided FAPE under the IDEA. *See Endrew F. v. Douglas Cnty. Sch. Dist. RE-1,* 137 S.Ct. 988 (2017). For a district to substantively offer FAPE, an IEP must be reasonably calculated to enable a child to make progress appropriate in light of his circumstances. *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1,* 137 S.Ct. 988, 999 (2017). An IEP should be "constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1,* 137 S.Ct. 988, 999 (2017). "For a child fully integrated in the regular classroom, an IEP typically should...be 'reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.'" *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1,* 137 S.Ct. 988, 999 (2017), *citing Bd. of Ed. of Hendrick Hudson Central Sch. Dist., Westchester Cty. v. Rowley,* 458 U.S. 176, 203-04 (1982); *see also Rowley,* 137 S.Ct. at 1000 ("providing a level of instruction reasonably calculated to permit advancement through the general curriculum.")

18

C.A.'s IEPs have consistently addressed his educational needs through goals and objectives, provided accommodations to address his behavioral needs and reduce frustration with academic tasks, and provided special education services in the LRE. "Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S.Ct. 988, 999 (2017). Furthermore, an IEP is a snapshot in time. *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.ed 1031, 1041 (3d Cir. 1993). Thus, the appropriateness of an IEP must be viewed by "what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted." The evidence shows that C.A.'s IEPs were substantively appropriate and were designed with his unique capabilities in mind for the purpose of providing him with access to educational services that were reasonably calculated enable him to achieve passing marks and advance from grade to grade.

## a. C.A.'s ▉▉▉ IEP was reasonably calculated to provide him educational benefit.

The starting point for determining the appropriateness of an IEP is determining the child's unique needs. To determine his unique needs, C.A.'s IEP team considered multiple sources of data from multiple informants and in multiple environments to determine his present levels of performance in thirteen different areas for the development of his ▉▉▉ IEP. Ultimately this information was used to develop C.A.'s present levels of performance for his IEP.

Taking into consideration all of C.A.'s data, C.A. was performing well in school with some mild inattention and/or hyperactivity/impulsivity difficulties. The attention behavior ratings from all of C.A.'s teachers did not endorse any behaviors that would be considered elevated or atypical for a student his age. In fact, according to all of the hearing testimony the

only behaviors by C.A. that would be considered even slightly troublesome occurred between C.A. and his mother or C.A. and a sibling and had absolutely nothing to do with his school setting. The adaptive behavior ratings in the school setting were within the realms of average and high average compared to his peers.

WCS took C.A.'s individual needs into consideration and developed an IEP that was reasonably calculated to enable C.A. to make progress appropriate in light of his circumstances. On            WCS proposed an IEP for C.A. for the            school year. The IEP team developed goals for C.A. for the two present levels of performance that were exceptional (not within normal limits): transition-vocational and social/emotional behavior. C.A.'s IEP proposed special education services for directed study (a structured study hall 48 mins. daily) in a special education setting and inclusion lifetime wellness services (48 mins. daily) in the general education setting in his home school,            The IEP also offered accommodations for English/Language Arts, Math, Science, Social Studies, Foreign Language, Lifetime Wellness, and Directed Study to address the impact of C.A.'s social, emotional, and vocational needs on his educational performance.

However, W.A. refused to sign the IEP and unilaterally placed C.A. at            essentially barring WCS from providing these services to C.A. First, Petitioners argue that the IEP goals were deficient because they did not include short-term objectives. Although the IDEA requires that each IEP have a statement of measurable annual goals, despite Petitioner's argument to the contrary, neither the IDEA nor State law requires a description of benchmark or short-term objectives for students who are not taking alternate assessments. 34 C.F.R. 300.320(a)(2); Tennessee Special Education Framework, (Final Version October 31, 2014), p. 11 (as of March 31, 2014, eliminating the state requirement to have benchmarks or short term objectives

20

accompanying each IEP goal for students not taking alternate assessments).    Additionally, the

proposed IEP goals were not vague. An IEP goal has been said to be well-written if it can pass

the "stranger test," meaning that a person unfamiliar with the goal would "be able to implement

the goal, be able to assess the student's progress on the goal, and be able to determine whether

the student's progress was satisfactory." *Mason City Community Sch. Dist.*, 46 IDELR 148 (SEA

