

**State of Tennessee**
# Department of State
Administrative Procedures Division
312 Rosa L. Parks Avenue
8th Floor, William R. Snodgrass Tower
Nashville, Tennessee 37243-1102
Phone: (615) 741-7008/Fax: (615) 741-4472

**July 12, 2021**

Cheryl Cheffins, Esq.
Cheffins & Nguyen Law Group, PLLC
P.O. Box 90857
Nashville, TN 37209

Justin S. Gilbert, Esq.
Gilbert Law, PLC
100 W. Martin Luther King Blvd
Suite 501
Chattanooga, TN 37402

Michael F. Braun, Esq.
Law Office of Michael Braun
5016 Centennial Blvd., Ste. 200
Nashville, TN 37209

Robert Sands, Esq.
Mounger & Molder, PLLC
808 South High Street
P.O. Box 1468
Columbia, TN 38402-1468

Taylor Jenkins, Esq.
Andrew Johnson Tower, 9th Floor
710 James Robertson Parkway
Nashville, TN 37243

Angel McCloud, Esq.
Arivett Law PLLC
201 E. Main St., Ste. 410
Murfreesboro, TN 37130

Deanna L. Arivett, Esq.
Arivett Law PLLC
201 E. Main St., Ste. 410
Murfreesboro, TN 37130

**RE: G.E., THE STUDENT AND S.B., THE PARENT/GUARDIAN V. WILLIAMSON COUNTY SCHOOLS, APD Case No. 07.03-190251J**

Enclosed is a *Final Order*, including a *Notice of Appeal Procedures,* rendered in this case.

Administrative Procedures Division
Tennessee Department of State

Enclosure(s)

# BEFORE THE TENNESSEE DEPARTMENT OF EDUCATION DIVISION OF SPECIAL EDUCATION

IN THE MATTER OF:

**G.E., THE STUDENT, and**
**S.B., THE PARENT,**
    *Petitioners,*

**T.E. and A.E.,**
    *Intervenors,*

*v.*

**WILLIAMSON COUNTY SCHOOLS,**
*Respondent.*

**APD Case No. 07.03-190251J**

## FINAL ORDER

This contested case pursuant to the Individuals with Disabilities Educational Act (IDEA), Title II of the Americans with Disabilities Act (ADA), and Section 504 of the Rehabilitation Act (Section 504) was heard on January 11 through 15, February 2 through 4, April 15, 16, and 23, and May 10, 2021, by Administrative Judge Elizabeth Cambron. The Petitioners, student G.E. and his mother, S.B., are represented by attorneys Justin Gilbert, Michael Braun, and Cheryl Cheffins. The Respondent, Williamson County Schools (WCS), is represented by attorneys Deanna Arivett and Angel McCloud.

At the close of proof on May 10, 2021, the following post-hearing schedule was agreed upon by the parties – the transcript was due and was filed on May 19, 2021; Proposed Findings of Fact and Conclusions of Law were due and filed by each party on June 9, 2021; and this order is due to be issued on or before July 12, 2021.

The issues in this case are: (1) whether WCS failed in its child find obligations to identify and evaluate G.E. as a student who might have a disability, (2) whether G.E. is eligible for

special education services under the IDEA, (3) whether G.E. was denied access to services in violation of the ADA and/or Section 504, and, if so, (4), what relief is appropriate. Based on review of all of the evidence in this case, it is determined that WCS did not violate its child find obligation to G.E. at any time relevant to this case, G.E. is not a student eligible for special education services under the IDEA, G.E. has not been denied access to services in violation of the ADA or Section 504, and thus, the Petitioners are not entitled to compensatory education, reimbursement for G.E.'s private placement, or any other requested relief.

The following witnesses[1] testified in the due process hearing: (1) Jessica Keezer Rumsey, the school psychologist who evaluated G.E.; (2) Dr. Patrick Boyd, the principle at Woodland Middle School; (3) Brian Riefenberg, G.E.'s sixth-grade math teacher; (4) Dr. Charles Ihrig,[2] a licensed clinical psychologist who evaluated G.E.; (5) Deana Stepanic, G.E.'s sixth- and seventh-grade counselor; (6) Jordan Gilliland, G.E.'s sixth-grade teacher for English Language Arts (ELA); (7) Katherine Fall, G.E.'s sixth-grade social studies teacher; (8) Megan McCullough, G.E.'s sixth-grade science teacher; (9) Elise Tepner, G.E.'s seventh-grade homebound teacher; (10) Sharon Stewart, a retired social worker for WCS; (11) Jennifer Randolph, G.E.'s fifth-grade counselor at Crockett Elementary School; (12) Lesley Ford, G.E.'s fifth-grade math teacher; (13) Paula Burnette, G.E.'s seventh-grade ELA teacher; (14) Terry Weingartner, the school nurse at Woodland Middle School; (15) Allison Nunley, the planning and zoning supervisor for WCS; (16) Jill Merritt, assistant director for student support services within WCS; (17) Maria Griego, executive director for student support services in WCS; (18), S.B., G.E.'s mother; (19) Barbara Thompson, a school nurse at Crockett Elementary School; (20) Brownwyn Rector, the principle of Crockett Elementary; (21) Nancy Tate, a planning and zoning

---

[1] Witnesses are listed in the order they first appeared in the hearing. Some witnesses testified for both parties.

[2] Dr. Ihrig was qualified as an expert in clinical psychology.

specialist for WCS; (22) Callie Hughes, G.E.'s tutor at Learning Lab; (23) Dr. Vance Sherwood,[3] a license clinical psychologist who evaluated G.E.; and (24) Dr. David Rostetter, the WCS' expert.[4]

In addition to these live witnesses, testimony was presented through the depositions of: (1) Dr. Brittany Paul, a licensed clinical psychologist who evaluated G.E., (2) Dr. Scot McKay, G.E.'s treating psychiatrist; and (3) Mary Ragsdale, the head of the middle school at Currey Ingram Academy. In addition to the three depositions, 145 other exhibits were admitted during the hearing.

## FINDINGS OF FACT

1.    G.E. is a 15-year-old eighth grade student at Currey Ingram Academy. Petitioner S.B. is G.E.'s mother.

2.    On July 4, 2019, Petitioners filed their initial due process complaint alleging that WCS violated its child find requirements by delaying an evaluation and failing to find G.E. eligible. Petitioners also assert that G.E.'s absences were sufficient to trigger the need for an evaluation under the IDEA and Section 504.

3.    Petitioners' initial complaint was prompted by WCS' denial of an out-of-zone request for G.E. to attend Woodland Middle School. WCS' denial was appropriate because G.E. did not meet the criteria for an out-of-zone exemption.

4.    On April 15, 2020, Petitioners filed an amended complaint, which asserts claims prior to G.E.'s fifth-grade school year. All claims prior to G.E.'s fifth-grade (2017-2018) school year are barred by the relevant statutes of limitations.

---

[3] Dr. Sherwood was qualified as an expert in the areas of psychology, the diagnosis of mental health disorders, assessments, and evaluator in the area of emotional disturbance.

[4] Dr. Rostetter was qualified as an expert on the IDEA, Section 504, and the provision of special education and related services to students with disabilities.

5. The Petitioners' initial complaint put WCS on notice of the parent's assertion that G.E.'s was experiencing mental health issues. Thereafter, WCS promptly requested consent to evaluate G.E. for a disability under the IDEA.

6. Despite continuous efforts on the part of WCS, Petitioners repeatedly refused to allow WCS to fully evaluate G.E.'s mental health needs.

7. The IEP team determined that, based upon all of the evaluation data that was available at the time, G.E. did not meet the criteria for a disability. The parent disagreed with this determination.

8. Overall, during G.E.'s time as a student at WCS, he presented as a typical child for his age and grade. Other than a few isolated incidents involving bullying by a peer, G.E. got along well with his peers, had friends, and did not demonstrate any difficulties with social interactions.

9. Academically, G.E. advanced from grade to grade successfully, maintained average grades, participated in class, scored average to above average on standardized academic assessments, and had overall academic performance comparable to that of his peers.

10. The reasons given for G.E.'s absences/tardies and pattern of physical symptoms at school were consistent with either known medical illnesses/injuries or those reported by S.B. Many absences were due to illnesses such as strep throat, bronchitis, croup, colds, flu, and stomach issues.

11. G.E.'s absences and tardies were not primarily caused by his anxiety. Even S.B. did not attribute G.E.'s numerous absences and tardies to his anxiety at the time.

12. Despite many requests from WCS staff, S.B. repeatedly failed to provide WCS any information from G.E.'s medical providers regarding his mental health.

13.     G.E. attended Crockett Elementary School for his fifth-grade year.  He had previously attended Mill Creek Elementary for fourth grade.  However, despite the transition to a new school, G.E. continued to be successful academically.  While G.E.'s teacher and school counselor were informed of possible issues at home, G.E. did not exhibit such concerns during his fifth-grade year.