IA 2006). The WCS's proposed IEP goals meet the stranger test. For example, C.A.'s second

social-emotional goal clearly states the parameters for implementing, measuring, and

successfully meeting the goal (i.e., during small group, defined as 2-5 students), method

presented (work opportunities within the general education setting), method of performance and

measurement (working with the group appropriately, defined as keeping conversations on topic,

maintaining appropriate boundaries, sharing the responsibilities), required level of accuracy (10

minutes), and measurement period (during 5 consecutive random observations over the course of

a nine-week grading period, measured weekly). Petitioners' arguments to the contrary are

without support. Since W.A. has steadfastly refused to permit WCS to implement the proposed

IEP, any determination of the actual effectiveness of the IEP goals would be merely speculative

at best.

Petitioners asserts that C.A.'s IEP lacks special education services needed for him to

receive FAPE. First, C.A.'s present levels of performance do not support a need for more special

education services. However, the IEP team discussed providing C.A. with more extensive

special education services and supports to address the fact that C.A. was transitioning from a

smaller private school setting and to address W.A.'s concerns, but W.A. continually brought up

concerns that these additional services and supports would be harmful to C.A., so the team

removed (or did not add) many of their proposed support services.

21

W.A. also asserts that the IEP was deficient because it did not provide vision therapy, counseling, and occupational therapy as related services. The IDEA defines related services as supportive services that "are required to assist a child with a disability to benefit from special education." 34 C.F.R. § 300.34. However, the team discussed whether C.A. needed vision therapy, counseling, and occupational therapy and determined he did not require them to benefit from his special education services. If the IEP team determined it was needed, WCS would provide it. The team discussed the various options for counseling services and determined that, since C.A.'s mental health issues were not impacting him in the educational setting, counseling was not necessary as a related service. There is no any indication anywhere in the record that C.A. needed vision therapy. C.A. was not receiving vision therapy at ███ When ███ contacted C.A.'s previous vision therapist, she indicated that C.A. had received vision therapy during his ███ school years because his vision issues were impacting his reading. However, Petitioners' own expert testified that vision therapy is not for the purpose of treating reading/academic deficits (e.g., dyslexia, learning disabilities). Even if such vision difficulties remained, they were no longer hindering C.A.'s reading skills, as C.A. no longer had reading deficits. The team also discussed C.A.'s fine motor needs and even collected additional information from ███ to determine the impact of any fine motor needs. Thus, the team determined that C.A.'s fine motor skills were not exceptional and that he did not require occupational therapy as a related service; however, the team included accommodations to address any fine motor needs. An IEP is based on a student's current needs, not what might be needed in the future. W.A. has failed to prove that the proposed IEP was not reasonably calculated to provide C.A. with an educational benefit.

22

Petitioners further claim that WCS predetermined C.A.'s placement at ███ however, such claim is without merit. The IDEA requires that students receive special education services in the LRE with nondisabled children to the maximum extent appropriate and "special classes, special schooling, or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 34 C.F.R. § 300.114(a)(2). The IDEA further provides the rebuttal presumption that a "child be educated in the school that he or she would attend if not disabled…unless the IEP of the child with a disability requires some other arrangement." 34 C.F.R. § 300.114(c). Thus, the IEP team's starting point is the child's home school. This is the mandate of the IDEA. This is not predetermination. *See Deal v. Hamilton Co. Bd. Of Education*, 392 F.3d 840, 857 (6th Cir. 2004). Only when a child cannot receive FAPE in his or her home school would a school district be required to consider a restrictive special school placement, such as ███ Furthermore, there was no predetermination. After developing C.A.'s present levels of performance and goals, the IEP team discussed C.A.'s placement and determined that the IEP could be implemented at ███ Clearly, the record supports that C.A. could be served at his home school, ███ WCS spent hours developing and amending C.A.'s IEP and ultimately proposed an IEP that was reasonably calculated to provide C.A. with educational benefit based on his unique circumstances.