14.     G.E. was absent 41 school days during his fifth-grade school year and tardy a total of 17 days.  Of those absences, at least 16 days were excused by the school based upon notes provided by a medical provider and 21 were unexcused due based upon the parent providing no documentation to the school.

15.     During the fifth-grade school year, G.E.'s absences were due to multiple battles with strep throat and bronchitis (over a week of school missed), a pulled muscle in his back (one day), type A and B flu (a week of school missed), a week of fever (almost a week of school missed), and a significant concussion (almost a week of school missed immediately after), and many days for which the parent failed to provide any documentation for attendance purposes.

16.     On March 8, 2018, S.B. informed Ms. Rector that G.E. had accumulated so many absences because he had multiple doctors' appointments in October, November, and December and had been sick with A/B Flu during February.

17.     Nine out of 17 tardies during G.E.'s fifth-grade year occurred when one of his brothers drove him to school. On one occasion in March of 2018, S.B. reported that G.E. was late because he did not want to go to school due to a peer who had recently teased him.  This incident was quickly addressed by school personnel and resolved without further issues.

18.     During G.E.'s fifth-grade school year, G.E. made average grades and his educational performance was that of a typical fifth-grade boy, as evidenced by his continuously increasing STAR math scores.

19.     G.E. never presented with any symptoms at school that indicated the presence of mental health issues during his fifth-grade school year, instead he was observed to be a happy and personable child that had no difficulty transitioning into the school building each morning. At no time did G.E. stand out to any school personnel as a student with sensory overload, anxiety, depression, and low self-esteem in the classroom.

20.     During his fifth-grade school year, G.E. maintained average social interactions without difficulties for a child his age, he did not present as a child struggling with anxiety, depression, or self-image.

21.     Although, S.B. met with Ms. Rector and S.B. conveyed that she felt G.E. was struggling with anxiety, depression, and self-image (issues that were not being seen at school), at no time during that meeting or any other time during G.E.'s fifth grade school year did S.B. assert to Ms. Rector or others that G.E.'s absences or tardies were due to anxiety or depression, nor did she provide any kind of documentation from a physician or psychologist to such effect.

22.     During G.E.'s fifth-grade school year, the Petitioners moved to a new home. Having been rezoned, the new residence was no longer in the Woodland Middle School zone. However, due to a clerical error during the rezoning process, G.E. continued to attend Woodland Middle School for sixth grade without knowing that he was out-of-zone.

23.     At Woodland Middle School (which serves approximately 1,000 students), G.E. successfully transitioned from elementary school to a new and much larger middle school where he continued to be academically and socially successful.

24.     Woodland Middle School has a robust support structure, including a school social worker, a school psychologist, a speech and language pathologist, and two shared instructional coaches for reading and math.

25.     Tennessee has historically utilized the Tennessee Comprehensive Assessment Program (TCAP) and TNReady Assessments to measure student growth and academic achievement.

26.     Over the last five years or so, the TCAP and TNReady Assessments have been rife with administration and technological problems across the state resulting in only one year (2018-2019, spring administration) of reliable student data in the last few years.

27.     Woodland Middle School's results from the Spring 2019 TNReady Assessment led recognition as a Tennessee Rewards School for performing in the top 5% of all middle schools in the state for both growth and achievement that year.

28.     During G.E.'s sixth-grade year he participated in school activities, maintained friendships, exhibited appropriate social interactions with adults and peers, and presented as a typical child his age.

29.     During G.E.'s sixth-grade year, despite being in a new school and having extensive absences, he was consistently able to concentrate, make up missed assignments and tests, and perform educationally on par with his peers.

30.     G.E.'s final grades reflected A's, B's, and C's for his sixth-grade year.

31.     G.E. demonstrated perseverance beyond his years when it came to making up his work and taking the initiative to catch up on his schoolwork.

32.    G.E. never presented with symptoms that would indicate that he was experiencing compulsivity, social anxiety, obsessive-compulsiveness, or panic attacks during sixth grade.

33.    On at least one occasion in sixth grade, G.E. got behind on his homework because the family had experienced some internet issues, requiring G.E. to try to complete his online math homework on S.B.'s phone.

34.    During G.E.'s sixth-grade school year, G.E. was absent on 18 days.  Many of his absences were due to acute illnesses, injuries, and medical appointments.  Like G.E.'s pattern of acute illnesses in the fifth grade, during G.E.'s sixth-grade year, he missed school due to upset stomach (missed two days of school after being out sick three days the week before), sore throat, headaches, headaches with congestion, jaw pain, chest pain, and there were 11 days for which the parent failed to provide any documentation for attendance purposes.

35.    G.E. was also late on 36 days during his sixth-grade school year; on most of these days an older sibling drove G.E. and noted the reason for the tardiness as "late" or 'traffic."[5]

36.    At no time during G.E.'s sixth-grade school year did S.B. assert that G.E.'s absences or tardies were due to anxiety or depression.

37.    Petitioners submitted an out-of-zone request to allow G.E. to continue to attend Woodland Middle School for his seventh-grade school year.

38.    The out-of-zone request was denied as G.E. did not qualify for such exemption pursuant to WCS policy.   Subsequently, the Petitioners retained an attorney and appealed the denial of the request, on or about June 10, 2019, claiming, for the first time, that G.E. should be

---

[5] At the hearing, the Petitioners complained that the sign-in sheet for students who were late was placed on a countertop in the main school office, and thus, visible to anyone who entered that office.  However, at no time prior to filing the due process complaint did S.B. raise concerns about the placement of the sign-in sheet to school personnel, nor did she ever provide an alternative or supplemental explanation about G.E being late to school personnel aside what was written on the sign-in sheet.

permitted to remain at Woodland Middle School due to his anxiety. Petitioners' asserted G.E.'s successful sixth grade year as justification for the request to allow G.E. to remain at Woodland Middle School.

39.     Petitioners' appeal letter to the Zoning Appeals Committee included the first and only medical document provided to WCS that confirmed a diagnosis of anxiety.

40.     The Petitioners' appeal was denied because (1) WMS's enrollment was projected to be over its building capacity (a denial based on board policy) and (2) the zoning appeals committee did not, based upon Petitioners' documentation and a review of G.E.'s educational records, find a need sufficient to override board policy.

41.     WCS received the due process complaint on July 4, 2019.

42.     On July 22, 2019, WCS sought and obtained consent for an initial evaluation to determine G.E.'s eligibility for special education and related services.

43.     While conducting the evaluation, WCS determined it needed additional information and sought consent to conduct a speech/language evaluation, sensory evaluation, autism ratings, and a clinical psychological evaluation by Dr. Vance Sherwood. However, Petitioners denied consent for the evaluation by Dr. Sherwood. As a result, WCS filed a motion to compel the evaluation by Dr. Sherwood, which Petitioners continued to contest for an entire year.

44.     Prior to G.E.'s seventh-grade year, Petitioners relocated again to the residence of S.B.'s new spouse which was in yet another school zone. On August 8, 2019, Petitioners submitted another out-of-zone request that G.E. continue to attend Woodland Middle School, indicating that they intended to move into a home within the Woodland Middle School zone during G.E.'s seventh grade school year.

45.     As this request met the requirements of WCS policy, it was approved and G.E. attended Woodland Middle School during the 2019-2020 school year.

46.     During the first few weeks of his seventh-grade year, G.E. did not present any symptoms of a child with any type of mental illness.

47.     G.E.'s evaluation and eligibility process extended into the fall of his seventh-grade year and the IEP team met on September 18, 2019, to discuss the results of the initial evaluation.

48.     The school psychologist, speech language pathologist, and occupational therapist conducted thorough evaluations of G.E. and provided a report of their findings.

49.     At the September 18, 2019, eligibility meeting, the team considered a variety of assessments, tools, and participant input as required under the IDEA and its accompanying regulations. Specifically, the IEP team considered: educational records, developmental/medical records provided by the parent, parent interview, student interview, sixth- and seventh-grade teacher interviews, vision/hearing results, classroom and other observations in the educational setting, review of benchmark and state assessment results, grades, attendance, nurse visits, standardized assessments and ratings, emails regarding G.E., the private neuropsychology evaluation conducted by Dr. Paul, diagnosis from medical and mental health providers, and parent input and concerns.

50.     At the September 18, 2019, eligibility meeting, the team (including S.B.) agreed that G.E. did not meet the criteria for autism. The team, with the Petitioners disagreeing, determined that G.E. did not meet the IDEA eligibility criteria as a student with Emotional Disturbance ("ED") or Other Health Impairment ("OHI") at that time.

51.     G.E.'s excessive absenteeism adversely impacted his education; however, G.E.'s absences were not primarily caused by his anxiety.

52.     The team had scheduled a Section 504 meeting to occur immediately after the IDEA eligibility meeting on September 18, 2019, if G.E. did not meet eligibility under the IDEA.