**b.  C.A.'s** ███ **IEP was reasonably calculated to provide him educational benefit.**

When W.A. requested an IEP for the ███ school year, WCS again began the same process of collecting information to update C.A.'s present levels of performance. Taking into consideration the updated data, C.A. was still performing well in school with some mild inattention and/or hyperactivity/impulsivity difficulties.   The team made changes to his present

23

levels and medical information based upon the updated information obtained. The team then amended and added to the IEP goals proposed for C.A. the previous year as needed based upon any changes in his present levels of performance. The team proposed special education services in the special education setting for directed studies (48 mins. daily) and occupational therapy consultation (20 times per year/15 mins. per session) at ████ The IEP also offered accommodations for English/Language Arts, Math, Science, Social Studies, Foreign Language, and Directed Study to address the impact of C.A.'s social, emotional, and vocational needs on his educational performance. On ████████ WCS proposed an IEP for C.A. for the ████ school year.

Again, W.A. refused to sign the IEP and unilaterally placed C.A. at ███ for the ████ school year, essentially barring WCS from providing these services to C.A. Petitioners argued that the IEP goals were deficient because some IEP goals remained the same as those proposed in the prior year's IEP. However, there is no requirement that IEP goals change from year to year. Typically IEP goals do increase in difficulty from year to year because of a student's progress with special education supports and services. However, WCS never had the opportunity to provide C.A. with special education supports and services for ████████ so it is not surprising that his present levels did not increase such that the proposed goals were no longer appropriate.

Petitioners assert that C.A.'s ██████ IEP also lacks special education supports and services needed for him to receive FAPE. However, again the IEP team discussed providing C.A. with more extensive special education services and supports to address the social-emotional behavioral concerns brought up by W.A.; however, W.A. rejected all the services offered. Again, WCS spent hours developing and amending C.A.'s IEP and ultimately proposed an IEP

24

that was reasonably calculated to provide C.A. with educational benefit based on his unique
circumstances.

W.A. again asserts that the IEP was deficient because it did not provide vision therapy
and counseling as related services. Again, none of the data supported that C.A. needed
counseling to be able to benefit from his special education.    And again, the team discussed
C.A.'s vision therapy needs. There still was no indication that C.A. needed vision therapy to
benefit from his special education services. C.A. was still not receiving vision therapy at ████
Thus, there is no evidence to support that C.A. needed vision therapy to access his special
education. W.A. has failed to prove that the proposed IEP was not reasonably calculated to
provide C.A. with an educational benefit.

**c.    W.A. was afforded the opportunity to meaningfully participate in the development
of both the████████and████████IEPs.**

W.A. was provided an opportunity for meaningful participation in the development of
C.A.'s IEPs, and, in fact, WCS frequently amended the IEP to address W.A.'s concerns.   The
IEP team spent numerous hours developing and amending the IEP.    The evidence clearly shows
that the team revised the draft IEP based on the input from W.A. and the other team members at
each meeting until the final IEP was proposed by WCS.

All of this evidence shows that W.A. was allowed meaningful participation in developing
the IEP. Additionally, nothing in the IDEA requires the WCS to develop an IEP from scratch at
the IEP meeting. The mere act of drafting an IEP prior to the meeting is *not* "predetermination"
as defined by the U.S. Court of Appeals for the Sixth Circuit. *See Deal v. Hamilton County Bd.
Of Education*, 392 F.3d 840, 857 (6th Cir. 2004) (pre-determinism exists where parents have been

deprived of the opportunity for meaningful participation in the IEP process). Thus, the fact that that the WCS drafted an IEP prior to the IEP meeting is irrelevant.