53.     Petitioners' requested to reschedule this meeting due to scheduling conflicts. WCS made multiple attempts to reschedule a Section 504 meeting over the next several months, which the Petitioners refused.

54.     While G.E. began to experience mental health difficulties in the school setting during the fall of his seventh-grade school year, these new mental health difficulties were managed appropriately through general education supports.

55.     S.B. informed WCS on October 4, 2019, that she was unilaterally placing G.E. in Rogers Behavioral Health OCD/Anxiety Partial Hospitalization Program on October 7, 2019.

56.     While G.E. was attending Rogers, WCS provided homebound instruction and collaborated with the Learning Lab (by providing assignments and tests) where he was receiving private tutoring which resulted in him continuing to make educational progress.

57.     G.E. mastered seventh-grade content and ended the year with final grades that were mostly A's and B's.

58.     WCS consistently received homebound applications from Rogers Behavioral Health from his initial placement at Rogers on October 11, 2019, through February 10, 2020, that informed WCS that G.E. was in treatment from 8:30 a.m. to 2:30 p.m. daily.

59.     Based on the location of Rogers and time it would take to travel from Rogers to G.E.'s home address (considering afternoon traffic), S.B. agreed to schedule homebound services to begin at 3:15 p.m.

60.     Although WCS attempted to collaborate with G.E.'s treating psychiatrist, Dr. McKay, to develop a plan to transition G.E. back to an educational setting with WCS upon his discharge from the Rogers program (a plan that Dr. McKay supported), WCS was unable to schedule a 504 meeting to discuss a transition plan because S.B. refused to participate.

61.     WCS, along with all schools in Tennessee, closed on March 5, 2020, due to the COVID-19 pandemic and did not reopen for the remainder of the year.

62.     WCS teachers were not regularly providing students with new instructional material after schools closed.

63.     WCS continued to communicate with S.B. and G.E. and offered to provide remote sessions in an attempt to assist G.E. in completing and submitting any outstanding work to receive grades; however, Petitioners did not accept the offer to meet with G.E. remotely.

64.     Through an out-of-zone request, G.E. was approved to attend Woodland Middle School for his eighth-grade school year pursuant to the district's zoning policies.

65.     G.E. did not return to Woodland Middle School and instead withdrew shortly thereafter.

66.     On August 14, 2020, Dr. Sherwood was finally permitted to conduct a clinical psychological evaluation of G.E.

67.     Shortly thereafter, WCS proposed to hold an IDEA eligibility meeting on September 2, 2020, to review and discuss the new information, G.E.'s mental health status since his time at Rogers, and his current educational performance.

68.     Petitioners refused to participate in the eligibility meeting and informed WCS that G.E. was being placed in a private program.

69.     Even with G.E.'s history of excessive absenteeism, educational data showed that G.E. met grade level expectations through the general education supports provided to all students; thus, his absences did not adversely impact his performance such that he needed special education and related services.

70.     WCS uses differentiated instruction techniques for different levels of learners and provides remediation and reteaching opportunities as part of the everyday instruction that students receive.

71.     WCS provides various counseling supports that are available to all students, including G.E., at Woodland Middle School.

72.     At all relevant times, WCS provided G.E. with general education interventions which were effective.

## ANALYSIS

The U.S. Supreme Court held in *Schaffer v. Weast* that the burden of proof is on the party "seeking relief." 546 U.S. 49, 51 (2005). Thus, when a parent files a request for a due process hearing, the parent bears the burden of proof in the due process hearing. *Id.* at 56; *see also, Cordrey v. Euckert*, 917 F.2d 1460, 1469 (6th Cir. 1990). Similarly, the parent bears the burden of proof for their ADA and Section 504 claims. *Doe v. Sumner Cty. Bd. of Educ.*, No. 3:19-CV-01172, 2020 WL 5797980, at *2 (M.D. Tenn. Sept. 29, 2020) (citing *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 452–53 (6th Cir. 2008)). In this case, the Petitioners clearly bear the burden of proof.

### CHILD FIND

School districts are required to identify students suspected of having a disability who are "in need of" special education and related services. IDEA U.S.C. §1401 (3)(A). Students who are eligible for special education and related services are entitled to an IEP. *Bd. of Educ. of the*

*Hendrick Hudson School Dist. v. Rowley*, 458 U.S. 176, 181 (1982). In developing educational programs and determining appropriate services for those students through an IEP, school districts must comply with the substantive and procedural requirements of the IDEA and related state law. *See Id.* at 182. However, parents are not entitled to relief for minor procedural violations alone. A determination of whether a student received FAPE must be based on substantive grounds. 34 C.F.R. § 300.513(1).

When a procedural violation is alleged, a FAPE violation exists only if a procedural violation "(1) impeded the child's right to FAPE; (2) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of FAPE to the parent's child; or (3) caused a deprivation of educational benefit." 34 C.F.R. § 300.513(2). Only procedural violations that result in substantive harm constitute a denial of FAPE and justify relief. *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001); *see also Bd. of Educ. of Fayette County, Ky. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007). "The United States Court of Appeals for the Third Circuit has recognized that the substantive requirements of the Rehabilitation Act's negative prohibition and the IDEA's affirmative duty have few differences." *Centennial Sch. Dist. v. Phil L. ex rel. Matthew L.*, 799 F. Supp. 2d 473, 481 (E.D. Pa. 2011) (referencing *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 253 (3d Cir.1999)). Here, Petitioners failed to meet the burden of proof to substantiate any procedural violations.

Under both the IDEA and Section 504, school districts have an obligation to identify, locate, and evaluate all children reasonably suspected of a disability, commonly referred to as "child find." IDEA, 34 C.F.R. § 300.111; 20 U.S.C. § 1412(a)(3); Rehabilitation Act of 1973, § 504, 29 U.S.C. § 794. The Petitioners assert that G.E.'s excessive absences and tardies were sufficient to trigger the need for an evaluation under the IDEA and Section 504. Thus,

Petitioners contend that WCS violated its child find obligations by failing to timely evaluate G.E. and failing to determine him eligible for special education as a student with a disability pursuant to the IDEA after completing an evaluation in September 2019. However, Petitioners have failed to meet their burden to substantiate such alleged violation. WCS met its child find obligations under both Section 504 and the IDEA.

### Child Find under Section 504/ADA

Under Section 504, districts must evaluate any student "who, because of a handicap, needs or is believed to need special education and related services." 34 CFR 104.35(a).[6] For a student to qualify as a student with a disability pursuant to Section 504, Petitioners must establish that "the child was 'handicapped' within the meaning of the Act[,]" which means the student must have a "physical or mental impairment which substantially limits one or more major life activities," such as learning. 34 C.F.R. 104.3(j)(1), (2)(ii). Therefore, courts must consider three prongs in determining whether a plaintiff has sufficiently alleged a disability of Section 504 or the ADA: "(1) whether plaintiff's condition is a physical or mental impairment; (2) whether that impairment affects a major life activity; and (3) whether the major life activity is substantially limited by the impairment." *Cerrato v. Durham*, 941 F. Supp. 388, 391-92 (S.D.N.Y. 1996).

For the first prong, a mental impairment can include emotional or mental illnesses. 34 C.F.R. 104.3(j)(2)(i). Under the second prong, "[m]ajor life activities are those 'that are of central importance to daily life,' such as 'caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *McCullough v. Bd. of Ed. of Canton City Sch. Dist.,* 2017 WL 3283995, Case No. 5:16-cv-527, *6 (N.D.Ohio Aug. 2,

---

[6] The Petitioner's claims under the ADA and Section 504 will be analyzed together. *S.S. v. E. Ky. Univ.,* 532 F.3d 445, 452-53 (6th Cir. 2008).

2017), *citing Brady v. Potter,* 273 Fed. Appx. 498, 502 (6th Cir.). Under the last prong, "substantially limited" means the inability to perform a major life activity that the average person in the general population can perform. 29 C.F.R. § 1630.2(j)

Here, Petitioners claim Section 504 child find violations for the 2017-2018, 2018-2019, and 2019-2020 school years. A. Compl., p. 5-6, ¶ 17. Specifically, they claim that G.E. suffers from mental illnesses (i.e., mental impairments) that "substantially limit his major life activities of social interaction, thinking, concentrating, learning, [] neurological function, . . . compulsivity, social anxiety, obsessive-compulsiveness, and the experience of panic attacks" and have caused G.E. to miss school due to "headaches, diarrhea, nausea, gastrointestinal sickness, sleep disturbance, symptoms of fear and avoidance, and associated conflicts with the school environment." *Id.* at p. 2, ¶ 5; p. 3, ¶ 6. However, Petitioners failed to prove that G.E. suffered a substantial limitation of a major life activity and was, thus, disabled.