Furthermore, WCS had no obligation to contact C.A.'s private practitioners for their input into the IEP. The Sixth Circuit Court of Appeals has clearly stated that school districts are not required to "include an expert in the particular teaching method preferred by the parents in order to satisfy the requirement that the [WCS] include persons knowledgeable about 'placement options.'" *Dong v. Bd. of Ed.*, 197 F.3d 793, 801 (6th Cir. 1999); *See also Renner v. Board of Ed.*, 185 F.3d 635, 644 (6th Cir. 1999) ("[W]e cannot find from the record that the failure of the team to consult with plaintiffs' expert...constituted a serious deficiency in the IEP."). The WCS's team members were well qualified to address C.A. needs. *See Dong v. Bd. of Ed.*, 197 F.3d 793, 801 (6th Cir. 1999) (finding that the school staff members were "extremely well qualified" to address the student's programming needs); *see also Renner v. Board of Ed.*, 185 F.3d 635 (6th Cir. 1999) (finding that the school's team did have "adequate 'background, experience, and training' to assess the child's needs and develop a program; thus, failure to consult with the child's expert did not cause a serious deficiency in the IEP). C.A.'s private practitioners were not required team members under the Act. At most, they were allowable team members with knowledge or special expertise regarding C.A. *See* 34 C.F.R. 300.321(a). There is no proof that W.A. requested that C.A.'s practitioners be included in the development of the IEP, much less that she was denied such opportunity. Instead, the record shows that WCS contacted C.A.'s private providers to obtain input and even contacted his psychologist during the IEP meeting. However, WCS had no obligation to include other private practitioners when developing the IEP.

d.    ▇▇▇ **is not an appropriate program under the IDEA.**

26

The Sixth Circuit Court of Appeals has held that a private placement is not appropriate under the IDEA "when it does not, at a minimum, provide some element of special education services in which the public school placement was deficient." *Berger v. Medina City Sch. Dist.,* 348 F.3d 513, 523 (6th Cir. 2003); *see also Indianapolis Pub. Sch. v. M.B.,* 771 F.Supp. 2d 928, 930-31 (S.D. Ind. 2011) (holding that a private placement was inappropriate when it only offered tutoring services, as opposed to special education services, and did not address the student's emotional needs). Thus, evidence that a child is "doing well" in a the private placement is not enough to support a claim for reimbursement when the placement fails to provide the special education services the public school district was found to be lacking. *M.B.,* 771 F.Supp. 2d at 930-31. Furthermore, a parent's concerns and fears do not justify a private placement at public expense. *See John M. v. Brentwood Union Free Sch. Dist.,* No. 11-CV-3634 PKC SIL, 2015 WL 5695648, at *7-10 (E.D.N.Y. Sept. 28, 2015) (holding reimbursement for a unilateral private placement was inappropriate despite feelings of security and safety at the private school and concerns of returning the child, who suffered from anxiety and depression, to an environment where he had been harassed).

Moreover, "parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk." *Sch. Comm. of Burlington v. Dep't of Educ.,* 471 U.S. 359, 373-374. In such a situation, under the *Carter* standard, parents are "entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA *and* that the private school placement was proper under the Act." *Carter,* 510 U.S. at 15 (emphasis added). As discussed below, Petitioners have failed to prove that CIA provided "appropriate" educational services pursuant to

the IDEA, and are therefore not entitled to reimbursement for the cost of their unilateral placement of C.A. at ██████

In general, the very nature of ██████ program is inappropriate to meet C.A.'s needs under the IDEA. ██████ is not required to provide a program correlated with Tennessee's curriculum standards. ██████ does not require its teachers to hold an educator's license. In fact the course in which C.A. reportedly struggled the most, chemistry, was not even taught by a teacher with a degree in chemistry. And, although Petitioners stated that ██████ provided supports for C.A. through an individual learning plan (ILP), an ILP holds no weight. ██████ is not required to implement an ILP as part of special education laws under the IDEA, and the teachers are not required to collect the same level of progress monitoring data as public schools.

Additionally, there is no evidence that ██████ provided C.A. with any emotional or behavioral supports or services that were not offered by WCS. In fact, ██████ is not designed to deal with children with significant emotional or behavioral difficulties. The only support that Petitioners can claim is different at ██████ then at ██████ is the typical class size (which smaller class options for part of the day were discussed by the IEP team and rejected by W.A.). However, there is nothing magical about small class sizes when WCS offered additional supports in larger classes in conjunction with smaller groups throughout the day to address C.A.'s needs. The mere fact that W.A. feels more comfortable with C.A. at ██████ does not make it an appropriate placement under IDEA. The evidence is clear that ██████ does not even provide the services and supports that WCS proposed, much less providing something that was lacking from C.A.'s proposed program. ██████ does not provide the special education and related services for which it claims WCS failed to offer; therefore, it cannot be "proper" under the IDEA.