First, there is no evidence of a substantial limitation in G.E.'s social interactions. The evidence from G.E.'s fifth- and sixth-grade school years shows that G.E. was social with adults and peers, had friends, made eye contact, participated in improv acting activities in class, appropriately gave a presentation to his class, and was respectful to adults. Other than a period of time in fifth grade when G.E. experienced teasing from a peer (which appeared to be due to inappropriate behavior on the part of the peer, not G.E.), there is no evidence of any difficulties with social interaction, much less a substantial limitation. In fact, Petitioners' zoning appeal letter (submitted prior to their due process request) asserts that G.E. had "appropriate peer interaction[s] and relationships...during his sixth (6th) grade year." Ex. 77, p. 2. Thus, Petitioners failed to prove that G.E.'s mental health difficulties substantially limited G.E.'s social interactions.

Next, Petitioners also failed to prove a substantial limitation in G.E.'s thinking, learning, or neurological functioning during his fifth- and sixth-grade school years. The evidence overwhelmingly shows that G.E. had average grades, participated in class, scored average to above average on standardized academic assessments, and had overall academic performance typical of his peers during his fifth- and sixth-grade years. The Petitioners also failed to prove a substantial limitation in G.E.'s concentration. In fact, the evidence shows that G.E. did not struggle with concentration or executive functioning skills.

With respect to Petitioners' remaining claims, they failed to prove that compulsivity, social anxiety, obsessive-compulsiveness, the experience of panic attacks, missing school, headaches, diarrhea, nausea, gastrointestinal sickness, sleep disturbance, symptoms of fear and avoidance, or associated conflicts are major life activities or that G.E. was substantially limited in these areas. Although compulsivity, social anxiety, obsessive-compulsiveness, the experience of panic attacks, headaches, diarrhea, nausea, gastrointestinal sickness, sleep disturbance, and symptoms of fear and avoidance are possible symptoms of mental health disorders (i.e., the mental impairment), they are *not* major life activities impacted by a mental impairment.

Furthermore, while such *symptoms* could impact a person's ability to perform major life activities, Petitioners failed to prove (1) that G.E. experienced such symptoms due to a mental impairment during his fifth- and sixth-grade school years and (2) that such symptoms, even if they did exist, substantially impacted a major life activity.[7] There is no evidence of G.E. experiencing compulsivity, social anxiety, obsessive-compulsiveness, or the experience of panic

---

[7] Petitioners failed to prove that G.E. had any mitigating effects from taking medication. Specifically, Petitioners have failed to prove that G.E.'s behavior substantially improved (or even mildly improved) from the first half of 5th grade when he was not on medication for mental health issues to the second half of fifth grade when he was taking such medications. Moreover, the record shows that G.E. was not taking medication consistently; thus, Petitioners have failed to prove that medication was a mitigating measure for G.E.

attacks to an extent that would impact a major life activity during his fifth- and sixth-grade school years.

Moreover, the record is void of any evidence that G.E. suffered headaches, diarrhea, nausea, gastrointestinal sickness, sleep disturbance, or symptoms of fear and avoidance as a result of a mental impairment during those years. Instead, the record shows that S.B. repeatedly reported other causes – G.E. had what the family thought was a stomach virus that was determined to be strep throat; G.E. was reportedly "sick;" had the flu; had diarrhea and upset stomach associated with fever; had headaches and nausea associated with a head injury and concussion; had strep and a virus; had headaches which were reported to be the same symptoms his brother had when he had mono; had cough, congestion, body aches, and vomiting associated with fever. *See e.g.,* Thompson Test., Hr'g Tr. Vol. XVIII, p. 2098, 2100, 2105-06, 2111-12, 2117-18; Weingartner Test., Hr'g Tr. Vol. XI, p. 1348-49 (parent reporting to school nurse that physical symptoms of chest pain were not related to anxiety or panic), 1357 (note from Vanderbilt explained chest pains as possible exercised-induced asthma), 1357-58 (parent reporting aunt staying with family had stomach bug when called about G.E.'s diarrhea); Petitioners' Admissions, Hr'g Tr. Vol XXIV p.2823 (S.B. admitted "that on or around November 12,2018, [she] told the school nurse, Teresa Weingartner, that G.E.'s brothers were not feeling[s/p] well." when called about G.E. being sick); p. 2824 (S.B. admitted "G.E. was seen on November 13 and was diagnosed with strep throat."); p. 2824 (S.B admitted that "on or around September 19, 2018, [she] told the school nurse, Teresa Weingartner that G.E.'s aunt who was staying with [her] had a stomach bug." when called about G.E. being sick); G.E.'s physical symptoms at school were consistent with known medical illnesses, injuries, or other causes as reported by S.B.

Moreover, G.E.'s nurse records from fifth grade do not show psychosomatic symptoms. For example, other than a single isolated incident of stomach upset in November of 2017, G.E.'s stomach issues either occurred within a 4-day period in February of 2018 (during the time period when G.E. had gone cold turkey off a medication) or during the month after his concussion (April-May of 2018). The only headaches reported to the school nurse during G.E.'s fifth-grade school year also occurred within a month of G.E.'s concussion.

Similarly, during G.E.'s sixth-grade school year, G.E. only reported four instances of upset stomach or diarrhea to the school nurse. For two of those four instances, S.B. told the school nurse that other family members were also sick. For one incident, S.B. reported to the school nurse that he was not experiencing anxiety or panic, so she did not feel like his diarrhea was related. Additionally, G.E. only reported four instances of headaches to the school nurse, one of which was associated with one of the instances of upset stomach and another which was associated with congestion.

Additionally, when G.E. did have several incidents of stomach upset for which the source of the symptoms was unclear during his fifth-grade year, the nurse consulted with S.B. and asked her to provide any information from G.E.'s doctor regarding the cause of his stomach issues. However, S.B. never provided the school with this information, nor did she ever assert that such issues were caused by mental health issues. It is overwhelmingly clear that there was no reason for WCS to suspect that G.E.s' sporadic physical symptoms were due to anything other than what the family reported—acute illness and injuries—let alone suspect that such symptoms were substantially impacting his abilities to perform major life activities. Accordingly, the Petitioners have failed to prove that WCS failed in its child find obligation under Section 504.

**Child Find under the IDEA**

Petitioners further claim that WCS violated the 'child find' requirement of the IDEA by failing to evaluate [G.E.] for special education. Petitioners also claim that WCS personnel were aware that G.E.'s absenteeism impacted his education and had notice that he was struggling with anxiety and depression. To prove that a delayed evaluation for a student constitutes a procedural violation of IDEA's child find requirements, a petitioner "must show that school officials *overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate*." *Bd. of Educ. of Fayette County, Ky. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007). For a student to be eligible to receive benefits as a disabled child under the IDEA, "three criteria must be met: (1) the child must suffer from one or more of the categories of impairments delineated in IDEA, (2) the child's impairment must adversely affect his educational performance, and (3) the child's qualified impairment must require special education and related services." *Jackson v. Nw. Local Sch. Dist.*, No. 1:09-CV-300, 2010 WL 3452333, at *6 (S.D. Ohio Aug. 3, 2010), *report and recommendation adopted*, No. 1:09CV300, 2010 WL 3474970 (S.D. Ohio Sept. 1, 2010). Thus, the fact that a child may have a qualifying disability does not necessarily make him "a child with a disability" eligible for special education services under the IDEA. *Id*. The child must also need special education and related services. *A.P. ex rel. Powers v. Woodstock Bd. of Educ.*, 572 F. Supp. 2d 221, 225 (D. Conn. Aug. 19, 2008), *aff'd*, 370 Fed. Appx. 202 (2nd Cir. 2010). "[A] child 'needs special education' if he cannot attain educational standards in the general education environment." *J.M. v. Summit City Bd. of Educ.*, No. CV1900159KMESK, 2020 WL 6281719, at *10 (D.N.J. Oct. 27, 2020), *referencing Durbow v. Cobb Cnty. Sch. Dist.*, 887 F.3d 1182, 1194–95 (11th Cir. 2018). Thus, "to violate child find, the school district must have been on notice not only of the student's disability but also of the student's need for special education

services." *Northfield City Bd. of Educ. v. K.S. on behalf of L.S.*, No. CV 19-9582 (RBK/KMW), 2020 WL 2899258, at *9 (D.N.J. June 3, 2020); *A.P.*, 572 F. Supp. 2d at 225 (*citing* 20 U.S.C. § 1412(a)(3)(A)) (holding that the child find provision itself applies only to children with disabilities "who are in need of special education and related services").