28

Moreover, ▇ is a highly restrictive placement. All the students attending ▇ with C.A. were students with unique learning styles. Thus, it is clear that C.A. does not participate with nondisabled peers to the maximum extend appropriate as required under the IDEA. Furthermore, a program in which C.A. is only receiving instruction with other students with special needs in a separate school is not less restrictive than the inclusion setting in his home school proposed by the WCS. Thus, ▇ is not the least restrictive setting for C.A. as required by the IDEA. 20 U.C.A. 1412(a)(5).

Importantly, one of the primary purposes of the IDEA is to prepare students for further education, employment, and independent living. 20 U.C.A. §1400(d)(1)(A). Although a placement that shelters C.A. may be desirable to W.A., it will not prepare him for the real world where he will inevitably be challenged by the demands of college, a job, and/or the requirements of maintaining independent living. C.A. is a student with a disability who is entitled to receive special education and related services from qualified teachers and service providers. W.A. may choose to place C.A. in any private school of her choosing, including ▇ but she is not entitled to receive public funds to reimburse her for services that are not appropriate under the Act.

**e. Petitioner cannot seek reimbursement for psychotherapy and counseling services, vision therapy services, occupational therapy services, or educational consulting services.**

Petitioners have failed to prove that reimbursement or future costs for psychotherapy or counseling services, vision therapy, occupational therapy, or educational consulting services are appropriate. As set forth above, Petitioners have failed to prove that counseling or vision therapy is a related service required for C.A. to receive FAPE. Petitioners have also failed to prove that C.A. was entitled to more occupational therapy services than offered through his IEP. Finally, WCS is not liable for Petitioners' consultation with Dr. ▇ for the purpose of trying

29

to send C.A. to a residential placement.    At the time of this consultation, C.A. was attending

████ WCS had no knowledge of this consultation, and there is no evidence that W.A. ever asked

WCS for residential placement services for C.A.    This consultation was purely a family/medical

decision. Petitioners have failed to prove how this consultation was required for C.A. to receive

FAPE. Thus, reimbursement for psychotherapy and counseling, vision therapy, occupational

therapy, and educational consulting services are not required for C.A. to receive FAPE and are,

therefore, not appropriate forms of relief.

**f.    Petitioners are not entitled to reimbursement for private evaluations.**

Petitioners seek reimbursement for the costs of several private evaluations of C.A.  IDEA

establishes a procedure for parents to request an independent educational evaluation (hereinafter

"IEE") at public expense if the parents disagree with the public school's evaluation. 34 C.F.R. §

300.502(a)(1) and (b)(1). This allows a district to first conduct their own evaluation prior to

paying for an independent evaluation at public expense. *See* 34 C.F.R. § 300.502(b)(5). If the

district agrees to offer an IEE at public expense, IDEA's provision allows the district to ensure

that the IEE comports with IDEA's evaluation requirements and that the evaluator is qualified.

34 C.F.R. § 300.502(a)(3)(i) & (e).    Furthermore, it allows the district to set reasonable

limitations on cost of the IEE, and it allows the district to limit the number of IEEs at provided at

public expense.  34 C.F.R. § 300.502(b)(5) & (e). However, W.A. never requested that WCS

provide an IEE for C.A. at public expense. As such, WCS was unaware of the components of

the evaluations or the qualifications of the evaluators until after the evaluations were completed.

Furthermore, WCS had no opportunity to set reasonable cost limitations on the evaluations. Of

course, a parent has the right to obtain as many IEE's as he or she chooses, *at his or her own*

30

*cost.* However, W.A. is now asserting that she is entitled to reimbursement for the IEEs she unilaterally chose to obtain. Equity does not support such a conclusion.