While the definition of "disability" is broad, school districts are afforded the "ability to exercise judgment or common sense in deciding whether to go through the lengthy process of evaluating a student for a potential IEP, no matter how minor or temporary the student's condition, and no matter whether the student's ability to learn is actually impaired." *Lincoln-Sudbury Reg'l Sch. Dist. v. W.*, No. CV 16-10724-FDS, 2018 WL 563147, at *17 (D. Mass. Jan. 25, 2018), *appeal dismissed sub nom. Lincoln Sudbury Reg'l Sch. Dist. v. Mr. & Mrs. W.*, No. 18-1524, 2018 WL 6584118 (1st Cir. Aug. 8, 2018); *See* 20 U.S.C. § 1401(3)(A). Requiring school districts to evaluate every child with "a touch of the flu (a health impairment) . . . would quickly [overwhelm schools with] unnecessary meetings and paperwork." *Id.* Furthermore, "teachers and staff would waste their valuable time and resources evaluating students who do not need special-education services…, [which] would substantially undercut the ability of teachers and staff to assist those students who do in fact need those services." *Id.* at 17 (finding "[t]he requirements of the law in this area are already sufficiently complex and burdensome without imposing nonsensical obligations upon the schools").

In *H.D. v. Kennett Consol. Sch. Dist.*, 2019 WL 4935193, Civil Action No. 18-3345 (E.D. Penn. Oct. 4, 2019), the parents argued that the district violated child find by failing to identify H.D. as a student with a disability by the middle of his seventh grade school year, in part due to his increasing late arrivals and absences, his declining grades, and emails among teachers about his behavior. *Id.* at *10. H.D. had been undergoing treatment for anxiety and obsessive

compulsive disorder ("OCD") since the first grade; however, through his sixth grade school year, he had minimal incidents of anxiety related behavior at school (*e.g.,* "off the wall" for a two week period, an educational record that "stated he suffered from 'Anxiety Disorder' without further comment," had a few instances from third through fifth grade when he was anxious, disruptive, or underperformed in school--although it was unclear how many of the disruptions or underperformance issues were related to anxiety) and maintained good grades even making the honor roll in sixth grade. *Id.* at *1-2. H.D.'s anxiety was reported to affect him more severely in the home setting than the school setting. *Id.* at *3. H.D. also displayed attendance issues from third through sixth grade (*i.e.,* a minimum of ten absences per school year, with 19 absences in sixth grade), including multiple tardies during fifth grade (*i.e.,* 12 tardies) and sixth grade (*i.e.,* 14 tardies). *Id.* at 2-3.

During H.D.'s seventh grade school year, his grades declined, he received four minor disciplinary infractions, his state assessment scores decreased, and his absences and tardies increased (*i.e.,* 26 absences with 24 excused and 2 unexcused; between 50 and 60 tardies/late arrivals). *Id.* at *3-4. However, some of these difficulties were unrelated to anxiety (*e.g.,* parent reporting on at least four occasions that failure to complete homework was not due to anxiety/was due to other reasons, absences reported because of illnesses including stomach virus and mono, and planned days off). *Id.* at *4. While H.D.'s teachers reported that he occasionally had difficulties with written assignments, attention/focus, leaving class for the restroom, and participating during class (*e.g.,* reporting his grades were not terrible but should be much better, referring to him as an anxious kid who can feel intimidated and is quiet socially) and H.D. visited the school nurse on one occasion because of a panic attack, the district's witnesses testified that they "did not consider H.D.'s difficulties with social skills, feeling overwhelmed in

class, anxiety behaviors, tiredness, or participation in class...to be atypical of middle school students such that H.D. would have required support other than that provided by regular education." *Id.* at *4-5.

The Court held that the school district did not violate its child find obligations by failing to identify H.D. as a student with a disability through his seventh-grade school year. *Id.* at 15.

> For evidence, the Parents point to a handful of isolated incidents for H.D. being disruptive, being anxious, or underperforming on individual assignments in second, third, fourth, and fifth grade; an unelaborated upon note in his medical record from third grade; and evidence that H.D. suffered from anxiety since the start of his schooling. It is doubtful that this evidence, which was available to the Hearing Officer, shows that the District should have known since second grade that H.D. suffered from serious anxiety. Even if it did, it does not demonstrate that H.D.'s anxiety affected his in-school behavior or performance such that the District should have been on notice by seventh grade that H.D. suffered from a mental health condition which required special education.

*Id.* at 16 (citations omitted).

The evidence presented by the Petitioners here is very much the same as in *H.D.*, and as in *H.D.*, it fails to show by a preponderance of the evidence that WCS failed in its child find responsibilities. At no point prior to evaluating G.E. in September 2019 did WCS overlook clear signs of disability which required special education. G.E. was academically successful in his fifth-grade year. The only concerns G.E.'s fifth-grade teachers and staff expressed were related to excessive absences and tardies. Although Petitioners claim that the excessive absences and tardies should have put WCS on notice to trigger its child find obligations, Petitioners failed to prove that G.E.'s absences and tardies were due to mental health issues. Instead, the evidence overwhelmingly shows that G.E.'s absences and tardies were primarily due to acute illness and injuries or were unexcused because no documentation was provided.

Additionally, at no point during G.E.'s sixth-grade school year did WCS have reasons to suspect a disability under the IDEA. Despite the fact that G.E. attended a new and much larger school (WMS) for sixth grade, he transitioned well and had a successful year. In fact, prior to being denied their choice of schools for G.E., Petitioners themselves asserted that G.E. "thrived his sixth (6th) grade year at Woodland Middle School." Ex. 77 Out of Zone Request Records, p. 2. Moreover, they attributed G.E.'s success to "not only…the caring and dedicated faculty and staff at Woodland Middle School, but also to the appropriate peer interaction and relationships that [G.E.] has been able to form during his sixth (6th) grade year." *Id.*

Moreover, any struggles that G.E. exhibited educationally were a direct result of absenteeism and not his academic skills or mental health needs. In fact, G.E. demonstrated perseverance beyond his years when it came to making up his work and taking the initiative to catch up on his schoolwork. Further, while WMS's school counselor, Ms. Stephanic, routinely provided students with support for mental health needs, G.E. never needed such supports during his sixth-grade year. Ms. Stepanic (who also provided all sixth graders with academic assistance for low grades and missing work) did not provide G.E. with academic support for missing work or low grades more frequently than peers. Therefore, WCS did not overlook any clear signs of disability, were not negligent in failing to initiate testing, and had a rational justification for deciding to not evaluate G.E.

G.E. did not display behaviors at school that would have WCS on notice of a suspected disability. A suspected disability is based on the child's school performance, not home performance. The Sixth Circuit has interpreted "adversely affects educational performance" to include "educational performance to the classroom and school experience" but excludes "social or behavioral deficits that were not shown to interfere with [] school based performance." *Q.W.*

*ex rel. M.W. v. Bd. of Educ. of Fayette Cty. Ky.*, 630 Fed.Appx. 580, 583 (6th Cir. 2015) (unpublished). Thus, a student who has behavior needs at home and generally good at-school behavior will not qualify a student with a disability on the basis of such behavior because his condition does not adversely affect his educational performance. *See id*. at 581-82.

Here, S.B. has consistently painted a different picture of G.E. than what was seen as school. In fact, the difficulties that S.B. was reporting were surprising to school staff, as they were not seeing such difficulties at school. Moreover, even if G.E. was having such difficulties at home, G.E. continued to meet academic benchmarks and successfully transition from grade to grade. Thus, these alleged struggles at home did not adversely affect his educational performance at school. Accordingly, at no time should WCS have suspected that G.E. required special education and related services (a threshold criteria for a suspected disability under the IDEA).

Prior to July 4, 2019, S.B. merely made sporadic and random comments to school staff regarding G.E. experiencing mental health issues at home with no connection to G.E.'s school performance; thus, such comments did not put WCS on notice of a suspected disability. Parental reports of mental health issues and/or diagnoses in and of themself do not put a district on notice of a suspected disability. It is well settled that "not every [medically diagnosed] disability necessarily falls within the scope of the IDEA as a 'qualified or eligible disability.'" *Heather H. v. Northwest Independent School District,* No. 419CV00823RWSCAN, 2021 WL 1523007, at *12, 16 (E.D. Tex. Feb. 25, 2021)*, report and recommendation adopted sub nom. Heather H. v. Nw. Indep. Sch. Dist., No. 4:19-CV-00823-RWS, 2021 WL 1152837 (E.D. Tex. Mar. 26, 2021).* Thus, knowledge of a medical or psychological diagnosis alone is not enough to trigger child find. *Id.* at 16 (upholding the lower court's decision that the district's evaluation was conducted

timely due to the lack of reason to suspect the student had ED despite parents claims of anxiety struggles.)

The Petitioners never provided WCS with medical documentation of any mental health diagnosis until the summer after G.E.'s sixth-grade year when they had hired an attorney to attempt to obtain their choice school for G.E. More importantly, G.E.'s clinical diagnoses, even once known, are not determinative of whether he has a disability pursuant to the IDEA because educational categories for disabilities are distinguishable from clinical diagnoses, as illustrated in *Northfield City Bd. of Educ.,* at *10 (D.N.J. June 3, 2020) (where the court found that the district did not violate child find by deciding to not evaluate a student for a disability despite its knowledge that student "was struggling with some emotional issues, was taking Prozac for depression, and was having difficulty with math.").