## CONCLUSION

This case turns on a determination of whether WCS offered C.A. an IEP that was reasonably calculated to enable him to make progress appropriate in light of his circumstances. The evidence clearly demonstrates that WCS spent hours carefully developing IEPs for the ████ and ████ school year. The IEPs were based upon information provided by W.A. from ██ and C.A.'s private providers. The IEP team took into consideration the input of W.A. in the development of the IEPs. Ultimately, WCS provided IEPs that were reasonably calculated to enable C.A. to make progress appropriate in light of his circumstances.

It is DETERMINED that Respondent is in compliance with IDEA procedures, has not committed any procedural or substantive violations of the IDEA, and was ready and capable to provide C.A. a FAPE. Petitioners' demand for reimbursement for ██ tuition and costs, psychotherapy and counseling services, vision therapy services, occupational therapy services, educational consultation, and private evaluations is DENIED. Respondent Williamson County Schools is the prevailing party in this matter.

This ORDER entered and effective this the 4TH day of FEB. 2019.

**ROB WILSON**
**ADMINISTRATIVE JUDGE**
**ADMINISTRATIVE PROCEDURES DIVISION**
**OFFICE OF THE SECRETARY OF STATE**

Filed in the Administrative Procedures Division, Office of the Secretary of State,

this the ___4TH___ day of ___FEBRUARY___ 2019.

**J. RICHARD COLLIER, DIRECTOR**
**ADMINISTRATIVE PROCEDURES DIVISION**
**OFFICE OF THE SECRETARY OF STATE**

32

**IN THE MATTER OF:**                          **APD CASE No.** ▆▆▆▆▆▆▆

**C.A., the Student, and W.A., the Student's**
**Parent, Petitioners vs. Williamson County**
**Schools**

## NOTICE OF APPEAL PROCEDURES

### REVIEW OF FINAL ORDER

Attached is the Administrative Judge's decision in your case in front of the **Tennessee Department of Education**, called a Final Order, with an entry date of **February 4, 2019**. If you disagree with this decision, you may take the following actions:

1. **File a Petition for Reconsideration:** You may ask the Administrative Judge to reconsider the decision by filing a Petition for Reconsideration. Mail to the Administrative Procedures Division (APD) a document that includes your name and the above APD case number, and states the specific reasons why you think the decision is incorrect. The APD must <u>receive</u> your written Petition no later than 15 days after entry of the Final Order, which is **February 19, 2019**.

   The Administrative Judge has 20 days from receipt of your Petition to grant, deny, or take no action on your Petition for Reconsideration. If the Petition is granted, you will be notified about further proceedings, and the timeline for appealing (as discussed in paragraph (2), below) will be adjusted. If no action is taken within 20 days, the Petition is deemed denied. As discussed below, if the Petition is denied, you may file an appeal no later than **April 5, 2019**. *See* TENN. CODE ANN. §§ 4-5-317 and 4-5-322.

2. **File an Appeal:** You may appeal the decision in federal or state court within 60 days of the date of entry of the Final Order, which is no later than **April 5, 2019** by:

   (a) filing a Petition for Review "in the Chancery Court nearest to the place of residence of the person contesting the agency action or alternatively, at the person's discretion, in the chancery court nearest to the place where the cause of action arose, or in the Chancery Court of Davidson County," TENN. CODE ANN. § 4-5-322; or
   (b) bringing a civil action in the United States District Court for the district in which the school system is located, 20 U.S.C. § 1415.

   The filing of a Petition for Reconsideration is not required before appealing. *See* TENN. CODE ANN. § 4-5-317. A reviewing court also may order a stay of the Final Order upon appropriate terms. *See* TENN. CODE ANN. §§ 4-5-322 and 4-5-317.

### STAY

In addition to the above actions, you may file a Petition asking the Administrative Judge for a stay that will delay the effectiveness of the Final Order. A Petition for stay must be <u>received</u> by the APD within 7 days of the date of entry of the Final Order, which is no later than **February 11, 2019**. *See* TENN. CODE ANN. § 4-5-316.

### FILING

To file documents with the Administrative Procedures Division, use this address:

Secretary of State
Administrative Procedures Division
William R. Snodgrass Tower
312 Rosa L. Parks Avenue, 8th Floor
Nashville, TN 37243-1102
Fax: (615) 741-4472