Although Petitioners' central argument is that WCS should have identified G.E. as a student with a disability due to his attendance issues, medical records and S.B.'s own testimony indicate that G.E. had many absences due to illnesses such as strep throat, bronchitis, croup, colds, flu, and stomach issues. Thus, S.B.'s assertions that G.E.'s absences and tardies were due to mental health during his fifth- and sixth-grade years, which were only asserted to WCS after the filing of the due process, are not credible, particularly as they are inconsistent with her prior reports.

Petitioners further assert that S.B.'s sporadic correspondence with the school regarding alleged mental health issues at home would have put WCS on notice that he should be identified as a student with a disability even though he was not exhibiting symptoms of such in the school setting. However, S.B. admitted, during her testimony, that her communication with the school increased after the filing of her due process complaint because G.E.'s symptoms were

Case 3:21-cv-00702   Document 1-1   Filed 09/09/21   Page 28 of 44 PageID #: 81

developing in a different way. She further admitted that no records regarding G.E.'s mental health diagnoses had been provided to WCS prior to the submission of the out-of-zone appeal letter.

Furthermore, despite S.B.'s assertion that G.E. suffered from severe anxiety such that he was unable to attend school, she repeatedly failed to follow recommendations from medical and mental health providers to have G.E. participate in individual therapy. Specifically, every appointment scheduled for therapy at Vanderbilt during G.E.'s fifth-grade school year was either cancelled or not shown up for. The evidence also showed that there were numerous occasions where she failed to take G.E. to appointments to address medication needs and that S.B. sometimes adjusted the dose of his medication without his knowledge.

Further, WCS sought consent to evaluate G.E. within a reasonable amount of time. Neither the IDEA nor its implementing regulations establish a deadline by which children who are suspected of having a qualifying disability must be identified and evaluated. However, courts have "inferred a requirement that this be done within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 271 (3d Cir. 2012). A "reasonable time" is determined by implementing "a case-by-case approach [to] assess whether the school district's response was reasonable 'in light of the information and resources possessed' by the district at a given point in time." *Id. at* 272.

Prior to G.E.'s seventh-grade school year there were no clear signs of a disability that would have put the district on notice that G.E. may have been a student with a disability. As WCS was first on notice of a suspected disability when Petitioners asserted, in their Due Process Complaint, on July 4, 2019, that G.E.'s chronic absenteeism was due to anxiety and mental health needs, WCS quickly sought and obtained consent for an initial evaluation on July 22,

2019.[8]  Obtaining consent for the evaluation less than a month after being provided with a complaint alleging anxiety and mental health needs  were impacting G.E.'s education meets the "reasonable time" standard.

After learning of G.E.'s increasing mental health needs and based on information obtained from G.E.'s clinical psychological evaluation completed in August of 2020 after G.E.'s seventh grade school year, WCS immediately attempted to revisit G.E.'s eligibility under the IDEA.  However, Petitioners refused to participate in the eligibility process.  Instead, Petitioners unilaterally enrolled G.E. in a private placement for his eighth-grade school year.  Because WCS timely attempted to revisit eligibility after G.E.'s mental health declined and additional evaluation information was available from his clinical psychological evaluation, WCS acted reasonably and met its obligations under the IDEA.  Thus, WCS has met its child find obligations at all times relevant to this case.  The Petitioners have failed to meet their burden of proof as to any child find violation by WCS.

## ELIGIBILITY

G.E. is not, and has not been, a child with a disability pursuant to the IDEA.  A child's eligibility for special education is determined by the local educational agency, which conducts an evaluation.  *M.A. v. Torrington Bd. of Educ.*, 980 F. Supp. 2d 245, 262 (D. Conn. 2013) (referencing 20 U.S.C. § 1414(a)(1)(A)-(B)).   G.E. was not eligible as a student with a disability under the IDEA as of September 2019.  Further, the Petitioners have failed to show that G.E.'s mental health adversely impacted his educational performance since that time; thus, the

---

[8] This is also the first time that Petitioners' requested an evaluation for special education services from WCS.

Petitioners have failed to meet their burden of proof that G.E. has become an eligible student under the IDEA or Section 504. [9]

**Eligibility under the IDEA**

WCS conducted thorough evaluations of G.E. in the fall of 2019. The IDEA requires that a school district "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information" when conducting an initial evaluation to determine whether a student is a child with a disability. 20 U.S.C. § 1414(b)(2)(A). Furthermore, the district shall "not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability or determining an appropriate educational program for the child." 20 U.S.C. § 1414(b)(2)(B). Ultimately, a district's evaluation is held to a standard of "reasonableness." *J.S. v. Shoreline Dist.*, 220 F. Supp. 2d 1175 (W.D. Wash. 2002) (quoting *Rowley*, 458 U.S. at 205-07).

Here, the school psychologist, speech language pathologist, and occupational therapist conducted extremely thorough evaluations of G.E. The evaluations were based on and reported the following information and data: review of relevant medical and developmental history, attendance history, school transfers, nurse visits over a three year period, review of his cumulative file for behavioral concerns and grade reports, a private neuropsychological evaluation by Dr. Brittany Paul, history of TCAP (state assessment) scores, recent history of district level assessments and benchmark scores (Achieve3000 and STAR), direct classroom observations by four different observers occurring in multiple settings (social studies, lunch, Warrior period, chemistry, hallway, math), teacher input/interviews (including sixth- and

---

[9] The Petitioners repeatedly conflate Dr. Sherwood's conclusion that G.E. meets the criteria for emotional disturbance with overall eligibility under the IDEA. While Dr. Sherwood concluded that G.E. meets criteria for emotional disturbance, he did not opine that G.E.'s disability adversely affected his educational performance. Thus, Dr. Sherwood did not conclude that G.E. was eligible as a student with a disability under the IDEA.

seventh-grade teachers), vision/hearing screenings, student interview, observations during testing sessions, standardized cognitive assessment, standardized achievement assessment, social-emotional and behavioral ratings completed by S.B., G.E., and multiple sixth-grade teachers, executive functioning ratings scales completed by S.B., G.E., and multiple sixth-grade teachers, several rating scales completed by G.E. specifically targeting experiences related to depression and anxiety, autism rating scales completed by S.B. and multiple seventh-grade teachers, review of motor/physical evaluations, visual motor assessment, adaptive rating scales completed by S.B. and multiple sixth-grade teachers, pragmatic language assessment, social skills rating scales completed by multiple sixth- and seventh-grade teachers, and sensory ratings scales completed by S.B., G.E., and G.E.'s seventh-grade teachers. Not only did WCS use a variety of assessment tools and standards, but WCS's evaluators were extremely thorough in their data collection and presentation of the data to the IEP team.[10]

G.E.'s IEP team, comprised of the parent, a regular education teacher, two special education teachers, interpreters of evaluation results, LEA representatives, school counselor/504 coordinator, and related service providers met on September 18, 2019 to review this evaluation data and determine G.E.'s eligibility under the IDEA. Although WCS also believed that data from a clinical psychological evaluation was needed to obtain information regarding G.E.'s mental health needs and understand differences in diagnosis from different providers and why parental reports of G.E.'s emotional functioning outside of the school environment were drastically different than his functioning in the educational setting, G.E.'s parent refused consent for such evaluation, preventing the team from consideration of such data when determining G.E.'s eligibility. WCS satisfied its obligations by evaluating G.E. and using multiple sources of

---

[10] WCS also attempted to obtain additional data from a clinical psychological evaluation, for which S.B. refused to provide consent.

data across multiple settings to determine whether G.E. was eligible under the IDEA. Any information and data later received from the clinical psychological evaluation was unavailable to the team in September of 2019.

An eligibility determination is "a snapshot of the student's condition at the time of the eligibility determination." *See Lisa M. v. Leander Indp. Sch. Dist.,* 924 F.3d 205, 215 (5th Cir. 2019). "At the eligibility determination moment, therefore, incorporating events that occur afterwards would be incongruous and, indeed, can only invite Monday morning quarterbacking." *Id.* "Subsequent events do not determine ex ante reasonableness in the eligibility context." *Id.* at 214. Thus, the "school district's eligibility determination should be assessed 'at the time of the child's evaluation and not from the perspective of a later time with the benefit of hindsight." *Id., quoting L.J.,* 850 F.3d at 1004; *D.L. v. Clear Creek Indep. Sch. Dist.,* 695 Fed. Appx. 733, 738 (5th Cir. 2017) (citations omitted).[11]

Upon consideration of the available data from the comprehensive evaluation, the IEP team correctly determined G.E. was not eligible as a student with a disability under the IDEA at such time. The IEP team considered three possible areas of eligibility: (1) autism, (2) other health impairment (OHI), and (3) emotional disturbance (ED). To be eligible as a child with a disability under the IDEA, the child must first meet this first prong of eligibility—meeting the State's definition for one of the identified categories of disability. 34 C.F.R. § 300.8. G.E. did not meet this first prong.

The team (including S.B.) agreed that G.E. did not meet the State's criteria for autism. Although S.B. disagreed, the team determined G.E. did not meet the eligibility requirements for

---

[11] The fact that G.E. was later hospitalized does not make the eligibility determination inappropriate. *See D.L. v. Clear Creek Indep. Sch. Dist.,* 695 Fed. Appx. 733, 738 (5th Cir. 2017) ("That [the student] subsequently spiraled does not undermine that earlier determination.").

an OHI because the data did not support a health problem that caused limited strength, vitality or alertness resulting in impaired organizational or work skills, inability to manage or complete tasks, excessive health related absenteeism, and/or medications that affect cognitive functioning.[12] While the team agreed that G.E. displayed characteristics of anxiety in the home and school setting, the data did not support that his anxiety adversely impacted his educational performance in his learning environment. The IEP team agreed that G.E.'s excessive absenteeism adversely impacted his educational performance; however, the data did not support S.B.'s position that G.E.'s absences were primarily caused by his anxiety. G.E.'s absenteeism adversely impacted his educational performance because he was not receiving the instruction, which would have an impact on nearly every student, rather than because he lacked the ability to receive the instruction. However, even with G.E.'s history of excessive absenteeism, the data showed that G.E. met grade level expectations through the general education supports provided to all students; thus, his absences did not adversely impact his performance such that he needed special education and related services.

Although S.B. disagreed, the team determined that G.E. did not meet the eligibility requirements for ED because data did not support that G.E. met one of the characteristics of an ED to a marked degree and over an extended period of time. In determining the requirements for special education eligibility as a student with an ED, the State of Tennessee requires that the school district obtain a "comprehensive social history/assessment…which includes (a) family history, (b) family-social interactions, (c) developmental history, [and] (d) medical history (including mental health)." Furthermore, the evaluation process requires the team to ensure that

---

[12] While there was conflicting medical information regarding whether G.E. had ADHD, the team reviewed assessment data related to ADHD like characteristics, which did not support a history of such difficulties to any marked degree in the educational setting.

the evaluation is sensitive to "environmental factors." The definition of ED takes into consideration that situational factors may cause a child to engage in some atypical behaviors or emotions without being eligible as a student with ED by requiring the conditions over a long period of time and to a marked degree.

Here, consideration of all the data, including social-emotional behavior ratings, nurse notes, attendance records, observations, and teacher interviews did not indicate an inability to learn, an inability to build or maintain satisfactory interpersonal relationships, inappropriate types of behavior or feelings, a general pervasive mood of unhappiness or depression, or a tendency to develop physical symptoms or fears associated with personnel or school problems that occurred to a marked degree, over an extended period of time that adversely impacted G.E.'s educational performance. Over the previous year, the data only indicated a couple of nurse visits related to anxiety, only one visit to the school counselor related to anxiety, only a couple of absences or tardies/early dismissals due to anxiety, and no difficulties (to a marked degree) in the educational environment (almost all of which had occurred within a month of the eligibility determination). Therefore, G.E. did not meet the eligibility requirements for ED and was not eligible as a student with autism, OHI, or ED because he did not meet the requirements of said disabilities. While Dr. Sherwood would later opine that G.E. met the criteria for ED at the time of Dr. Sherwood's assessment in August of 2020, and *perhaps* as early as August 2019, the IEP could not take this information into account at the time of the September 2019 eligibility meeting since Dr. Sherwood's evaluation had not yet been conducted. Further, the team could not know that G.E.'s mental health would decline rapidly in the coming weeks. The team thoroughly and carefully considered all of the information it had available at the time and reached the correct

conclusion—that G.E. was not eligible for special education services under the IDEA – based on that information.

Even if G.E. had met the first prong of eligibility—having a disability – there was no adverse impact on his educational performance requiring special education services under the second prong. The fact that a child may have a disability does not necessarily make him "a child with a disability" eligible for special education services under the IDEA because the student must also need special education and related services. *A.P.*, 572 F. Supp. 2d at 225. The question of educational need involves consultation of "a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations, as well as information about the child's physical condition, social or cultural background, and adaptive behavior...." *M.P. BNF K.S*, No. 2:15-CV-233, 2016 WL 632032, at *5 (citing 34 C.F.R. § 300.306(c)(1)(i)). Moreover, the standard is not whether the student could "benefit" from special education services or whether the student could meet his potential with special education services. *M.A.*, 980 F. Supp. 2d at 274-75. Instead, the standard is whether the student needs special education and related services to progress in the general education setting. *Hupp v. Switzerland of Ohio Local Sch. Dist.*, 912 F. Supp. 2d 572, 595 (S.D. Ohio 2012) (finding that the issue before the Court was not whether the student would "benefit" from special education services, but whether the special education services were necessary for the student to receive FAPE). "'Need' should not be measured according to 'whether or not [a student's] potential could be maximized via special education services.'" *See Lisa M.*, at 216, *quoting Alvin Indep. Sch. Dist.,* 503 F.3d at 383; *see L.M.,* 478 F.3d at 314, *quoting Rowley,* 458 U.S. at 201 ("There is no additional requirement, however, 'that the services so provided be sufficient to *maximize* each child's potential commensurate with the opportunity provided other children.'"). Where a student is not *in need*

of special education and related services, he cannot be found eligible under the IDEA." *A.P.*, 572 F. Supp. 2d at 225 (citing 20 U.S.C. § 1412(a)(3)(A)).

G.E. did not require special education and related services, as he was making passing grades, was performing successfully on state and district level assessments, and was successful socially and behaviorally in the educational setting. There is no record that supports the contention that G.E. was struggling educationally.

Finally, WCS appropriately considered Dr. Paul's independent evaluation. "Consideration," under the law, does not even require a substantive discussion of the independent evaluation during the IEP meeting. *Mr. P. v. West Hartford Bd. of Educ.*, 885 F.3d 735, 753 (2d Cir. 2018). The IEP team expressly considered Dr. Paul's evaluation report by having the school psychologist thoroughly review it and discussing it during the IEP meeting. The school psychologist references Dr. Paul's evaluation results within WCS's psychoeducational report. Therefore, Petitioners failed to prove that the team did not adequately consider Dr. Paul's evaluation.

## ACCESS TO PROGRAMS AND SERVICES UNDER THE ADA AND SECTION 504

The Petitioners have asserted that WCS failed to provide "the necessary supports/reasonable accommodations, including but not limited to functional supports" pursuant to Title II of the ADA and failed to provide "Supports and Services to enable Section 504's [FAPE]—including functional progress." A. Compl., p. 5-6, ¶ 17(b-c). Section 504 and the ADA combat discrimination against disabled individuals who are excluded from participation in, denied benefits of, or discriminated against in a program because of their disability. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs,

or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. Section 504 uses similar language and provides that a qualified disabled individual shall not, "solely by reason of her ... disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). *See also Doe v. Sumner Cty. Bd. of Educ.*, No. 3:19-CV-01172, 2020 WL 5797980, at *2 n.3 (M.D. Tenn. Sept. 29, 2020).

Section 504 and ADA claims are typically analyzed together. *M.G. v. Williamson Cty. Sch.*, 720 F. App'x 280, 287 (6th Cir. 2018). "Apart from [Section] 504's limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded–as opposed to 'public'–entities, the reach and requirements of both statutes are precisely the same." *Doe v. Sumner Cty. Bd. of Educ.*, No. 3:19-CV-01172, 2020 WL 5797980, at *2 (M.D. Tenn. Sept. 29, 2020) (citing *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 452–53 (6th Cir. 2008)). To establish discrimination under either the ADA or Section 504, Petitioners must prove that the student "is (1) disabled under the statute, (2) 'otherwise qualified' for participation in the program, and (3) being excluded from participation in, denied the benefits of, or subjected to discrimination under the program by reason of ... [his] disability." *Doe v. Sumner Cty. Bd. of Educ.*, at *2 (citing *id. at* 452–53 (6th Cir. 2008).

In order "for 504 plan violations to constitute disability discrimination, they must be significant enough to *effectively* deny a disabled child the benefit of a public education." *CTL ex rel. Trebatoski v. Ashland School Dist*, 743 F.3d 524 529–30 (7th Cir. 2014). Therefore, "to offer an 'appropriate' education under [Section 504], a school district must reasonably accommodate the needs of the handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits. *Ridley*, 680

F.3d at 281. Moreover, the Sixth Circuit has held that "[s]urmounting that evidentiary hurdle requires that 'either bad faith or gross misjudgment must be shown before a § 504 violation can be made out, at least in the context of education of handicapped children." *Campbell v. BD. of Educ. of Centerline Sch. Dist.,* 58 Fed.Appx. 162, 167 (6th Cir. 2003).

Under Section 504, FAPE is the "provision of regular or special education and related aids and services that are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met and are based upon adherence to procedures that satisfy the requirements [of the Act]." 34 CFR 104.33(b)(1). FAPE under the IDEA is an affirmative duty to provide an appropriate public education, whereas FAPE under Section 504 is a negative prohibition against discrimination. *See CG v. Pennsylvania Dept. of Edu.*, 734 F.3d 229, 234 (3d Cir. 2013.)[13] Thus, FAPE under Section 504 requires that districts "reasonably accommodate" the needs of students with disabilities. *Ridley*, 680 F.3d at 280.

When a Section 504 or Title II ADA claim only relates to providing a FAPE, a school district satisfies its obligations under Section 504 and Title II of the ADA if it properly evaluates a student in accordance with the IDEA, unless the district engages in intentional discrimination.[14] *See Estate of Lance v. Lewisville Indep. School Dist.*,743 F.3d 982, 992 (5th Cir. 2014). However, where a student with a qualifying disability under Section 504 is not eligible for IDEA services, the district must still provide the student with access to his education pursuant to Section 504 by providing accommodations, modifications, and related aids and services the student needs to be successful. *See, e.g., Ridley*, 680 F.3d at 282 (holding the district "took

---

[13] However, "a violation of the IDEA is not a *per se* violation of [Section] 504 and the elements of a [Section] 504 claim must still be proven." *Id.* (referencing *Andrew M. v. Del. Cnty. Office of Mental Health and Mental Retardation,* 490 F.3d 337, 350 (3d Cir.2007); *Derrick F. v. Red Lion Area Sch. Dist.,* 586 F.Supp.2d 282, 298 (M.D.Pa.2008)).

[14] There is no claim of intentional discrimination in this case.

reasonable steps to accommodate [the student's] disabilities and include her in all class activities; it was not required to grant the specific accommodations requested by Parents or otherwise make substantial modifications to the programs that were used for all other students."). To prevail on "Section 504's FAPE requirement (the 'failure-to-provide' claim)," a parent "must show that the School District '*refused* to provide a reasonable accommodation for the handicapped [student] to receive the full benefits of the school program.'" *Estate of Lance*, 743 F.3d at 992.

Here, Petitioners failed to prove (1) that G.E. was disabled/handicapped under the statute and (2) that G.E. was excluded from participation in, denied the benefits of, or subjected to discrimination by reason of his disability. As discussed above, Petitioners failed to prove that G.E. was handicapped under Section 504 and the ADA, particularly at the time of the appeal of the out-of-zone request (the summer after G.E.'s sixth-grade school year). Moreover, even if Petitioners could prove that G.E. was disabled at such time, they cannot prove that G.E. was excluded from participation in or denied the benefits of an education because of his disability. First, Petitioners failed to prove that G.E needed to attend the school of his choice (as opposed to his home school) for his seventh-grade school year to receive FAPE (or as a reasonable accommodation necessary to benefit from WCS's educational programs). By Petitioners' own admission, G.E. had a successful sixth-grade school year (despite the fact that he had transitioned to a much larger school with many new peers). In fact, G.E. had transitioned to a new school for fourth grade, fifth grade, and sixth grade without significant difficulty. According to Petitioners, G.E. also successfully transitioned to his unilateral placement at Currey Ingram at the start of his eighth-grade school year (2019-2020).

Moreover, allowing G.E. to attend the school of his choice was not a reasonable accommodation when a team of persons who knew him and his educational needs (as required

under Section 504 and the IDEA) had not yet determined he had a qualifying disability and was in need of special education services including reasonable accommodations (nor had they had any reason to do so). In fact, the IDEA provides the rebuttable presumption that a "child educated in the school that he or she would attend if not disabled…unless the IEP of a child with a disability requires some other arrangement." 34 C.F.R. § 300.114(c). Only when the nature or severity of the disability is such that the child cannot receive FAPE in his or her home school with nondisabled students in regular classes with "the use of supplementary aids and services cannot be achieved satisfactorily" can a student be removed from this least restrictive environment. IDEA, 34 C.F.R. § 300.114(a)(2); *see also* Section 504, 34 C.F.R. § 104.34. As G.E. has repeatedly been successful in his home school in the general education setting, despite transitions to different schools over the years, there is no evidence to support Plaintiffs' position that G.E. could not benefit from WCS's programs if he transitioned to his zoned school when his residence changed. Accordingly, the Petitioners have failed to show that G.E. was denied access to programs and services in violation of Section 504 or the ADA.

## CONCLUSIONS OF LAW

1.    The Petitioners have failed to meet their burden of proof that WCS committed a child find violation for the 2017-2018 school year.

2.    The Petitioners have failed to meet their burden of proof that WCS committed a child find violation for the 2018-2019 school year.

3.    The Petitioners have failed to meet their burden of proof that WCS committed a child find violation for the 2019-2020 school year.

4.    The Petitioners have failed to meet their burden of proof that G.E. is eligible for special education services under the IDEA.

5.    The Petitioners have failed to meet their burden of proof that G.E. was denied access to programs or services in violation of the Americans with Disabilities Act and/or Section 504 of the Rehabilitation Act.

6.    The Petitioners have failed to meet their burden of proof that G.E. is entitled to compensatory education, reimbursement for placement at Currey Ingram Academy, or any other requested relief.

7.    WCS is the prevailing party on all claims.

It is so **ORDERED**.

This FINAL ORDER entered and effective this the **12th day of July, 2021.**


_Elizabeth D. Cambron_
ELIZABETH D. CAMBRON
ADMINISTRATIVE JUDGE
ADMINISTRATIVE PROCEDURES DIVISION
OFFICE OF THE SECRETARY OF STATE


Filed in the Administrative Procedures Division, Office of the Secretary of State, this the **12th day of July, 2021.**


STEPHANIE SHACKELFORD, DIRECTOR
ADMINISTRATIVE PROCEDURES DIVISION
OFFICE OF THE SECRETARY OF STATE

Page **40** of **40**

## NOTICE OF APPEAL PROCEDURES

### REVIEW OF FINAL ORDER

The Administrative Judge's decision in your case in front of the **Tennessee Department of Education**, called a Final Order, was entered on **July 12, 2021**.  If you disagree with this decision, you may take the following actions:

1. **File a Petition for Reconsideration:**  You may ask the Administrative Judge to reconsider the decision by filing a Petition for Reconsideration with the Administrative Procedures Division (APD).  A Petition for Reconsideration should include your name and the above APD case number and should state the specific reasons why you think the decision is incorrect.  APD must **receive** your written Petition no later than 15 days after entry of the Final Order, which is no later than **July 27, 2021.**

   The Administrative Judge has 20 days from receipt of your Petition to grant, deny, or take no action on your Petition for Reconsideration.  If the Petition is granted, you will be notified about further proceedings, and the timeline for appealing (as discussed in paragraph (2), below) will be adjusted.  If no action is taken within 20 days, the Petition is deemed denied.  As discussed below, if the Petition is denied, you may file an appeal no later than **September 10, 2021**.  *See* TENN. CODE ANN. §§ 4-5-317 and 4-5-322.

2. **File an Appeal:**  You may file an appeal the decision in federal or state court within 60 days of the date of entry of the Final Order, which is no later than **September 10, 2021**, by:

   (a)  filing a Petition for Review "in the Chancery Court nearest to the place of residence of the person contesting the agency action or alternatively, at the person's discretion, in the chancery court nearest to the place where the cause of action arose, or in the Chancery Court of Davidson County," TENN. CODE ANN. § 4-5-322; or
   (b)  bringing a civil action in the United States District Court for the district in which the school system is located, 20 U.S.C. § 1415.

   The filing of a Petition for Reconsideration is not required before appealing.  *See* TENN. CODE ANN. § 4-5-317.

### STAY

In addition to the above actions, you may file a Petition asking the Administrative Judge for a stay that will delay the effectiveness of the Final Order. A Petition for Stay must be **received** by APD within 7 days of the date of entry of the Final Order, which is no later than **July 19, 2021**.  *See* TENN. CODE ANN. § 4-5-316.  A reviewing court also may order a stay of the Final Order upon appropriate terms.  *See* TENN. CODE ANN. §§ 4-5-322 and 4-5-317.

## NOTICE OF APPEAL PROCEDURES

### FILING

Documents should be filed with the Administrative Procedures Division by email *or* fax:

Email:  APD.Filings@tn.gov

Fax: 615-741-4472

In the event you do not have access to email or fax, you may mail or deliver documents to:

Secretary of State
Administrative Procedures Division
William R. Snodgrass Tower
312 Rosa L. Parks Avenue, 8th Floor
Nashville, TN 37243-1102